RECEIPT # _6009_
AMOUNT $ _250.00_
SUMMONS ISS. _yes_
LOCAL RULE 4.1 _____
WAIVER OF FORM _____
MCF ISS. _____
AO 120 OR 121 _____
BY DPTY CLK _____
DATE _8-4-05_

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED SENIORS ASSOCIATION, INC.,        )
as a private attorney general,           )
                                         )
            Plaintiff,                    )        Case No.
                                         )
      v.                                 )        JURY TRIAL DEMANDED
                                         )
PHILIP MORRIS USA, R.J. REYNOLDS         )
TOBACCO COMPANY, BROWN &                 )
WILLIAMSON TOBACCO CORPORATION           )   05 - 11623
individually and as the successor to     )   Referred to MJ J. Alexander
THE AMERICAN TOBACCO COMPANY,            )
LORILLARD TOBACCO COMPANY, INC.,         )
and LIGGETT GROUP, INC.,                 )
                                         )
            Defendants.                   )

## COMPLAINT

### THE NATURE OF THE CASE

1.    Plaintiff, United Seniors Association, Inc., brings this action as a
"private attorney general" pursuant to the private cause of action provisions of the
Medicare as Secondary Payer ("MSP") statute, 42 U.S.C. § 1395y(b)(3)(A), seeking
to recover for the Medicare program all the expenditures it made from August 4,
1999 to the present for the health care services rendered to Medicare's beneficiaries
for the treatment of diseases attributable to cigarette smoking, including, but not
limited to, coronary heart disease, chronic obstructive pulmonary disease ("COPD"),
lung cancer, emphysema, peripheral vascular disease, and atherosclerosis. This

action does not seek to recover such Medicare expenditures made for health care services rendered in Florida for the treatment of diseases attributable to smoking the cigarettes of Philip Morris USA and the Liggett Group, Inc.

2.      The MSP statute's function is straightforward: to relieve Medicare of the obligation to pay a beneficiary's medical expenses if payment for covered services has been or is reasonably expected to be made by someone else, called the "primary payer" or the "primary plan."

3.      The defendants are corporations that engage in the business of manufacturing and selling almost all of the cigarettes purchased in this country. The defendants have operated their businesses pursuant to plans and arrangements by which they have taken out insurance with carriers who carry all or part of the risk of liability for torts resulting from the operation of the defendants' businesses, including torts resulting from smoking the defendants' cigarettes. As such, the defendants have liability insurance policies or plans that are "primary plans" within the meaning of the MSP statute. To the extent that the defendants have not taken out such liability insurance with carriers or such liability insurance is no longer in force, or to the extent that the liability insurance they have taken out with carriers does not provide payment for all the tort liability resulting from the defendants' products, the defendants operate their businesses pursuant to plans and arrangements by which they carry their own risk of liability for such torts. As such, the defendants constitute self-insured liability plans that are "primary plans" within the meaning of the MSP statute.

2

4.    The nicotine in cigarettes is an addictive drug.  While the defendants
were aware of this fact, their customers, including the Medicare beneficiaries who
have suffered from or are suffering from diseases attributable to cigarette smoking,
were not.  Addiction is the key to the injury inflicted by the defendants' cigarettes
because it is the prolonged use of cigarettes that commonly causes these diseases.
The defendants not only intentionally concealed this addictive character of their
cigarettes, but sought to discredit any information that might bring this
addictiveness to light.  At the same time, the defendants knowingly manipulated
the addictiveness of their cigarettes to enhance its impact on their customers.  The
Medicare beneficiaries who have suffered from or are suffering from diseases
attributable to smoking the defendants' cigarettes did not consent to being exposed
to the addictive properties of the defendants' cigarettes.  Consequently, the
defendants are liable in tort, specifically battery, for the health care expenses of the
Medicare beneficiaries who have suffered from or are suffering from diseases
attributable to smoking the defendants' cigarettes.

5.    As a result of this battery, the defendants are entities that have or had
a responsibility under the MSP statute to pay for the health care expenses of the
Medicare beneficiaries necessitated by these diseases attributable to smoking the
defendants' cigarettes; that is, their primary plans have failed to provide for
primary payment or appropriate reimbursement to Medicare for such expenses.
Accordingly, Medicare has been unlawfully and unnecessarily forced to pay

3

enormous sums to diagnose and treat the diseases of Medicare beneficiaries
attributable to smoking the defendants' cigarettes.

6.      The role of the plaintiff as a "private attorney general" reflects the
public importance of this case, especially to the Medicare program and its
beneficiaries.

(a)      In their 2005 Report, the Medicare Board of Trustees has reported that
in 2004, 41.7 million people were covered by Medicare, which paid in that year
alone $303 billion in benefits.  Thus the importance of Medicare as a source of
health care funding for tens of millions of Americans cannot be disputed.

(b)      In a stark summary, the Public Trustees report that "Medicare's
financial outlook has deteriorated dramatically over the past five years and is now
much worse than Social Security's."  In 2000, annual cash-flow deficits were
projected to appear for Medicare's Hospital Insurance Trust Fund in 2010.  In fact,
as the Trustees note, that negative cash flow began in 2004, and by 2020 the Trust
Fund will be bankrupt.

(c)      The MSP regime was codified by Congress in the 1980s to reduce
Medicare expenditures, a role all the more essential with Medicare's financial
status in such precarious straits.  However, enforcement of the MSP regime,
especially reimbursement of improper Medicare expenditures from other parties
that should have been primary payers, has been disappointing.  The Government
Accounting Office ("GAO") has reported the lack of progress that has been made in
collecting MSP debts, which "arise when Medicare covers expenses related to

4

accidents, malpractice, workers' compensation, or other items not associated with group health plans that are subsequently determined to be the responsibility of another payer." According to the GAO, Medicare "lacks information on the total dollar amount of eligible debts not covered by its current referral instructions to Medicare contractors, and it has not developed a detailed plan or specific time frame for referring these debts." Moreover, Medicare does not even try to collect older MSP debts because it believes it is "not cost-effective to collect them." Indeed, the Justice Department simply does not have the resources to pursue these reimbursement cases on behalf of Medicare.

(d)     Accordingly, Congress added the private right of action for double damages to the MSP statute "to save the government money by giving private citizens incentives to recover funds erroneously paid by Medicare." Even when Medicare itself lacks the information necessary to collect an MSP debt, that information nevertheless exists in the hands of each Medicare beneficiary who may be a tort victim and who, with the incentive provided by the double damages provision of the MSP statute, can be motivated to sue as a "private attorney general" to collect that debt even if it is not cost-effective for Medicare to make the effort, and even if the more cumbersome federal bureaucracy is slow to take action.

(e)     The MSP private right of action, like the *qui tam* provision of the False Claims Act, empowers private citizens to prosecute cases in which the federal government has overpaid. There have been hundreds of *qui tam* cases filed under the False Claims Act each year. In FY 2003, a record $2.1 billion was recovered

under the False Claims Act (a 75% increase from FY 2002), and of that sum a staggering 70% was recovered not in suits brought by the government itself but in *qui tam* actions brought by citizens. This case – with reimbursements legally owing to Medicare of billions of dollars – suggests that the promise of the MSP private right of action for recovery of improper Medicare payments may be even greater than the impact of the *qui tam* statute.

(f) Indeed, Congress has long been committed to the MSP statute having exactly such an impact, as was underscored by the retroactive clarification of the MSP statute Congress enacted as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003. Congress' clarification (retroactive to 1980 when "self-insured plan" was first added to the MSP statute) provides that "[a]n entity that engages in a business, trade, or profession shall be deemed to have a self-insured plan if it carries its own risk (whether by a failure to obtain insurance or otherwise) in whole or in part."

(g) As the Chair of the Senate Finance Committee (which has jurisdiction over Medicare), Sen. Charles E. Grassley, explained, "when a Medicare beneficiary is injured by wrongful conduct of another entity, that entity's liability insurance or the entity itself, if it has no insurance, or it might be self-insured, is always required to pay first instead of having the taxpayers pay." The defendants here caused Medicare beneficiaries to be injured by their wrongful conduct, and this case seeks to recover from the defendants the money taxpayers wrongly had to pay for the medical care of those beneficiaries.

6

**JURISDICTION AND VENUE**

7.     This Court has jurisdiction over this matter pursuant to 42 U.S.C. §

1395y(b)(3)(A), 28 U.S.C. § §1331, 1332, and 1367.  Venue is proper in this district

pursuant to 28 U.S.C. § 1391.

**THE PARTIES**

8.     Plaintiff United Seniors Association, Inc. is a nonprofit, non-partisan,

taxpayer protection organization with a nationwide network of over 1.5 million men

and women.  Founded in 1991, United Seniors Association, Inc. is dedicated to being

a champion for taxpayers and expanding retirement and investment freedom,

financial freedom, tax freedom, and health freedom for Senior Americans, their

children, grandchildren, and great-grandchildren.  The work of the United Seniors

Association, Inc. is greatly focused on protecting the vital interests of America's

taxpayers, safeguarding the Social Security Trust Fund, creating Medicare and

Social Security for the 21st Century, and creating effective and dynamic market

solutions in public policy.  The financial integrity of Medicare is clearly critical if

taxpayers are to be protected and if Medicare is to remain an important source of

affordable, quality health care for older Americans.  In that regard, the United

Seniors Association, Inc. is strongly committed to the governing principle of the

MSP regime -- which the taxpayers, through Medicare, should not function as the

"deep pocket" to pay for the health care consequences of the wrongful acts of those

who injure older Americans.  By bringing this case as an MSP private attorney

general as provided by Congress, the United Seniors Association, Inc. is thus acting

7

to protect taxpayers, to preserve Medicare's financial integrity, and to vindicate the principle that Medicare is not intended to act as the "insurer" for those who injure Medicare's beneficiaries.

9.    Defendant Philip Morris USA is a Virginia corporation with its principal place of business at 120 Park Avenue, New York, New York. At all relevant times, Philip Morris manufactured, advertised, and sold cigarettes, including Philip Morris, Merit, Cambridge, Collector's Choice, Commander, Marlboro, Benson & Hedges, Virginia Slims, Alpine, Dunhill, English Ovals, Galaxy, Players, Saratoga, Basic, Bristol, Bucks, Chesterfield, Lark, L&M, B&H Menthols, and Parliament cigarettes, throughout the United States.

10.    Defendant R.J. Reynolds Tobacco Company ("RJR" or "Reynolds") is a Delaware corporation with its principal place of business at 401 North Main Street, Winston-Salem, North Carolina. At all relevant times, RJR manufactured, advertised, and sold cigarettes, including Camel, Vantage, Now, Doral, Winston, Sterling, Magna, Monarch, More, Century, Bright Rite, Eclipse, and Salem cigarettes, throughout the United States.

11.    Defendant Brown & Williamson Tobacco Corporation ("B&W") is a Delaware corporation with its principal place of business at 200 Brown & Williamson Tower, Louisville, Kentucky. At all relevant times, B&W manufactured, advertised, and sold cigarettes, including Kool, Raleigh, Barclay, BelAir, Capri, Richland, Laredo, Eli Cutter, GPC, GOC Lights, and Viceroy cigarettes throughout the United States. As a result of its acquisition of American

8

Tobacco Company, B&W has succeeded to the liabilities of American Tobacco either by operation of law, or as a matter of fact. At all relevant times, American Tobacco manufactured, marketed, and sold cigarettes, including, Lucky Strike, Pall Mall, Tareyton, American, Malibu, Montclair, Newport, Misty, Iceberg, Silk Cut, Silva Thins, Sobrania, Bull Durham, and Carlton cigarettes, throughout the United States.

12.     Defendant Lorillard Tobacco Company ("Lorillard") is a Delaware corporation with its principal place of business at 714 Green Valley Road, Greensboro, North Carolina. At all relevant times, Lorillard manufactured, advertised, and sold cigarettes, including Old Gold, Kent, Triumph, Satin, Maverick, Max, Spring, Newport and True cigarettes, throughout the United States.

13.     Defendant Liggett Group, Inc. (f/k/a Liggett & Myers) is a Delaware corporation with its principal place of business at 100 Maple Lane, Mebane, North Carolina. At all relevant times, Liggett manufactured, advertised, and sold cigarettes, including Chesterfield, Decade, L & M, Pyramid, Dorado, Eve, Stride, Generic and Lark cigarettes, throughout the United States.

## GENERAL ALLEGATIONS

### A. THE MEDICARE AS SECONDARY PAYER REGIME

14.     Under the Medicare program, the federal government pays for certain health care expenses of the aged (persons over 65 years old), the disabled, and persons suffering from end stage renal disease.

9

15.    From its inception in 1965 until 1980, Medicare generally acted as the

primary payer for all covered health care services rendered to eligible beneficiaries.

That is, Medicare was the payer of first resort, even where some other entity might

have been legally obligated to pay for the health care expenses in a particular case.

The sole exception up to 1980 was where payment for the health care services had

been made or could "reasonably be expected to be made" under a state or federal

workers' compensation scheme.  In such a case, any Medicare payment for the

services was conditioned on reimbursement from the involved workers'

compensation plan.

16.    Beginning in 1980, in response to burgeoning expenditures, Congress

enacted a series of amendments now known collectively as the Medicare as

Secondary Payer ("MSP") statute.  The MSP statute was designed to reduce

Medicare's obligation to make primary payment for covered services – and so

conserve the dwindling Medicare Trust Funds -- when another person or entity had

a legal obligation to provide or pay for health care services needed by a Medicare

beneficiary.

17.    In general, under the terms of the MSP statute, Medicare is a

secondary payer to two groups of entities: a) entities who have "a responsibility to

make payment" for a Medicare beneficiary's health care costs because of a legal

obligation voluntarily assumed, and b) entities who have "a responsibility to make

payment" for a Medicare beneficiary's health care costs because of a legal obligation

imposed by operation of law.  In either case, any Medicare payment already made

10

must be reimbursed by the entity that legally has the "responsibility to make payment," that is, where that entity has, or is, a "primary plan" that should have paid for the medical expense before Medicare.

18.   A "primary plan" in the context of a legal obligation to pay medical expenses that is voluntarily assumed mainly refers to the health care coverage provided to employees as a benefit of their employment. That is, when an employer establishes a "group health plan" to pay for certain medical expenses of employees and their families, that group health plan is a "primary plan" under the MSP statute and must pay before Medicare on behalf of the employer.

19.   A "primary plan" in the context of a legal obligation to pay medical expenses that is imposed by operation of law includes "a workmen's compensation law or plan, an automobile or liability insurance policy or plan (including a self-insured plan) or no fault insurance."

20.   The MSP statute expressly provides that "[a]n entity that engages in a business, trade, or profession shall be deemed to have a self-insured plan if it carries its own risk (whether by a failure to obtain insurance or otherwise) in whole or in part."

21.   The Centers for Medicare and Medicaid Services of the Department of Health and Human Services ("CMS"), formerly known as the Health Care Financing Administration ("HCFA"), the agency to whom Congress has delegated the responsibility to administer and interpret the MSP statute, has by lawful rulemaking provided that "'[p]lan' means any arrangement, oral or written, by one

11

or more entities, to provide health benefits or medical care or assume legal liability
for injury or illness."

22.    CMS has by lawful rulemaking also provided that "'[s]elf-insured plan'
means a plan under which an individual, or a private or governmental entity,
carries its own risk instead of taking out insurance with a carrier."

23.    Reflecting the remedial purpose of the MSP statute, CMS has further
provided by lawful rulemaking that a "liability insurance payment" that should be
primary to Medicare includes out-of-pocket payments made by an entity that carries
liability insurance or is covered by a self-insured plan.  CMS recognized that such
out-of-pocket payments might be made to avoid reporting an incident to a liability
insurer, to pay a required deductible, or for other reasons.  CMS expressly
concluded that it was not consistent with the MSP statute to allow such payments
to escape the mandate of the MSP statute.

24.    Thus, a "self-insured plan" within the meaning of the MSP statute and
the governing regulations includes a corporation that has decided not to buy
insurance for the legal liabilities or obligations that might be imposed on it,
whether or not that decision is written down, and whether or not the corporation
has established reserves to cover such liabilities or obligations.

25.    The MSP statute provides no limitation on the kind of "liability" that
might create an obligation to pay for the health care expenses of a Medicare
beneficiary, and so makes the entity on whom such liability has been imposed a
payer primary to Medicare.  CMS has by lawful rulemaking provided that

12

"'[l]iability insurance' means insurance (including a self-insured plan) that provides payment based on legal liability for injury or illness or damage to property."

26.     To help enforce compliance with the MSP statute and to assure that Medicare would not improperly pay for health care costs that were lawfully the responsibility of other entities like the defendants here, Congress authorized private parties like the plaintiff to bring suit for damages against entities, like these defendants, which have not properly paid primary for the health care costs of Medicare beneficiaries.  In the MSP statute, Congress expressly required recovery in such a private action of damages in an amount double the expenditures of Medicare that should have been paid by such primary plans.

27.     Under the MSP statute, the liability of a primary plan to reimburse Medicare can be demonstrated in an almost unlimited variety of ways.  The MSP statute provides that liability "may be demonstrated by a judgment, a payment conditioned upon the recipient's compromise, waiver, or release (whether or not there is a determination or admission of liability) of payments for items or services included in a claim against the primary plan or the primary plan's insured, *or by other means*."  (Emphasis added.)  Thus, MSP liability based on an alleged tort may be established by proving the tort in an MSP reimbursement action.

### B. THE DEFENDANT CORPORATIONS ARE PRIMARY PLANS

28.     On information and belief, each of the defendants has or had a liability insurance policy or plan (including a self-insured plan), within the meaning of the

MSP statute, that covers liability to Medicare beneficiaries for the health care services required by their tobacco-related illnesses.

29.    Insurance in any amount, however, cannot limit the liability the law might impose, and so the purchase of insurance does not fully protect the defendants or their assets from the liability that might be imposed, particularly where, as here, the intentionally wrongful conduct of the defendants is at issue. As a result, even a defendant which had purchased insurance from a third party is self-insured to the extent that insurance does not fully cover a liability imposed by law.

30.    In addition, some defendants at various times obtained insurance under the best terms they could, such as one policy under which defendant Philip Morris retained the risk of $1 million for each occurrence, with an overall cap on the liability insured of $10 million. At other times, the cost of insurance was, from the perspective of some of the defendants, prohibitively expensive in light of what they saw to be their risks, compared to what insurance underwriters saw as the defendants' risks.

31.    To the extent that the defendants are not insured for the liability claimed in this action, they are entities "that engage[] in a business, trade, or profession" which "carr[y their] own risk (whether by a failure to obtain insurance or otherwise)," and so "are deemed to have a self-insured plan" under the express terms of the MSP statute.

14

32.    In addition, there is significant other evidence that the defendants are self-insured plans by virtue of their *ex ante*, deliberate choice to carry the risk of liability for tobacco-related illnesses, including the following:

(a)    By the early 1950s, scientific researchers were publishing findings that indicated a relationship between cigarette smoking and various illnesses, including lung cancer. As early as 1954, this growing scientific knowledge triggered litigation brought to hold the defendants liable for tobacco-related illnesses. Since that time, the pace of litigation has increased, while regulatory and legislative bodies have taken a variety of actions addressing tobacco-related illnesses. For example, in 1964, the Surgeon General of the United States declared cigarettes to be a health hazard.

(b)    The executives of the defendants, and others in their employ, were, and continue to be, fully aware of the significant risk that the defendants would be held legally liable for the injury or illness caused by their cigarettes.

(c)    The executives of the defendants had and continue to have fiduciary duties to the shareholders of the defendant corporations to make prudent arrangements to protect their corporations from the legal liability to which their cigarettes expose them. Such arrangements could include the purchase of insurance to cover, at least in part, the liability they might face. However, the risks involved have made many insurers reluctant to write liability insurance for defendants, and, where they did so, often insurers required a high deductible and a cap on the overall amount insured.

(d)   Knowing the risks of legal liability that their cigarettes generated, the defendants made business decisions to continue to produce and market cigarettes, while vigorously contesting every case brought against them seeking to impose legal liability for tobacco-related illnesses.

(e)   Accordingly, the defendants have deliberately chosen and planned to self-insure for risks of product liability and other tort claims inherent in their business, that is, they have planned to pay such claims from self-insured funds or retained earnings.

(f)   The defendants have admitted that they have specifically planned *ex ante* to self-insure. Thus, for example, in a June 17, 1963 letter, William R. Lybrook of R.J. Reynolds responded to the inquiry of a current or prospective Reynolds shareholder as follows:

> This is to acknowledge your recent letter in which you inquired as to whether this Company has products liability insurance.
>
> We have never carried such insurance but have chosen to be self-insurers in this field.

(g)   Some time after the 1963 letter quoted above, defendant R.J. Reynolds apparently did carry products liability insurance, and then chose to again become self-insured. As the company itself explained in its May 30, 1991 10-K:

> RJRN previously had maintained product liability insurance covering certain of these tobacco-related legal actions, proceedings and claims. As of April 13, 1990, RJRN became wholly self-insured for existing tobacco-related litigation risks.

(h)     In 1999, Seth Moscowitz, a representative of R.J. Reynolds, "asserted that R.J. Reynolds Tobacco was self-insured" and explained that "product hazard exclusions" and "health hazard exclusions" have existed in their outside insurance policies for decades.  Dan Lonkevich, *Fed's Tobacco Suit Might Prompt Ins. Claims*, NATIONAL UNDERWRITER, PROPERTY & CASUALTY/RISK & BENEFITS MANAGEMENT 42 (September 27, 1999).

(i)     Similarly, "A spokesman told [World Insurance Report] that Brown & Williamson's product liability insurance exclusion *and consequent self-insurance arrangement* extends to legal costs."  *Kicking Butts*, WORLD INSURANCE REPORT (April 4, 1997).  A spokesman for Brown & Williamson's parent BAT had earlier told the same publication that "like most tobacco companies, BAT's tobacco product liability is entirely self-insured."  *Tobacco Makers Concede Over Litigation*, WORLD INSURANCE REPORT (February 21, 1997).

(j)     The defendants have routinely admitted in reports filed with the federal government that they planned to rely on their own cash flows or retained earnings to fund their obligations in the event of liability.  For instance, Philip Morris has stated: "It is possible that the Company's results of operations or cash flows could be materially affected by an ultimate unfavorable outcome of certain pending litigation.  Management believes, however, that the ultimate outcome of all pending litigation should not have a material adverse effect on the Company's financial position."  Philip Morris, Inc., 10-K, at 23 (Dec. 31, 1996).

17

(k)     The Liggett Group Inc. has similarly stated, "it is possible that Liggett's financial position, results of operations and cash flows could be materially adversely affected by an ultimate unfavorable outcome in any of such pending litigation." Liggett Group Inc., 10-K, at 19 (Dec. 31, 1996).

(l)     As far back as 1986 it was reported that tobacco "industry sources say the companies are now self-insuring," as "the cost of liability insurance has 'gone through the roof,' according to one tobacco marketer." Nancy Giges, *Marketers Feel Product Liability Pressure; Risks Crimp Launch of New Items*, ADVERTISING AGE (May 12, 1986).

(m)     Over a dozen years ago it had already become well-known in the insurance industry that "[p]roduct liability insurance covering health risk has been largely unavailable to most cigarette makers for roughly a decade, and several large companies now self-insure their product exposures." Douglas McLeod, *Tobacco Award Raises Insurance Questions*, BUSINESS INSURANCE (June 20, 1988).

(n)     The prevailing practice in the tobacco industry to have self-insurance plans for liability coverage is evident from the statements of other entities involved in the cigarette business. For example, Core Mark International, Inc. is a distributor of various consumer goods, including cigarettes. As it pointed out in a prospectus filed with the SEC, it "is particularly dependent on the leading producers of cigarettes," which, as of 1997, included RJR, Philip Morris, and Brown & Williamson. Core Mark International, Inc., Prospectus Filed Pursuant to Rule

18

424 (B)(1), at 16 (filed Jan. 10, 1997). In its Prospectus, Core Mark went on to

explain:

> In light of the claimed health risks related to the use of
> cigarettes and other tobacco products, there can be no assurance that
> product liability claims will not be asserted against the tobacco
> industry or the Company in the future. Such lawsuits, if asserted
> against the tobacco industry or the Company and adversely
> determined, could have a material adverse effect on the Company's
> business and financial position. The Company carries general liability
> insurance, but *self-insures against liability in respect of health-related
> claims, which management believes is consistent with industry practice.*

*Id.* at 18 (emphasis added).

(o)     The defendants' choice to pay liability claims from their cash flows or

retained earnings, that is, to carry their own risk of legal liability for tobacco-

related illnesses rather than taking out insurance with a carrier, relies in part on

behavior patterns of consumers that indicate that increases in the price of

cigarettes will not significantly decrease the volume of purchases of these products

(in economics parlance, price-inelasticity), evidencing a peculiarly stable demand

due to the addiction of customers and the effectiveness of massive advertising; and

on a sophisticated body of knowledge that has been developed to estimate the

liability risks they carry.

(p)     Defendant Philip Morris illustrated how this mechanism works in

practice in its 1998 10-K, in which it detailed that "[o]perating companies' [or

company's] income for 1998 decreased . . . due primarily to higher tobacco-related

settlement charges ($1.9 billion) . . . partially offset by price increases, net of cost

increases ($1.8 billion)." Philip Morris, Inc., 10-K, at 27 (March 18, 1999).

33.    As entities that engage in a business, trade, or profession, the

defendants have self-insured plans and are primary plans within the meaning of

the MSP statute if they simply have failed to obtain insurance for their tort

liabilities, for whatever reasons or even lack of reasons.  However, the defendants

surpass that basic statutory threshold because they have adopted deliberate, *ex ante*

plans to carry their own risk of tort liability, and so have adopted plans of self-

insurance and are primary plans within the meaning of the MSP statute.

## C.  THE DEFENDANTS ARE LIABLE IN TORT FOR THE TOBACCO-RELATED ILLNESSES OF MEDICARE BENEFICIARIES.

### 1. DEFENDANTS CONCEALED, DENIED, AND MANIPULATED THE ADDICTIVE PROPERTIES OF THEIR CIGARETTES.

34.    In the latter half of the twentieth century, some 10 million Americans

were killed by tobacco-related illnesses.  As the Surgeon General confirmed in a

report on the health consequences of smoking issued in 2004, "tobacco use remains

the leading preventable cause of disease and death in the United States, causing

approximately 440,000 deaths each year and costing approximately $157 billion in

annual health-related economic losses."  It has been estimated that the medical

expenses needed to treat diseases attributable to smoking totaled approximately

$75.5 billion per year between 1995 and 1999.

35.    Diseases attributable to smoking the defendants' cigarettes include

coronary heart disease, COPD, peripheral vascular disease, lung cancer,

emphysema, atherosclerosis, leukemia, and cancers of the larynx, oral cavity,

esophagus, pancreas, bladder, kidney, stomach, and cervix.

20

36.     Cigarettes contain nicotine, which, among other effects, activates areas of the brain that are involved in producing feelings of pleasure and reward. At the same time, nicotine causes physical dependence and a withdrawal syndrome after abstinence from it. Nicotine thus is an addictive drug. The addictive nature of nicotine is directly related to the harm caused by cigarettes, because the health risks of smoking increase with prolonged use. The primary factor that prevents cigarette smokers from quitting smoking is their addiction to nicotine and their need for continuing intake of nicotine to avoid nicotine withdrawal.

37.     The defendants and their agents have long known that nicotine is a powerful pharmacological agent – that is, a drug – with significant psychoactive effects. Most importantly for purposes of this action, defendants have long recognized that nicotine is addictive, and that addiction is what preserves the market for cigarettes and ensures their profits.

38.     In contrast, the public at large has not been aware of the addictive properties of nicotine, and has believed that smoking and – most importantly for the health consequences of smoking -- *continuing* to smoke are largely matters of choice for which the individual is responsible. Most beginning smokers – particularly youngsters – falsely believe that they will be able to quit after smoking for a few years and thereby avoid the illnesses caused by smoking.

39.     The defendants not only have been fully aware of this popular misconception of the addictive properties of nicotine; they have sought to perpetuate it by concealing the facts concerning nicotine's addictiveness thus rendering their

product dangerously defective.  Indeed, the defendants have deliberately understood and manipulated the addictive properties of nicotine in their cigarettes to undermine the ability of consumers to freely choose to refrain from smoking.  The defendants have consciously pursued a clandestine business strategy that relies on creating and maintaining a market of captive consumers by virtue of the defendants' control over, and manipulation of, the nicotine in their cigarettes.

40.    The defendants have understood nicotine's addictive properties since at least the early 1960s.  More than 30 years ago, a report was completed for one of the defendants that specifically addressed the mechanism of nicotine addiction in smokers.  The researchers concluded that chronic intake of nicotine, such as that which occurs in regular cigarette smokers, creates a need for ever-increasing levels of nicotine to maintain the desired action:  "[u]nlike other dopings, such as morphine, the rate of increasing demand for greater dose levels is relatively slow for nicotine."  The report continues:

> A body left in this unbalanced state craves for renewed drug intake in order to restore the physiological equilibrium.  This unconscious desire explains the addiction of the individual to nicotine.

41.    Forty three years ago, in 1959, the research department of Philip Morris stated the fact of the matter quite baldly: "Why do people smoke? . . . Addiction."

42.    Lorillard similarly noted: "The consensus of opinion derived from a review of the literature on the subject indicates the most probable reason for the addictive properties of the smoke is nicotine."

43.   In 1962, Sir Charles Ellis, a scientific advisor to the board of directors

of BAT Industries, asserted in a meeting attended by Brown & Williamson

representatives, that "smoking is a habit of addiction." Similarly, a year later

Brown & Williamson general counsel Addison Yeaman pointed out that "nicotine is

addictive," and concluded, logically, "We are, then, in the business of selling

nicotine, an addictive drug." In the early 1980s researchers at Brown & Williamson

echoed the point: "Nicotine is the addicting agent in cigarettes."

44.   Similarly, Reynolds, understanding the importance of retaining

sufficient nicotine to maintain dependence on its so-called "low tar/low nicotine"

cigarettes, internally proposed in 1971 that the company undertake research into

determining more exactly the "habituating level of nicotine." Developing their

understanding of the addictive attributes of nicotine became a key effort for the

defendants, as was reflected in a 1980 memorandum from a Philip Morris official:

> ***Nicotine is a powerful pharmacological agent*** with
> multiple sites of action ***and may be the most important component
> of cigarette smoke. Nicotine and an understanding of its
> properties are important to the continued well being of our
> cigarette business*** since this alkaloid has been cited often as the
> reason for smoking and theories have been advanced for nicotine
> titration by the smoker. Nicotine is known to have effects on the
> central and peripheral nervous system as well as influencing memory,
> learning, pain perception, response to stress and level of arousal.

(Emphasis added.)

45.   Much of the defendants' inquiries into the attributes of nicotine

reflected an appreciation of the role of nicotine in creating new consumers of the

defendants' cigarettes. For example, in 1974, Philip Morris researchers began a

23

study designed to test their theory that hyperkinetic children take up smoking in

adolescence because nicotine may perform the same pharmacological function as

prescription medications used to treat hyperkinesis:

> It has been found that amphetamines, which are strong stimulants,
> have the anomalous effect of quieting these children down . . . Many
> children are therefore regularly administered amphetamines
> throughout grade school years. . . . *We wonder whether such*
> *children may not eventually become cigarette smokers in their*
> *teenage years as they discover the advantage of self-stimulation*
> *via nicotine*. We have already collaborated with a local school system
> in identifying some such children in the third grade.

(Emphasis added.)

46.    The commercial value of the addictive attributes of nicotine – that is,

the properties of their cigarettes that help to create a captive market – were not lost

on the defendants.  For example, a 1971 secret internal report distributed to Philip

Morris executives showed that tobacco executives knew the powerfully addictive

nature of nicotine in cigarettes.  The report studied persons who had tried to stop

smoking and concluded that only 28 percent of those who tried to quit were still

non-smokers eight months later:

> Even after eight months quitters were apt to report having neurotic
> symptoms, such as feeling depressed, being restless and tense, being
> ill-tempered, having a loss of energy, being apt to doze off. They were
> further troubled by constipation and weight gains which averaged
> about five pounds per quitter . . . This is not the happy picture painted
> by the Cancer Society's anti-smoking commercial which shows an
> exuberant couple leaping into the air and kicking their heels with joy
> because they've kicked the habit. A more appropriate commercial
> would show a restless, nervous, constipated husband bickering
> viciously with his bitchy wife who is nagging him about his slothful
> behavior and growing waistline.

24

47.    As one presenter at a tobacco company conference summed up the results of studies of smokers who attempted to quit: "Although intentions and attempts to quit are relatively high (30-40% of smokers [in a given year]), the actual success rate of quitting is relatively low and stable."

48.    Notwithstanding the facts concerning the addictiveness of nicotine established by the defendants' own studies, the defendants concealed their research and continued to deny the addictiveness of nicotine.

49.    For example, a 1977 Philip Morris study on the withdrawal effects of nicotine was permitted to proceed only if the results were favorable. If not, as a Philip Morris researcher explained, "we will bury it."

50.    For example, an internal 1978 Brown & Williamson memorandum discussed the addictiveness of nicotine and characterized nicotine as a poison, while noting that most consumers were unaware of this: "Very few consumers are aware of the effects of nicotine, i.e., its addictive nature and that nicotine is a poison. . . . [H]ardly any consumers use nicotine numbers as a basis for their purchase."

51.    For example, in March 1980, a Philip Morris scientist produced an internal memorandum discussing company research into the pharmacology of nicotine. The research was "aimed at understanding that specific action of nicotine which causes the smoker to repeatedly introduce nicotine into his body." The internal memorandum noted that it was "a highly vexatious topic" that company lawyers did not want to become public because nicotine's drug properties, if known, would support regulation of tobacco by the federal Food and Drug Administration.

25

Consequently, the memorandum observed, "[o]ur attorneys . . . will likely continue to insist on a clandestine effort in order to keep nicotine the drug in low profile."

52. For example, in the early 1980s, Philip Morris hired Victor DeNoble and Paul Mele to study the effects of nicotine on the behavior of rats and to research and test potential nicotine analogues. DeNoble and Mele's research demonstrated that nicotine was addictive and that, in terms of addictiveness, "nicotine looked like heroin." In August 1983, Philip Morris ordered DeNoble to withdraw a research paper on nicotine that had already been accepted for publication after full peer review by the respected journal, PSYCHOPHARMACOLOGY. Less than a year later, Philip Morris abruptly closed DeNoble's research lab. Philip Morris executives threatened DeNoble and Mele with legal action if they published or talked about their nicotine research. Their research animals were killed, the equipment was removed, and all traces of the former lab were eliminated.

53. For example, in 1988, when the Surgeon General concluded, based on non-industry research, that nicotine is addictive, agents of the defendants disputed that conclusion, saying that "claims that cigarettes are addictive contradict common sense. . . . The claim that cigarette smoking causes physical dependence is simply an unproven attempt to find some way to differentiate smoking from other behaviors."

54. For example, in a 1992 pamphlet, Philip Morris claimed, "Those who term smoking an addiction do so for ideological – not scientific – reasons."

26

55.    As late as 1994, in an appearance before Congress, the chief executive

officers of the defendant corporations were asked by Rep. Ron Wyden: "Do you

believe nicotine is not addictive?"  Under oath, they replied:

> William Campbell (Philip Morris):  "I believe that nicotine is not
> addictive, yes."
>
> James Johnston (Reynolds): "Congressman, cigarettes and nicotine
> clearly do not meet the classic definition of addiction."
>
> Andrew Tisch (Lorillard): "I believe that nicotine is not addictive."
>
> Edward Horrigan (Liggett): "I believe that nicotine is not addictive."
>
> Thomas Sandefur (Brown & Williamson): "I believe that nicotine is
> not addictive."
>
> Donald Johnson (American Tobacco):  "And I, too, believe that nicotine
> is not addictive."

56.    At the same time that they were denying the addictiveness of nicotine,

the defendants not only knowingly continued to produce and market cigarettes with

the addicting properties of nicotine, but they were developing and using highly

sophisticated technologies designed to deliver nicotine to smokers in ways intended

to create and sustain addiction in the vast majority of individuals who smoke

regularly.  This manipulation of the nicotine content of cigarettes is achieved

through selective breeding and cultivation of plants for nicotine content, and careful

tobacco leaf purchasing and blending plans.  The manipulation of nicotine delivery

(that is, the amount of nicotine absorbed by the smoker) is achieved by various

design and manufacturing techniques.  As a 1973 internal document from the R.J.

Reynolds Tobacco Company explained:

Methods which may be used to increase smoke pH and/or nicotine "kick" include: (1) increasing the amount of (strong) burley in the blend, (2) reduction of casing sugar used on the burley and/or blend, (3) use of alkaline additives, usually ammonia compounds, to the blend, (4) addition of nicotine to the blend, (5) removal of acids from the blend, (6) special filter systems to remove acids from or add alkaline materials to the smoke, and (7) use of high air dilution filter systems. Methods 1-3, in combination, represent the Philip Morris approach, and are under investigation [by Reynolds].

57.    Common among the chemical manipulations of tobacco to enhance the

effect of nicotine is the use of ammonia. As a handbook from Brown & Williamson

explains:

Ammonia, when added to a tobacco blend, reacts with the indigenous nicotine salts and liberates free nicotine. As a result of such change, the ratio of extractable nicotine to bound nicotine in the smoke may be altered in favor of extractable nicotine. As we know, extractable nicotine contributes to impact in cigarette smoke and this is how ammonia can act as an impact booster.

58.    Thus the denial and concealment of the addictiveness of nicotine is a

central element of this case, at the core of defendants' tortious conduct. As a 1980

memorandum from the industry's Tobacco Institute conceded, "We can't defend

continued smoking as 'free choice' if the person was addicted."

59.    However, at least one defendant, Philip Morris, has now abandoned

that strategy of denial and concealment of which it was a part for so many decades,

coinciding with its support for legislation, now pending in Congress, which would

provide for FDA regulatory authority over tobacco products. While Philip Morris

states that such regulation would provide for "greater consistency in tobacco policy,"

and "more predictability for the tobacco industry," other observers conclude that

"selling cigarettes under government supervision would improve its public relations

and legal atmosphere and would enable it to roll out 'reduced risk' cigarettes with the apparent approval of government scientists."

60.    On its website, Philip Morris now says, "We agree with the overwhelming medical and scientific consensus that cigarette smoking is addictive."

61.    No longer does Philip Morris dismiss the Surgeon General's warnings about the health effects and addictiveness of cigarette smoking as ideologically motivated, but describes the Surgeon General as "the nation's leading spokesperson on matters of public health," and the Philip Morris website provides a direct link to the very Surgeon General Report on nicotine addictiveness it sought to discredit.

62.    The Philip Morris website also provides a direct link to the Centers for Disease Control ("CDC") website, which emphasizes, "[N]icotine is a very addictive drug.  For some people, it can be as addictive as heroin or cocaine."

63.    Philip Morris now "agree[s] with the overwhelming medical and scientific consensus that cigarette smoking causes lung cancer, heart disease, emphysema and other serious diseases in smokers."

## 2. DEFENDANTS' CONDUCT IS TORTIOUS

64.    The risk of a cigarette smoker contracting a disease attributable to cigarette smoking greatly increases with prolonged use of cigarettes.

65.    Smoking cigarettes is addictive.

66.    The addictive properties of cigarettes cause or significantly contribute to the prolonged use of cigarettes.

29

67.    The addictive properties of smoking cigarettes are caused by the nicotine in or added to the tobacco.

68.    The addictive properties of the defendants' cigarettes pose a hazard distinct from the direct physical dangers of smoking.

69.    At all relevant times, the defendants were aware of the addictive quality of the nicotine in their cigarettes.

70.    At all relevant times, the defendants attempted to manipulate the levels of nicotine in their cigarettes to maintain or increase the addictive properties of their cigarettes.

71.    At all relevant times, the defendants denied and attempted to conceal the addictive properties of the nicotine in their cigarettes rendering them dangerously defective products.

72.    The exposure of a person to the addictive properties of nicotine in the defendants' cigarettes constitutes a harmful or offensive contact with that person.

73.    The defendants intended to cause the exposure of the persons who became Medicare beneficiaries to the addictive properties of nicotine in the defendants' cigarettes, that is, the defendants intended to cause this harmful or offensive contact with those persons.

74.    This harmful or offensive contact with persons who became Medicare beneficiaries, that is, the exposure of the persons who became Medicare beneficiaries to the addictive properties of nicotine in the defendants' cigarettes, directly or indirectly resulted from the acts of the defendants.

30

75.    The persons who became Medicare beneficiaries did not consent to this harmful or offensive contact, that is, they did not consent to exposure to the addictive properties of nicotine in the defendants' cigarettes.

76.    This harmful or offensive contact constitutes a battery.

77.    As a result of this battery, these persons who became Medicare beneficiaries contracted diseases attributable to smoking the defendants' cigarettes.

78.    The defendants are liable for the medical expenses incurred to treat the diseases attributable to smoking the defendants' cigarettes of these persons who are the victims of the defendants' battery.

79.    From the time the victims of the defendants' battery became Medicare beneficiaries, Medicare paid for the medical expenses necessitated by their diseases attributable to smoking the defendants' cigarettes.

CAUSE OF ACTION

80.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 79, as though fully set forth herein.

81.    As a result of their battery, each defendant was and is an entity which has or had a responsibility to pay for the costs of the health care services provided to Medicare beneficiaries to treat their diseases attributable to smoking the defendants' cigarettes, within the meaning of the MSP statute.

82.    Under the terms of the MSP statute, each defendant was and is, with respect to the costs of the health care services provided to Medicare beneficiaries to treat their diseases attributable to smoking the defendants' cigarettes, a primary

31

plan and so required to be the payer primary for those costs, while Medicare was to be only the secondary payer.

83. None of the defendants paid for, or in any other way provided for primary payment of, these costs of the health care services provided to Medicare beneficiaries to treat their diseases attributable to smoking the defendants' cigarettes, in violation of the MSP statute.

84. Due to this wrongful conduct of the defendants, Medicare became and continues to be the primary payer for these costs of the health care services provided to Medicare beneficiaries to treat their diseases attributable to smoking the defendants' cigarettes, in violation of the MSP statute.

85. Under the terms of the MSP statute, Medicare's payments for these costs of the health care services provided to Medicare beneficiaries to treat their diseases attributable to smoking the defendants' cigarettes were conditioned on reimbursement from the correct primary payer, which each defendant is.

86. As a result, under the MSP statute, damages from the defendants should be awarded in an amount twice that of Medicare's payments for the costs of the health care services provided to Medicare beneficiaries to treat their diseases attributable to smoking the defendants' cigarettes.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that the Court enter judgment against the defendants, and each of them, jointly and severally:

a.   awarding the plaintiff damages in an amount double the amount paid by Medicare for the health care services provided to Medicare beneficiaries to treat their diseases attributable to smoking the defendants' cigarettes, for which treatment the defendants were "required or responsible . . . to make payment" under the Medicare as Secondary Payer Act;

b.   awarding the plaintiff attorneys' fees and the costs of this litigation, including interest; and

c.   granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

The Plaintiff hereby demands a jury on all counts so triable.

Respectfully submitted,

UNITED SENIORS ASSOCIATION, INC.

By its counsel:

**Christopher Weld, Jr.** (BBO # 522230)
**Kevin T. Peters** (BBO # 550522)
**Raymond P. Ausrotas** (BBO # 640315)
TODD & WELD LLP
28 State Street, 31st Floor
Boston, MA  02109
(617) 720-2626
E-mail: cweld@toddweld.com

Dated:  August 4, 2005

33

OF COUNSEL FOR PLAINTIFF:

**Robert J. Cynkar**
**Joseph R. Egan**
**Charles J. Fitzpatrick**
Egan, Fitzpatrick, Malsch & Cynkar, PLLC
The American Center at Tysons Corner
8300 Boone Blvd., Suite 340
Vienna, VA 22182
Telephone: (703) 918-4946
E-mail: rcynkar@nuclearlawyer.com

**Jonathan W. Cuneo**
Cuneo, Gilbert & LaDuca, LLP
507 C Street N.E.
Washington, DC 20002
Telephone: (202) 789-3960
E-mail: jonc@cuneolaw.com

34

%JS 44  (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
UNITED SENIORS ASSOCIATION, INC.

**DEFENDANTS** PHILIP MORRIS USA, R.J. REYNOLDS TOBACCO COMPANY, BROWN & WILLIAMSON TOBACCO CORPORATION, INDV. AND AS SUCCESSOR TO THE AMERICAN TOBACCO COMPANY, LORILLARD TOBACCO**

**(b)** County of Residence of First Listed Plaintiff  Fairfax County, VA
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.  **COMPANY, INC. and LIGGETT GROUP, INC.**

**(c)** Attorney's (Firm Name, Address, and Telephone Number) Christopher Weld, Jr., Esq., Todd & Weld LLP, 28 State St., Boston, MA 02109 Tel. (617) 720-2626
*See Addendum for Additional Counsel.

Attorneys (If Known)

05 - 11623 RGS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question (U.S. Government Not a Party)
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES(Place an "X" in One Box for Plaintiff
(For Diversity Cases Only) and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☒ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☒ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ 6 Multidistrict Litigation  ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity): 42 U.S.C. § 1395
Brief description of cause:  Medicare Secondary Payer Claim

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):  JUDGE ___  DOCKET NUMBER ___

DATE  8/4/05
SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # ___  AMOUNT ___  APPLYING IFP ___  JUDGE ___  MAG. JUDGE ___

**Civil Cover Sheet**
United States District Court for the District of Massachusetts
Part I(c) – Attorneys

Plaintiff United Seniors Association, Inc. represented by:

**Christopher Weld, Jr.**
**Kevin T. Peters**
**Raymond P. Ausrotas**
Todd & Weld LLP
28 State Street, 31" Floor
Boston, Massachusetts 02109
Telephone: (617) 720-2626
E-mail: cweld@toddweld.com

**Robert J. Cynkar**
**Joseph R. Egan**
**Charles J. Fitzpatrick**
Egan, Fitzpatrick, Malsch & Cynkar, PLLC
The American Center at Tysons Corner
8300 Boone Blvd., Suite 340
Vienna, VA 22182
Telephone: (703) 918-4946
E-mail: rcynkar@nuclearlawyer.com

**Jonathan W. Cuneo**
Cuneo, Gilbert & LaDuca, LLP
317 Massachusetts Ave., N.E.
Suite 300
Washington, DC 20002
Telephone: (202) 789-3960
E-mail: jonc@cuneolaw.com

1

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1. Title of case (name of first party on each side only) UNITED SENIORS ASSOCIATION, INC. v. PHILIP MORRIS
   USA, et al.

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See local
   rule 40.1(a)(1)).

   [ ] I.    160, 410, 470, 535, R.23, REGARDLESS OF NATURE OF SUIT.

   [X] II.   195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730,    *Also complete AO 120 or AO 121
             740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.            for patent, trademark or copyright cases

   [ ] III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
             315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
             380, 385, 450, 891.

   [ ] IV.   220, 422, 423, 430, 460, 480, 490, 510, 530, 610, 620, 630, 640, 650, 660,
             690, 810, 861-865, 870, 871, 875, 900.

   [ ] V.    150, 152, 153.

3. Title and number, if any, of related cases.  (See local rule 40.1(g)).  If more than one prior related case has been filed in this
   district please indicate the title and number of the first filed case in this court.

   N/A

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

                                                             YES [ ]      NO [X]

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC
   §2403)

                                                             YES [ ]      NO [X]
   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

                                                             YES [ ]      NO [ ]

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

                                                             YES [ ]      NO [X]

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of
   Massachusetts ("governmental agencies"),  residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).
   N/A
                                                             YES [ ]      NO [ ]

   A.   If yes, in which division do all of the non-governmental parties reside?

        Eastern Division  [ ]        Central Division  [ ]        Western Division  [ ]

   B.   If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies,
        residing in Massachusetts reside?

        Eastern Division  [ ]        Central Division  [ ]        Western Division  [ ]

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court?  (If yes,
   submit a separate sheet identifying the motions)
   N/A
                                                             YES [ ]      NO [ ]

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME  Christopher Weld, Jr., Esq.

ADDRESS  Todd & Weld LLP, 28 State Street, Boston, MA 02109

TELEPHONE NO.  (617) 720-2626

(CategoryForm.wpd - 5/2/05)