# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED SENIORS ASSOCIATION, INC., as a private attorney general, )<br><br>Plaintiff, )<br><br>v. )<br><br>PHILIP MORRIS USA, R.J. REYNOLDS TOBACCO COMPANY, BROWN & WILLIAMSON TOBACCO CORPORATION, individually and as the successor to THE AMERICAN TOBACCO COMPANY, LORILLARD TOBACCO COMPANY, INC., and LIGGETT GROUP, INC., )<br><br>Defendants. ) | Case No. 05-11623 RGS |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS OR TRANSFER

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... iii

PRELIMINARY STATEMENT ............................................................................................... 1

BACKGROUND ........................................................................................................................ 4

ARGUMENT ............................................................................................................................ 13

I.     UNITED SENIORS' CLAIMS ARE NOT LEGALLY VIABLE UNDER THE MSP
       BECAUSE DEFENDANTS ARE NOT "REQUIRED OR RESPONSIBLE" TO
       REIMBURSE MEDICARE .......................................................................................... 13

       A.     United Seniors' Claims Are Barred By The Plain Text Of The MSP Statute ...... 13

       B.     There Is No Merit To The Other Arguments That Plaintiff's Counsel Made In
              Their Previous Lawsuits Against These Defendants ........................................... 20

II.    UNITED SENIORS DOES NOT HAVE STANDING .................................................... 22

       A.     United Seniors Lacks Constitutional Standing ...................................................... 22

       B.     United Seniors Has No Statutory Standing Under The MSP .............................. 26

III.   UNITED SENIORS' CLAIMS ARE BARRED BY COLLATERAL ESTOPPEL ........ 28

       A.     The First Four Requirements Are Easily Met........................................................ 29

       B.     United Seniors Is In Privity With The *Glover* Plaintiffs....................................... 30

IV.    PLAINTIFF'S CLAIMS ARE DUPLICATIVE OF THE CLAIMS IN *GLOVER* AND
       THEREFORE SHOULD BE TRANSFERRED............................................................. 31

CONCLUSION.......................................................................................................................... 32

## TABLE OF AUTHORITIES

## Other Authorities

*Bezanson v. Bayside Enters., Inc.*, 922 F.2d 895 (1st Cir. 1991)................................................... 30

*Brooks v. Blue Cross & Blue Shield of Fla. Inc.*, 116 F.3d 1364 (11th Cir. 1997) ................. 4, 25

*Brooks v. Blue Cross & Blue Shield of Fla.*, No. 95-405-CIV, 1995 WL 931702 (S.D. Fla. Sept. 22, 1995).................................................................................................... 25

*Christo v. Padgett*, 223 F.3d 1324 (11th Cir. 2000) ..................................................................... 30

*Colo. River Water Constr. Dist. v. United States*, 424 U.S. 800 (1976)........................................ 4

*E. Enters. v. Apfel*, 524 U.S. 498 (1998)..................................................................................... 18

*Fagin v. Kelly*, 184 F.3d 67 (1st Cir. 1999) ................................................................................ 29

*Fanning v. United States*, 346 F.3d 386 (3d Cir. 2003)................................................................. 6

*Frazer v. CNA Ins. Co.*, 374 F. Supp. 2d 1067 (N.D. Ala. 2005)........................................ passim

*Glover v. Philip Morris USA*, 380 F. Supp. 2d 1279 (M.D. Fla. 2005)................................. passim

*Glover v. Philip Morris USA*, No. 05-14219 (11th Cir.) ................................................................ 4

*Gomez v. United States*, 490 U.S. 858 (1989) ............................................................................. 18

*Gregory v. Ashcroft*, 501 U.S. 452 (1991)................................................................................... 19

*Grella v. Salem Five Cent Sav. Bank*, 42 F.3d 26 (1st Cir. 1994) ............................................... 29

*Handigran v. Travis & Natalie, Inc.*, 379 F. Supp. 2d 83 (D. Mass. 2005)................................. 32

*Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998 (9th Cir. 2004) ........................ 25

*Harvey v. Veneman*, 396 F.3d 28 (1st Cir. 2005) ....................................................................... 22

*Hoult v. Hoult*, 157 F.3d 29 (1st Cir. 1998)................................................................................ 30

*In re Diet Drugs Prods. Liab. Litig.*, MDL No. 1203, No. Civ.A. 99-20593, 2001 WL 283163 (E.D. Pa. Mar. 21 2001)..................................................................................... 6

*In re Dow Corning Corp.*, 250 B.R. 298 (Bankr. E.D. Mich. 2000) .............................................. 6

*In re Gotham Provision Co.*, 669 F.2d 1000 (11th Cir. 1982)........................................ 21

*In re Nangle*, 274 F.3d 481 (8th Cir. 2002) ........................................................ 30

*Joyner v. The News Journal*, No. CIV A 99-23-GMS, 1999 WL 33220037 (D.
    Del. Aug. 18, 1999) , *aff'd*, 33 Fed. Appx. 648 (3d Cir. 2002). ..................... 23

*Keystone Shipping Co. v. New England Power Co.*, 109 F.3d 46 (1st Cir. 1997)...................... 29

*Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994)........................................................ 18

*Liberty Cablevision of Puerto Rico, Inc. v. Caguas*, 417 F.3d 216 (1st Cir. 2005).................... 18

*Littlefield v. Acadia Ins. Co.*, 392 F.3d 1 (1st Cir. 2004)........................................... 16

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ........................................... 22, 24

*Manning v. Utils. Mut. Ins. Co.*, 254 F.3d 387 (2d Cir. 2001)...................................... 13

*Maroni v. Pemi-Baker Reg'l Sch. Dist.*, 346 F.3d 247 (1st Cir. 2003)........................... 26

*Mason v. Am. Tobacco Co.*, 212 F. Supp. 2d 88 (E.D.N.Y. 2002)................................. 7

*Mason v. Am. Tobacco Co.*, 346 F.3d 36 (2d Cir. 2003) ................................... passim

*Mason v. Am. Tobacco Co.*, 541 U.S. 1057 (2004) .................................... 1, 10

*Mason v. Am. Tobacco Co.*, No. 02-7923, slip op., (2d Cir. Jan. 16, 2004) ................... 1, 10

*Massachusetts v. Mellon*, 262 U.S. 447 (1923) ................................................ 24

*Meltzer v. Epstein Becker & Green, P.C.*, 233 F. Supp. 2d 213 (D. Mass. 2002)...................... 29

*Mertens v. Hewitt Assocs.*, 508 U.S. 248 (1993) ............................................... 18

*Montera v. N. Am. Mortgage Co.*, 172 F. Supp. 2d 1240 (N.D. Cal. 2001) ...................... 25

*NLRB v. Donna-Lee Sportswear Co.*, 836 F.2d 31 (1st Cir. 1987) ...................... 28, 29, 30

*Open Software Found., Inc. v. Fid. & Guar. Co.*, 307 F.3d 11 (1st Cir. 2002)................... 16

*Osediacz v. City of Cranston*, 414 F.3d 136 (1st Cir. 2005)................................. 24

*Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979)....................................... 28

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) .................................... 26

*Raygor v. Regents of Univ. of Minn.*, 534 U.S. 533 (2002) ............................... 19

*Thompson v. Goetzmann*, 337 F.3d 489 (5th Cir. 2003)................................... 6, 8

*Transamerica Corp. v. Trans-American Leasing Corp.*, 670 F. Supp. 1089 (D. Mass. 1987) ...................................................................................... 32

*United States ex rel. S. Prawer & Co. v. Fleet Bank*, 24 F.3d 320 (1st Cir. 1994) ..................... 23

*United States ex rel. Yankston Sioux Tribe v. Gambler's Supply, Inc.*, 925 F. Supp. 658 (D.S.D. 1996) ............................................................................ 31

*United States Trust Co. of New York v. New Jersey*, 431 U.S. 1 (1977) ...................................... 18

*United States v. Baxter Int'l, Inc.*,  345 F.3d 866 (11th Cir. 2003)......................................... 8, 20

*United States v. One Ford 198X Mustang*, 749 F. Supp. 330 (D. Mass. 1990)........................... 30

*United States v. Philip Morris Inc.*, 116 F. Supp. 2d 131 (D.D.C. 2000)................................. 3, 7

*United States v. Philip Morris Inc.*, 156 F. Supp. 2d 1 (D.D.C. 2001)......................... 2, 7, 15, 23

*United States v. Winstar Corp.*, 518 U.S. 839 (1996)................................................................. 18

*Valley Forge Christian College v. Ams. United for Separation of Church & State*, 454 U.S. 464 (1982)......................................................................................... 24

*Vermont Agency of Nat'l Res. v. United States*, 529 U.S. 765 (2000).................................. passim

*VonGrabe v. Sprint PCS*, 312 F. Supp. 2d 1313 (S.D. Cal. 2004) ............................................. 25

*Washington State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371 (2003).......................................................................... 16

*Wheeler v. Travelers Ins. Co.*, 22 F.3d 534 (3d Cir. 1994).................................................. 23, 26

## Regulations

28 U.S.C. § 1404(a) ....................................................................................................................... 4

28 U.S.C. §1404(a) ...................................................................................................................... 31

31 U.S.C. § 3279, *et seq.*............................................................................................................. 23

31 U.S.C. § 3730(b)(5) ................................................................................................................ 24

42 U.S.C. 1395y(b)(2)(A) ............................................................................................................. 5

42 U.S.C. § 1395y(b)(2)(A)(ii) ..................................................................................................... 5

42 U.S.C. § 1395y(b)(2)(B)(i) ....................................................................................................... 5

42 U.S.C. § 1395y(b)(2)(B)(ii) .............................................................................................. passim

42 U.S.C. § 1395y(b)(2)(B)(iii) ................................................................ 5, 13

42 U.S.C. § 1395y(b)(3)(A) .................................................................... 1, 13

Cal. Bus. & Prof. Code § 17200, *et seq.* ................................................ 25

Cal. Bus. & Prof. Code § 17204 ............................................................ 25

H.R. 1 (108th Cong.) § 301(b)(1) (2003) ............................................... 9

H.R. 1 (108th Cong.) § 301(b)(2) (2003) ............................................... 10

H.R. 1 (108th Cong.) § 301(d)(1) (2003) ............................................... 10

H.R. 1 (108th Cong.) § 301(d)(2) (2003) ............................................... 10

Medicare Prescription Drug, Improvement, and Modernization Act of 2003, P.L.
   108-173, 117 Stat. 2066 (Dec. 8, 2003) ........................................... 9

West's Ann. Cal. Bus. & Prof. Code § 17204 (West 2004) ...................... 25

## 9

Fed. R. Civ. P. 12(b)(6) ........................................................................ 13

Fed. R. Civ. P. 23 ......................................................................... 12, 14

N.Y. C.P.L.R. § 4545(c) ........................................................................ 20

## 12

42 C.F.R. § 411.24(i) ............................................................................ 20

42 C.F.R. § 411.50(b) ....................................................................... 5, 15

42 C.F.R. § 411.52 ............................................................................... 5

Medicare as Secondary Payer and Medicare Recovery against Third Parties, 54
   Fed. Reg. 41,716-01 at 41,727 (Oct. 11, 1989) ............................... 6

## 13

132 Cong. Rec. S11930-01 (1986) ........................................................ 27

149 Cong. Rec. S8499-02 (2003) .......................................................... 9

H.R. Rep. No. 101-247 (1989), *reprinted in* 1989 U.S.C.C.A.N. 1906 ......... 5

H.R. Rep. No. 108-178(II) (2003), *available at* 2003 WL 21690538 ............................................. 9

H.R. Rep. No. 96-1167, *reprinted in* 1980 U.S.C.C.A.N. 5526 ....................................................... 6

Jack H. Friedenthal et al., *Civil Procedure* § 14.11 (1985) ............................................................ 29

*Restatement (Second) Torts* § 892 cmts. b & c (1979) ................................................................. 26

W. Prosser, *Law on Torts*, § 18 (4th ed. 1971) ............................................................................ 26

## PRELIMINARY STATEMENT

Plaintiff United Seniors Association ("United Seniors") asks this Court to apply a rarely used statute in a manner never contemplated by Congress and rejected by every court that has considered it.  The statute – the Medicare as Secondary Payer statute ("MSP"), 42 U.S.C. § 1395y(b)(3)(A) – was designed to ensure that Medicare would function as a secondary payer for its beneficiaries.  It does this by creating a narrow cause of action against insurers and related entities (called "primary plans") that failed to pay medical costs paid by Medicare when the primary plan had the primary responsibility to do so.  *See Mason v. Am. Tobacco Co.*, 346 F.3d 36, 42-43 (2d Cir. 2003), *cert. denied*, 541 U.S. 1057 (2004) (Ex. 1); *Glover v. Philip Morris USA*, 380 F. Supp. 2d 1279, 1290-91 (M.D. Fla. 2005) (appeal docketed, No. 05-14219 (11th Cir. Aug. 1, 2005)) (Ex. 2).  The trigger for the cause of action is the failure of a primary plan to satisfy its responsibility to reimburse Medicare within 120 days after the primary plan first had the responsibility to do so.  This failure is the crux of an MSP suit, which results in the imposition of double liability.  *See Mason*, 346 F.3d at 43; *Glover*, 380 F. Supp. 2d at 1291.

United Seniors seeks to invoke the MSP in a unique context:  against corporate defendants (1) who have not settled with or assumed any liability to Medicare beneficiaries and (2) whose alleged liability for battery has never been adjudicated.  United Seniors thus seeks to put the cart before the horse – it seeks to hold defendants liable for failing to pay Medicare when no responsibility to do so has yet been established.  The government brought a similar suit before, as did this same plaintiff's counsel twice.  All three lawsuits were dismissed for failure to state a claim; in fact, every court that has considered United Seniors' interpretation of the MSP statute has rejected it.  *See, e.g.*, *Mason v. Am. Tobacco Co.*, No. 02-7923, slip op., at 2 (2d Cir. Jan. 16, 2004) (Ex. 3)  ("*Mason* slip. op."); *Mason*, 346 F.3d at 43; *Glover*, 380 F. Supp. 2d at

1291; *United States v. Philip Morris Inc.* ("*Philip Morris II*"), 156 F. Supp. 2d 1, 7-8 (D.D.C. 2001) (Ex. 4). This suit is plaintiffs' counsel's third bite at the apple.

If anything, United Seniors' claims here are even more expansive than those that would have been allowed under the theories rejected in *Philip Morris*, *Mason*, and *Glover*. United Seniors is neither a smoker nor a Medicare beneficiary. Nonetheless, United Seniors seeks to impose massive liability on defendants, amounting to billions of dollars in damages, for all of the money that Medicare spent to treat diseases caused by cigarette smoking. Whereas *Philip Morris*, *Mason*, and *Glover* were at least brought by the federal government or Medicare beneficiaries, this case has been brought by a plaintiff that has no connection whatsoever to Medicare or the alleged underlying injuries. United Seniors is a self-described taxpayer protection organization that has suffered no injury from the torts that it alleges defendants committed. Allowing United Seniors to proceed with this suit would violate Article III and statutory standing requirements.

United Seniors' interpretation of the MSP would transform the statute into a procedural and jurisdictional vehicle for allowing parties to assert disputed and unadjudicated garden-variety state-law tort claims in federal court. If United Seniors' interpretation of the MSP were adopted, it would allow any person to bring any disputed state-law claim in federal court against any alleged corporate tortfeasor so long as the injured party happened to be a Medicare beneficiary. United Seniors' theory would essentially federalize state tort law and greatly expand federal jurisdiction over state products liability suits. Furthermore, it would harshly and unfairly double a defendant's liability by imposing the penalty of double damages simply for contesting a disputed tort claim.

United Seniors' complaint is fatally flawed and should be dismissed for substantive, jurisdictional, and procedural reasons. *First*, United Seniors' claims fails on the merits. Before a plaintiff can sue an alleged tortfeasor under the MSP, the tortfeasor's responsibility to pay Medicare must have been voluntarily assumed (such as by an insurance contract or settlement) or otherwise independently established (such as by a judgment or finding of liability). *See* 42 U.S.C. § 1395y(b)(2)(B)(ii). United Seniors' claims fail because United Seniors does not allege that defendants have ever been found liable for the Medicare expenditures that it seeks to recover (and there is no allegation of any voluntary assumption of liability). The MSP does not provide a federal forum for a state-law tort claim against a defendant whose responsibility to pay medical costs has never been previously established. *See Mason* slip op. at 2; *Glover*, 380 F. Supp. 2d at 1291.

*Second*, United Seniors, as an association that has suffered no injury, has neither constitutional nor statutory standing to pursue their claims. United Seniors does not assert any particularized injury of its own, but instead seeks to recover the federal government's alleged losses. United Seniors' sole interest in prosecuting this case is a bounty – an interest insufficient to confer constitutional standing. *See Vermont Agency of Nat'l Res. v. United States*, 529 U.S. 765, 772 (2000) (The potential receipt of a bounty from a successful suit is "[a]n interest unrelated to injury in fact [and thus] insufficient to give a plaintiff standing."). This is not a *qui tam* action where the government's interest is assigned to a private party. The federal government already filed its own MSP action against these defendants for these same costs, *United States v. Philip Morris Inc*. ("*Philip Morris I*"), 116 F. Supp. 2d 131 (D.D.C. 2000) (Ex. 5), and there is no remaining interest to assign. United Seniors also lacks statutory standing because it has no relationship to the Medicare expenditures it seeks to recover and thus falls well

outside the MSP's "zone of interests." *Brooks v. Blue Cross & Blue Shield of Fla. Inc.*, 116 F.3d 1364, 1378 (11th Cir. 1997); *Frazer v. CNA Ins. Co.*, 374 F. Supp. 2d 1067, 1078 (N.D. Ala. 2005).

*Third*, United Seniors' claims are duplicative of the claims brought by these same plaintiffs' counsel in *Glover* and *Mason*. The *Glover* plaintiffs, like United Seniors here, claimed to be acting as "private attorneys general" and filed a virtually identical lawsuit against defendants Philip Morris USA Inc. and Liggett Group, Inc. in the United States District Court for the Southern District of Florida. *See Glover*, 380 F. Supp. 2d at 1283. The district court dismissed the plaintiffs' claims as a matter of law. *Id.* at 1299. Under principles of collateral estoppel, the court's rulings against the *Glover* "private attorneys general" bar United Seniors from relitigating the issue of defendants' liability under the MSP.

*Finally*, the *Glover* plaintiffs have appealed the dismissal of their claims and that appeal is currently being briefed. *Glover v. Philip Morris USA*, No. 05-14219 (11th Cir.). When two cases involving the same parties or their privies are pending in two different federal courts, "the general principle is to avoid duplicative litigation." *Colo. River Water Constr. Dist. v. United States*, 424 U.S. 800, 817 (1976). If the Court does not dismiss United Seniors' claims, it should at the very least transfer this case to the United States District Court for the Middle District of Florida pursuant to 28 U.S.C. § 1404(a).

## BACKGROUND

The relevant text, history, and operation of the MSP are fully set forth in *Mason*, 346 F.3d 36, and *Glover*, 380 F. Supp. 2d 1279. We briefly summarize the MSP below.

### A.     The Medicare As Secondary Payer Statute

Under the MSP, Medicare acts as a "secondary insurer" for its beneficiaries. *Mason*, 346 F.3d at 38; *Glover*, 380 F. Supp. 2d at 1282. Thus, if a Medicare beneficiary has other medical

insurance, the other insurance – not Medicare – is supposed to pay the beneficiary's medical bills. 42 U.S.C. § 1395y(b)(2)(A). However, because the existence of other insurance coverage may be unknown at the time of treatment, the MSP authorizes Medicare to make "conditional" payments. 42 U.S.C. § 1395y(b)(2)(B)(i). The condition is this: If it turns out that the beneficiary has other insurance coverage, that insurance is required to reimburse Medicare. 42 U.S.C. § 1395y(b)(2)(B)(ii); *Mason*, 346 F.3d at 38; *Glover*, 380 F. Supp. 2d at 1282.

Entities subject to the MSP are referred to as "primary plan[s]." 42 U.S.C. § 1395y (b)(2)(B)(ii). "Primary plans" include group health plans, "workmen's compensation law[s] or plan[s]," "liability insurance polic[ies] or plan[s]," and "self-insured plan[s]." 42 U.S.C. § 1395y (b)(2)(A)(ii). If Medicare makes a conditional payment when a primary plan is "required or responsible . . . to make payment" under the statute, Medicare may seek reimbursement from the primary plan. 42 U.S.C. § 1395y(b)(2)(B)(iii). If the primary plan fails to reimburse Medicare within 120 days, the federal government or the Medicare beneficiary may bring a suit for double damages against the primary plan. *Id.*; 42 C.F.R. § 411.50(b). MSP liability thus attaches (1) to "primary plan[s]" that (2) were obligated to make payment under the plan, but (3) failed to do so within 120 days. *See Glover*, 380 F. Supp. 2d at 1290; 42 C.F.R. § 411.50(b).

This is true in cases involving traditional health insurance as well as in cases involving tort liability. At the time of the alleged tort, there is no determination that the alleged tortfeasor is liable for medical costs. Accordingly, where the Medicare beneficiary has a potential tort claim, Medicare's payment is considered conditional. 42 C.F.R. § 411.52; *see also* H.R. Rep. No. 101-247 at 1021 (1989), *reprinted in* 1989 U.S.C.C.A.N. 1906, 2492. Medicare (or the beneficiary) then may assert a claim for reimbursement from the private insurance carrier, but only "*after, and to the extent that, such carrier's liability under the private policy for the services*

*has been determined*."  Medicare as Secondary Payer and Medicare Recovery against Third

Parties, 54 Fed. Reg. 41,716-01 at 41,727 (Oct. 11, 1989) (quoting H.R. Rep. No. 96-1167,

*reprinted in* 1980 U.S.C.C.A.N. 5526 , at 389 (1980)) (emphasis added).  The same rules apply

where the potential tortfeasor has internalized the insurance function by adopting a "self-insured

plan."  If and when tort liability is established, the tortfeasor is obligated to reimburse Medicare

for its conditional payment, and the failure to do so within 120 days gives rise to a cause of

action under the MSP.

### B.    MSP Claims Prior To The MSP's Amendment In 2003

In the late-1990s, the federal government began bringing MSP claims seeking

reimbursement from manufacturers that entered into settlements with Medicare beneficiaries.

*See Fanning v. United States*, 346 F.3d 386 (3d Cir. 2003); *Thompson v. Goetzmann*, 337 F.3d

489 (5th Cir. 2003); *In re Diet Drugs Prods. Liab. Litig.*, MDL No. 1203, No. Civ.A. 99-20593,

2001 WL 283163 (E.D. Pa. Mar. 21 2001); *In re Dow Corning Corp.*, 250 B.R. 298 (Bankr. E.D.

Mich. 2000).  The government's lawsuits drew criticism from many courts, which held that

companies were not "primary plans" merely because they had settled tort claims.[1]  In

*Goetzmann*, for example, the Fifth Circuit rejected the government's argument that an alleged

corporate tortfeasor was a "self-insured plan" under the MSP due to its corporate form.

*Goetzmann*, 337 F.3d at 502 ("[T]here is simply no statutory support for the government's

position that uninsured 'sophisticated corporations' are *per se* self-insurers.").  Because the

corporate manufacturer was not a "self insured plan," the court affirmed the dismissal of the

government's claims.  *Id*. at 504.

---

[1]    *See, e.g.*, *Fanning*, 346 F.3d at 401 n.17; *Goetzmann*, 337 F.3d at 504; *In re Orthopedic
Bone Screw Prods. Liab. Litig.*, 202 F.R.D. 154, 162-69 (E.D. Pa. 2001); *In re Diet Drugs*, 2001
WL 283163, at *9-12; *In re Dow Corning*, 250 B.R. at 337-41.

### C.     Tobacco Cases

The federal government extended its MSP theory when it sued the tobacco industry, bringing claims virtually identical to those here.  In *United States v. Philip Morris Inc.*, the government for the first time sought to recover double damages against a non-insurance company defendant that had neither been found liable for Medicare expenditures nor entered into a settlement with Medicare beneficiaries.  *See Philip Morris II*, 156 F. Supp. 2d at 2-3.  The district court rejected the government's interpretation of the statute and dismissed its claims. The court held that imposing liability on *alleged* tortfeasors "would transform that statute, meant primarily for use against insurers, . . .  into [an] across-the-board procedural vehicle for suing tortfeasors."  *See Philip Morris II*, 156 F. Supp. 2d at 7-8 (citation omitted); *see also Philip Morris I*, 116 F. Supp. 2d at 144-46.  The court further held that the government had not alleged that the companies fulfilled the requirements of being "self insured plan[s]."  *Philip Morris II*, 156 F. Supp. 2d at 8; *Philip Morris I*, 116 F. Supp. 2d at 146.

In *Mason v. American Tobacco Co.*, a putative nationwide class of Medicare beneficiaries – represented by the same counsel who represent United Seniors – filed suit against these same defendants based on the same broad interpretation of the MSP that the federal government asserted in its suit.  212 F. Supp. 88 (E.D.N.Y. 2002).  The district court dismissed the case, and the Second Circuit affirmed on two independent grounds.  First, the court held that these defendants were not subject to suit under the MSP because their liability for Medicare costs had not yet been established.  In the court's view, "the trigger for bringing a MSP claim is not the pendency of a disputed tort claim, but the established obligation to pay medical costs pursuant to a pre-existing arrangement to provide insurance benefits."  *Mason*, 346 F.3d at 43 (internal quotation marks omitted).  Second, the court dismissed the plaintiffs' complaint on

the ground that the defendants were not "self-insured plans" and thus not "primary plans" subject to the MSP. *Mason*, 346 F.3d at 41 (citations omitted).

While the *Mason* appeal was pending, the Eleventh Circuit took a more expansive view of the phrase "self-insured plan." In *United States v. Baxter Int'l, Inc.*, 345 F.3d 866 (11th Cir. 2003), the court held that a corporate defendant could constitute a self-insured plan if it had created a mass-tort settlement fund because such a fund "assume[d] responsibility and liability" for the Medicare beneficiaries' medical costs. *Id.* at 895-97. The court, however, did not disagree with the principle, expressed in *Mason*, that the "trigger" for bringing an MSP claim was the "established obligation" to pay medical costs, not the mere allegation of wrongdoing. The court stated that it found "no tension" with the *Mason* district court decision (at that time, the Second Circuit had not yet issued its decision). *Id*. at 896 n.22. The Second Circuit also saw no tension between *Mason* and *Baxter*. In affirming the dismissal of the complaint in *Mason*, the Second Circuit found *Mason* and *Baxter* to be entirely consistent: *Mason* involved "alleged tortfeasors who have yet to assume the medical costs of any identifiable group of individuals," whereas *Baxter* involved defendants who "[t]hrough the establishment of a settlement fund . . . had assumed obligations to pay for the medical costs of plaintiff class members." *Mason*, 346 F.3d at 42.

**D.    <u>Congress' 2003 Amendment Of The MSP</u>**

Shortly after the court in *Goetzmann* held that a settlement fund was not a self-insured plan, the Department of Justice submitted a letter to the Chairman of the Committee on Energy and Commerce regarding proposed amendments to the MSP. Citing *Goetzmann*, the letter stated that the amendments would protect the fiscal integrity of Medicare by resolving "contentious litigation" surrounding the scope of the MSP:

> [The proposed amendments] would protect the integrity of the
> Medicare Trust Fund by clarifying that Medicare must be
> reimbursed whenever another insurer's responsibility to pay has
> been established.  The Section is consistent with the litigation
> positions taken by this Department and the Department of Health
> and Human Services ("HHS") in numerous court cases. . . .  Some
> recent court decisions have held, however, that Medicare has no
> right to reimbursement. . . .  *See, e.g.*, *Thompson v. Goetzmann*,
> 315 F.3d 457 (5th Cir. 2002).  These rulings make the statute's
> reimbursement mechanism inoperative in some jurisdictions.
> Section 301 of this legislation would end this costly litigation and
> provide clear legislative guidance regarding Medicare's status as a
> secondary payer of health benefits.

149 Cong. Rec. S8499-02, S8,535 (2003) (Ex. 6).  The House Report on the amendments

ultimately adopted the DOJ's rationale.  *See* H.R. Rep. No. 108-178(II) (2003), *available at* 2003

WL 21690538.  On December 8, 2003, President Bush signed the MSP amendments into law as

part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, P.L. 108-

173, 117 Stat. 2066 (Dec. 8, 2003) ("MMA").

The MMA amended the MSP in two principal respects.  First, the MMA expanded the

definition of "primary plan" to include "[a]n entity that engages in a business, trade, or

profession . . . if it carries its own risk (whether by a failure to obtain insurance, or otherwise) in

whole or in part."  *See* H.R. 1 (108th Cong.) § 301(b)(1) (2003).  This provision was meant to

include uninsured companies within the meaning of "self-insured plan," thereby reversing

*Goetzmann* and allowing MSP suits in cases involving tort settlements.  *See* H.R. Rep. No. 108-

178(II) (2003), *available at* 2003 WL 21690538.

Second, the MMA clarified the circumstances under which a "primary plan" may be held

liable under the MSP.  The MMA provided that an alleged tortfeasor was not required to make a

payment to Medicare unless and until the responsibility to do so was voluntarily assumed or

otherwise determined:

> A primary plan's responsibility for such payment may be
> demonstrated by a judgment, a payment conditioned upon the
> beneficiary's compromise, waiver, or release (whether or not there
> is a determination or admission of liability) of payment for items
> or services included in a claim against the primary plan or the
> primary plan's insured, or by other means.

H.R. 1 (108th Cong.) § 301(b)(2) (2003).  Congress stated that it intended the amendments to

apply retroactively.  *See* H.R. 1 (108th Cong.) § 301(d)(1) (2003) & (2).

### E.      The *Mason* Court's Interpretation Of The MSP As Amended

The 2003 amendments went into effect while the plaintiffs' petition for rehearing was

pending before the Second Circuit in *Mason*.  The Second Circuit held that the amendments did

not change the requirement that a defendant's responsibility to reimburse Medicare must first be

established before a private cause of action for double damages arises under the MSP:

> [T]he new amendments clarify only that an entity "shall be deemed
> to have a self-insured plan if it carries its own risk (whether by a
> failure to obtain insurance or otherwise)," but do not alter the
> principle, previously recognized, that "MSP liability attaches only
> to an entity that is required or responsible to pay under a 'primary
> plan,'" *Mason v. American Tobacco Co.*, 345 F.3d 36, 42 (2d Cir.
> 2003), a principle inapplicable to the alleged tortfeasors in this
> case.

*Mason* slip op. at 2.  The Supreme Court denied the plaintiffs' petition for a writ of *certiorari*.

*See Mason v. Am. Tobacco Co.*, 541 U.S. 1057 (2004).

### F.      The *Glover* Lawsuit

A little more than a week after the Supreme Court denied *certiorari* in *Mason*, two

plaintiffs – represented by the same counsel as in *Mason* and this case – filed a federal lawsuit

under the MSP, seeking to recover expenditures that Medicare incurred in Florida for the

treatment of smoking-related disease.  *See Glover*, 380 F. Supp. 2d 1279.  The plaintiffs, as

United Seniors does here, alleged that these defendants were liable for smokers' Medicare costs

because they had committed battery by exposing smokers "to the addictive properties of

nicotine" without their consent. *Glover* First Am. Compl. ¶¶ 57-72 (M.D. Fla. filed July 7, 2004) (Ex. 7). The plaintiffs claimed that, as a result of those alleged batteries, the defendants were "required to pay for the costs of the health care services provided to Medicare beneficiaries to treat their diseases attributable to smoking the defendants' cigarettes." *Id.* ¶ 74. The plaintiffs argued that they were entitled to tens of billions of dollars in double damages under the MSP because the defendants had not paid those costs. *Id.* ¶ 79.[2] The *Glover* court, like the *Philip Morris* and *Mason* courts before it, dismissed the plaintiffs' claims. The court concluded that the MSP does not provide a private right of action against an *alleged* tortfeasor whose responsibility for Medicare costs had not been adjudicated or assumed through settlement. *Glover*, 380 F. Supp. 2d at 1290.

### G.    This Lawsuit

As noted above, United Seniors is represented by the same attorneys who unsuccessfully sued these defendants in the *Mason* and *Glover* cases. This is the third forum in which they have sued these defendants. They filed *Glover* a little more than a week after they lost in *Mason*; they filed this lawsuit a little more than a week after they lost in *Glover*. United Seniors alleges no settlement or judgment. Rather, like the plaintiffs in *Glover* and *Mason*, United Seniors alleges an unadjudicated tort claim (battery) against defendants. Unlike the plaintiffs in *Glover* and *Mason*, however, United Seniors is not a Medicare beneficiary and does not claim to have been

---

[2]    The *Glover* plaintiffs originally filed suit against all of the major American cigarette manufacturers as "private attorneys general" seeking to recover not just their own medical costs, but also costs incurred by *every other* Florida Medicare beneficiary who ever smoked cigarettes. *See generally Glover* Compl. (M.D. Fla. filed May 26, 2004) (Ex. 8). The *Glover* plaintiffs also sued, in the alternative, as representatives of a putative state-wide class of Medicare-beneficiary smokers. *Id.* Some six weeks after filing suit, the *Glover* plaintiffs voluntarily dismissed their claims against all but two cigarette manufacturers (leaving Philip Morris USA Inc., and Liggett Group, Inc. as defendants). They also dropped their class action allegations. *See generally Glover* First Am. Compl.

subrogated to the rights of any Medicare beneficiary.  It asserts no standing to sue defendants

and alleges no interest in the lawsuit other than the MSP's double damages bounty.  Indeed,

United Seniors asserts no more of an interest in these claims than that of a complete stranger.

United Seniors' theory of "battery" here is identical to the theory asserted in *Glover*.

United Seniors asserts that defendants committed a battery on all smoking Medicare

beneficiaries by exposing those persons "to the addictive properties of nicotine" without their

consent.  *United Seniors* Compl. ¶ 75.  Notably, however, the complaint is silent as to how

United Seniors can possibly hope to overcome the innumerable problems presented by their

theory, such as:

- How can United Seniors, without any access to medical records or Medicare data, hope to determine which Medicare beneficiaries smoked cigarettes and which Medicare beneficiaries developed medical conditions not caused by smoking?

- Even if it can establish a battery (which it cannot), how can United Seniors show that the battery, and not smoking per se, caused any injury?

- How can the parties begin to adjudicate the defense of "consent" – a highly individualized issue whose relevance is clear given the general awareness of the addictive properties of smoking?

United Seniors' theory would in essence create a backdoor class action that could not begin to

satisfy the requirement of Federal Rule of Civil Procedure 23.[3]  As demonstrated below,

Congress in enacting the MSP never intended the type of lawsuit presented here.

---

[3]    Defendants reserve the right to challenge, if necessary, this improper aggregation of claims in any subsequent proceedings.

12

## ARGUMENT

I.  **UNITED SENIORS' CLAIMS ARE NOT LEGALLY VIABLE UNDER THE MSP BECAUSE DEFENDANTS ARE NOT "REQUIRED OR RESPONSIBLE" TO REIMBURSE MEDICARE**

### A.  United Seniors' Claims Are Barred By The Plain Text Of The MSP Statute

United Seniors' complaint should be dismissed because it fails to state a claim. *See* Fed. R. Civ. P. 12(b)(6). The inescapable flaw in the complaint is that United Seniors cannot point to any judgment, settlement, or similar resolution of their battery claims against defendants. Because defendants have never been "required" to make a payment to Medicare, they cannot have "failed" to make such a payment and thus cannot be subject to double damages under the MSP. *See Glover*, 380 F. Supp. 2d at 1290.

The MSP was enacted to ensure that, when a Medicare beneficiary has private insurance, the insurer – and not Medicare – foots the bill. *See Manning v. Utils. Mut. Ins. Co.*, 254 F.3d 387, 396 (2d Cir. 2001). Under the MSP, a "primary plan . . . shall reimburse the appropriate Trust Fund for any payment made by the Secretary under this subchapter with respect to an item or service if it is demonstrated that such primary plan has or had a responsibility to make payment with respect to such item or service." 42 U.S.C. § 1395y(b)(2)(B)(ii). A "primary plan's" responsibility for reimbursing Medicare "may be demonstrated by a judgment, a payment conditioned upon the recipient's compromise, waiver, or release . . . of payment for items or services included in a claim against the primary plan or the primary plan's insured, or by other means." *Id*. If a primary plan fails to reimburse Medicare when it was "responsible" to do so, then the federal government and private parties may sue the primary plan for double damages. *See* 42 U.S.C. §§ 1395y(b)(2)(B)(iii) & (3)(A).

The MSP's remedial scheme, therefore, is straightforward. If Medicare pays medical bills that should have been paid by another insurer, it may request reimbursement from that

insurer because the insurer is contractually "responsible." If the insurer fails to pay, the federal government or the beneficiary may sue the insurer for double damages. In the case of a tortfeasor, if a settlement, judgment, or similar event established a tortfeasor's liability for a Medicare beneficiary's medical costs, the tortfeasor has a responsibility to reimburse Medicare for its medical costs. If the tortfeasor fails to pay Medicare, the federal government or the beneficiary may sue the tortfeasor for double damages. *See Mason*, 346 F.3d at 43 ("[T]he trigger for bringing a MSP claim is not the pendency of a disputed tort claim, but the established obligation to pay medical costs pursuant to a pre-existing arrangement to provide insurance benefits." (internal quotation marks omitted)).

United Seniors has not – and cannot – allege any judgment, settlement, or similar resolution of its battery claims against defendants that would demonstrate a responsibility to reimburse Medicare. United Seniors instead contends that the MSP is a procedural device that allows it to bring a massive quasi-class action in federal court – not subject to Rule 23 – against defendants to determine state-law liability and MSP liability at the same time. United Seniors' interpretation of the MSP would result in a revolutionary change in tort law, federal-state relations, and the boundaries of federal jurisdiction. It would allow a Medicare beneficiary injured by *any* product – ranging from a coffeemaker to asbestos – to bring a tort claim against the corporate manufacturer in federal court to recoup double damages. Because such a claim would be brought under the auspices of the MSP, it would be within the federal jurisdiction of this Court; no showing of diversity or jurisdictional amount would be required. And although such a claim would ostensibly sound in state tort law, the MSP would allow the imposition of double damages irrespective of the provisions of state law. Nothing in the text of the MSP or its legislative history even hints that Congress intended such dramatic changes in tort law or federal

14

jurisdiction. *See, e.g.*, *Mason*, 346 F.3d at 43; *Glover*, 380 F. Supp. 2d at 1299; *Philip Morris II*, 156 F. Supp. 2d at 7-8.

As the *Glover* court recognized, the plain text of the MSP squarely refutes plaintiffs' interpretation of the statute. *First*, the MSP "requires a primary plan to reimburse Medicare" only "'*if it is demonstrated*' that the primary plan '*has or had responsibility*' to make payment for an item or service*." *Glover*, 380 F. Supp. 2d at 1290 (quoting 42 U.S.C. § 1395y(b)(2)(B)(ii)) (emphasis added). As a matter of logic and common sense, "it cannot be 'demonstrated' that an alleged tortfeasor, which has neither been adjudicated as liable nor has agreed to settle a tort claim, 'has' an existing 'responsibility' to reimburse Medicare or 'had' a previous responsibility to do so." *Id.* Because United Seniors cannot demonstrate that defendants have an existing or previous responsibility to reimburse Medicare, the complaint fails.

*Second*, the MSP expressly provides that a primary plan's "responsibility" to pay can be "demonstrated" by "a judgment, a payment conditioned upon the recipient's compromise, waiver, or release . . . or by other means." 42 U.S.C. § 1395y(b)(2)(B)(ii). Under the plain text of the statute, defendants are not subject to suit under the MSP unless and until they are found responsible for Medicare costs *and* they fail to reimburse Medicare within 120 days after that responsibility first arises. 42 C.F.R. § 411.50(b). An alleged tortfeasor cannot be liable for failing to make a payment that it has no requirement to make. *See Glover*, 380 F. Supp. 2d at 1295 ("[T]he new amendments . . . do not alter the principle, previously recognized, that MSP liability attaches only to an entity that is required or responsible to pay under a primary plan, a principle inapplicable to the alleged tortfeasors in this case." (citation and internal quotation marks omitted)).

United Seniors likely will assert, as its counsel did in *Glover*, that the phrase "by other means" in the above-mentioned provision allows United Seniors to litigate its underlying battery claims as part of the MSP private right of action. That argument, however, cannot be reconciled with basic canons of statutory construction. The traditional canons of statutory interpretation *noscitur a sociis* and *ejusdem generis* dictate that "where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Washington State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 384 (2003) (citation and quotation marks omitted); *see also Littlefield v. Acadia Ins. Co.*, 392 F.3d 1, 9 (1st Cir. 2004) ("[T]he doctrine of *ejusdem generis* . . . provides that where general words follow an enumeration of persons or things, by words of a particular and specific meaning, such general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the same kind or class as those specifically mentioned." (citation and internal quotation marks omitted)); *Open Software Found., Inc. v. Fid. & Guar. Co.*, 307 F.3d 11 (1st Cir. 2002) (*Noscitur a sociis* is a "canon of construction" that provides that "the meaning of a word is or may be known from the accompanying words." (citation and internal quotation marks omitted)).

In the MSP, all of the specific examples that Congress listed in the statute indicate a pre-existing determination of the primary plan's obligation to make payment: (1) a "judgment," (2) a "payment conditioned upon the beneficiary's compromise," (3) "a payment conditioned upon the beneficiary's . . . waiver," and (4) "a payment conditioned upon the beneficiary's . . . release." 42 U.S.C. § 1395y(b)(2)(B)(ii). "By other means," therefore, must be construed to embrace only

similar pre-existing determinations of the primary plan's obligation to make payment.  As the

court explained in *Glover*:

> The "by other means" language in section 1395y(b)(2)(B)(ii)
> encompasses other instances of "like kind" where there is a
> previously established requirement or agreement to pay for
> medical services for which Medicare is entitled to be reimbursed,
> which instances Congress chose not to try to exhaustively
> enumerate.  The "by other means' language of section
> 1395y(b)(2)(B)(ii) does not encompass the unresolved,
> unestablished tort claim plaintiffs rely upon to demonstrate
> defendants' responsibly to reimburse Medicare.

*Glover*, 380 F. Supp. 2d at 1291.

Plaintiff's counsel has argued in previous cases that it would be improper to apply

*ejusdem generis* because doing so would render the phrase "by other means" a nullity.

According to counsel, there are no "other" means for establishing a defendant's responsibility

aside from a judgment or settlement – means that are already enumerated in the statute.  This is

incorrect for at least four reasons:

1.      The premise of plaintiff's counsel's argument is wrong.  There clearly are "other

means" of showing a previously established requirement or agreement to pay for medical

services.  For example, one "other means" of demonstrating a party's responsibility for Medicare

costs would be an arbitrator's finding of liability.  Another would be the decision of an

administrative agency.  The interpretation of the MSP adopted by the *Glover* and *Mason* courts

not only is consistent with canons of statutory construction, but gives meaning to each statutory

phrase that Congress employed.

2.      By contrast, plaintiff's counsel's expansive interpretation of "by other means"

would render the specific examples that Congress included in the provision – judgment and

settlement – meaningless, contrary to the well established canon of statutory construction that

statutory language "must mean *something*" and may not be rendered "meaningless."  *Mertens v.*

*Hewitt Assocs.*, 508 U.S. 248, 258 n.8 (1993) (emphasis in original); *Liberty Cablevision of Puerto Rico, Inc. v. Caguas*, 417 F.3d 216, 222 n.8 (1st Cir. 2005). There would be no point in requiring a primary plan's responsibility to be demonstrated "by a judgment" or by "compromise" if responsibility could be demonstrated in any other way – including, for example, by merely alleging that the defendant engaged in wrongdoing. United Seniors would rewrite the phrase "by other means" to read "by *any* means" and thus to be so unrestricted as to render the specific examples given – all requiring a pre-existing determination of liability like a "judgment" – entirely superfluous.

3.       Construing "by other means" to include a mere allegation of tort liability also would violate the principle that courts should "avoid an interpretation of a federal statute that engenders constitutional issues if a reasonable alternative interpretation poses no constitutional question." *Gomez v. United States*, 490 U.S. 858, 864 (1989). Ever since its enactment, courts have consistently interpreted the MSP to require some pre-existing obligation to pay the medical bills of a Medicare beneficiary. *See supra* at 4-11. Construing "by other means" as United Seniors advocates would create a new cause of action under the MSP that would retroactively double defendants' liability for pre-amendment conduct in violation of the Due Process and Takings Clauses of the Constitution. *See E. Enters. v. Apfel*, 524 U.S. 498, 528-32 (1998). Courts have recognized that imposing increased damages on a party retroactively "raise[s] a serious constitutional question." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 281 (1994). This is particularly true where, as here, the government retroactively increases liability for past acts solely to serve its own financial self interest. Such legislation is subject to heightened judicial scrutiny and review. *See United States Trust Co. of New York v. New Jersey*, 431 U.S. 1, 25-26 (1977); *see also United States v. Winstar Corp.*, 518 U.S. 839, 896 (1996) (recognizing

18

difference between legislation "relatively free of Government self-interest" and "statutes tainted by a government object of self-relief").  The court should construe "by other means" according *ejusdem generis* to avoid these constitutional issues.[4]

4.     United Seniors' interpretation of the MSP also runs afoul of the presumption against construing a statute to alter the balance of federal-state relations in the absence of an express command by Congress.  The power of Congress to "legislate in areas traditionally regulated by the States" is "an extraordinary power in a federalist system," and "a power that we must assume Congress does not exercise lightly."  *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991).  Thus, when regulating sensitive areas affecting the federal-state balance, Congress must make "its intention to do so unmistakably clear in the language of the statute."  *Id.* at 460-61 (internal quotation marks and citation omitted) ; *see also Raygor v. Regents of Univ. of Minn.*, 534 U.S. 533, 543-44 (2002).  As noted above, United Seniors' interpretation of the MSP would result in a revolutionary change in tort law, federal-state relations, and the boundaries of federal jurisdiction.  Nothing in the text or the legislative history of the MSP even hints that Congress intended to create a broad-ranging statute "federalizing" tort law whenever the plaintiff happens to be a Medicare beneficiary.  *See supra* at 8-11.  If Congress intended the MSP to provide a federal forum to bring unadjudicated tort claims against corporate defendants for double damages, Congress would have said so directly.  *See Glover*, 380 F. Supp. 2d at 1292.

---

[4]     The retroactive application of Congress' change in the definition of "primary plan" to include uninsured corporations also would raise serious constitutional questions.  We assume for purposes of argument that that change in the law may in fact be applied retroactively.  We reserve the right to assert, if necessary, that the retroactive application of this change is barred by due process and other constitutional guarantees.

**B.**    **There Is No Merit To The Other Arguments That Plaintiff's**
**Counsel Made In Their Previous Lawsuits Against These Defendants**

In the two lawsuits that plaintiff's counsel previously filed, counsel made several other

arguments in support of their interpretation of the MSP.  None has any merit.

For example, plaintiff's counsel have argued that the *Philip Morris*, *Mason*, and *Glover*

courts' interpretation of the MSP would render the private cause of action provision of MSP

unnecessary.  According to plaintiff's counsel, if a Medicare beneficiary must successfully sue

an alleged tortfeasor before bringing an MSP claim, the MSP could only be used in the rare case

where a state court fails to enforce a judgment.  But that is not true.  In certain states, for

example, a plaintiff *cannot* recover damages for medical costs that a third party paid.  *See, e.g.*,

N.Y. C.P.L.R. § 4545(c) (abrogating the common law collateral source doctrine).  In those states,

once a defendant is found responsible for an injury, the MSP's private enforcement provision

would kick in to impose on the defendant the obligation to reimburse Medicare.  *See* 42 U.S.C. §

1395y(b)(2)(B)(ii).  In other cases, the defendant may pay the judgment to the plaintiff, but may

fail to pay Medicare its share.  The MSP would authorize a cause of action against the defendant

under these circumstances as well.  In such cases, the MSP authorizes a cause of action even if it

means that the defendant will have to pay twice – once to the plaintiff and once to Medicare.  *See*

*Baxter*, 345 F.3d at 879 ("Under [42 C.F.R. §] 411.24(i), a 'third party payer' may be required to

reimburse Medicare if it paid a provider or a claimant when it knew, or should have known, that

Medicare had made a conditional primary payment.").

Plaintiff's counsel have also argued that, if a tortfeasor's liability must be determined in a

separate proceeding, the same rule would apply to any insurance company that is contesting

liability, thereby preventing Medicare from recovering from primary health insurers.  That

argument mixes apples and oranges.  *An insurance company, by virtue of its contract of*

*insurance, has already assumed responsibility to pay medical costs of third parties*.  Thus, when insurance is implicated, usually the only issue is the scope of the coverage – *i.e.,* whether the insurance contract covers the particular medical services for which Medicare paid.  The issue whether a primary plan has breached such an established duty to pay Medicare is precisely what can and should be resolved in an MSP action.  Defendants here, however, have not assumed *any* duty to pay medical costs and have not been found responsible for *any* such costs.

This difference between an alleged tortfeasor and an insurance company is directly supported by the language of the MSP itself.  The MSP expressly provides that the responsibility to pay medical costs must be demonstrated "by a judgment, a payment conditioned upon the recipient's compromise, waiver, or release . . . or by other means."  42 U.S.C. § 1395y (b)(2)(B)(ii).  A judgment or an insurance contract would equally demonstrate a responsibility to pay medical costs; a disputed and unadjudicated tort claim would not.  The *Glover* court made precisely this point in rejecting plaintiffs' attempt to equate a MSP claim against an insurer with one against an alleged tortfeasor.  *Glover*, 380 F. Supp. 2d at 1290.[5]

In short, none of plaintiff's counsel's previous arguments should give this Court any pause.  Nothing in the text or legislative history of the MSP indicates that Congress' purpose in enacting the MSP was to provide a federal cause of action against *alleged* tortfeasors.  Under the MSP, a plaintiff cannot combine an unadjudicated tort claim with an MSP double damages action because the MSP action does not arise until after the defendant is found liable and then fails to make payment to Medicare within 120 days.  An alleged tortfeasor cannot be liable for

---

[5]     Plaintiff's counsel have argued that the MSP must be construed broadly to effectuate its remedial purposes.  The remedial nature of a statute, however, cannot trump the statute's plain language.  *See, e.g.*, *In re Gotham Provision Co.*, 669 F.2d 1000, 1013 n.16 (11th Cir. 1982).

failing to make a payment that it has no requirement to make.  For this reason, plaintiff's

complaint should be dismissed on the merits.

## II.    UNITED SENIORS DOES NOT HAVE STANDING

United Seniors is an association that has suffered no injury and has no interest in the

claims it brings other than the collection of a bounty.  It therefore has neither Article III standing

nor statutory standing.  Its claims should be dismissed.

### A.    United Seniors Lacks Constitutional Standing

In order to meet the standing requirements of Article III, "a plaintiff must point to an

'injury in fact' that a favorable judgment will redress."  *Harvey v. Veneman*, 396 F.3d 28, 34 (1st

Cir. 2005) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  This injury

cannot be speculative and general, but rather must be "concrete and particularized."  *Lujan*, 504

U.S. at 560.  United Seniors has alleged no injury at all, let alone one "concrete and

particularized" so as to confer standing.  The complaint is wholly devoid of any allegation that

United Seniors has been injured by defendants' alleged batteries.

The complaint alleges that "Medicare has been unlawfully and unnecessarily forced to

pay enormous sums to diagnose and treat diseases of Medicare beneficiaries attributable to

smoking the defendants' cigarettes."  *United Seniors* Compl. ¶ 5.  United Seniors, however,

cannot rely on an alleged injury to Medicare beneficiaries for its own constitutional standing

because "Art[icle] III judicial power exists only to redress or otherwise to protect against injury

*to the complaining party*."  *Vermont Agency*, 529 U.S. at 771 (internal quotation marks omitted)

(emphasis in original).[6]  Nor can United Seniors rely on injury to the United States for its own

standing.  In *qui tam* cases, a plaintiff has standing to pursue claims only because the United

States has assigned its claims to the plaintiff.  *See Vermont Agency*, 529 U.S. at 773 (In *qui tam*

actions, "the assignee of a claim has standing to assert the injury in fact suffered by the

assignor.").  But this is not a *qui tam* action.  Unlike under the False Claims Act, 31 U.S.C. §

3279, *et seq.*, the federal government has not assigned its MSP claims to private parties.  *See*

*generally Frazer*, 374 F. Supp. 2d at 1082 n.19 (recognizing that an MSP claim is not a *qui tam*

claim and rejecting a plaintiff's attempt to base her own standing on that of the federal

government when alleging an MSP claim).  Indeed, far from assigning its claim to plaintiff, the

federal government already has asserted an MSP claim for these same Medicare expenditures

against these same defendants.  *See Philip Morris II*, 156 F. Supp. 2d at 2.

    United Seniors cannot have it both ways.  If United Seniors' action *is* in the nature of *qui*

*tam*, then it must be dismissed because the federal government is maintaining its own cause of

action against these same defendants for the same medical costs.  *See United States ex rel. S.*

*Prawer & Co. v. Fleet Bank*, 24 F.3d 320, 328 (1st Cir. 1994) (noting that "Congress clearly

---

[6]    A plaintiff does not have Article III standing even if a statute purports to grant the person standing to sue.  In *Wheeler v. Travelers Insurance Co.*, 22 F.3d 534, 539 (3d Cir. 1994), the plaintiff asserted that the MSP required Travelers to reimburse Medicare for health care expenses stemming from her automobile accident.  The Third Circuit held that the plaintiff did not have standing because "Medicare paid the medical expenses for which she seeks a recovery," and plaintiff "therefore pleads that Travelers wronged, but did not injure her."  22 F.3d at 538. United Seniors is even further removed from the alleged injury here than was the plaintiff in *Wheeler*.  In *Wheeler*, the plaintiff sought to recover for Travelers' failure to reimburse *her own* medical expenses.  In this case, United Seniors seeks to recover for Medicare expenditures that have absolutely nothing to do with United Seniors.  *See also Joyner v. The News Journal*, No. CIV A 99-23-GMS, 1999 WL 33220037, at *5 (D. Del. Aug. 18, 1999) (ruling that plaintiff did not state a viable cause of action under the MSP because "there is no record, not even an allegation, that [plaintiff] has incurred any medical expenses for the treatment he received after his accident.  Instead, it appears as if Medicare has paid for all of these services."), *aff'd*, 33 Fed. Appx. 648 (3d Cir. 2002).

rejected" allowing *qui tam* claims that were "completely derivative of another case in which the government is a party" as being "parasitic" (emphasis removed)); 31 U.S.C. § 3730(b)(5). If United Seniors' action is not in the nature of *qui tam*, it has no standing other than its interest in a "bounty" and therefore no constitutional standing. *See Vermont Agency*, 529 U.S. at 771.

Finally, United Seniors cannot rely upon taxpayer standing. Even assuming that taxpayers suffer harm when Medicare pays for services that other insurers should cover, such an "injury" fails to satisfy constitutional standing requirements. A plaintiff's injury must be particularized, meaning that "the injury must affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1. As the Supreme Court has explained, a federal taxpayer's "interest in the moneys of the treasury – partly realized from taxation and partly from other sources – is shared with millions of others, is comparatively minute and indeterminable, and the effect upon future taxation, of any payment out of the funds, is so remote, fluctuating and uncertain" as to not suffice to confer standing. *Massachusetts v. Mellon*, 262 U.S. 447, 487 (1923); *see Osediacz v. City of Cranston*, 414 F.3d 136, 142 (1st Cir. 2005) (noting that this principle has been "clear for more than three-quarters of a century"); *cf. Frazer*, 374 F. Supp. 2d at 1077 (noting the need for a plaintiff to show a "particularized" injury).[7]

United Seniors' sole interest in this case is to collect a bounty. But that "interest" is not sufficient for Article III standing. In *Vermont Agency of Natural Resources*, the Supreme Court held that the existence of the False Claims Act bounty was insufficient to confer standing, even on the would-be *qui tam* relator:

---

[7]    Taxpayer status can suffice to confer Article III standing only in narrow categories of cases, like Establishment Clause cases, under very restrictive conditions not present here. *See Valley Forge Christian College v. Ams. United for Separation of Church & State*, 454 U.S. 464, 478 (1982) (internal quotations and citations omitted).

> There is no doubt, of course, that as to this portion of the
> recovery—the bounty he will receive if the suit is successful—a
> *qui tam* relator has a "concrete private interest in the outcome of
> [the] suit." But the same might be said of someone who has placed
> a wager upon the outcome. An interest unrelated to injury in fact
> is insufficient to give a plaintiff standing.

529 U.S. at 772 (citation omitted).[8]

Indeed, this case is no different from suits prosecuted under California's Unfair Business Practices Act, Cal. Bus. & Prof. Code § 17200, *et seq.*, before 2004. Before 2004, an uninjured private party could prosecute a suit for unfair business practices in California state court "acting for the interests of . . . the general public." § 17204.[9] Even though California had created a private attorney general provision conferring statutory standing, federal courts nevertheless repeatedly held that uninjured private parties did not have Article III standing to pursue § 17200 claims in federal court. *See, e.g.*, *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1022 (9th Cir. 2004); *VonGrabe v. Sprint PCS*, 312 F. Supp. 2d 1313, 1324 (S.D. Cal. 2004); *Mortera v. N. Am. Mortgage Co.*, 172 F. Supp. 2d 1240 (N.D. Cal. 2001). Likewise, in this case, even if the MSP creates a private attorney general action for wholly uninjured plaintiffs like United Seniors, this cause of action is foreclosed for want of Article III standing.

---

[8]    Prior to *Vermont Agency of Natural Resources*, one court allowed standing – even though plaintiff's medical costs were covered by Medicare – based on the MSP's double damage provision. *See Brooks v. Blue Cross & Blue Shield of Fla.*, No. 95-405-CIV, 1995 WL 931702, at * 15 (S.D. Fla. Sept. 22, 1995). This holding fails to withstand the Supreme Court's decision in *Vermont Agency of Natural Resources*. On appeal, the Eleventh Circuit did not reach the constitutional standing argument. *See Brooks*, 116 F.3d at 1365 (affirming the holding and rationale of the court's statutory MSP decision and stating "no view" on the remaining issues).

[9]    In 2004, the California voters amended § 17204, which establishes the standing requirements for § 17200 claims. Section 17204, as amended, requires that a private cause of action shall only be prosecuted by a party "who has suffered injury in fact and has lost money or property as a result of such unfair competition." West's Ann. Cal. Bus. & Prof. Code § 17204 (West 2004).

**B.**    **United Seniors Has No Statutory Standing Under The MSP**

In addition to lacking constitutional standing, United Seniors cannot meet statutory, or prudential, standing requirements. The First Circuit has explained that "[t]o meet the prudential standing restrictions, parties must show that the harm asserted is to themselves and not a generalized grievance pervasively shared by a large class of citizens, and in statutory cases, that the claim is within the 'zone of interests' protected by the statute." *Maroni v. Pemi-Baker Reg'l Sch. Dist.*, 346 F.3d 247, 254 (1st Cir. 2003). As the Third Circuit summarized the three-part test, prudential "considerations require that: (1) a litigant assert his or her own legal interests rather than those of third parties; (2) courts refrain from adjudicating abstract questions of wide public significance which amount to generalized grievances; and (3) a litigant demonstrate that her interests are within the zone of interests intended to be protected by the statute, rule, or constitutional provision on which the claim is based." *Wheeler*, 22 F.3d at 538 (quotations and citations omitted). United Seniors' claims fail both the first and third requirements.

United Seniors fails the first requirement because it seeks to assert legal interests that belong to a third party – the United States government and/or Medicare beneficiaries. A party may not sue to assert the rights of other parties in order to ensure that access to the federal courts is limited to the "litigants best suited to assert a particular claim." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 804 (1985) (internal quotation marks omitted). In this case, the parties that have allegedly suffered injury due to defendants' conduct, and who are therefore best suited to assert those claims, are the federal government and Medicare beneficiaries. The allegedly battered Medicare beneficiaries have knowledge of facts surrounding their underlying injuries (smoking history, diseases allegedly caused by smoking, etc.) and would best be able to litigate them. Consent, for example, is generally a defense to battery, *see Restatement (Second) Torts* § 892 cmts. b & c (1979); W. Prosser, *Law on Torts*, § 18 (4th ed. 1971), yet United Seniors has no

firsthand knowledge of the consent or lack thereof of any allegedly battered Medicare beneficiary.

United Seniors also fails the third requirement because it does not fall within the "zone of interests" of the MSP. "The recover of costs by Medicare is the primary purpose of the MSP." *Frazer*, 374 F. Supp. 2d at 1077 (citing 132 Cong. Rec. S11930-01 (1986)). As such, parties within the "zone of interests" of the MSP statute include "Medicare and the federal treasury," and parties who received Medicare benefits that have not been reimbursed. *Frazer*, 374 F. Supp. 2d at 1082. United Seniors, neither a representative of the federal government nor a Medicare beneficiary, has absolutely no relation to the MSP's "zone of interests" and thus has no prudential standing. Indeed, plaintiffs' counsel freely admitted at oral argument in *Glover* that, under plaintiff's interpretation of the MSP, *anyone* – even someone with "no connection to the controversy" – can bring an MSP claim:

> THE COURT: So Congress intended that a person off the street could file this suit, and if a four billion dollars [sic] judgment was entered, that that person who had no connection to the controversy at all would get two billion?
>
> MR. CYNKAR: Yes, sir. That's exactly right.

Motion Hearing at 63, *Glover v. Philip Morris USA*, No. 3:04-cv-403 (M.D. Fla. Feb. 25, 2005) (Ex. 9).

In *Frazer*, the court recently refused to find prudential standing in a case involving a plaintiff who was similarly removed from the MSP's "zone of interests." There, an employee sued her workers' compensation carrier for failure to reimburse Medicare for expenditures related to an injury she suffered while working. The plaintiff had already settled her claim with her carrier, but alleged that the carrier should have separately reimbursed Medicare due to her

becoming Medicare eligible within 30 months of the settlement.[10]  The court dismissed her case,

holding that the plaintiff satisfied neither constitutional nor prudential standing requirements.

The court noted that the plaintiff had "never been required to pay for medical care arising [from

her accident]," had "never had a claim denied," and was "not alleged to be a recipient of

Medicare benefits . . . within thirty months."  374 F. Supp. 2d. at 1078.  The court therefore held

that the "[p]laintiff simply does not allege facts which demonstrate that she is within the zone of

interest of the MSP[]."  *Id.* at 1083.

      United Seniors has no more relationship to the claims that it seeks to assert than does any

other organization or individual in the United States.  Thus, if there is any limit on prudential

standing under the MSP, it must apply here to bar United Seniors' claims.

## III.  UNITED SENIORS' CLAIMS ARE BARRED BY COLLATERAL ESTOPPEL

      This Court also should dismiss United Seniors' claims because United Seniors is

collaterally estopped from arguing that defendants are "required or responsible" to reimburse

Medicare.  Collateral estoppel "precludes relitigation of issues actually litigated and necessary to

the outcome" of a prior lawsuit.  *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n.5 (1979).

"The rules of collateral estoppel embody the principle that one opportunity to litigate an issue

fully and fairly is enough."  *NLRB v. Donna-Lee Sportswear Co.*, 836 F.2d 31, 33 (1st Cir. 1987)

(citations and internal quotation marks omitted).  Collateral estoppel will apply where, in a

subsequent action: (1) the issue to be precluded is the same as that disputed in the prior

proceeding; (2) the issue was actually litigated in the earlier proceeding; (3) the issue was

determined by a valid and binding final judgment or order; (4) the determination of the issue in

---

[10]    Under the MSP, Medicare has a right to reimbursement if a settling claimant who was not
eligible for Medicare will be eligible within 30 months of the settlement.  *Id.* at 1075.

the prior proceeding was essential to the final judgment or order; and (5) the parties in the second action are the same as, or in privity with, those in the first. *See Fagin v. Kelly*, 184 F.3d 67, 78 (1st Cir. 1999); *Grella v. Salem Five Cent Sav. Bank*, 42 F.3d 26, 30-31 (1st Cir. 1994); *Donna-Lee Sportswear Co.*, 836 F.2d at 34. Each of these requirements is satisfied in this case.[11]

### A.    The First Four Requirements Are Easily Met

The first four requirements of collateral estoppel are easily met here. *First*, there can be no dispute that the issue in this lawsuit is identical to the issue in the *Glover*. United Seniors claims that defendants are responsible for paying "the costs of the health care services provided to Medicare beneficiaries to treat their diseases attributable to smoking the defendants' cigarettes." *United Seniors* Compl. ¶ 82. This was the exact issue adjudicated in *Glover*. *Glover*, 380 F. Supp. 2d at 1283. Indeed, the factual allegations and legal basis for the two complaints are virtually identical.

*Second*, no one can seriously dispute that the issue whether defendants are responsible to reimburse Medicare was "actually litigated" in *Glover*, as it was "subject to an adversary presentation and consequent judgment that was not a product of the parties' consent and is a final decision on the merits." *Meltzer v. Epstein Becker & Green, P.C.*, 233 F. Supp. 2d 213, 219 (D. Mass. 2002) (internal quotation marks omitted); *Keystone Shipping Co. v. New England Power Co.*, 109 F.3d 46, 52 (1st Cir. 1997) (quoting Jack H. Friedenthal et al., *Civil Procedure* § 14.11, at 672, 673 (1985)).

---

[11]    Defendants argued that the *Glover* plaintiffs were estopped by *Mason* and *Philip Morris II*, but the court used its discretion to decline to apply preclusive effect to those opinions because "plaintiffs did not have a full and fair opportunity to litigate the effect" of the 2003 amendments. *Glover*, 380 F. Supp. 2d at 1288. That is not the case here, where the *Glover* plaintiffs filed suit *after* the 2003 amendments were adopted.

*Third*, in *Glover* the issue of defendants' responsibility under the MSP was determined by a valid and binding final judgment. *See Glover*, 380 F. Supp. 2d at 1298-99. Although *Glover* is on appeal, the district court's ruling is final for purposes of collateral estoppel because it is "sufficiently firm to be accorded conclusive effect." *Christo v. Padgett*, 223 F.3d 1324, 1339 n.47 (11th Cir. 2000) (citation omitted); *see also In re Nangle*, 274 F.3d 481, 485 (8th Cir. 2002).

*Fourth*, the determination of whether defendants were required to reimburse Medicare was not only essential to the final judgments in *Glover* – it is the very issue upon which the judgment rests. That issue clearly was central to the court's judgment in *Glover*. *See Hoult v. Hoult*, 157 F.3d 29, 32 (1st Cir. 1998) (A finding is necessary to judgment "if it was central to the route that led the factfinder to the judgment reached.").

### B.    United Seniors Is In Privity With The *Glover* Plaintiffs

The fifth requirement of collateral estoppel – that parties in the second action be the same as or in privity with the parties in the first action – is also satisfied here. "The traditional exception to the rule that issue preclusion affects only the parties to the initial litigation has been the understanding that the privies of those parties are also bound." *Donna-Lee Sportswear Co.*, 836 F.2d at 34-35 (citation omitted). Privity exists where the nonparty's interests are "closely identified" with the party's interests such that it would be "incongruous not to bind them both" by the prior rulings. *Id.* at 35.

United Seniors brings its claims as a private attorney general in the same procedural posture as the *Glover* plaintiffs, under the same set of facts, and pursuant to the same legal theory. Such a close alignment of interests amounts to "virtual representation" by the *Glover* plaintiffs and gives rise to privity with United Seniors. *Bezanson v. Bayside Enters., Inc.*, 922 F.2d 895, 901 (1st Cir. 1990); *United States v. One Ford 198X Mustang*, 749 F. Supp. 324, 330 (D. Mass. 1990). Parties that act as private attorneys general and assert the same government

interest are in privity for purposes of issue and claim preclusion.  *See United States ex rel. Yankston Sioux Tribe v. Gambler's Supply, Inc.*, 925 F. Supp. 658, 670 (D.S.D. 1996) (barring second *qui tam* action against the defendant on the ground that it was barred by settlement in earlier *qui tam* action).  Because the *Glover* plaintiffs and United Seniors assert the same interests on the same set of facts, under the same legal theory, and in the same procedural posture, they are in privity with one another.  A judgment against one binds the others, and United Seniors is collaterally estopped from relitigating the issue of defendants' liability under the MSP.[12]

## IV.    PLAINTIFF'S CLAIMS ARE DUPLICATIVE OF THE CLAIMS IN *GLOVER* AND THEREFORE SHOULD BE TRANSFERRED

If this Court does not dismiss United Seniors' claims, it should at least transfer this case to the United States District Court for the Middle District of Florida.  This case reflects blatant forum shopping by plaintiff's counsel.  Plaintiff's counsel have already asserted the same claims in *Glover* and, before that, in *Mason*.  Faced with the unequivocal rejection of those claims, they simply refiled in another circuit – and they apparently intend to shop their claims around to every circuit in hopes of finding one that rules in their favor.  Here, anything short of a transfer would countenance plaintiff's counsel's forum shopping.

The Court has discretion to transfer this case, "[f]or the convenience of parties" and "in the interest of justice."  28 U.S.C. §1404(a).  A transfer is appropriate here because this case is virtually identical to the *Glover* case, and the Middle District of Florida is already fully familiar

---

[12]    The fact that plaintiffs here have named additional defendants not present in *Glover* at the time of the entry of final judgment, *see supra* page 11 n.2, does not distinguish this case for purposes of collateral estoppel.  Rather, the central issue is the privity that exists between the *Glover* plaintiffs and the plaintiff in this case.  It is the privity between plaintiffs that precludes relitigation of whether the MSP provides a private right of action for an *alleged* tortfeasor.

with United Seniors' claims.  Transfer would also conserve judicial resources and avoid

duplicative litigation and inconsistent judgments.  Finally, transfer is appropriate because

Massachusetts has no interest in this case.  United Seniors, headquartered in Virginia, has alleged

no connection to Massachusetts – and none of the defendants is located in Massachusetts.  Where

a state has little or no interest in a suit, transfer is appropriate.  *See Handigran v. Travis &*

*Natalie, Inc.*, 379 F. Supp. 2d 83, 84 (D. Mass. 2005) (venue transfer granted and stating,

"[p]laintiff offers no reason why Massachusetts is a more convenient or preferable forum");

*Transamerica Corp. v. Trans-American Leasing Corp.*, 670 F. Supp. 1089, 1093 (D. Mass.

1987) ("where the plaintiff is not bringing suit on its 'home turf' plaintiff's choice of forum

carries less weight").  It makes no sense for this case and *Glover* to proceed independently of one

another.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should dismiss plaintiff's claims or transfer this case

to the United States District Court for the Middle District of Florida.

32

Respectfully submitted,

R.J. REYNOLDS TOBACCO COMPANY

_/s/  Thomas E. Peisch_____
Thomas E. Peisch  (BBO #393270)
CONN KAVANAUGH ROSENTHAL
PEISCH & FORD LLP
Ten Post Office Square
Boston, MA 02109
(617)482-8200

PHILIP MORRIS USA INC.

_/s/  Michael K. Murray_____
Michael K. Murray (BBO #563804)
GOODWIN PROCTER LLP
Exchange Place
53 State Street
Boston, MA 02109
(617)570-1000
(617)523-1231 (fax)

Murray R. Garnick
Robert A. McCarter
ARNOLD & PORTER LLP
555 12th Street NW
Washington, DC 20004
(202)942-5000
(202)942-5999 (fax)

LIGGETT GROUP, INC.

__/s/ Patricia A Hartnett_____
Patricia A. Hartnett (BBO #568206)
CORNELL & GOLLUB
75 Federal Street
Boston, Massachusetts  02110
Phone: (617) 482-8100

BROWN & WILLIAMSON TOBACCO
CORP., Individually and as the successor to
AMERICAN TOBACCO CO.

_/s/  Thomas E. Peisch_____
Thomas E. Peisch  (BBO #393270)
CONN KAVANAUGH ROSENTHAL
PEISCH & FORD LLP
Ten Post Office Square
Boston, MA 02109
(617)482-8200

LORILLARD TOBACCO COMPANY, INC.

_/s/  Scott E. Erlich_____
Scott E. Erlich (BBO #637202)
NUTTER, MCCLENNEN & FISH LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA  02210-2604
(617)439-2965

Gay Tedder
Andrew Carpenter
SHOOK, HARDY & BACON LLP
2555 Grand Boulevard
Kansas City, Missouri  64108-2613
(816) 474-6550

Dated:  October 24, 2005

# EXHIBIT 1

James MASON, Billie June Richie, and Glenn Bailey, individually and on behalf of a class of all others similarly situated, Plaintiffs–Appellants,

v.

The AMERICAN TOBACCO COMPANY, R.J. Reynolds Tobacco Company, Brown & Williamson Tobacco Corp., Philip Morris USA Incorporated, Lorillard Inc., United States Tobacco Company, Liggett Group Inc., Liggett & Myers, Inc., and Brooke Group Ltd., Defendants–Appellees.

Docket No. 02–7923.

United States Court of Appeals, Second Circuit.

Argued: March 31, 2003.

Decided: Oct. 2, 2003.

Medicare recipients brought proposed class action against tobacco companies under Medicare as Secondary Payer (MSP) statute, alleging tortious conduct resulting in recipients' illnesses and seeking recovery of Medicare payments for treatment of those illnesses. The United States District Court for the Eastern District of New York, 212 F.Supp.2d 88, Jack B. Weinstein, J., denied recipients' motion for certification and dismissed action. Recipients appealed. The Court of Appeals, Pooler, Circuit Judge, held that: (1) tobacco companies were not "self-insured plans" and thus could not be liable under MSP statute for payments made by Medicare to treat recipients' illnesses; (2) companies' status as alleged tortfeasors did not render them liable under MSP statute; and (3) *Chevron* deference did not apply to Health Care Financing Administration (HCFA) agency's interpretation of MSP.

Affirmed.

**1. Federal Courts ⚖776, 797**

The Court of Appeals reviews the district court's grant of a motion to dismiss de novo, a standard pursuant to which it accepts all of the plaintiffs' factual allegations as true and draws all reasonable inferences in favor of the plaintiffs.

**2. Federal Courts ⚖797**

On review of a motion to dismiss, legal conclusions, deductions or opinions couched as factual allegations are not given a presumption of truthfulness.

**3. Health ⚖545**

The Medicare as Secondary Payer (MSP) statute allows Medicare to be reimbursed whenever a primary payer has wrongfully failed to provide healthcare coverage to an individual pursuant to a primary plan. Social Security Act, § 1862(b), as amended, 42 U.S.C.A. § 1395y(b).

**4. Health ⚖545**

Tobacco companies were not "self-insured plans," and thus were not potentially liable to Medicare recipients under Medicare as Secondary Payer (MSP) statute's double-recovery provision for payments made by Medicare to treat recipients' tobacco-related illnesses allegedly caused by companies' tortious conduct, by virtue of their status as large corporations, or based upon companies' numerous public statements, contained in documents filed with the Securities and Exchange Commission, that they would meet future tort liability through internal funds, not with liability insurance; potential liability under MSP required showing that companies had assumed posture similar to that of a health insurance company. Social Security Act, § 1862(b), as amended, 42 U.S.C.A. § 1395y(b).

MASON v. AMERICAN TOBACCO CO.    **37**
Cite as 346 F.3d 36 (2nd Cir. 2003)

**5. Health ☞545**

The Medicare as Secondary Payer (MSP) statute allows Medicare, or an individual Medicare recipient, to be awarded reimbursement for healthcare costs pursuant to a preexisting contractual obligation on the part of third parties who were required to pay for medical costs, not on the basis of a third party's tort liability. Social Security Act, § 1862(b)(2), as amended, 42 U.S.C.A. § 1395y(b)(2).

**6. Health ☞545**

Tobacco companies' status as alleged tortfeasors did not render companies potentially liable under Medicare as Secondary Payer (MSP) statute's double recovery provision for health care costs related to tobacco-related illnesses allegedly caused by companies' tortious conduct. Social Security Act, § 1862(b)(2), as amended, 42 U.S.C.A. § 1395y(b)(2).

**7. Statutes ☞219(2, 4)**

Courts must defer to an administrative agency's permissible construction or reasonable interpretation of ambiguous statutory terms.

**8. Statutes ☞219(6.1)**

*Chevron* deference did not apply to Health Care Financing Administration (HCFA) agency's interpretation of the Medicare as Secondary Payer (MSP) statute, in action brought by Medicare recipients against tobacco companies under the MSP, seeking recovery of health care costs paid by Medicare for treatment of recipients' tobacco-related illnesses, allegedly caused by companies' alleged tortious conduct, where agency's interpretation was largely unsupported by regulations, rulings or administrative practice. Social Security Act, § 1862(b)(2), as amended, 42 U.S.C.A. § 1395y(b)(2).

Robert J. Cynkar, Cooper & Kirk, PLLC (Charles J. Cooper and Victor J. Wolski, Cooper & Kirk, PLLC, on the brief), Washington, D.C., Mark B. Hutton, Derek S. Casey, Chan P. Townsley, Hutton & Hutton, Witchita, KS, Ronald D. Wells, Dallas, TX, Gary Richardson, Richardson, Stoops, Richardson & Ward, Tulsa, OK, Jonathan W. Cuneo, Charles J. LaDuca, The Cuneo Law Group, P.C., Washington, D.C., for Plaintiffs–Appellants.

Alan Mansfield, Greenberg Traurig (Stephen L. Saxl, Greenberg Traurig, on the brief) New York, NY, for Lorillard Tobacco Co.

Harold K. Gordon, Bryon Stier, George Kostlolampros, Jones, Day, Reavis & Pogue, New York, N.Y. and Robert H. Klonoff, Michael S. Fried, Washington, D.C., for R.J. Reynolds Tobacco Company.

Murray R. Garnick, David S. Eggert, Sheila B. Scheuerman, J. Benjamin King, Arnold & Porter, Washington, D.C., for Philip Morris Incorporated.

Kenneth N. Bass, Kirkland & Ellis, Washington, D.C., for Brown & Williamson Tobacco Corporation (individually and as successor by merger to The American Tobacco Company).

Colin T. Roskey Washington, D.C., for Amicus Curiae Senator Charles E. Grassley.

Before: NEWMAN, POOLER, and KATZMANN, Circuit Judges.

POOLER, Circuit Judge.

The plaintiffs in this action seek to represent a class of "[i]ndividuals who have received or are receiving health care services for the treatment of tobacco-related illnesses ... which services have been paid for, or are being paid for, by Medicare." *Mason v. American Tobacco Co.,* 212

F.Supp.2d 88, 90 (E.D.N.Y.2002) The defendants are major producers of tobacco products. The district court granted the defendants' motion to dismiss and denied the plaintiffs' motion for class certification. We affirm.

## FACTS

Because the defendants' motion to dismiss rests upon a narrow issue of statutory construction, an extensive discussion of the facts is not required. According to the plaintiffs, "[t]his lawsuit advances essentially one claim: that, under the terms of the MSP statute, defendants should have been the primary payers for the health care services needed to treat certain tobacco-related illnesses of Medicare beneficiaries." Plaintiffs' Brief at 13. The referenced statute is the "Medicare as Secondary Payer" statute. 42 U.S.C. § 1395y(b). We have found the following description of the MSP statute to be particularly useful:

The Medicare Secondary Payer Program allows the United States to recover Medicare payments from third parties who are required or responsible to pay for medical costs. Congress enacted these provisions to give the United States a right, as a secondary insurer, to demand reimbursement from primary insurers who have a duty to pay for medical treatment. "The Medicare Secondary Payer Program is intended to help the Medicare Program identify situations where another health care plan should be, or should have been, the primary payer for a beneficiary's health services." H.R.Rep. No. 104–87(I), at 4 (1995); *see also Blue Cross & Blue Shield of Tex., Inc. v. Shalala,* 995 F.2d 70, 71–72 (5th Cir.1993) (stating that purpose of program is to prevent group health plans from providing that plan will be secondary payer if Medicare coverage exists).... In other words, the Program seeks to prevent primary insurers from refusing to pay medical expenses because those who are insured under their plans are also eligible for Medicare.

Hanoch Dagan and James J. White, Governments, Citizens, and Injurious Industries, 75 N.Y.U. L. Rev. 354, 402, n. 201 (2000).

Thus, the MSP statute "makes Medicare a 'secondary' payer where another entity, a 'primary payer' is required to pay under a 'primary plan' for an individual's healthcare." *In re Diet Drugs Prods. Liab. Litig.,* 2001 WL 283163 at *9 (E.D.Pa. March 21, 2001) (citing 42 U.S.C. § 1395y(b)(2)). The statute provides for the government to receive double damages in successful actions against primary payers. 42 U.S.C. § 1395y(b)(2)(B)(ii). It also provides for a private right of action, under which the plaintiffs proceed here, pursuant to which individuals may be awarded double damages against a primary plan that has wrongfully denied them payment for health care that has been paid for by Medicare. *See* 42 U.S.C. § 1395y(b)(3)(A).

The district court dismissed the plaintiffs' Fourth Amended Class Action Complaint, holding that, as a matter of law, plaintiffs cannot recover under the MSP statute because the "[d]efendants' status as accused tortfeasors, standing alone, does not convert them under the statute into primary plans or self-insured plans for Medicare beneficiaries injured by using their products." *Mason v. American Tobacco Co.,* 212 F.Supp.2d at 92. That is, there is no basis for the argument "that the MSP statute was intended to apply to tortfeasors generally," as opposed to insurance entities that have wrongfully refused to pay for an individual's healthcare. *Id.* at 93.

## DISCUSSION

[1, 2] We review the district court's grant of the defendants' motion to dismiss *de novo*, a standard pursuant to which we accept all of the plaintiffs' factual allegations as true and draw all reasonable inferences in favor of the plaintiffs. *DeMuria v. Hawkes*, 328 F.3d 704, 706 (2d Cir.2003). On the other hand, " '[l]egal conclusions, deductions or opinions couched as factual allegations are not given a presumption of truthfulness.' " *U.S. v. Bonanno Organized Crime Family of La Cosa Nostra*, 879 F.2d 20, 27 (2d Cir.1989) (quoting 2A J. Moore, *Moore's Federal Practice*, ¶ 12.07[2.–5] at 63–64 (2d ed. 1987)).

Amicus Senator Grassley characterizes this case as "the first major use of the MSP private right of action fashioned to encourage 'private attorneys general' to assist in this critical initiative to preserve the financial integrity of Medicare." Grassley Brief at 4. Nevertheless, the most striking thing about this appeal is that it carries with it a terrific amount of precedential baggage. The federal government has already tried unsuccessfully to use the MSP statute to assert a claim against the proceeds of a settlement in an individual tort action, *Thompson v. Goetzmann*, 2001 WL 771012 (N.D.Tex. July 3, 2001) (Rule 12(b)(6) dismissal granted), *aff'd*, 315 F.3d 457 (5th Cir.2002), *superceded*, 337 F.3d 489 (5th Cir.2003) (per curiam), and to assert claims against settlement funds established in mass tort cases. *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 202 F.R.D. 154 (E.D.Pa.2001) (granting preliminary injunction against government's claims); *In re Diet Drugs Prods. Liab. Litig.*, 2001 WL 283163 (E.D.Pa.2001) (motion to distribute settlement funds granted); *but see U.S. v. Baxter Int'l, Inc.*, 345 F.3d 866 (11th Cir.2003) ("*Baxter Int'l*") (reversing district court's dismissal of federal government's motion to intervene in

order to assert claims against settlement fund). The federal government has also failed in an attempt to use the statute as a basis to file proofs of claim against the bankruptcy estate of a manufacturer of silicone breast implants. *See In re Dow Corning Corp.*, 250 B.R. 298 (Bkrtcy. E.D.Mich.2000) (summary judgment granted). Most important, the government has already attempted to bring essentially the same claim against tobacco companies that plaintiffs are bringing here and lost. *See U.S. v. Philip Morris, Inc.*, 156 F.Supp.2d 1 (D.D.C.2001) ("*Philip Morris II*")(motion to dismiss amended complaint granted); *U.S. v. Philip Morris, Inc.*, 116 F.Supp.2d 131 (D.D.C.2000) ("*Philip Morris I*") (motion to dismiss granted). As we now discuss, there are at least three reasons why these precedents convince us that the district court properly granted the defendants' motion to dismiss.

### A. Are the Defendants a "Primary Plan?"

[3] As already noted, the MSP statute allows Medicare to be reimbursed whenever a "primary payer" has wrongfully failed to provide healthcare coverage to an individual pursuant to a "primary plan." The statute defines "primary plan" as "a group health plan or large group health plan, . . . a workmen's compensation law or plan, an automobile or liability insurance policy or plan *(including a self-insured plan)* or no fault insurance . . . ." 42 U.S.C. § 1395y(b)(2)(A) (emphasis added). Regulations promulgated under the MSP statute define "self-insured plan" as an "arrangement, oral or written . . . to provide health benefits or medical care or [to] assume legal liability for injury or illness" under which an entity "carries its own risk instead of taking out insurance with a carrier." 42 C.F.R. §§ 411.21, 411.50(b).

Plaintiffs argue that each defendant in this action "is a self-insured plan as a matter of law because the corporate structure through which each conducts its business has the purpose and legal effect, in part, to assume legal liability for injury." Plaintiffs' Brief at 15. That is, the corporate form in and of itself is a means of self-insurance because it allows individual directors and shareholders to shift liability from themselves to the corporation. Or, as the plaintiffs put it, "it is commonly recognized that liability insurance and the corporate structure accomplish the same ends, and are 'substitutes' for each other." Plaintiffs' Brief at 41.

The obvious problem with this approach is that it turns *every* corporation into an insurance company subject to suit under the MSP statute. But courts have uniformly rejected similar readings of the statute as seriously overbroad. The rejection is best stated in *Philip Morris II*:

> Its logical implication is that any [corporate] entity with a risk of legal liability which chooses to retain any portion of that risk, no matter how small, may be pursued under MSP on the ground that it is a "self-insured plan."  ...  The practical effects of [this] conception of MSP liability would transform the statute, meant primarily for use against insurers, *see Philip Morris [I]*, 116 F.Supp.2d at 146 n. 22, into the very "across-the-broad procedural vehicle for suing tortfeasors," which this Court has already declared impermissible. *Id.* at 135. Significantly, the Government is unable to provide any logically consistent way in which this outcome could be averted.

*Philip Morris II*, 156 F.Supp.2d at 7–8.

[4] The plaintiffs here try to supply the argument's missing logical consistency by asserting that only "large corporations" will be *per se* subject to suit under the MSP statute because "it is only large corporations, like defendants, that can afford to bear all the risk of their potential liabilities, that is, to self-insure." Plaintiffs' Brief at 49.   But the district court correctly rejected this assertion because the text and the legislative history of the MSP statute do not support any such distinction "between large corporations and 'mom and pop' corporations without liability insurance.   There is no indication of a legislative design to treat a homeowner or any individual without insurance differently from a small 'S' corporation or a huge public corporation." *Mason v. American Tobacco Co.*, 212 F.Supp.2d at 93.   *See also Thompson v. Goetzmann*, 337 F.3d at 502 ("there is simply no statutory support for the government's position that uninsured 'sophisticated corporations' are *per se* self-insurers"); *Philip Morris II*, 156 F.Supp.2d at 7 ("the Government never advances any reason why a distinction should be made under MSP between 'sophisticated corporations' and other parties, and how such a dichotomy could hold up in practice").

In their reply brief, plaintiffs make the following assertion in a further attempt to overcome this problem:

> We do not posit that every entity, or every tortfeasor, without insurance is a self-insured plan. We *do* contend, however, that every publicly-traded corporation—such as the defendants—that does not purchase insurance to cover the risk of its activities is, to that extent, a self-insured plan as a matter of law.

Reply Brief at 21 (emphasis in original).

But limiting the MSP statute to "publicly-traded corporations" has no more basis in the statutory text or the regulations promulgated pursuant to the statute than does limiting the statute to "sophisticated corporations."   It also makes less sense in light of the fact that some of the largest

corporations in the world are closely-held, and not publicly-traded, corporations.

The plaintiffs also argue that the defendants are self-insured plans as a matter of *fact* because they have made numerous public statements, made for the most part in documents required to be filed with the Securities and Exchange Commission, declaring that they will meet future tort liability through internal funds, and not through the purchase of liability insurance. *See* Plaintiffs' Brief at 57–60. These statements may very well be assertions of a preference for self-insurance on the part of the defendants. But regulations promulgated by the Health Care Financing Administration ("HCFA"), the agency that administers Medicare, state explicitly that "'the mere absence of insurance purchased from a carrier does not necessarily constitute a "plan" of self-insurance.'" *Philip Morris II*, 156 F.Supp.2d at 6 (quoting Medicare as Secondary Payer and Medicare Recovery Against Third Parties, 54 Fed. Reg. 41716, 417272 (Oct. 11, 1989)). Further, "HFCA itself has ruled that '[o]ne of the conditions for a self-insurance program is that the provider must establish a fund with an independent fiduciary which is documented by a written agreement that includes legal responsibilities and obligations required by State laws.'" *Id.* (quoting *Mt. Diablo Med. Ctr. v. Blue Cross & Blue Shield Ass'n*, Dec. No. 96–D40, 1996 WL 862610 at *6 (P.R.R.B. July 1, 1996)). Thus, "[t]he statute's requirement of the existence of a primary 'plan', connotes some type of formal arrangement by which an entity consciously undertakes to set aside funds to cover potential future liabilities and a formal procedure for processing claims made against that fund pursuant to the terms of the 'plan.'" *In re Diet Drugs Prods. Liab. Litig.*, 2001 WL 283163 at *10.

But the complaint merely declares the purely legal conclusion, which we have just held to be incorrect, that "a 'self-insured plan' within the meaning of the MSP statute includes a corporation that has decided not to buy insurance for the legal liabilities or obligations that might be imposed on it, whether or not that decision is written down, and whether or not the corporation has established reserves to cover such liabilities or obligations." Fourth Amended Class Action Complaint, ¶ 34. The complaint does not allege, even in a conclusory fashion, that the defendants, alone or collectively, have actually established any concerted plan to pay anyone's healthcare expenses beyond having made a decision to set aside funds to cover potential future tort liability. This is not sufficient to constitute a self-insured plan for the purposes of the MSP statute, and the district court correctly held that, at least on the strength of the allegations set forth in the complaint, the "[d]efendants have no such plan in place." *Mason v. American Tobacco Co.*, 212 F.Supp.2d at 92. *See also Thompson v. Goetzmann*, 337 F.3d at 500–01 ("we are compelled to pose the rhetorical question, where's the plan?"); *Philip Morris II*, 156 F.Supp.2d at 6 (dismissing MSP claim where plaintiffs failed to allege the existence "of claims-handling procedures; of a fiduciary ... or of written documents allocating legal responsibilities and obligations").

Our conclusion here is not called into question by the Eleventh Circuit's very recent decision in *Baxter Int'l*. That case involved the federal government's motion to intervene in a mass tort litigation in which a settlement had been negotiated between a plaintiff class and a group of defendants who were manufacturers of silicone breast implants. The government sought intervention in order to seek reimbursement under the MSP statute for medical costs of class members which had

been paid by Medicare. The Eleventh Circuit reversed the district court's dismissal of the motion, a decision that was in part based upon a finding that the defendants were not a self-insured plan within the meaning of the MSP statute.

The instant case is clearly distinguishable. Through the establishment of a settlement fund, the *Baxter Int'l* defendants had assumed obligations to pay for the medical costs of plaintiff class members. Thus, as the Eleventh Circuit noted, "[a]ccording to the Government's complaint, about 81,000 claimants had received some payment from [the settlement fund] as of April 1999. To date, more than 400,000 women have registered as potential claimants, and [the defendants] have paid more than $1 billion" into the settlement fund. 345 F.3d at 873–74, 2003 WL 22120071 at *2. The instant case presents a far different situation. Here the plaintiffs are asserting claims under the MSP statute against alleged tortfeasors who have yet to assume the medical costs of any identifiable group of individuals. At most, the plaintiffs can only assert that the defendants have set aside funds to cover possible future liabilities. But the Eleventh Circuit specifically held in *Baxter Int'l* that the mere "set[ting] aside of funds … to cover future liabilities" is insufficient by itself to constitute a self-insurance plan within the meaning of the MSP statute. *Id.* 345 F.3d at 894, *20. Indeed, the court declared its agreement with the district court's opinion in the instant case, which it correctly characterized as "rejecting the theory that a large corporation without insurance that was accused of inflicting a tortious injury was, by definition, operating a self-insured plan." *Id.* at 895, n. 22, *22, n. 22. For the reasons discussed above, we have rejected this theory as well.

**B. Does the MSP Statute Reach Alleged Tortfeasors?**

The MSP statute establishes a program of *reimbursement.* That is, the statute allows Medicare (or an individual Medicare recipient) to be awarded healthcare costs pursuant to a preexisting contractual obligation: "MSP liability attaches only to an entity that is 'required or responsible' to pay under a 'primary plan.'" *Philip Morris II,* 156 F.Supp.2d at 5 (citing 42 U.S.C. Section 1395y(b)(2)); *see also In re Dow Corning Corp.,* 250 B.R. at 340 ("the primary plan's responsibility rests upon contract principles and the question of tort liability is not part of the equation").

[5] Not surprisingly, therefore, "the [MSP] statute has apparently never been successfully used to pursue a non-insurance entity." *Philip Morris II,* 156 F.Supp.2d at 5. And, with the exception of the Eleventh Circuit in its decision in *Baxter Int'l,* courts have rejected all efforts to apply the statute's heavy remedy of double damages to the context of tort litigation. *See Thompson v. Goetzmann,* 337 F.3d at 504 (no cause of action under MSP against party who "was simply an alleged tortfeasor"); *Philip Morris II,* 156 F.Supp.2d at 8 ("neither in its brief nor in its complaint does the Government describe the actual circumstances in which 'a tortfeasor that elects to carry its own risk of liability in a lawsuit rather than to claim against its insurance [would], by that election, make itself subject to an MSP claim'"); *In re Orthopedic Bone Screw Prods. Liab. Litig.,* 202 F.R.D. at 163 ("MSP was not meant to encompass alleged tortfeasors who merely fund liability settlements with their own assets or corporate borrowings"); *In re Diet Drugs Prods. Liab. Litig.,* 2001 WL 283163 at *11 ("MSP cause of action arises when the 'primary plan' is obligated to pay for the primary care at issue under a contract of insurance,

not when the payment obligation arises out of tort litigation").

[6] We find these holdings persuasive and do not find that the plaintiffs here have offered any compelling, or even colorable, reason as to why the MSP statute *should* apply to tort litigation. The plaintiffs question "why is it 'harsh' to impose double damages on a corporate tortfeasor who has chosen to self-insure (and who actually caused the victim's harm), but it is not 'harsh' to impose double damages on the corporate tortfeasor who has bought insurance, or, even worse, on the insurance company who has actually done nothing wrong?" Plaintiffs' Brief at 53. But the answer to this is simply that it is harsh to impose MSP liability against alleged tortfeasors, but it is not harsh to impose such liability against entities who renege upon a pre-existing contractual arrangement to provide healthcare coverage. That is, it is not harsh to use the statute to serve the purpose for which it was enacted. In sum, the defendants are clearly correct when they assert that "the trigger for bringing a MSP claim is not the pendency of a disputed tort claim, but the established obligation to pay medical costs pursuant to a pre-existing arrangement to provide insurance benefits." Defendants' Brief at 12.

### C. Is There a *Chevron* Problem?

[7, 8] Under familiar principles of administrative law, courts must defer to an agency's "permissible construction" or "reasonable interpretation" of ambiguous statutory terms. *Chevron U.S.A. v. Natural Res. Def. Counsel, Inc.*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The plaintiffs argue that such deference is due here. Plaintiffs' Brief at 21, 25. And the federal government itself has argued that courts must defer to the interpretation of the MSP statute it had urged in the cases discussed in this opinion. But

these claims have been uniformly rejected. *Thompson v. Goetzmann*, 337 F.3d at 502 (court need not defer to statutory interpretation that is "nothing more than the litigation position of agency counsel that is wholly unsupported by regulations, rulings, or administrative practice"; citation omitted); *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 202 F.R.D. at 164 (same). Because we believe that plaintiffs' interpretation of the MSP statute is essentially the same unsupported interpretation of the MSP statute urged by the federal government, we do not believe this Court need pay it the substantial deference called for by *Chevron*.

### CONCLUSION

We are sensitive to the concerns expressed by amicus regarding "the fiscal integrity of Medicare." Grassley Brief at 9. The MSP statute was certainly enacted with these concerns in mind. But we cannot accept that the statute extends as far as the plaintiffs contend. Amicus has also asserted that the MSP statute has previously been amended to effect a "continuing expansion of the MSP regime." Grassley Brief at 10. Future amendments will be required for the statute to extend to the defendants in this action.

The judgment of the district court is AFFIRMED.



# EXHIBIT 2

gorically precluded an *Apprendi*-type challenge. *See United States v. Sanchez,* 269 F.3d 1250, 1262–63 (11th Cir. 2001) (*en banc*) ("*Apprendi* does not apply to judge-made determinations pursuant to the Sentencing Guidelines"). **But the Defendants' failure to make their argument in their initial brief is not excused by the fact that our precedent was then to the contrary. Even if our precedent at the time foreclosed their argument, the Defendants still had to raise this issue in their initial brief and assert that our precedent was wrongly decided in order for us to consider it. It is through this process that the law evolves. By making such an argument in their initial brief to this court, the Defendants would have preserved their argument for further appellate review, both in this court and in the Supreme Court.** *See Levy,* 379 F.3d at 1243 n. 3 (noting that "while *Levy* may not have predicted the Supreme Court's ultimate conclusions in *Blakely,* it is also true that the general argument that a jury must determine all facts regarding sentence enhancements was available to *Levy* and indeed made by defendants ever since the Sentencing Guidelines came into being").

*Id.* at 1253 (emphasis supplied).

It can readily be seen from the Eleventh Circuit's implicit but devastating criticism of Pipkins' counsel, that the same thing can be said of the sad performance by Holland's counsel in 1995. Holland was sentenced after the Sentencing Guidelines had "come into being". The contention that a jury determination is necessary for all issues affecting the sentence certainly "was available" to Holland, and therefore should have been raised by his counsel. This is precisely what this court held in its original opinion on July 11, 2005, without this most recent guidance of the Eleventh

Circuit. Holland's counsel, even if he was faced with an uphill fight, "had to raise the issue", because it is through effective assistance of counsel that "the law evolves", as it did, into *Booker.*

### Conclusion

The holding in *Johnson* that restitution is penal was necessary to the central holding in *Johnson,* namely, that a victim has no standing to complain about a denial of restitution under the VWPA. In the instant case, the victim bank may, by now, be aware that it will receive no further restitution payments from Holland or from Hicks. If it believes that *Johnson* was wrongly decided, or that 18 U.S.C. § 3771, the new, mushy, "feel good" statute with the grand title "*Crime Victims' Rights*", abrogated *Johnson* by including among the victims' "rights", "the right to full and timely restitution as provided by law", the bank may, of course, mount an appeal from the order of June 11, 2005.

The memorandum opinion of July 11, 2005, is AMENDED and EXTENDED accordingly.



Geneva GLOVER and James Gillins, as private attorneys general, Plaintiffs,

v.

PHILIP MORRIS USA, and Liggett Group, Inc., Defendants.

No. 3:04–CV–403–J–32MMH.

United States District Court, M.D. Florida, Jacksonville Division.

July 26, 2005.

**Background:** As private attorneys general, plaintiffs filed action against cigarette

**1280**        **380 FEDERAL SUPPLEMENT, 2d SERIES**

manufacturers under Medicare Secondary Payer (MSP) statute to recover expenditures Medicare made in Florida for the treatment of diseases attributable to cigarette smoking. Manufacturers filed motion to dismiss.

**Holdings:** The District Court, Corrigan, J., held that:

(1) plaintiffs were not collaterally estopped from bringing action, and

(2) plaintiffs did not have a federal private right of action under MSP statute where manufacturers' underlying tort liability was unresolved and their responsibility to pay Medicare had not been established by a judgment, settlement, or other means of like kind.

Motion granted with prejudice.

---

**1. Judgment** ⟨⟝739

Plaintiffs, as private attorneys general, were not collaterally estopped from bringing action against cigarette manufacturers under Medicare Secondary Payer (MSP) statute to recover expenditures Medicare made in Florida for the treatment of diseases attributable to cigarette smoking as result of prior dismissal of government's federal court suit in District of Columbia against manufacturers raising the same issue since MSP statute had been amended in relevant part subsequent to the dismissal. Social Security Act, § 1862(b)(2), as amended, 42 U.S.C.A. § 1395y(b)(2).

**2. Judgment** ⟨⟝739

Doctrine of collateral estoppel has no application where there has been an intervening change in legal principles.

**3. Federal Courts** ⟨⟝1145

As between federal district courts, general principle is to avoid duplicative litigation.

**4. Federal Courts** ⟨⟝1145

Generally, a suit is "duplicative" of another suit if the parties, issues and available relief do not significantly differ between the two actions.

> See publication Words and Phrases for other judicial constructions and definitions.

**5. Federal Courts** ⟨⟝1145

A district court has broad discretion in determining whether to stay or dismiss litigation in order to avoid duplicating a proceeding already pending in another federal court.

**6. Federal Courts** ⟨⟝1145

Action brought by private attorneys general against cigarette manufacturers under Medicare Secondary Payer (MSP) statute to recover expenditures Medicare made in Florida for the treatment of diseases attributable to cigarette smoking was not impermissibly duplicative of government's federal court suit in District of Columbia against manufacturers raising the same issue; MSP statute had been amended in relevant part subsequent to the dismissal and it was uncertain whether the government would appeal the dismissal of its MSP claim. Social Security Act, § 1862(b)(2), as amended, 42 U.S.C.A. § 1395y(b)(2).

**7. Judgment** ⟨⟝665, 713(1)

Collateral estoppel is a discretionary doctrine that can apply only when the parties are the same or in privity and if the party against whom the issue was decided had a full and fair opportunity to litigate the issue in the earlier proceeding.

**8. Judgment** ⟨⟝713(1)

Even assuming that plaintiffs-private attorneys general, who brought action against cigarette manufacturers under Medicare Secondary Payer (MSP) statute to recover expenditures Medicare made in

Florida for the treatment of diseases attributable to cigarette smoking, were in privity with New York private attorneys general, whose similar action was dismissed, plaintiffs were not collaterally estopped from bringing their action because the New York plaintiffs, whose petitions for rehearing based on amendments of MSP statute were summarily denied, did not have a full and fair opportunity to litigate the effect of the amendments before appellate court; New York plaintiffs' letter citing supplemental authorities was limited to 350 words, and appellate court construed their letter as a motion to recall the mandate, a remedy an appellate court exercises only in extraordinary circumstances. Social Security Act, § 1862(b)(2), as amended, 42 U.S.C.A. § 1395y(b)(2); F.R.A.P.Rule 28(j), 28 U.S.C.A.

**9. Health ⚖545**

There are three elements of a private cause of action under Medicare Secondary Payer (MSP) statute: (1) a primary plan, (2) that is responsible to pay for an item or service, and (3) that failed to make the appropriate payment to Medicare for the item or service. Social Security Act, § 1862(b), as amended, 42 U.S.C.A. § 1395y(b).

**10. Statutes ⚖194**

Where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words.

**11. Health ⚖545**

Private attorneys general did not have a federal private right of action under Medicare Secondary Payer (MSP) statute to recover from cigarette manufacturers expenditures which Medicare made for the treatment of diseases attributable to cigarette smoking where manufacturers' underlying tort liability was unresolved and their responsibility to pay Medicare had not been established by a judgment, settlement, or other means of like kind; MSP statute did not allow private attorneys general to first try, within context of their MSP suit, to establish state law tort liability and then, after manufacturers' liability had been established, to seek reimbursement for medical costs Medicare paid for smoking related illnesses. Social Security Act, § 1862(b)(2)(B)(ii), as amended, 42 U.S.C.A. § 1395y(b)(2)(B)(ii).

———

Chan P. Townsley, Deborah B. McIlhenny, Derek S. Casey, Mark B. Hutton, Hutton & Hutton, Wichita, KS, Charles J. Fitzpatrick, Egan, Fitzpatrick, Malsch & Cynkar, PLLC, McLean, VA, Robert J. Cynkar, Joseph R. Egan, Egan, Fitzpatrick, Malsch & Cynkar, PLLC, Vienna, VA, Charles L. Richardson, Fred Stoops, Gary L. Richardson, Richardson, Stoops, Richardson & Ward, Tulsa, OK, Daniel M. Cohen, Jonathan W. Cuneo, The Cuneo Law Group, Washington, DC, Mark Rowan Miller, Ford, Miller & Wainer, P.A., Norwood Sherman Wilner, Stephanie J. Hartley, Spohrer, Wilner, Maxwell & Matthews, P.A., Jacksonville, FL, for Plaintiffs.

Dana G. Bradford, II, David Scott Brecher, Smith, Gambrell & Russell, LLP, Charles Cook Howell, III, Howell & O'Neal, P.A., Jacksonville, FL, Daniel F. Molony, Shook, Hardy & Bacon, L.L.P., Tampa, FL, Murray R. Garnick, Robert Alexander McCarter, Arnold & Porter, Washington, DC, for Defendants.

### ORDER

CORRIGAN, District Judge.

This case is before the Court on Defendants' Motion to Dismiss pursuant to Fed-

**1282**    **380 FEDERAL SUPPLEMENT, 2d SERIES**

eral Rule of Civil Procedure 12(b)(6), (Doc. 57), and plaintiffs' response (Doc. 66). The Honorable Charles E. Grassley, United States Senator, filed an *amicus curiae* memorandum in opposition to defendants' motion. (Doc. 72). Defendants, with leave of the Court, filed a reply. (Doc. 77). The Court heard oral argument on defendants' motion, the proceedings of which are hereby incorporated by reference. (Doc. 89).

### I. Motion to Dismiss Standard

When considering a motion to dismiss under Rule 12(b)(6) a court must accept the allegations of the plaintiff's complaint as true and construe the allegations in the light most favorable to the plaintiff. *Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003). A complaint may not be dismissed under Rule 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Lopez v. First Union Nat'l Bank*, 129 F.3d 1186, 1189 (11th Cir.1997) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Rule 12(b)(6) authorizes a court to dismiss a complaint on a dispositive issue of law. *Marshall County Bd. of Educ. v. Marshall County Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir.1993).

### II. Background

The Medicare Secondary Payer statute ("MSP"), which was enacted to reduce federal health care costs, "makes Medicare the secondary payer for medical services provided to Medicare beneficiaries whenever payment is available from another primary payer." *Cochran v. United States Health Care Fin. Admin.*, 291 F.3d 775, 777 (11th Cir.2002). "This means that if payment for covered services has been or is reasonably expected to be made by someone else, Medicare does not have to pay." *Id.* "Consequently, Medicare is empowered to recoup from the rightful primary payer (or from the recipient of

such payment) if Medicare pays for a service that was, or should have been, covered by the primary insurer." *United States v. Baxter Int'l, Inc.*, 345 F.3d 866, 875 (11th Cir.2003). The MSP also contains a private cause of action which gives private citizens an incentive to aid the government in recovering "funds erroneously paid by Medicare." *Manning v. Utilities Mut. Ins. Co.*, 254 F.3d 387, 397 n. 8 (2d Cir.2001). The Eleventh Circuit has noted that while the "MSP's function is straightforward," the "statute is structurally complex—a complexity that has produced considerable confusion among courts attempting to construe it." *Baxter*, 345 F.3d at 875.

Plaintiffs Geneva Glover and James Gillins filed this action as private attorneys general under the MSP to recover expenditures Medicare made in Florida after May 26, 1998, for the treatment of diseases attributable to cigarette smoking. (Doc. 42, ¶ 1). According to the First Amended Complaint, defendants Philip Morris USA and Liggett Group, Inc. have long known that the nicotine in cigarettes is addictive. (*Id.*, ¶ 62). Defendants, however, allegedly denied and attempted to conceal the addictive nature of their cigarettes. (*Id.*, ¶ 64). The addictiveness of cigarettes, plaintiffs allege, causes their prolonged use which in turn increases the risk of a smoker contracting a disease attributable to smoking. (*Id.*, ¶¶ 57, 59). Thus, plaintiffs contend that exposing persons to the nicotine in cigarettes is a harmful or offensive contact with those persons constituting a common law battery by defendants. (*Id.*, ¶¶ 57–69). Plaintiffs claim that, as a result of this battery, defendants are liable for the victims' medical expenses attributable to cigarette smoking. (*Id.*, ¶ 71). Some of these victims became Medicare beneficiaries and Medicare has paid for their smoking related medical expenses. (*Id.*, ¶ 72).

Based on these allegations, plaintiffs bring a cause of action under the MSP. (*Id.*, ¶ 74). Plaintiffs allege that defendants, as a result of their battery, have the responsibility to reimburse Medicare for the medical costs of Medicare beneficiaries' smoking related diseases. (*Id.*). Neither defendant has paid such costs, (*Id.*, ¶ 76), while Medicare continues to pay medical expenses for diseases associated with the smoking of defendants' cigarettes. (*Id.*, ¶ 77). Plaintiffs allege that, under the MSP's private cause of action, they are entitled to sue as private attorneys general for damages totaling double the amount Medicare has paid in medical expenses for its Florida beneficiaries' diseases attributable to smoking cigarettes. (*Id.*, ¶ 79). Plaintiffs' First Amended Complaint limits their claim to post May 26, 1998, medical expenses paid by Medicare on behalf of its Florida beneficiaries. (*Id.*, ¶ 1). Even with these limitations, at oral argument, plaintiffs estimated their damages claim to be in the billions of dollars.

Defendants have now moved to dismiss plaintiffs' First Amended Complaint. (Doc. 57). Defendants argue that plaintiffs' claims are barred by collateral estoppel, are duplicative of those brought by the United States in a different forum, and fail to state a claim because the MSP does not provide a private cause of action against an alleged tortfeasor, meaning a defendant accused of a tort that has not yet been found liable, against which no judgment has been entered and as to which no settlement or compromise has been reached. (*Id.*).

## III. Discussion

### A. Collateral Estoppel

[1] Defendants argue that the Court should dismiss the First Amended Complaint because plaintiffs are collaterally estopped from arguing that defendants are "required or responsible" to reimburse

Medicare under the MSP. (Doc. 58 at 15). That issue, according to defendants, has been fully litigated by the government in federal court in the District of Columbia and by private attorney general plaintiffs in federal court in New York. (*Id.* at 15–20). Plaintiffs respond that collateral estoppel is inapplicable here because there has been an intervening change in the MSP, plaintiffs are not in privity with the plaintiffs in the other lawsuits, and the public interest mandates that the prior adjudications not be given conclusive effect. (Doc. 66 at 17–18).

### 1. The Lawsuit Brought by the United States

Defendants first argue that plaintiffs' claims are collaterally estopped based upon the claims brought by the United States in the District of Columbia. *See United States v. Philip Morris Inc.*, 116 F.Supp.2d 131 (D.D.C.2000) (*Philip Morris I*); *United States v. Philip Morris Inc.*, 156 F.Supp.2d 1 (D.D.C.2001) (*Philip Morris II*). In *Philip Morris I* and *Philip Morris II*, the United States sued eleven tobacco entities (including defendants in this case) to recover health care expenditures for tobacco-related illnesses. *Philip Morris I*, 116 F.Supp.2d at 134. The government's claims were based on three statutes: the MSP, the Medical Care Recovery Act ("MCRA"), and the Racketeer Influenced and Corrupt Organizations Act ("RICO"). The government's theory under the MSP was that the defendants were "primary plans" as defined by the MSP because they "themselves assumed the liability stemming from tobacco-related tort suits and, therefore, as 'self-insured' entities, [could] be sued under MSP." *Id.* at 145. The *Philip Morris I* court dismissed the government's MSP count because it lacked "any allegation that [the companies] have established a 'plan' or 'arrangement'

under which they would be considered self-insured entities subject to MSP's reach." *Id.* at 146.

The government subsequently amended its MSP claim, *Philip Morris II*, 156 F.Supp.2d at 2, alleging that the companies "recognized the risks associated with their manufacture, sale, and promotion of tobacco products, considered the possibility of insuring against such risks through contract, agreement, or arrangement with one another, and/or, third party insurers, and made the business decision to obtain partial third party insurance and/or to self-insure, in whole or in part, against those risks." *Id.* at 4–5. However, the court again granted defendants' motion to dismiss, reasoning that the amended complaint failed to allege the requirements of a "self-insured plan" as used in the MSP, including "the existence of reserves or procedures for establishing and calculating them; of claims-handling procedures; of a fiduciary (or other independent body) to perform these tasks; or written documents allocating legal responsibilities and obligations." *Id.* at 6.

Defendants argue that the holdings in *Philip Morris I* and *Philip Morris II* that they were not "required or responsible" under the MSP to reimburse Medicare precludes that issue from being revisited here. According to defendants, plaintiffs, as private attorneys general, are in privity with the federal government, and the dismissal of the government's MSP claim is final. Plaintiffs respond that the MSP has been amended since *Philip Morris I* and *Philip Morris II*.

At the time *Philip Morris I* and *Philip Morris II* were decided, the MSP defined the term "primary plan" in relevant part as "a workmen's compensation law or plan, an automobile or liability insurance policy or plan (including a self-insured plan) or no fault insurance." 42 U.S.C.

§ 1395y(b)(2)(A)(ii) (2001). The statute did not define "self-insured plan," *see id.*, and courts split over what constituted a self-insurance plan under the statute. Some courts, such as the *Philip Morris II* court, held that "under MSP a 'primary plan' of 'self-insurance' requires an entity's *ex ante* adoption, for itself, of an arrangement for (1) a source of funds and (2) procedures for disbursing these funds when claims are made against the entity." *Brown v. Thompson*, 374 F.3d 253, 261 (4th Cir.2004) (quoting *Thompson v. Goetzmann*, 337 F.3d 489, 498 (5th Cir.2003)) (quotations omitted). Other courts "found that a self-insured plan merely had to involve some kind of '*ex ante* arrangement,' but need not involve any setting aside of funds or formal procedures." *Brown*, 374 F.3d at 261 (citing *Baxter*, 345 F.3d at 896–98).

**[2]** On December 8, 2003, the President signed the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA") which "set forth with more particularity the requirements for a self-insured plan" under the MSP. *Brown*, 374 F.3d at 261. The MMA added the following sentence to the MSP: "An entity that engages in a business, trade, or profession shall be deemed to have a self-insured plan if it carries its own risk (whether by a failure to obtain insurance, or otherwise) in whole or in part." Pub.L. No. 108–173, § 301(b)(1), 117 Stat.2066, 2222 (2003). This clarification in the law, which Congress made retroactive to the Omnibus Reconciliation Act of 1980 (the origin of the MSP), *id.* at § 301(d)(2), was added to address "[r]ecent court decisions" that allowed "firms that self-insure for product liability ... to avoid paying Medicare for past medical payments related to the claim." H.R.Rep. No. 108–178(II), at 189–90 (2003). *See also Brown*, 374 F.3d at 262 ("With this language ... Congress

has plainly indicated that the term 'self-insured plan' should be given a relatively broad definition, unrestricted by formalistic requirements."). Because the *Philip Morris II* court relied on a definition of a self-insured plan that Congress has now amended, collateral estoppel based on the *Philip Morris II* decision would be improper because the doctrine "has no application where there has been an intervening change in legal principles." *Brock v. Williams Enters. of Ga., Inc.*, 832 F.2d 567, 574 (11th Cir.1987).

Defendants apparently recognize that the MMA altered the law applied by the *Philip Morris II* court. Unlike the motion to dismiss in *Philip Morris II*, defendants have not argued that the Court should dismiss this case because they are not self-insured plans under the MSP. Instead, defendants assume, for the purposes of this motion, that they are self-insured plans. (Doc. 58 at 21 n. 5). While defendants reserve the right to challenge this assertion in any subsequent proceedings, their failure to simply rely on the same arguments they put forth in *Philip Morris II* is a telling indication that the MMA changed the law applied in that case. Thus, the court's holdings in *Philip Morris I* and *Philip Morris II* regarding the applicability of the MSP to these defendants cannot be given preclusive effect in this case.

In a related argument, defendants contend that the Court should dismiss this action or transfer it to the United States District Court for the District of Columbia because it is duplicative of the government's action in *Philip Morris I* and *Philip Morris II*. (Doc. 58 at 11–15). Defendants posit that plaintiffs are in privity with the government, are asserting a claim against defendants under the same statute as the government, and are seeking the same damages (Medicare expenditures for tobacco-related illnesses in Florida) sought by the government (Medicare expenditures for tobacco-related illnesses nationwide, including Florida). Moreover, defendants point out that the government still may choose to appeal the district court's dismissal of its MSP claim following the conclusion of the case. Plaintiffs respond that they are not in privity with the government, that they do not seek the same money sought by the government, and that defendants' argument regarding future government appeals is speculative.

[3–5] "As between federal district courts, . . . the general principle is to avoid duplicative litigation." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). "This doctrine rests on considerations of wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation." *I.A. Durbin, Inc. v. Jefferson Nat'l Bank*, 793 F.2d 1541, 1551 (11th Cir.1986) (quoting *Colorado River*, 424 U.S. at 817, 96 S.Ct. 1236) (quotations omitted). Generally, "a suit is duplicative of another suit if the parties, issues and available relief do not significantly differ between the two actions." *Id.* A district court has "broad discretion in determining whether to stay or dismiss litigation in order to avoid duplicating a proceeding already pending in another federal court." *Id.* at 1551–52.

[6] While there is the potential for overlap between the government's suit and the case *sub judice*, the procedural posture of the government's suit counsels against a finding that this litigation is impermissibly duplicative. Though the District Court for the District of Columbia dismissed the government's MSP claim, the government's RICO claim remained. Indeed, the court recently concluded a lengthy bench trial on the government's RICO claim and

currently has the case under advisement. In the meantime, the MSP was amended by the MMA, and it is uncertain whether the government will appeal the dismissal of its MSP claim. Thus, plaintiffs' claim under the MSP, as amended by the MMA, is not duplicative of the government's litigation as it currently stands; therefore, this case is not due to be dismissed on this ground.

For the same reasons, the Court declines to transfer this action the District of Columbia pursuant to 28 U.S.C. § 1404(a). Defendants assert that transfer is appropriate here because it would avoid duplicative litigation and prevent the possibility of inconsistent judgments. As discussed above, defendants' duplicative litigation argument is not meritorious. Furthermore, any concern over inconsistent judgments is alleviated by the intervening amendment to the MSP by the MMA. The Court therefore exercises its discretion in favor of not transferring the case. *See Brown v. Connecticut Gen. Life Ins. Co.*, 934 F.2d 1193, 1197 (11th Cir.1991) ("The decision to transfer a case to another district is left to the sound discretion of the trial court.").

### 2. The Lawsuit Brought by Private Attorneys General

Prior to the MMA amendments to the MSP, a group of plaintiffs (represented by some of the same lawyers representing plaintiffs in this case) brought a proposed class action against several tobacco companies (including the defendants in this case) under the private cause of action provision of the MSP. *See Mason v. American Tobacco Co.*, 212 F.Supp.2d 88, 90 (E.D.N.Y. 2002). The *Mason* plaintiffs sought to represent the class of "[i]ndividuals who have received or are receiving health care services for the treatment of tobacco-related illnesses, ... which services have been paid for, or are being paid for, by Medicare." *Id.* The district court granted the

defendants' motion to dismiss, reasoning in part that "[d]efendants' status as accused tortfeasors, standing alone, does not covert them under the statute into primary plans or self-insured plans for Medicare beneficiaries injured by using their products." *Id.* at 92. The district court, relying on *Philip Morris II*, further reasoned that "one requirement for an entity to be a self-insured plan is the provider must establish a fund with an independent fiduciary which is documented by a written agreement that includes legal responsibilities and obligations required by State laws for payment of medical expenses of those injured by its products." *Id.* (quotations and citations omitted). The district court found that the "[d]efendants ha[d] no such plan in place" and that there was no basis conclude "that the MSP statute was intended to apply to tortfeasors generally." *Id.* at 92–93.

The Second Circuit affirmed. *Mason v. American Tobacco Co.*, 346 F.3d 36 (2d Cir.2003). The court rejected the plaintiffs' argument that the corporate structure through which each of the defendants acted had the purpose of assuming legal liability for injuries and that the corporate form was the means of self-insurance on the part of each company. *Id.* at 40. The court reasoned that "[t]he obvious problem with [that] approach is that it turns *every* corporation into an insurance company subject to suit under the MSP statute." *Id.* (emphasis in original). The Second Circuit also reasoned that the MSP requires "some type of formal arrangement by which an entity consciously decides to set aside funds to cover potential future liabilities and a formal procedure for processing claims made against that fund pursuant to the terms of the 'plan.'" *Id.* at 41 (quotations and citation omitted). Finally, the court determined that there was no "reason as to why the MSP statute *should*

apply to tort litigation." *Id.* at 43 (emphasis in original). The court reasoned that "the defendants are clearly correct when they assert that the trigger for bringing a MSP claim is not the pendency of a disputed tort claim, but the established obligation to pay medical costs pursuant to a pre-existing arrangement to provide insurance benefits." *Id.* at 43.

Based on the Second Circuit panel opinion alone, the Court would decline to give *Mason* preclusive effect for the same reasons expressed as to *Philip Morris I* and *Philip Morris II*. The intervening change in the MSP wrought by the MMA clarifies that "the term 'self-insured plan' should be given a relatively broad definition, unrestricted by formalistic requirements." *Brown,* 374 F.3d at 262.

However, defendants' collateral estoppel argument does not focus on the panel decision in *Mason.* Instead, defendants point out that the *Mason* plaintiffs sent a Federal Rule of Appellate Procedure 28(j) letter to the Second Circuit on November 25, 2003, informing the court that Congress had passed the MMA and urging the panel to withdraw its opinion. (Doc. 58, Ex. 9). This letter was sent while the *Mason* plaintiffs' petitions for rehearing and rehearing *en banc* were pending. On December 8, 2003, the same day the President signed the MMA, the Second Circuit summarily denied the petitions for rehearing. The *Mason* plaintiffs apparently also sent a letter on that date informing the Second Circuit that the President had signed the MMA. On January 16, 2004, the Second Circuit issued an unpublished order addressing the November 25, 2003,

letter. (Doc. 65, Ex. B). The Second Circuit wrote:

> Treating the Plaintiffs–Appellants' letters as a motion to recall the mandate, which was issued on December 15, 2003, the motion is DENIED. As the Defendants–Appellees point out, the new amendments clarify only that an entity "shall be deemed to have a self-insured plan if it carries its own risk (whether by a failure to obtain insurance or otherwise)," but do not alter the principle, previously recognized, that "MSP liability attaches only to an entity that is required or responsible to pay under a 'primary plan'" *Mason v. American Tobacco Co.,* 346 F.3d 36, 42 (2d Cir.2003), a principle inapplicable to the alleged tortfeasors in this case.

(*Id.*). Based on this order, defendants argue that the Second Circuit addressed the MSP as amended. (Doc. 58 at 20). Plaintiffs respond that the *Mason* plaintiffs did not have a full and fair opportunity to litigate the effect of the MMA amendments. (Doc. 66 at 19–20).

[7]  In the Eleventh Circuit, "[c]ollateral estoppel is a discretionary doctrine" [1] that "can apply *only* when the parties are the same (or in privity) and if the party against whom the issue was decided had a full and fair opportunity to litigate the issue in the earlier proceeding." *EEOC v. Pemco Aeroplex, Inc.,* 383 F.3d 1280, 1285 (11th Cir.2004) (emphasis in original). "Recognizing that the doctrine places termination of litigation ahead of the correct result, the application of collateral estoppel has been narrowly tailored to ensure that it applies only where the circumstances indicate the issue estopped from further

---

1.  *Brock,* 832 F.2d at 574; *see also Dailide v. United States Attorney Gen.,* 387 F.3d 1335, 1341 (11th Cir.2004) (noting that the Eleventh Circuit reviews decisions to apply collateral estoppel for abuse of discretion); *United States ex rel. Stinson, Lyons, Gerlin & Busta-* *mante. P.A. v. Blue Cross Blue Shield of Ga., Inc.,* 755 F.Supp. 1040, 1046 (S.D.Ga.1990) (collateral estoppel is "a *discretionary* doctrine" that a court is permitted to use when all of the requisite elements are present) (emphasis in original).

consideration was thoroughly explored in the prior proceeding, and that the resulting judgment thus has some indicia of correctness." *Johnson v. Watkins*, 101 F.3d 792, 795 (2d Cir.1996). "[T]he most significant consideration in determining whether to invoke collateral estoppel is whether the party had a full and fair opportunity to litigate the issue to be estopped." *Hercules Carriers, Inc. v. Claimant State of Fla.*, 768 F.2d 1558, 1580 (11th Cir.1985).

[8] Even assuming that plaintiffs are in privity with the *Mason* plaintiffs, the Court declines to apply collateral estoppel because the *Mason* plaintiffs did not have a full and fair opportunity to litigate the effect of the MMA amendments before the Second Circuit. First, the MMA did not become the law until the President signed it on December 8, 2003, the same day the Second Circuit denied rehearing. Second, Federal Rule of Appellate Procedure 28(j) limits a letter citing supplemental authorities to 350 words. Finally, the Second Circuit construed the *Mason* plaintiffs' letter as a motion to recall the mandate, a remedy an appellate court exercises only in extraordinary circumstances. *See Calderon v. Thompson*, 523 U.S. 538, 550, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998) ("In light of the profound interest in repose attaching to the mandate of a court of appeals ... the power [to recall the mandate] can be exercised only in extraordinary circumstances."). While the Second Circuit has held that "[o]ne circumstance that may justify recall of a mandate is a supervening change in governing law that calls into serious question the correctness of the court's judgment," *Sargent v. Columbia Forest Prods., Inc.*, 75 F.3d 86, 90 (2d Cir.1996) (citation and quotations omitted), the Court nevertheless concludes that, under the unique circumstances of the case, giving *Mason* preclusive effect

would be inappropriate. Thus, plaintiffs in this case are entitled to proceed. The Court will therefore consider defendants' motion to dismiss on the merits.

**B.  Plaintiffs' MSP Claim**

Plaintiffs seek to use the private cause of action under the MSP to first establish defendants' state law tort liability and then to seek reimbursement for Medicare payments made on account of that tortious conduct. Thus, this Court must determine whether Congress has provided a federal private right of action under the MSP, as amended by the MMA, that allows plaintiffs to first try to establish state law tort liability for battery based on defendants' marketing and sale of cigarettes, and then, after defendants' liability has been established, to seek reimbursement for double the amount of the medical costs Medicare paid for smoking related illnesses.

Defendants argue that the MSP only provides a private cause of action to recoup Medicare costs against a tortfeasor after that tortfeasor has already been found liable in a previous action or has settled the claims against it. Defendants rely on language inserted into the MSP by the 2003 MMA amendments which provides: "A primary plan's responsibility for such payment [reimbursement of Medicare benefits] may be demonstrated by a judgment, a payment conditioned upon the recipient's compromise, waiver, or release (whether or not there is a determination or admission of liability) of payment for items or services included in a claim against the primary plan or the primary plan's insured, or by other means." Pub.L. No. 108–173, § 301(b)(2), 117 Stat.2066, 2222 (2003). Plaintiffs respond that the "demonstration of a defendant's tort-law 'responsibility' to pay the plaintiffs' medical costs is a condition precedent to *reimbursement* of Medicare under the MSP,

GLOVER v. PHILIP MORRIS USA    **1289**
Cite as 380 F.Supp.2d 1279 (M.D.Fla. 2005)

but it is not a condition precedent to a determination that the alleged tortfeasor has a self-insured plan to which the MSP regime is applicable." (Doc. 66 at 12–13). Nothing in the statute, according to plaintiffs, indicates that there is a "two lawsuit rule" whereby a separate adjudication of defendants' tort liability is required before an MSP reimbursement action may be brought. (*Id.* at 13).

### 1. The MSP's Language

"The starting point for all statutory interpretation is the language of the statute itself." *United States v. DBB, Inc.,* 180 F.3d 1277, 1281 (11th Cir.1999). "The first step is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Barnhart v. Sigmon Coal. Co.,* 534 U.S. 438, 450, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002) (quotations and citations omitted). When considering the statutory language, courts do not "examine statutory provisions in isolation," but instead read the words of the statute "in their context and with a view to their place in the overall statutory scheme." *Nyaga v. Ashcroft,* 323 F.3d 906, 914 (11th Cir. 2003) (citations omitted).

The MSP, as amended by the MMA, provides in relevant part:

(2) Medicare secondary payer

(A) In general

Payment under this subchapter may not be made, except as provided in subparagraph (B), with respect to any item or service to the extent that-

(i) payment has been made, or can reasonably be expected to be made, with respect to the item or service as required under paragraph (1), or

(ii) payment has been made or can reasonably be expected to be made under a workmen's compensation law or plan of the United States or a State or

under an automobile or liability insurance policy or plan (including a self-insured plan) or under no fault insurance.

In this subsection, the term "primary plan" means a group health plan or large group health plan, to the extent that clause (i) applies, and a workmen's compensation law or plan, an automobile or liability insurance policy or plan (including a self-insured plan) or no fault insurance, to the extent that clause (ii) applies. An entity that engages in a business, trade, or profession shall be deemed to have a self-insured plan if it carries its own risk (whether by a failure to obtain insurance, or otherwise) in whole or in part.

(B) Repayment required

(i) Authority to make conditional payment

The Secretary may make payment under this subchapter with respect to an item or service if a primary plan described in subparagraph (A)(ii) has not made or cannot reasonably be expected to make payment with respect to such item or service promptly (as determined in accordance with regulations). Any such payment by the Secretary shall be conditioned on reimbursement to the appropriate Trust Fund in accordance with the succeeding provisions of this subsection.

(ii) Primary plans

*A primary plan, and an entity that receives payment from a primary plan, shall reimburse the appropriate Trust Fund for any payment made by the Secretary under this subchapter with respect to an item or service if it is demonstrated that such primary plan has or had a responsibility to make payment with respect to such item or service. A primary plan's responsibility for such payment may be demonstrated by a judgment, a pay-*

**1290**     380 FEDERAL SUPPLEMENT, 2d SERIES

*ment conditioned upon the recipient's compromise, waiver, or release (whether or not there is a determination or admission of liability) of payment for items or services included in a claim against the primary plan or the primary plan's insured, or by other means. . . .*

(iii) Action by United States

In order to recover payment made under this subchapter for an item or service, the United States may bring an action against any or all entities that are or were required or responsible (directly, as an insurer or self-insurer, as a third-party administrator, as an employer that sponsors or contributes to a group health plan, or large group health plan, or otherwise) to make payment with respect to the same item or service (or any portion thereof) under a primary plan. The United States may, in accordance with paragraph (3)(A) collect double damages against any such entity. In addition, the United States may recover under this clause from any entity that has received payment from a primary plan or from the proceeds of a primary plan's payment to any entity. . . .

(3) Enforcement

(A) Private cause of action

There is established a private cause of action for damages (which shall be in an amount double the amount otherwise provided) in the case of a primary plan which fails to provide for primary payment (or appropriate reimbursement) in accordance with paragraphs (1) and (2)(A).

42 U.S.C. § 1395y(b) (emphasis added).

[9]  Considering the provisions of the MSP together, there are three elements of

the MSP's private cause of action: (1) a primary plan, (2) that is responsible to pay for an item or service, and (3) that failed to make the appropriate payment to Medicare for the item or service. Although both plaintiffs and *amicus* spend most of their briefs attempting to establish that the MMA amendments render defendants "primary plans" under the MSP, defendants concede for the purposes of this motion that they are primary plans. Instead, defendants focus on the second element and assert that, as a matter of law, plaintiffs cannot allege that defendants are responsible to reimburse Medicare.[2]

Section 1395y(b)(2)(B)(ii), as amended by the MMA, requires a primary plan to reimburse Medicare "if it is demonstrated" that the primary plan "has or had a responsibility" to make payment for an item or service. Applying this language, it cannot be "demonstrated" that an alleged tortfeasor, which has neither been adjudicated as liable nor has agreed to settle a tort claim, "has" an existing "responsibility" to reimburse Medicare or "had" a previous responsibility to do so.

Additionally, section 1395y(b)(2)(B)(ii) defines how a primary plan's "responsibility" to pay can be "demonstrated" under the MSP. The language, which was also added by the MMA amendments, provides: "A primary plan's responsibility for such payment may be demonstrated by a judgment, a payment conditioned upon the recipient's compromise, waiver, or release (whether or not there is a determination or admission of liability) of payment for items or services included in a claim against the

2.  Paragraph 74 of plaintiffs' First Amended Complaint alleges: "As a result of their battery, each defendant was and is an entity which has or had a responsibility to pay for the costs of the health care services provided     to Medicare beneficiaries to treat their diseases attributable to smoking the defendants' cigarettes, within the meaning of the MSP statute." (Doc. 42, ¶ 74).

primary plan or the primary plan's insured, or *by other means.*" 42 U.S.C. § 1395y(b)(2)(B)(ii) (emphasis added). Defendants argue that plaintiffs "cannot identify any judgment, settlement, or similar resolution of their battery claims against defendants." (Doc. 58 at 22). While conceding that their battery claim against defendants has not yet been adjudicated and so far has not resulted in a judgment or settlement, plaintiffs respond that the "by other means" language of section 1395y(b)(2)(B)(ii) includes the ability to litigate the underlying tort claim as part of the MSP private right of action to secure reimbursement for Medicare payments.

[10] Considered in isolation, the plain meaning of the rather generic phrase "by other means" might be difficult to determine. However, read in context and applying accepted canons of statutory construction, the meaning can be ascertained. "If the statutory language is not entirely transparent, [courts] employ traditional canons of construction before reverting to legislative history to assist [them] in determining the meaning of a particular statutory provision ...." *Shotz v. City of Plantation,* 344 F.3d 1161, 1167 (11th Cir.2003) (quotations and citation omitted). "[U]nder the established interpretative canons of *noscitur a sociis* and *ejusdem generis,* where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Washington State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler,* 537 U.S. 371, 384, 123 S.Ct. 1017,

154 L.Ed.2d 972 (2003) (quoting *Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 114–15, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001)); *see also Baxter,* 345 F.3d at 906 (utilizing the canon of *ejusdem generis* to interpret different language in the MSP).

[11] Applying *ejusdem generis* here, the "by other means" language is preceded by specifically enumerated means by which a primary plan's responsibility to pay may be demonstrated: a judgment and "a payment conditioned upon the recipient's compromise, waiver, or release ... of payment for items or services included in a claim against the primary plan ..." (i.e., a settlement). In these situations, a primary plan has either been adjudicated as required to pay for medical services as to which Medicare is a secondary payer or has agreed to do so as part of a settlement. In either case, the obligation of the primary plan to make the payment has already been established. The "by other means" language in section 1395y(b)(2)(B)(ii) encompasses other instances of "like kind"[3] where there is a previously established requirement or agreement to pay for medical services for which Medicare is entitled to be reimbursed, which instances Congress chose not to try to exhaustively enumerate. The "by other means" language of section 1395y(b)(2)(B)(ii) does not encompass the unresolved, unestablished tort claim plaintiffs rely upon to demonstrate defendants' responsibility to reimburse Medicare.[4]

Neither in their briefing nor at oral argument were plaintiffs able to articulate how an unliquidated, unadjudicated tort

---

3. *Baxter,* 345 F.3d at 906.

4. The Court recognizes that section 1395y(b)(2)(B)(ii) provides that a primary plan's responsibility to reimburse Medicare *"may* be demonstrated" by a judgment, settlement, or other means. However, the use of

the word "may," when read in the context of the entirety of section 1395y(b)(2)(B)(ii), does not connote an ability to demonstrate responsibility to pay in a manner other than a judgment, settlement, or by other means of like kind.

claim fits within the language of the MSP when read in its full context. If Congress had meant to take the significant, additional step of allowing a plaintiff to try to prove a self-insured defendant's state law tort liability within an MSP private right of action, it would have explicitly said so.

In reaching this decision, the Court has carefully considered plaintiffs' various arguments in support of their interpretation of the MSP. First, plaintiffs rely heavily on the Eleventh Circuit's *Baxter* decision. In *Baxter*, the Eleventh Circuit reversed the district court's dismissal of the government's MSP claim against manufacturers of silicone breast implants that had established a settlement fund to dispose of a class action products liability suit. *Baxter*, 345 F.3d at 872. Although decided prior to the MMA amendments, the Eleventh Circuit adopted a definition of "self-insured plan" in line with the forthcoming MMA amendments. *See id.* at 898–99.[5] The *Baxter* court held that the government could maintain an MSP claim against the implant manufacturers for reimbursement of Medicare expenditures even though the manufacturers had already paid some of the settlement claims. *Id.* at 899–905. The court reasoned that "if the [manufacturer] [d]efendants had either knowledge or constructive knowledge that some of the recipients of the funds they were paying out had received breast implant-related medical treatment for which Medicare already paid, then the [manufacturer] [d]efendants would be liable to reimburse the [g]overnment pursuant to [the MSP]." *Id.* at 901–02. If the manufacturers' liability in *Baxter* had neither been adjudicated nor settled and the Eleventh Circuit had permitted an MSP claim

against the manufacturers, *Baxter* might be more supportive of plaintiffs' interpretation of the MSP. However, because the Eleventh Circuit in *Baxter* was dealing with an established settlement fund to pay breast implant claims clearly covered by the MSP as amended, it provides no support for plaintiffs' attempt to extend the MSP's reach to unliquidated tort claims.

Plaintiffs also argue that excluding alleged tortfeasors from the reach of the MSP's private cause of action would render that part of the statute superfluous. (Doc. 66 at 13–14). Noting that Medicare benefits are not excluded from tort damages under the common law collateral source rule, plaintiffs assert that "if tort liability had to be established in a separate lawsuit, there would never be a circumstance in which a primary plan failed to make a primary payment (for it would have been compelled to do so in the initial tort suit), and so the private right of action enacted by Congress could never be brought when a Medicare beneficiary was the victim of a tort." (Doc. 66 at 14). Even assuming, *arguendo*, plaintiffs' argument is correct, the MSP's private cause of action provision would not be rendered superfluous because a private cause of action is still available in other circumstances. *See Harris Corp. v. Humana Health Ins. Co. of Fla.*, 253 F.3d 598, 605–06 (11th Cir.2001) (holding that there is a private cause of action under the MSP "in cases involving the failure of an insurance plan to make its coverage primary to Medicare as required by the statute," such as when a private insurer denies "a timely claim for benefits based solely on [a Medicare beneficiary's] eligibility for Medi-

---

5.    In so holding, the court relied heavily on the definition of "self-insured plan" provided in the relevant regulations. *See Baxter*, 345 F.3d at 895 (quoting 42 C.F.R. § 411.50(b)). The

parties do not cite, and the Court could not locate, any regulations addressing the issue in this case.

care").[6]

Plaintiffs contend that, similar to a civil RICO claim, the tort claim here is a predicate element of an MSP claim which need not be established in a separate lawsuit. Plaintiffs correctly assert that there is no prior conviction requirement for the predicate acts that form the basis of a civil RICO claim. *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 493, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). Civil RICO claims, however, are based in part on the existence of a "pattern of racketeering activity." *See* 18 U.S.C. § 1962. "Racketeering activity" is in turn defined by a specific list of crimes "*chargeable* under State law" or "*indictable*" under federal law. *See* 18 U.S.C. § 1961(1) (emphasis added). For example, section 1961(1)(A) provides that "any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene material, or dealing in a controlled substance or listed chemical ... which is *chargeable* under State law" constitutes "racketeering activity." *Id.* (emphasis added). Thus, the RICO statute specifically provides for the establishment of the predicate acts within the RICO cause of action. By contrast, the MSP does not contain a list of "chargeable" predicate acts such as "battery" or "negligence" or other tort claims, but instead requires a primary plan's responsibility to pay to be "demonstrated" by a judgment, settlement, or other similar means. Thus, RICO is not analogous to the MSP.

Plaintiffs also argue that defendants' interpretation of the MSP effectively erases the provisions for government enforcement. The Fourth Circuit's decision in *Brown* belies this contention. In *Brown*, the first published federal appellate decision to address the MSP after the MMA amendments, a Medicare beneficiary who had recovered a settlement in a medical malpractice action argued that the MSP did not require her to reimburse Medicare out of her settlement proceeds because the defendant's self-insurance program did not qualify as a primary plan. *Brown*, 374 F.3d at 261. The Fourth Circuit rejected her argument and held that the MSP entitled Medicare to reimbursement from the settlement fund for the payments Medicare made for the plaintiff's medical care as a result of the malpractice. *Id.* at 262. The court reasoned that "the uncontroverted record evidence demonstrates that [the hospital] did have what MMA clarifies will suffice to constitute a self-insured 'primary plan'—an *ex ante* arrangement to pay for liability claims." *Id.* Because the plaintiff beneficiary was paid pursuant to this self-insured plan, Medicare was entitled to reimbursement. *Id.* The MSP, as amended by the MMA, allows Medicare to bring a cause of action against the beneficiary in such situations. *See* 42 U.S.C. § 1395y(b)(2)(B)(iii) ("[T]he United States may recover under this clause from any entity that has received payment from a primary plan or from the proceeds of a primary plan's payment to any entity."); *see also Baxter*, 345 F.3d at 901–03 (holding that the government stated a subrogation claim under the MSP based on allegations that the defendants had constructive knowledge that some of the recipients of payments from a tort settlement fund had received treatment for which Medicare had already paid).

---

**6.** Moreover, the purpose of the MSP is to reduce Medicare costs. *Baxter*, 345 F.3d at 874. A Medicare beneficiary that recovers from a self-insured tortfeasor for medical expenses that Medicare has paid is required to reimburse Medicare. 42 C.F.R. § 411.24(h) (2004) ("If the beneficiary or other party receives a third party payment, the beneficiary or other party must reimburse Medicare within 60 days.").

*Amicus* and plaintiffs also urge that adopting defendants' reading of the MSP would fly in the face of Congress's continuing expansion of the MSP regime. *See Baxter,* 345 F.3d at 877 ("Since enacting the MSP statute, Congress has expanded its reach several times, making Medicare secondary to a greater array of primary coverage sources, and creating a larger spectrum of beneficiaries who no longer may look to Medicare as their primary source of coverage."). This "expansion," reflected in both *Brown* and *Baxter,* allows for recovery under the MSP from tort settlements entered into by self-insured entities. Prior to the MMA clarifications, several courts, such as the Fifth Circuit in *Goetzmann,* did not allow for such a recovery. However, neither the language of the amended MSP nor the legislative history [7] support the expansion that plaintiffs seek.[8]

Plaintiffs' final argument is that a reading of the MSP as requiring a judgment, settlement, or other similar means of demonstrating responsibility of a primary plan to pay cannot be limited to alleged self-insured tortfeasors, but instead must apply to all types of primary plans. (Doc. 66 at 15–16). As an example, plaintiffs contend that if it is alleged that a group health plan is the primary payer, then the responsibility to pay will only arise after its duty to pay is established in a separate adjudication. Of course, the question of when a private party may bring an MSP claim

against a group health plan is not before the Court. That being said, there is an existing contractual relationship between the primary payer and the beneficiary in plaintiffs' example that does not exist between an alleged tortfeasor and a Medicare beneficiary. While plaintiffs are correct in asserting that this difference does not matter under the definition of a primary plan, *see* 42 U.S.C. § 1395y(b)(2)(A)(ii), it may well matter under the MSP's statement of how a primary plan's responsibility to pay may be demonstrated under 42 U.S.C. § 1395y(b)(2)(B)(ii). As previously discussed, the "by other means" language of this provision indicates other situations where a primary plan has either been required to pay for the item or services covered by the claim or has agreed to do so. A group health plan, unlike an alleged tortfeasor, has agreed *ab initio* to cover the beneficiary's health care costs. Thus, there is a difference, based on the language of the amended MSP, between a self-insured alleged tortfeasor and a preexisting group health care plan that agrees to provide primary health care coverage for a beneficiary.

Thus, plaintiffs may not maintain their MSP claim against defendants because they cannot "demonstrate" that these defendants are "responsible" to pay under the MSP. After conducting its own inde-

---

7.  *See infra,* pp. 1294–1299.

8.  Plaintiffs also assert that "if tort liability must be proved in a separate individual litigation, which for mass torts could require thousands of lawsuits, the advantage of the MSP action (whether by the government or a private attorney general) for securing a global reimbursement for Medicare would be lost." (Doc. 66 at 15 n. 14). Citing the district court in *Mason* for the proposition that "all of Medicare's overpayments due to a mass tort can be recovered in one MSP action," plaintiffs argue that dismissal of their MSP claim

would be "obviously at odds with the remedial purposes and scope of MSP." (*Id.*). That this is overstatement is shown by *Baxter,* where the government, by intervening in a class action tort claim after the settlement agreement had been reached, "sought to recover for medical bills it paid on behalf of Medicare beneficiaries who received treatment related to silicone breast implants." *Baxter,* 345 F.3d at 872. The *Baxter* court allowed the government, in one MSP action, to attempt to recover all of Medicare's expenditures related to a mass tort claim.

pendent analysis, the Court agrees with the Second Circuit's statement that the MMA amendments to the MSP "do not alter the principle ... that MSP liability attaches only to an entity that is required or responsible to pay under a 'primary plan' ..., a principle inapplicable to ... alleged tortfeasors." (Doc. 65, Ex. B) (quoting *Mason*, 346 F.3d at 42) (quotations omitted). The language of the MSP, as amended by the MMA, simply does not support plaintiffs' private cause of action where the underlying tort liability is unresolved and defendants' responsibility to pay Medicare has not been established by a judgment, settlement, or other means of "like kind." *Baxter*, 345 F.3d at 906.

### 2.  The Legislative History of the 2003 MMA Amendments

The Eleventh Circuit has instructed that "where the meaning of a statute is discernible in light of canons of construction, [courts] should not resort to legislative history or other extrinsic evidence." *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1225 (11th Cir.2001). However, plaintiffs and *amicus* insist that interpreting the MSP's language as the Court has would nullify Congress's intent in enacting the MMA amendments. (Doc. 72 at 3–8). Thus, the Court will review the legislative history of the 2003 MMA amendments to the MSP only to determine whether there is such history contrary to the Court's reading of the MSP.

Before examining the legislative history, the Court notes that while the MMA amendments to the MSP are the focus of this litigation, amending the MSP was not Congress's primary focus in enacting the MMA. *See* Pub.L. No. 108–173, 117 Stat. 2066 (2003). The MMA included, among other significant changes to the Medicare program, the addition of voluntary prescription drug coverage. *Id.* Indeed, while

the legislative history of the MMA is voluminous, the parties cite and the Court could locate only scant legislative history addressing the MMA amendments to the MSP.

Prior to the MMA's enactment, the government unsuccessfully sought to recover Medicare expenditures under the MSP in cases involving settled tort claims. *See Thompson v. Goetzmann*, 315 F.3d 457, 469–70 (5th Cir.2002) (holding that the government could not recover under the MSP based upon a beneficiary's settlement of a products liability claim with a manufacturer); *Fanning v. United States (In re Orthopedic Bone Screw Prods. Liab. Litig.)*, 202 F.R.D. 154, 163–69 (E.D.Pa.2001) (government could not recover under the MSP based upon the settlement of a class action tort claim against an orthopedic bone screw manufacturer); *Brown v. American Home Prods. Corp. (In re Diet Drugs)*, Nos. MDL 1203, CIV.A. 99–20593, 2001 WL 283163, at *9–12 (E.D.Pa. Mar.21, 2001) (government could not recover under the MSP from a settlement fund established as a result of a mass tort claim). These cases based their conclusions on two portions of the MSP: the definition of a "self-insured plan" and the language allowing Medicare to be reimbursed for expenditures that were made when a primary plan was "reasonably expected" to pay "promptly." *See Goetzmann*, 315 F.3d at 460–68. With respect to their "self-insured plan" holdings, these courts required an "entity's *ex ante* adoption, for itself, of an arrangement for (1) a source of funds and (2) procedures for disbursing these funds when claims are made against the entity." *Id.; see also Fanning*, 202 F.R.D. at 166; *American Home Prods. Corp.*, 2001 WL 283163, at *10. As for their reliance on the MSP's use of "promptly," these courts reasoned that:

Given the time delay inherent in strongly prosecuted and defended tort litigation, the Government cannot legitimately assert that a settlement arrived at in the heat of a hard fought adversarial engagement for alleged tort liability from a defective product is the type of insurance 'plan' that the Government can reasonably expect to make prompt payment for medical care.

*Goetzmann*, 315 F.3d at 467–68 (quoting *Fanning*, 202 F.R.D. at 167);[9] *see also American Home Prods. Corp.*, 2001 WL 283163, at *11 n. 20.

It is clear from the legislative history that it was these holdings that the MMA amendments to the MSP were meant to address. The House Committee on Ways and Means July 15, 2003 report gave the following reasons for the amendments:

Recent court decisions such as *Thompson v. Goetzmann* resulted in a narrow interpretation of the statutory reference to "promptly." Liability insurers would have been able to draw out their settlements and avoid repaying Medicare for payment of medical expenses. Moreover, firms that self-insure for product liability would have been able to avoid paying Medicare for past medical payments related to the claim.

H.R. Rep. 108–178(II) (2003). The committee report further explained the MMA amendments:

The Secretary would be able to make a Medicare payment if a [payment from a primary plan] has not been made or cannot reasonably be expected to be

made promptly.... This payment would be contingent on reimbursement by the primary plan to the Medicare Trust Funds.

The list of primary plans for which conditional payment could be made would be expanded; an entity engaging in a business, trade, or profession would be deemed as having a self-insured plan if it carries its own risk. Failure to obtain insurance would be required as evidence of carrying risk. A primary plan, as well as an entity that receives payment from a primary plan, would be required to reimburse the Medicare Trust Funds for any payment made by the Secretary if the primary plan was *obligated to make payment.*

*Id.* (emphasis added).[10]

The legislative history also includes two relevant statements by the Department of Justice ("DOJ"). Before the House Ways and Means Committee on July 17, 2003, William H. Jordan, Senior Counsel to the Assistant Attorney General for the Civil Division, testified in favor the MMA amendments to the MSP:

Finally, I would like to restate the Department's support for section 301 of H.R. 1, the 'Medicare Prescription Drug and Modernization Act of 2003,' which would protect the integrity of the Medicare Trust Fund by clarifying that Medicare must be reimbursed *whenever another insurer's responsibility to pay has been established.* This section is consistent with the litigation positions taken by this Department and the Department

---

9. On petition for rehearing, the Fifth Circuit withdrew its prior opinion with respect to its "prompt payment" holding but adhered to its "self-insured plan" holding. *Goetzmann*, 337 F.3d at 492–93. The court noted, however, that it "remain[ed] convinced that the plain language of the MSP statute makes the reasonable expectation of prompt payment a re-

quirement for the government's collection from those 'primary plans' listed in [the MSP]." *Id.* at 492.

10. The November 21, 2003 conference report adopts the same interpretation of the MMA amendments. *See* H.R. Conf. Rep. 108–391 (2003).

GLOVER v. PHILIP MORRIS USA          **1297**
Cite as 380 F.Supp.2d 1279 (M.D.Fla. 2005)

of Health and Human Services in numerous court cases.

Congress enacted the Medicare Secondary Payer ("MSP") statute in 1980 to protect the fiscal integrity of the Medicare program by making Medicare a secondary, rather than a primary, payer of health benefits. To ensure that Medicare would be secondary, Congress precluded it from making payment when a primary plan has already made payment or can reasonably be expected to pay promptly. *Congress recognized, however, that in contested cases, payments under such plans would be delayed.* To protect providers, suppliers, and beneficiaries, Congress authorized Medicare to make a "conditional" payment when prompt resolution of a claim cannot reasonably be expected. The Medicare Trust Fund must be reimbursed, however, *once the primary insurer's obligation to pay is demonstrated.*

Some recent court decisions have held, however, that Medicare has no right to reimbursement unless the primary insurer could reasonably have been expected to make prompt payment at the outset. *See, e.g., Thompson v. Goetzmann,* 315 F.3d 457 (5th Cir.2002); *Fanning v. United States,* 202 F.R.D. 154 (E.D.Pa.2001). These rulings make the statute's reimbursement mechanism inoperative in some jurisdictions. Section 301 of this legislation would end this costly litigation and provide clear legislative guidance regarding Medicare's status as a secondary payer of health benefits....

*Waste, Fraud, and Abuse: Hearing Before the House Comm. on Ways and Means,* 108th Cong. 88 (2003) (statement of William H. Jordan, Senior Counsel to the Asst. Atty. Gen.), *available at* 2003 WL 21667339 (emphasis added). The second DOJ statement is a letter from the Office

of Legislative Affairs that was read into the congressional record during debate in the Senate. This letter, written by Assistant Attorney General William E. Moschella and addressed to the Chairman of the House Committee on Energy and Commerce, stated that the MMA amendments to the MSP clarify "that Medicare must be reimbursed whenever another insurer's responsibility to pay *has been established.*" 149 Cong. Rec. S8499, S8535 (daily ed. June 25, 2003). Mr. Moschella's letter echoes Mr. Jordan's statement that "[t]he Medicare Trust Fund must be reimbursed . . . *once the primary insurer's obligation to pay is demonstrated.*" *Id.* (all emphasis supplied).

Thus, the legislative history does not support the idea that the 2003 amendments to the MSP create the cause of action plaintiffs attempt to allege in their First Amended Complaint. First, only two cases are mentioned in the legislative history (*Goetzmann* and *Fanning* ), both of which involved the government's efforts to recover, under the MSP, proceeds of a settlement in a tort case. Absent from both the committee reports and the DOJ's statements is any reference to the *Philip Morris* or *Mason* cases. Second, the DOJ viewed the amendments as requiring reimbursement only after "responsibility to pay has been established." Finally, there is no statement anywhere in the legislative history indicating that the amendments were meant to subject an alleged tortfeasor—an entity that has neither settled a tort claim nor been adjudicated as responsible for the Medicare beneficiary's injuries—to a private right of action under the MSP for double damages. The absence of legislative history supporting plaintiffs' interpretation of the MSP is more significant when one considers the consequences of plaintiffs' position, namely that virtually every state law tort claim involving a Medicare beneficiary would become a federal lawsuit

**1298**          **380 FEDERAL SUPPLEMENT, 2d SERIES**

for double damages under the MSP. It is unlikely that Congress intended to create such a cause of action under the MSP but failed to mention anything about it in the legislative history.

Senator Grassley, appearing as *amicus,* argues that the "notion that an alleged tortfeasor may not be sued under the MSP is wrong, and should be rejected." (Doc. 72 at 8). The Court has the utmost respect for Senator Grassley and acknowledges his expertise in this area. Nevertheless, the position Senator Grassley espouses in his brief is unsupported in the legislative history. Senator Grassley cites, and the Court could locate, only one statement made by the Senator in support of the 2003 amendments:

> While the False Claims Act is one of our best weapons in the war on fraud and abuse, our policies in this new language of the title III conference agreement adds still more weapons to our arsenal. First, we make important technical clarifications to existing law that strengthen and improve what is known as the secondary payer statute. The purpose of the statute is to ensure that Medicare pays first for seniors' medical needs when other sources should be, in fact, paying instead of the taxpayer paying.

> These other sources include, for instance, employer coverage. In addition, when a Medicare beneficiary is injured by wrongful conduct of another entity, that entity's liability insurance or the entity itself, if it has no insurance, or it might be self-insured, is always required to pay first instead of having the taxpayers pay. The provisions in title III do not change existing law in this area but, in fact, clarify the intent of Congress in protecting Medicare's resources.

149 Cong. Rec. S15574, S15584–S15585 (daily ed. Nov. 22, 2003) (statement of Senator Grassley).[11] This statement does not address the cause of action plaintiffs attempt to bring in this case and is consistent with the Court's interpretation of the MSP's language. Moreover, the Court is not permitted to accept Senator Grassley's statements in his *amicus* brief that Congress intended to create the cause of action plaintiffs assert here when neither the wording of the statute nor the legislative history supports that construction. *See Blanchette v. Connecticut Gen. Ins. Corps.,* 419 U.S. 102, 132, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974) (holding that the post-passage remarks of Congressmen, in both oversight hearings and an *amicus* brief, were irrelevant to the statutory construction question because "post-passage remarks of legislators, however explicit, cannot serve to change the legislative intent of Congress"). Thus, the legislative history provides no clear indication that Congress, by enacting the 2003 amendments to the MSP, intended to create a private cause of action based on unadjudicated and unresolved tort claims. Indeed, if anything, the legislative history is supportive of the Court's reading of the statute.

### IV.  Conclusion

The Court has endeavored to avoid the competing public policy arguments the parties have made as to why the MSP should be interpreted as that respective party suggests. It is not for this Court to decide the appropriate scope of the MSP; that is for Congress. The Court has simply attempted to apply the words of this complex statute, in context, to the allegations of plaintiffs' First Amended Complaint.

Accordingly, it is hereby **ORDERED:**

---

**11.** This statement is also the only legislative    history cited by plaintiffs.

Defendants' Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (Doc. 57) is **GRANTED WITH PREJUDICE.** The Clerk shall enter judgment in favor of defendants Philip Morris USA and Liggett Group, Inc. and close the file.[12]



**Carlos WARTER, Carolina Warter, and Gulden, S.A., a Uruguayan corporation, Plaintiffs,**

v.

**BOSTON SECURITIES, S.A., an Argentine Corporation, Fleet National Bank, N.A., Mario Rossi, Eduardo Scuderi, Xavier Capdevielle, Patricio Pusso and the International Bank of Miami, N.A., Defendants.**

Nos. 03–81026–CIV–RYSKAMP, 03–81026–CIV–VITUNAC.

United States District Court, S.D. Florida.

Dec. 15, 2004.

**Background:** United States citizen, his wife, and their wholly owned Uruguayan company, brought state-court action against Argentine securities brokerage, majority owner of brokerage, individual broker, and others, alleging fraud and related torts in connection with alleged embezzlement of funds invested with brokerage. Defendants removed pursuant to Edge Act. The District Court, 2004 WL 691787, Ryskamp, J., denied investors' motion to remand, and denied in part defendants' motions to dismiss. Defendants moved for dismissal on grounds of forum non conveniens.

**Holdings:** The District Court held that:

(1) Argentina was adequate alternative forum;

(2) private interests weighed in favor of dismissal; and

(3) public interests also weighed in favor of dismissal.

Motion granted.

**1. Federal Courts** ⟨key⟩45

Movant seeking dismissal on forum non conveniens grounds must demonstrate that: (1) adequate alternative forum is available; (2) public and private factors weigh in favor of dismissal; and (3) plaintiff can reinstate his suit in alternative forum without undue inconvenience or prejudice.

**2. Federal Courts** ⟨key⟩818

Court of Appeals reviews for abuse of discretion district court's dismissal on forum non conveniens grounds.

**3. Federal Courts** ⟨key⟩45

Adequacy of alternative forum requirement for dismissal on forum non conveniens grounds usually is satisfied when defendant is amenable to process in other jurisdiction; alternative forum is inadequate when remedy it affords is clearly unsatisfactory or is essentially no remedy at all.

**4. Federal Courts** ⟨key⟩45

Defendant's submission to jurisdiction of alternate forum renders that forum available for purposes of forum non conveniens analysis.

---

**12.** Ordinarily, the Court would grant plaintiffs leave to amend their complaint. However, plaintiffs' counsel stated at oral argument that the issue presented by defendants' motion to dismiss is dispositive and could not be cured by amendment. Thus, dismissal with prejudice will expedite plaintiffs' ability to appeal this decision.

# EXHIBIT 3

107a

## UNITED STATES COURT OF APPEALS

### FOR THE SECOND CIRCUIT

At a stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, Foley Square, in the City of New York, on the        day of January, two thousand four.

PRESENT:  HONORABLE JON O. NEWMAN,
HONORABLE ROSEMARY S. POOLER,
HONORABLE ROBERT A. KATZMANN,
Circuit Judges.

------------------------------------------------

JAMES MASON, BILLIE JUNE RICHIE and GLENN BAILEY, individually and on behalf of a class of all others similarly situated,

    Plaintiffs-Appellants,

       v.                                        02-7923

THE AMERICAN TOBACCO COMPANY, R.J. REYNOLDS TOBACCO COMPANY, BROWN & WILLIAMSON TOBACCO CORP., PHILIP MORRIS INCORPORATED, LORILLARD TOBACCO COMPANY, LORILLARD INC., UNITED STATES TOBACCO COMPANY, LIGGETT GROUP INC., LIGGETT & MYERS, INC., and BROOKE GROUP LTD.,

    Defendants-Appellees.

------------------------------------------------

### ORDER

#### (Filed Jan. 16, 2004)

The Plaintiffs-Appellants have submitted a letter dated November 25, 2003, suggesting that this Court's opinion be withdrawn, the judgment reversed, and the case remanded because of the imminent enactment of amendments to the Medicare as Secondary Payer statute.

W0C2A7758

108a

By letter dated December 8, 2003, the Plaintiffs-Appellants submitted a supplemental letter, advising that the legislation making the amendments previously referred to has been signed by the President. By letter also dated December 8, 2003, the Defendants-Appellees oppose the request of the Plaintiffs-Appellants.

Initially, we point out that correspondence is not the appropriate procedure for seeking relief from an appellate court, except in those limited circumstances where the court has explicitly invited letter requests. Normally, relief should be requested by motion.

Treating the Plaintiffs-Appellants' letters as a motion to recall the mandate, which was issued on December 15, 2003, the motion is DENIED. As the Defendants-Appellees point out, the new amendments clarify only that an entity "shall be deemed to have a self-insured plan if it carries its own risk (whether by a failure to obtain insurance or otherwise)," but do not alter the principle, previously recognized, that "MSP liability attaches only to an entity that is required or responsible to pay under a 'primary plan,'" *Mason v. American Tobacco Co.*, 346 F.3d 36, 42 (2d Cir. 2003), a principle inapplicable to the alleged tortfeasors in this case.

It is hereby ORDERED that the Plaintiffs-Appellants' request to withdraw the previously issued opinion in this case is DENIED.

FOR THE COURT,
ROSEANN B. MacKECHNIE, Clerk

By /s/ Chandella Armstrong
       Chandella L. Armstrong,
       Deputy Clerk

W0C2A77S9

# EXHIBIT 4

**U.S. v. PHILIP MORRIS INC.**
Cite as 156 F.Supp.2d 1 (D.D.C. 2001)

1

UNITED STATES of America,
Plaintiff,

v.

PHILIP MORRIS INCORPORATED,
et al., Defendants.

No. CIV. A. 99–2496(GK).

United States District Court,
District of Columbia.

July 27, 2001.

Government brought suit against nine tobacco companies and two related entities to recover health care expenditures that government has paid for or will pay for to treat tobacco-related injuries allegedly caused by defendants' tortious conduct, and to disgorge the proceeds of that unlawful conduct. Defendants moved to dismiss one count, which alleged that government could recover under the Medicare Secondary Payer provisions, for failure to state a claim. The District Court, Kessler, J., held that tobacco companies were not "self-insured" entities within the meaning of the Medicare Secondary Payer (MSP) provisions, which make Medicare a secondary payer when another entity is required to pay under a primary plan, including a self-insured plan, for an individual's health care, and thus, government failed to state claim under the MSP provisions.

Motion granted.

1. Federal Civil Procedure ⚚1773

Complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. Fed. Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

2. Federal Civil Procedure ⚚1831, 1835

At the motion to dismiss stage, the only relevant factual allegations are plaintiff's, and they must be presumed to be true. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

3. Federal Civil Procedure ⚚1835

In ruling on motion to dismiss for failure to state a claim, court may not accept legal conclusions cast in the form of factual allegations or inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

4. Social Security and Public Welfare ⚚241.10

Tobacco companies, which were being sued by the government to recover health care expenditures that government has paid for to treat tobacco-related injuries, were not "self-insured" entities within the meaning of the Medicare Secondary Payer provisions, which make Medicare a secondary payer when another entity is required to pay under a primary plan, including a self-insured plan, for an individual's health care, even though tobacco companies allegedly knew of the potential liability arising from risks associated with their products, where there were no allegations that tobacco companies engaged in the same sorts of underwriting procedures that insurance companies employ, or that they maintained fund or reserve to cover possible losses or had procedure for considering claims and for managing the reserve. Social Security Act, § 186(b)(2)(A), as amended, 42 U.S.C.A. § 1395y(b)(2)(A).

See publication Words and Phrases for other judicial constructions and definitions.

Sharon Y. Eubanks, U.S. Department of Justice, Washington, DC, for United States Department of Justice.

**2**        **156 FEDERAL SUPPLEMENT, 2d SERIES**

Peter Thomas Grossi, Jr., Jonathan Louis Stern, Arnold & Porter, Washington, DC, Cynthia S. Cecil, Hunton & Williams, Richmond, VA, Timothy M. Broas, Winston & Strawn, Washington, DC, Dan K. Webb, Bradley E. Lerman, Ricardo E. Ugarte, Kevin J. Narko, Luke A. Palese, Winston & Strawn, Chicago, IL, Herbert M. Wachtell, Ben M. Germana, Steven M. Barna, Jeffrey M. Wintner, Wachtell, Lipton, Rosen & Katz, New York City, C. Ian Anderson, Davis, Polk & Wardwell, New York City, Robert M. Rader, Debevoise & Plimpton, New York City, for Philip Morris Inc.

Robert Francis McDermott, Jr., Jonathan M. Redgrave, Jones, Day Reavis & Pogue, Washington, DC, Robert C. Weber, Paul Crist, Jones, Day, Reavis & Pogue, Cleveland, OH, Nicholas N. Nierengarten, Gray, Plant, Mooty, Mooty & Bennett, PA, Minneapolis, MN, Robert M. Rader, Debevoise & Plimpton, New York City, Ivan C. Smith, Jone, Day, Reavis & Pogue, Columbus, OH, for R.J. Reynolds Tobacco Co.

William Charles Hendricks, III, Andrew McCormack, King & Spalding, Washington, DC, David M. Bernick, Kirkland & Ellis, Chicago, IL, Kenneth N. Bass, Jason Beckerman, David Mendelson, David Sullivan, Kirkland & Ellis, Washington, DC, Stephen R. Patton, Kirkland & Ellis, Chicago, IL, Douglas G. Smith, Michelle H. Browdy, Chicago, IL, for Brown & Williamson Tobacco Corp.

*MEMORANDUM OPINION–*
*ORDER # 72*

KESSLER, District Judge.

**I.  Introduction**

The United States of America ("Plaintiff" or "the Government") brought suit against nine tobacco companies and two related entities (collectively "Defendants")[1] to recover health care expenditures the Government has paid for or will pay for to treat tobacco-related injuries allegedly caused by Defendants' tortious conduct, and to disgorge the proceeds of that unlawful conduct.

The Court previously dismissed Count One (the Medical Care Recovery Act or "MCRA" Count) and Count Two (the Medicare Secondary Payer provisions or "MSP" Count) of the Government's original complaint, *United States v. Philip Morris*, 116 F.Supp.2d 131 (D.D.C.2000) ("*Philip Morris*" or the "Memorandum Opinion"); dismissed Defendant B.A.T. Industries p.l.c. ("BAT Ind.") for lack of personal jurisdiction, *United States v. Philip Morris*, 116 F.Supp.2d 116 (D.D.C.2000); and denied the Government's request to reconsider the dismissal of BAT Ind. *United States v. Philip Morris*, 130 F.Supp.2d 96 (D.D.C.2001).

The Government subsequently filed an amended complaint, which added a revised Count Two (the MSP Count).[2] Defendants moved to dismiss that Count pursuant to Fed.R.Civ.P. 12(b)(6) for failure to

---

1. The initial eleven Defendants were: Philip Morris, Inc., R.J. Reynolds Tobacco Co., Brown & Williamson Tobacco Co., Lorillard Tobacco Company, The Liggett Group, Inc., American Tobacco Co., Philip Morris Cos., B.A.T. Industries p.l.c. ("BAT Ind."), British American Tobacco (Investments) Ltd., The Council for Tobacco Research—U.S.A., Inc., and The Tobacco Institute, Inc. BAT Ind. has since been dismissed from this action.

2. Prior to filing its amended complaint, the Government filed a Motion to Limit Court's Order Dismissing Count One of Complaint to Claims for Payments Under Medicare and FEHBA. This Motion is disposed of in a separate Memorandum Opinion, to be issued this same day.

state a claim.[3] Upon consideration of Defendants' Motion, the Opposition, the Reply, and the entire record herein, Defendants' Motion to Dismiss Count Two of the Amended Complaint [# 272] is granted. The Government shall not be permitted to further amend its complaint with respect to the MSP Count.

Neither this ruling nor the companion ruling on Defendants' Motion to Amend changes the current posture of the case. The parties are proceeding with extensive discovery and are preparing for trial.

## II.  Standard of Review

[1, 2] The legal standard for judging the adequacy of a complaint is well established. A "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 654, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999). At the motion to dismiss stage, "the only relevant factual allegations are the plaintiffs'," and they must be presumed to be true. *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1506 (D.C.Cir.1984), *vacated on other grounds*, 471 U.S. 1113, 105 S.Ct. 2353, 86 L.Ed.2d 255 (1985); *Shear v. National Rifle Ass'n of Am.*, 606 F.2d 1251, 1253 (D.C.Cir.1979).

[3] However, a court may not "accept legal conclusions cast in the form of factual allegations" or "inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint." *Western Assocs. Ltd. Partnership v. Market Square Assocs.*, 235 F.3d 629, 634 (D.C.Cir.2001) (citing *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C.Cir.1994)) (internal quotations omitted); *see also Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (holding that courts "are not bound to accept as true a legal conclusion couched as a factual allegation").

## III.  Analysis

### A.  Overview of the Medicare Secondary Payer Provisions

The Medicare Secondary Payer provisions ("MSP"), a series of amendments to Medicare enacted in 1980 and further amended thereafter,[4] provide the Government with statutory authority to obtain reimbursement for certain Medicare expenditures. MSP essentially makes Medicare a "secondary" payer where another entity is required to pay under a "primary plan" for an individual's health care. *See* 42 U.S.C. § 1395y(b)(2).

Under certain circumstances, the Government may make a conditional payment "with respect to [an] item or service" provided for an injured Medicare recipient and then, if not reimbursed, may "bring an action against [the] entity which is required or responsible (directly, as a third-party administrator, or otherwise) to make payment with respect to such item or service (or any portion thereof) *under a primary plan . . .*" 42 U.S.C. § 1395y(b)(2)(A) and (B)(ii) (emphasis added).[5]

---

3.  The Motion was filed on behalf of all current Defendants except for Liggett Group, Inc., which timely joined the Motion.

4.  Pub.L. No. 97–35, § 988, 95 Stat. 604 (1981).

5.  In addition to bringing suit against the entity "which is required or responsible . . . to make payment . . . under a primary plan," the Government may also pursue a secondary entity, such as a "physician or provider," which has received payment from the primary ("required or responsible") entity. 42 U.S.C.

A "primary plan" is defined in the statute as "a group health plan or large group health plan, ... a workmen's compensation law or plan, an automobile or liability insurance policy or plan (*including a self-insured plan*) ..." 42 U.S.C. § 1395y(b)(2)(A) (emphasis added). As stated in the Memorandum Opinion, it is this last phrase ("self-insured plan") from which the Government draws its legal support for the MSP Count.

**B.  Whether the Amended MSP Count States a Claim**

[4] In dismissing the MSP Count as alleged in the original complaint, the Court explained that "[a]lthough MSP ... allows the Government to bring suit against non-insurance entities required to pay for health care costs under a 'self-insured plan,' the Government's complaint contains no allegation that Defendants have at any time maintained a 'self-insured plan,' as that term is defined by MSP and the relevant regulations." *Philip Morris*, 116 F.Supp.2d at 135.[6] The Court also determined that the Government was attempting to improperly use the MSP statute as "an across-the-board procedural vehicle for suing tortfeasors." *Id.*

In response, and with the intention of revitalizing its MSP claim, the Government amended Count Two of its complaint, adding four paragraphs and nine pages thereto. The amended complaint contains a number of new allegations, including that:

- "[i]n the first half of the 1900's, Defendants apparently chose a plan of insurance under which they were entirely self-insured against liability arising from their manufacture, sale, and promotion of tobacco products." Am. Compl. ¶ 167a.

- certain research reports on the dangers of tobacco use published in the 1940's and 1950's "prompted Defendants to explore the possibility of obtaining liability insurance coverage for the harms caused by tobacco products." Am. Compl. ¶ 167b.

- in 1957, an individual with "Corporate Insurance Services, Inc." "predicted" that the tobacco industry would need "catastrophe protection" "in the next ten year period." Am. Compl. ¶ 167c, e.

- "at least some Defendants resisted purchasing insurance coverage through the early 1960's," and one Defendant (R.J. Reynolds Tobacco Co.) wrote to a shareholder in 1963 that it has "never carried [products liability] insurance but [has] chosen to be self-insurers in this field." Am. Compl. ¶ 167f.

- "in the mid–1960's, Defendants obtained, in earnest, insurance policies that explicitly insured against the risks of injury from their tobacco products." Am. Compl. ¶ 167h.

- Defendants discussed "[d]eveloping a plan of insurance and self-insurance" and at some point in the past "had considered an industry insurance company" but "declined to go that route." Am. Compl. ¶ 167k.

Relying on these new allegations, the Government concludes in its amended complaint that Defendants "recognized the

---

§ 1395y(b)(2)(B)(ii). However, since this provision is not relevant in this case, its mention will be hereafter omitted.

**6.** Technically, the pertinent statutory question on which the MSP Count turns, for purposes of this Opinion, is whether Defendants "are required or responsible" "to make payment" "under" "a self-insured plan." 42 U.S.C.

§ 1395y(b)(2)(A) and (B)(ii). To avoid repeatedly stating this somewhat contorted question (which is itself an abbreviated version of the statutory language), this Opinion will instead discuss the issue in terms of whether Defendants "maintain a self-insured plan."

**U.S. v. PHILIP MORRIS INC.**
Cite as 156 F.Supp.2d 1 (D.D.C. 2001)

**5**

risks associated with their manufacture, sale, and promotion of tobacco products," "considered the possibility of insuring against such risks through contract, agreement, or arrangement with one another, and[/]or, third party insurers," and "made the business decision" to "obtain partial third party insurance" and/or to "self-insure, in whole or in part," against those risks. Am. Compl. ¶ 167I.

In contrast to the original MSP Count, the amended count does assert that Defendants have maintained "plans of self-insurance"—an allegation which is necessary, at a bare minimum, to state an MSP claim.[7] *See Philip Morris*, 116 F.Supp.2d at 145–46 (stating that original complaint "[did] not allege, in even the most conclusory fashion, the existence of any 'primary plan' under which Defendants pay health care costs" and that even if it had, "it fail[ed] to allege, or even suggest, that Defendants specifically maintain any form of *self-insured* plan") (emphasis in original). Defendants, however, argue that the Government is once again attempting to use MSP as a means of proceeding against them as tortfeasors, rather than as insurers, and that the allegations contained in the amended complaint are still insufficient to state a claim.

MSP liability attaches only to an entity that is "required or responsible" to pay under a "primary plan." *See* 42 U.S.C. § 1395y(b)(2). MSP defines the term "primary plan" as "a group health plan[,] large group health plan, . . . a workmen's com-

pensation law or plan, an automobile or liability insurance policy or plan (including a self-insured plan) or no fault insurance" 42 U.S.C. § 1395y(b)(2)(A). As is apparent, the phrase "self-insured plan" is a limited type of "primary plan," and of the eight types of plans named in the statute, it is the only one to be relegated to a parenthetical phrase. Perhaps not surprisingly, the statute has apparently never been successfully used to pursue a non-insurance entity.[8] Indeed, "[c]ourts have uniformly recognized that the statute's clear purpose was to grant the Government a right to recover Medicare costs from insurance entities." *Philip Morris*, 116 F.Supp.2d at 146 n. 22 (citing cases).

On the other hand, there is certainly no indication that the phrase "self-insured plan" was meant to be, or should be viewed as, superfluous. Under the appropriate circumstances, the statutory inclusion of that phrase will permit the Government to pursue noninsurance entities under MSP. *See id.* at 146 (noting that "the typical factual scenario" is that MSP is used to "seek recovery from entities that are unquestionably providers of insurance"). To the extent that the literal language of certain decisions seems to suggest otherwise, *see, e.g., Health Ins. Ass'n of Am. v. Shalala*, 23 F.3d 412, 427 n. * (D.C.Cir.1994) ("[T]he MSP statute plainly intends to allow recovery only from an insurer.") (Henderson, J., concurring), it is apparent that those courts simply were not faced with a factual sce-

---

7. In the only passage where it uses the words "self-insured" and "plan" together, the amended complaint describes the terms of a products liability policy purchased by one Defendant, and then in the next sub-paragraph asserts that "[o]ther Defendants had similar plans of insurance and self-insurance." Am. Compl. ¶ 167g-i. Viewing the complaint in its most favorable light, the amended MSP Count strongly implies, though it might not clearly

articulate, that Defendants maintain a "self-insured plan," so as to subject them to liability under the statute.

8. The Government has identified only one case in which the statute has been used in this way, and in that case, the plaintiff (a private entity) has not (yet) been successful. *See Philip Morris*, 116 F.Supp.2d at 146 n. 22.

**6**          **156 FEDERAL SUPPLEMENT, 2d SERIES**

nario in which the term "self-insured plan" was analytically relevant.[9]

To explicate the meaning of the term "self-insured plan," as it is used in MSP, it is necessary to look at various interpretative sources, particularly the one which both parties agree is highly relevant: the regulations and comments issued by the Health Care Financing Administration ("HCFA") which administers Medicare. HCFA has concluded that "the mere absence of insurance purchased from a carrier does not necessarily constitute a 'plan' of self-insurance." Medicare as Secondary Payer and Medicare Recovery Against Third Parties, 54 Fed.Reg. 41716, 417272 (Oct. 11, 1989). Rather, HCFA regulations, when considered in tandem, define the term "self-insured plan" as an "arrangement, oral or written . . . to provide health benefits or medical care or [to] assume legal liability for injury or illness" under which an entity "carries its own risk instead of taking out insurance with a carrier." See 42 C.F.R. §§ 411.21 (defining the term "plan") and 411.50(b) (defining the term "self-insured plan").

The requirements for such an "arrangement" have been spelled out in various cases and treatises. HCFA itself has ruled that "[o]ne of the conditions for a self-insurance program is that the provider must establish a fund with an independent fiduciary which is documented by a written agreement that includes legal responsibilities and obligations required by State laws." Mt. Diablo Med. Ctr. v. Blue Cross & Blue Shield Ass'n, Dec. No. 96–D40, 1996 WL 862610, at *6 (P.R.R.B. July 1, 1996). One of the leading treatises on insurance law has adopted the same basic approach:

> To meet the conceptual definition of self-insurance, an entity would have to en-

gage in the same sorts of underwriting procedures that insurance companies employ; estimating likely losses during the period, setting up a mechanism for creating sufficient reserves to meet those losses as they occur, and, usually, arranging for commercial insurance for losses in excess of some stated amount.

1 Couch on Insurance 3d 1:1 (1997), quoted approvingly in In re Diet Drugs Prods. Liab. Litig., No. MDL 1203, C.A. No. 99–20593, 2001 WL 283163, at *10 (E.D.Pa. Mar.21, 2001). "It is implicit in the term, 'self-insurer,' that such person maintains a fund, or a reserve, to cover possible losses, from which it pays out valid claims, and that the self-insurer have a procedure for considering such claims and for managing that reserve." Alderson v. Insurance Co. of N. Am., 223 Cal.App.3d 397, 273 Cal. Rptr. 7, 13 (1990).

Clearly, the amended complaint does not allege any of the requirements delineated above. It does not allege the existence of reserves or procedures for establishing and calculating them; of claims-handling procedures; of a fiduciary (or other independent body) to perform these tasks; or of written documents allocating legal responsibilities and obligations. Conceding that such requirements must ultimately be proven at trial to establish MSP liability, the Government takes the position that they need not be included in the complaint. See Gov't's Mem. of Points and Auth. in Supp. of its Opp'n to Defs.' Mot. to Dismiss Count Two of Am. Compl. ("Gov't Opp'n") at 19.

What, then, does the Government assert must be alleged to state an MSP claim? At an early point in its brief, the Government appears to argue that it need only allege that Defendants are "required or

---

**9.** For example, in Health Ins. Ass'n. the issue was whether HCFA exceeded its statutory au-

thority in promulgating certain MSP-related regulations.

**U.S. v. PHILIP MORRIS INC.**    **7**
Cite as 156 F.Supp.2d 1 (D.D.C. 2001)

responsible" to pay for an injured party's medical expenses under a "primary plan." *See* Govt's Opp'n at 3 ("To plead an MSP claim, the United States need only allege...."). To the extent that this is the Government's argument, however, it has already been squarely rejected and warrants no further response. *See Philip Morris*, 116 F.Supp.2d at 145–46 (acknowledging that the original complaint alleged that Defendants are "required or responsible ... to make payment," and holding that this allegation was insufficient to state a claim).

In another part of its brief, the Government contends that because Defendants are "sophisticated corporations, undeniably aware of the liability risks posed by their products, making business decisions concerning insurance against such risks," their choice to retain certain amounts of risk, and not others, should be treated as a decision to self-insure, thus subjecting them to MSP's reach. *See* Govt's Opp'n at 6, 4; Compl. ¶ 167i-j, *l* (summarized at pages 4–5 *supra*). Yet, the Government never advances any reason why a distinction should be made under MSP between "sophisticated corporations" and other parties, and how such a dichotomy could hold up in practice. Indeed, in responding to whether its understanding of the term "self-insured" would (or should) encompass, for example, a homeowner who had not purchased homeowners' insurance, or a sufficient amount thereof, the Government takes no position and simply suggests that the issue not be addressed.[10]

Finally, the Government argues that, even if MSP liability does necessitate the formal arrangements spelled out in *Mt. Diablo Med. Ctr.*, Couch on Insurance, and *Alderson*, it need only be able to prove

their existence *after* discovery, which it intends to do. It states: "The United States fully expects that, at the appropriate time, it will be capable of presenting evidence showing the Defendants have utilized formal arrangements by which they undertook to set aside funds, and a formal procedure for processing claims." *Id.* Of course, this begs the question, namely, why, if the Government "expects" to ultimately produce such evidence, it does not make the necessary allegations in its complaint.

Having fully considered the Government's position on what a plaintiff needs to allege in its complaint to make out an MSP claim, the Court concludes that such a theory cannot withstand serious scrutiny and must be rejected. Its logical implication is that any entity with a risk of legal liability which chooses to retain any portion of that risk, no matter how small, may be pursued under MSP on the ground that it is a "self-insured plan." The Government attempts to evade the far-ranging implications of its theory of MSP liability, contending that "such questions can be left for another day." Govt's Opp'n at 7. However, a party's theory of statutory liability, and the implications that flow therefrom, are extremely important in interpreting the statute. *See Dowling v. United States*, 473 U.S. 207, 226, 105 S.Ct. 3127, 87 L.Ed.2d 152 (1985) (holding that the "broad consequences of the Government's theory" of statutory liability "provide a final and dispositive factor against reading [the statute] in the manner suggested"). The practical effects of the Government's conception of MSP liability would transform that statute, meant primarily for use against insurers, *see Philip Morris*, 116 F.Supp.2d at 146 n. 22, into the very

---

**10.** The Government does assert that the present case "is vastly different than a suit against an individual with homeowner's insurance,"

but it does not follow that assertion with any analysis or explanation. Govt's Opp'n at 6.

**8**                    **156 FEDERAL SUPPLEMENT, 2d SERIES**

"across-the-board procedural vehicle for suing tortfeasors," which this Court has already declared impermissible. *Id.* at 135. Significantly, the Government is unable to provide any logically consistent way in which this outcome could be averted.

The Government makes one final argument that must be addressed. It contends that, "should discovery reveal" that Defendants obtained insurance policies but elected to "pay any liability out of pocket" (*i.e.,* to make "liability insurance payment[s]" as defined by 42 C.F.R. § 411.50(b)) rather than "claiming against available insurance coverage," they would also be liable under MSP. *See* Govt's Opp'n at 17–18. However, even assuming this theory has merit, nowhere in its amended complaint does the Government allege that Defendants elected to make such payments, or that by making such payments, they exposed themselves to MSP liability. Further, neither in its brief nor in its complaint does the Government describe the actual circumstances in which "a tortfeasor that elects to carry its own risk of liability in a lawsuit rather than to claim against its insurance [would], by that election, make itself subject to an MSP claim." *Id.*

Accordingly, for the reasons stated, the MSP Count contained in the amended complaint will be **dismissed**.[11]

### IV.  Conclusion

For the reasons stated, Defendants' Motion to Dismiss Count Two of the Amended Complaint is granted and Count Two (the Medicare Secondary Payer provisions or "MSP" Count) is dismissed with prejudice. The Government shall not be permitted to bring a cause of action pursuant to MSP.

---

11.  The Government is commended for bringing to the Court's attention a decision, *Thompson v. Goetzmann,* No. 00–CV–2174,

An appropriate Order will accompany this Opinion.

### ORDER # 72

This matter is before the Court on Defendants' Motion to Dismiss Count Two of the Amended Complaint [## 272, 277]. Upon consideration of the Motion, the Opposition, the Reply, and the entire record herein, for the reasons discussed in the accompanying Memorandum Opinion, it is this—day of July 2001

ORDERED, that Defendants' Motion [## 272, 277] is granted; it is further

ORDERED, that Count Two of the Amended Complaint is dismissed with prejudice.



**Jose BEN–KOTEL, Plaintiff,**

v.

**HOWARD UNIVERSITY, Defendant.**

**Civil Action No. 00–1968(RMU).**

United States District Court,
District of Columbia.

Aug. 15, 2001.

Unsuccessful Hispanic applicant for part-time teaching position brought suit against university, claiming national origin discrimination under Title VII and District of Columbia Human Rights Act and intentional infliction of emotional distress. University moved for summary judgment. The District Court, Urbina, J., held that: (1)

---

2001 WL 771012 (N.D.Tex. July 3, 2001), which is adverse to the Government's position. *See* Govt's Praecipe of July 19, 2001.

# EXHIBIT 5

U.S. v. PHILIP MORRIS INC.    **131**
Cite as 116 F.Supp.2d 131 (D.D.C. 2000)

UNITED STATES of America,
Plaintiff,

v.

PHILIP MORRIS INCORPORATED,
et al., Defendants.

No. CIV.A.99–2496 GK.

United States District Court,
District of Columbia.

Sept. 28, 2000.

United States brought action against tobacco companies to recover health care expenditures federal government had paid or would pay to treat tobacco-related illnesses. On companies' motions to dismiss, the District Court, Kessler, J., held that: (1) Medical Care Recovery Act (MCRA) did not grant United States authority to recover payments made under Medicare and Federal Employees Health Benefits Act (FEHBA); (2) companies were not liable under Medicare Secondary Payer (MSP) statute; but (3) government's claims adequately alleged violations of Racketeer Influenced and Corrupt Organizations Act (RICO).

Motions granted in part, and denied in part.

**1. Statutes ☞219(1)**

When agency interprets statute other than that which it has been entrusted to administer, its interpretation is not entitled to deference.

**2. Statutes ☞212.1**

In adopting subsequent statutes, Congress is presumed to act against backdrop of agency statements regarding parameters of agency's authority to act under original statute.

**3. Statutes ☞219(1, 3)**

Agency interpretations and practices should be given considerable weight in interpreting statute where they involve contemporaneous construction of statute and where they have been in long use.

**4. United States ☞39(14)**

Medical Care Recovery Act (MCRA) did not grant United States authority to recover from tobacco companies payments made by federal government under Medicare and Federal Employees Health Benefits Act (FEHBA) to treat tobacco-related illnesses allegedly caused by companies' tortious conduct. Medical Care Recovery Act, § 1(a), 42 U.S.C.A. § 2651(a).

**5. Statutes ☞173**

Mere nonuse of statute cannot cause government to forfeit powers granted thereunder.

**6. Statutes ☞212.7**

When, despite many opportunities to do so, government agency refuses to take advantage of wide-ranging powers seemingly implicated by statute's plain language, courts may presume that Congress did not intend statute to be given meaning that its language, in vacuum, might imply.

**7. Social Security and Public Welfare ☞241.10**

Tobacco companies were not liable to United States under Medicare Secondary Payer (MSP) statute for payments made by Medicare to treat tobacco-related illnesses allegedly caused by companies' tortious conduct, absent showing that companies were self-insured entities. Social Security Act, § 1862(b)(2), as amended, 42 U.S.C.A. § 1395y(b)(2); 42 C.F.R. §§ 411.21, 411.50(b).

**8. Racketeer Influenced and Corrupt Organizations ☞69**

To successfully state RICO claim, government must allege (1) conduct (2) of enterprise (3) through pattern of racketeering activity. 18 U.S.C.A. §§ 1961–1968

**9. Injunction ☞22**

To obtain injunctive relief, plaintiff must show that defendant's past unlawful conduct indicates reasonable likelihood of further violations in future.

**132**        **116 FEDERAL SUPPLEMENT, 2d SERIES**

**10. Injunction ⟗22**

To determine whether there is reasonable likelihood of future violations sufficient to warrant injunctive relief, court must consider whether: (1) defendant's violation was isolated or part of pattern, (2) violation was flagrant and deliberate or merely technical in nature, and (3) defendant's business will present opportunities to violate law in future.

**11. Racketeer Influenced and Corrupt Organizations ⟗82**

United States' claims that tobacco companies violated RICO by conspiring over prior four decades to preserve and expand market for, and profits from, cigarettes by making false and deceptive statements regarding health risks of smoking, concealing and destroying documents, and improperly asserting legal privileges to evade legitimate civil discovery and government requests, and that companies continued manufacturing, selling and marketing tobacco products, established reasonable likelihood that companies would continue to violate law, so as to warrant injunctive relief to enjoin companies from committing future RICO violations and to disgorge companies' past profits associated with and derived from their alleged unlawful racketeering activity. 18 U.S.C.A. § 1964(a).

**12. Compromise and Settlement ⟗17(2)**

United States was not precluded from seeking to enjoin tobacco companies from committing future RICO violations and to disgorge companies' past profits associated with and derived from their alleged unlawful racketeering activity due to master settlement agreement (MSA) between companies and states enjoining companies from same unlawful activity. 18 U.S.C.A. § 1964(a).

**13. Federal Civil Procedure ⟗636**

Party seeking to enjoin future violations of RICO is not required to plead future violations with particularity. 18 U.S.C.A. § 1964(a); Fed.Rules Civ.Proc. Rule 9(b), 28 U.S.C.A.

**14. Racketeer Influenced and Corrupt Organizations ⟗83**

Disgorgement of profits from past unlawful conduct is available and appropriate remedy for civil violations of RICO. 18 U.S.C.A. § 1964.

**15. Racketeer Influenced and Corrupt Organizations ⟗83**

Whether disgorgement is appropriate remedy in particular RICO case depends on whether there is finding that gains are being used to fund or promote illegal conduct, or constitute capital available for that purpose. 18 U.S.C.A. § 1964.

**16. Federal Civil Procedure ⟗1831**

Issue of whether tobacco companies continued to use illegally derived profits to fund or promote concealment and misstatement of health risks associated with tobacco raised fact issue that could not be determined on motion to dismiss United States' claim against companies under RICO for disgorgement for failure to state claim. 18 U.S.C.A. § 1964.

**17. Racketeer Influenced and Corrupt Organizations ⟗34**

To establish RICO enterprise, plaintiff must show: (1) common purpose among participants, (2) organization, and (3) continuity. 18 U.S.C.A. § 1961(4).

**18. Racketeer Influenced and Corrupt Organizations ⟗73**

Government's allegation that tobacco companies acted in concert to create and fund tobacco research body and public relations organization that functioned for several decades to counter evidence of smoking's adverse health effects in order to preserve and expand cigarette market and to maximize their profits sufficiently described RICO "enterprise," even though complaint did not describe how enterprise operated, who its leaders were, or how its decision-making process functioned. 18 U.S.C.A. § 1961(4).

See publication Words and Phrases for other judicial constructions and definitions.

**19. Racketeer Influenced and Corrupt Organizations ⟪73**

Racketeer Influenced and Corrupt Organizations Act (RICO) plaintiff is not required spell out mechanics or logistics of enterprise in its complaint. 18 U.S.C.A. § 1961(4).

**20. Postal Service ⟪35(7)**

Defendant who uses mail with intent of defrauding someone of property is guilty of mail fraud, whether attempt succeeds or not. 18 U.S.C.A. § 1341.

**21. Federal Civil Procedure ⟪636**

Government pled tobacco companies' alleged mail fraud with sufficient particularity in complaint charging them with Racketeer Influenced and Corrupt Organizations Act (RICO) violations, even though allegations of what was retained or given up as consequence of fraud was not included in each specific allegation; complaint described time, place, and content of each allegedly fraudulent act, stated facts misrepresented, and named particular Defendants involved, and alleged elsewhere that item "given up" was money government spent on tobacco-related health care. 18 U.S.C.A. §§ 1341, 1961(5); Fed.Rules Civ. Proc.Rule 9(b), 28 U.S.C.A.

**22. Evidence ⟪333(1)**

**Federal Civil Procedure ⟪1832**

"Public records" that court may take into account when deciding motion to dismiss include only certain official documents, not mere newspaper articles. Fed. Rules Evid.Rule 803(8), 28 U.S.C.A.

See publication Words and Phrases for other judicial constructions and definitions.

**23. Federal Civil Procedure ⟪1831**

Issue of whether tobacco company withdrew from alleged enterprise with other tobacco companies to conceal and misstate health risks associated with smoking raised fact issue that could not be determined on motion to dismiss United States' Racketeer Influenced and Corrupt Organizations Act (RICO) action against company for failure to state claim. 18 U.S.C.A. § 1961(4).

**24. Racketeer Influenced and Corrupt Organizations ⟪50**

To establish that it is no longer member of enterprise, Racketeer Influenced and Corrupt Organizations Act (RICO) defendant must show that it withdrew from conspiracy by affirmative act designed to defeat purpose of conspiracy. 18 U.S.C.A. § 1961(4).

———

J. Patrick Glynn, Sharon Y. Eubanks, Department of Justice Civil Division/Torts Branch, Washington, DC, David W. Ogden, Acting Asst. Atty. Gen., William Schultz, Thomas J. Perrelli, Deputy Asst. Attys. Gen., Frank J. Marine, Sr. Litigation Counsel, Patrice M. Mulkern, U.S. Dept. of Justice, Washington, DC, Mark B. Stern, J.P. Ellison, Douglas Hallward–Driemeier, Robert Loeb, Dana J. Martin, Collette G. Matzzie, Mary Jo Moltzen, Peter J. Smith, Elizabeth A. Welsh, Attys., Civ. Div., Washington, DC, for Plaintiff.

Timothy M. Broas, Robert M. Rader, Winston & Strawn, Washington, DC, Dan K. Webb, Winston & Strawn, Chicago, IL, Herbert M. Wachtell, Ben M. Germana, Winston & Strawn, Washington, DC, Steven M. Barna, Jeffrey M. Wintner, Wachtell, Lipton, Rosen & Katz, New York City, Robert Francis McDermott, Jr., Jones, Day, Reavis & Pogue, Washington, DC, Robert C. Weber, Paul Christ, Jones, Day, Reavis & Pogue, Cleveland, OH, Jonathan, M. Redgrave, Gray, Plant, Mooty, Mooty & Bennett, PA, Minneapolis, MN, David M. Bernick, Kirkland & Ellis, Chicago, IL, Kenneth N. Bass, Kirkland & Ellis, Washington, DC, Stephen R. Patton, Kirkland & Ellis, Chicago, IL, Michael B. Minton, Thompson Coburn, LLP, Washington, DC, J. William Newbold, Coburn & Croft, St. Louis, MO, Richard Paul Cassetta, Thompson & Coburn, LLP, St. Louis, MO, Warren Neil Eggleston, Michael P.A. Cohen, Howrey, Simon, Arnold & White, Washington, DC, Kenneth Anthony Gallo, Fred W. Reinke, Clifford, Chance, Rogers & Wells, LLP, Washington, DC, Aaron H. Marks, Marc E. Kasowitz, Daniel R. Benson, Kasowitz, Benson, Torres, Friedman L.L.P., New York City, Michael Asher Schlanger, Sonnenschein, Nath & Rosenthal, Washington, DC, Mary Elizabeth

McGarry, Simpson, Thacher & Bartlett, New York City, Michael V. Corrigan, Simpson Thacher & Bartlett, New York City, Demetra Frawley, Simpson Thacher & Bartlett, New York City, William Salvatore D'Amico, Chadbourne & Parke, Washington, DC, Timothy M. Hughes, Garyowen P. Morrisroe, Chadbourne & Parke, New York City, Bruce G. Merrit, Steven S. Michaels, Debevoise & Plimpton, New York City, Judah Best, Debevoise & Plimpton, Washington, DC, John Vanderstar, Keith Allen Teel, Covington & Burling, Washington, DC, for Defendants.

### MEMORANDUM OPINION

KESSLER, District Judge.

#### I.  Introduction

Plaintiff, the United States of America ("the Government"), brings suit against eleven tobacco-related entities ("Defendants")[1] to recover health care expenditures the Government has paid for or will pay for to treat tobacco-related illnesses allegedly caused by Defendants' tortious conduct.  The Government also asks this Court to enjoin Defendants from engaging in fraudulent and other unlawful conduct and to order Defendants to disgorge the proceeds of their past unlawful activity.

The Government makes four claims against Defendants under three statutes. The first statute, the Medical Care Recovery Act ("MCRA"), 42 U.S.C. §§ 2651–2653, provides the Government with a cause of action to recover certain specified health care costs it pays to treat individuals injured by a third-party's tortious conduct (Count 1).  The second statute is a series of amendments referred to as the Medicare Secondary Payer provisions ("MSP"), 42 U.S.C. § 1395y, which provides the Government with a cause of action to recover Medicare expenditures

when a third-party caused an injury requiring treatment and a "primary payer" was obligated to pay for the treatment (Count 2).  The third statute is the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968 (Counts 3 and 4), which provides parties with a cause of action to recover treble damages due to injuries they received from a defendant's unlawful racketeering activity, and to seek other equitable remedies to prevent future unlawful acts.

This matter is now before the Court on Defendants' motions to dismiss for failure to state a claim.[2]  Upon consideration of the motions, oppositions, replies, the applicable case law, the arguments presented at the motions hearing, and the entire record herein, for the reasons discussed below, the Non–Liggett Defendants' motion to dismiss for failure to state a claim [# 72] is **granted** as to the MCRA claim (Count 1), **granted** as to the MSP claim (Count 2), and **denied** as to the RICO claims (Counts 3 and 4).  Liggett's separate motion to dismiss for failure to state a claim [# 70] is **denied**.

#### Summary of Legal Conclusions

The United States Government has brought this massive civil action against the tobacco industry, seeking billions of dollars in damages for what it alleges to be a lengthy unlawful conspiracy to deceive the American public about the health effects of smoking and the addictiveness of nicotine.  In order to prevail on these allegations, the Government has offered three distinct legal theories of liability.  Two of these theories are being rejected, and therefore, Counts 1 and 2 of the Complaint will be dismissed.  A significant portion of the Government's case, however, will go forward, namely its claims under RICO for disgorgement of all profits Defendants derived from activities, beginning in 1953 and

---

1.  The eleven Defendants are: Philip Morris, Inc. ("Philip Morris"), R.J. Reynolds Tobacco Co. ("R.J.Reynolds"), Brown & Williamson Tobacco Co. ("Brown & Williamson"), Lorillard Tobacco Company ("Lorillard"), The Liggett Group, Inc. ("Liggett"), American Tobacco Co. ("American Tobacco"), Philip Morris Cos., B.A.T. Industries p.l.c. ("BAT Ind."), British American Tobacco (Investments) Ltd., The Council for Tobacco Research—U.S.A.,

Inc. ("CTR"), and The Tobacco Institute, Inc. ("TI").  The latter two entities do not manufacture or sell tobacco products, but are alleged to be co-conspirators in Defendants' tortious activities.

2.  Defendant BAT Ind.'s motion to dismiss for lack of personal jurisdiction is addressed in a separate Memorandum Opinion issued the same day as this Opinion.

continuing to the present, related to the alleged pattern of racketeering activity. Consequently, Counts 3 and 4 of the Complaint will proceed. In sum, while the Government's theories of liability have been limited, the extent of Defendants' potential liability remains, in the estimation of both parties, in the billions of dollars. The scope and complexity of this case will continue to pose significant challenges to the parties and to the Court.

1. The Government's Medical Care Recovery Act claim will be dismissed. The congressional intent in enacting MCRA in 1962—at which time Medicare did not exist and the Federal Employees Health Benefits Act ("FEHBA") [3] was still in its infancy—was to provide a means for the Government to recover from third-party tortfeasors [4] medical expenses it had furnished for (primarily military) employees. Applying the principles from a recent U.S. Supreme Court decision, *FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000), this Court concludes that Congress did not intend that MCRA be used as a mechanism to recover Medicare or FEHBA costs. The Court reaches this conclusion after examining the broad context in which MCRA has existed for 38 years—including its legislative history, the construction given it by those agencies charged with its interpretation, a body of long-standing state and federal case law, and its total non-enforcement by the Department of Justice for thirty-seven of those thirty-eight years.

2. The Government's Medicare Secondary Payer claim will also be dismissed. MSP permits the Government to seek reimbursement from insurance entities, when Medicare has paid for health care expenses for which those entities should have paid. Although MSP also allows the Government to bring suit against non-insurance entities required to pay for health care costs under a "self-insured plan," the Government's Complaint contains no allegation that Defendants have at any time maintained a "self-insured plan," as that term is defined by MSP and the relevant regulations. Further, it is clear that Congress did not intend MSP to be used as an across-the-board procedural vehicle for suing tortfeasors, which is precisely how the Government attempts to use the statute in this case.

3. The Government's Racketeer Influenced and Corrupt Organization Act claims will be permitted to go forward. The Government has adequately alleged, which is all it must do at this early stage in the litigation, the necessary elements of a RICO claim: that Defendants formed an "enterprise" which engaged in the requisite "pattern of racketeering activity." In addition, given the nature and scope of Defendants' alleged prior misconduct, the Government has adequately pleaded its basis for requesting injunctive relief, including the specific remedy of disgorgement. [5]

## II. *Standard of Review*

A "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, 654, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999). At the motion to dismiss stage, "the only relevant factual allegations are the plaintiffs'," and they must be presumed to be true. *Ramirez de Arellano v. Weinberger,* 745 F.2d 1500, 1506 (D.C.Cir.1984), *vacated on other grounds,* 471 U.S. 1113, 105 S.Ct. 2353, 86 L.Ed.2d 255 (1985); *Shear v. National Rifle Ass'n of Am.,* 606 F.2d 1251, 1253 (D.C.Cir.1979). Despite the sweeping breadth and seriousness of the Government's allegations, their validity is not for this Court to judge at this time.

---

**3.** FEHBA is codified at 5 U.S.C. § 8901 *et seq.*

**4.** A "tortfeasor" is an individual or entity that commits a civil wrong for which a remedy, usually monetary damages, may be obtained. *See* Black's Law Dictionary (7th ed.1999).

**5.** "Disgorgement" is defined as the "act of giving up something (such as profits illegally obtained) on demand or by legal compulsion." *See* Black's Law Dictionary (7th ed.1999).

### III.  *Statement of Facts*

The Government's Complaint describes in detail what it alleges to be a four-decade long conspiracy, dating from at least 1953, to intentionally and willfully deceive and mislead the American public about, among other things, the harmful nature of tobacco products, the addictive nature of nicotine, and the possibility of manufacturing safer and less addictive tobacco products. Complaint ("Compl.") at ¶ 3. Defendants' conspiratorial activity includes making numerous "false and deceptive" statements and concealing documents and research in an attempt to cover-up their deceit. Compl. at ¶ 5. According to the Government, Defendants continue to "prosper and profit" from their actions and will continue to do so into the future, unless restrained by this Court. Compl. at ¶ 6. The specifics of the alleged conspiracy are described below.

"In the 1940's and early 1950's, scientific researchers published findings that indicated a relationship between cigarette smoking and diseases, including lung cancer." Compl. at ¶ 30. Tobacco companies "closely monitored" this research, conscious that if the public became aware of these findings, the companies' profits would likely decline and they would "face the prospect of civil liability and government regulation." Compl. at ¶ 31. To combat these possibilities, the chief executives of Defendants American Tobacco, Brown & Williamson, Lorillard, Philip Morris, and R.J. Reynolds met in late 1953 in New York City, where they devised a concerted strategy to preserve and expand the market for, and profits from, cigarettes. Compl. at ¶ 32.

According to the Government, the underlying strategy Defendants adopted was simple: to deny that smoking caused disease and to consistently maintain that whether smoking caused disease was an "open question." Compl. at ¶ 34. To maintain and further this strategy, Defendants issued deceptive press releases, published false and misleading articles, destroyed and concealed documents which indicated that there was in fact a correlation between smoking and disease, and aggressively targeted children as potential new smokers. Compl. at ¶ 36.

One of the first major steps Defendants took was to announce the formation of an entity initially known as the Tobacco Industry Research Committee ("TIRC") and which later became known as the Council for Tobacco Research ("CTR" or "Council").[6] This entity, which Defendants publicized widely as an objective research body, published in January 1954 a full-page statement that ran in 448 newspapers throughout the United States. Titled "A Frank Statement to Cigarette Smokers," the statement asserted that, according to "distinguished authorities," "there is no proof that cigarette smoking is one of the causes" of lung cancer. Compl. at ¶ 37. Defendants further stated: "We believe the products we make are not injurious to health"—even though Defendants' own employees had by this time "identified the carcinogenic substances in tobacco smoke." Compl. at ¶¶ 37, 38. Promising to aid and assist research into all phases of tobacco use and health and to provide complete information to the public, the publication stated that the newly formed Council would perform independent, objective, and reliable research about the allegations against smoking. Compl. at ¶ 37.[7]

According to the Government, CTR was not independent, objective or reliable. Its purpose was not to research issues of concern to the public, but rather to serve as a "front" or "cover" for Defendants' conspiracy to conceal the truth about smoking's health risks. Compl. at ¶ 60. Defendants

---

6.  According to the Government, Defendant Liggett did not join the Council until 1964. Compl. at ¶ 41.

7.  Defendants also established a Scientific Advisory Board ("SAB"), which they claimed

was an independent research arm of the CTR. Compl. at ¶ 61. The Government disputes this, alleging that the SAB was "closely controlled" by Defendants to prevent it from approving research that suggested any link between smoking and disease. Compl. at ¶ 62.

used CTR to fund "Special Projects" that were devised to counter evidence of smoking's adverse health effects by providing alternative explanations for tobacco-related diseases. Compl. at ¶ 65.

The Government alleges that these projects were designed largely to generate research data and witnesses for use in defending lawsuits and opposing tobacco regulation, rather than to ascertain or improve the safety of Defendants' products. To accomplish this objective, Defendants put attorneys in control of the Council's research and devised strategies to withhold from civil discovery critical information about the health effects of cigarette smoking by improperly invoking the attorney-client privilege and work-product doctrine. *Id.* If CTR research ever "threatened to confirm the link between smoking and disease," Defendants exerted pressure on the scientists conducting the research, so as to alter the results, terminate the research, and/or conceal the findings. Compl. at ¶ 67.

In 1958, Defendants created another entity, the Tobacco Institute ("TI"), a "public relations organization" whose function was to keep the public, the medical establishment, the media and the government in the dark about tobacco's health risks, especially the "connection between smoking and disease." Compl. at ¶ 42.

Defendants also entered into what they termed a "gentleman's agreement" not to perform in-house research on smoking, health, or the development of "safe" cigarettes. Compl. at ¶ 45. Each Defendant enforced this agreement—a central tenet of the conspiracy—by obstructing research efforts by any other company. Even when individual companies performed limited in-house research, the fundamental understanding remained intact: information that would tend to establish the harm caused by cigarette smoking would be suppressed and concealed. Compl. at ¶ 48.

The Government alleges that over the course of the conspiracy, Defendants have made numerous misstatements concerning one item in particular: nicotine. Defen-

dants continually denied that nicotine is addictive, even in the face of overwhelming evidence to the contrary. Compl. at ¶¶ 71–72. For example, Defendant Brown & Williamson acknowledged internally in 1963 that "we are ... in the business of selling nicotine, an addictive drug." Comp. at ¶ 72. Researchers hired by Philip Morris in the 1980's concluded that "in terms of addictiveness, 'nicotine looked like heroin'." Compl. at ¶ 73. Instead of making these results public, however, Defendant Philip Morris threatened the researchers with legal action, killed the lab animals, removed the lab equipment and closed the lab down entirely. *Id.*

And in 1963, Defendant Brown & Williamson deliberately withheld from the Surgeon General research on the addictiveness of nicotine. Compl. at ¶ 74. When the Surgeon General finally concluded, based on independent research, that nicotine is in fact addictive, TI attacked and criticized the report as "an unproven attempt to find some way to differentiate smoking from other behaviors." *Id.* Defendants have engaged in these and numerous other acts of deception because they recognize that "getting smokers addicted to nicotine is what preserves the market for cigarettes and ensures their profits." Compl. at ¶ 71.

Not only have Defendants denied the addictive powers of nicotine, but it is alleged that they have also taken non-public actions to increase its potency and make cigarettes even more addictive. Despite having used "highly sophisticated technologies," including the selective breeding and cultivation of tobacco plants, to manipulate and increase the potency of nicotine in their cigarettes, Compl. at ¶ 77, Defendants have repeatedly denied that they manipulated the level of nicotine in their products. Compl. at ¶ 79. A 1994 R.J. Reynolds advertisement, for example, states: "We do not increase the level of nicotine in any of our products in order to addict smokers." Compl. at ¶ 81. Defendants also marketed "light" or "low tar/low

nicotine" cigarettes as being less hazardous to smokers, Compl. at ¶ 86, even though individuals who smoke such cigarettes are "not appreciably reducing their health risk." Compl. at ¶ 88.

The Government also alleges that Defendants suppressed research regarding less hazardous cigarettes. Phillip Morris, for example, conducted research which concluded that a "medically acceptable low-carcinogen cigarette may be possible," but this finding was never released to the public. Compl. at ¶ 105. Indeed, Defendants have refused to acknowledge the possibility of such a cigarette. Compl. at ¶¶ 108, 109.

The Government charges that Defendants have "aggressively targeted their campaigns to children." Compl. at ¶ 96. R.J. Reynolds' Joe Camel campaign is just one of the most well-known examples of such tactics. Compl. at ¶ 97. Defendants have advertised in stores near high schools, promoted brands heavily during spring and summer breaks, given away cigarettes at places where young persons congregate, paid for product placement in movies with youth audiences, placed advertisements in magazines with high youth readership, and sponsored sporting events, rock concerts, and other events of interest to children. Compl. at ¶ 96. Defendants have consistently made false and misleading statements that their expenditures on advertising and marketing were directed exclusively at convincing current smokers to switch brands, not at enticing children. Compl. at ¶ 100.

The Government maintains that all the above misstatements, and fraudulent and conspiratorial activity are ongoing. Although Defendants have now admitted that there is "a substantial body of evidence which supports the judgment that cigarette smoking plays a causal role in the development of lung cancer and other diseases in smokers," Compl. at ¶ 116, and

have conceded that cigarettes are "addictive," as that term is used by the public at large. Compl. at ¶ 120, Defendants still market their products in deceptive and unlawful ways; they conceal documents relating to the health effects of cigarettes, nicotine and the true nature of CTR; and they continue to pose a threat "to the health and well-being of the American public." Compl. at ¶ 124.

The Government alleges that the harm caused by the Defendants' decades-long conspiracy has compelled numerous entities, including the government, to expend immense resources to treat, alleviate and minimize the resulting disease and devastation. Compl. at ¶ 6. In this action, the Government seeks to recover some or all of the "$20 billion annually" it has spent to treat the "injuries and diseases caused by defendants' products." Compl. at ¶ 5. It also seeks various forms of equitable relief, including the disgorgement of Defendants' profits, to deter Defendants and others from engaging in similar conduct in the future.

## IV.  *Defendants' Motion To Dismiss* [8]

### A.  The Government's Medical Care Recovery Act Claim

In 1962, Congress enacted the Medical Care Recovery Act ("MCRA"), which provides in pertinent part:

> In any case in which the United States is authorized or required by law to furnish [or pay for] [9] hospital, medical, surgical, or dental care and treatment ... to a person who is injured or suffers a disease, ... under circumstances creating a tort liability upon some third person ... to pay damages therefore, the United States shall have a right to recover (independent of the rights of the injured or diseased person) from said third person, or that person's insurer,

---

8.  Section IV specifically addresses arguments raised by the Non–Liggett Defendants but applies equally to Liggett, which has joined in this Motion.

9.  The bracketed language was added by a 1996 amendment. *See* Pub.L. No. 104–201, § 1075, 110 Stat. 2442, 2663 (1996).

the reasonable value of the care and treatment so furnished, to be furnished, paid for, or to be paid for and shall, as to this right be subrogated to any right or claim that the injured or diseased person ... has against such third person ...

42 U.S.C. § 2651(a), Pub.L. No. 87–693, § 1, 76 Stat. 593 (1962).

At first blush, MCRA's language might seem quite clear. The statute generally provides the Government with a means to recover the health care costs it has expended on behalf of victims of tortious conduct. If the Government has "paid for" or "furnished" such care, it may seek reimbursement from the individual or entity that caused the injury. The statute is broadly worded: Congress could have restricted the Government's ability to obtain reimbursement in any number of ways, both substantively and procedurally, but it did not.

However, the specific question before this Court—and it is a difficult one the resolution of which has enormous ramifications—is whether MCRA, a statute enacted in 1962 and amended in a minor fashion in 1996, covers, or was intended by Congress to cover, payments made by the United States Government under Medicare and the Federal Employees Health Benefits Act ("FEHBA")[10] to treat tobacco-related illnesses allegedly caused by Defendants' tortious conduct.

[1] Only a few months ago, the Supreme Court grappled with an equally difficult issue of statutory interpretation in *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 120 S.Ct. 1291, 146

L.Ed.2d 121 (2000), a case in which it had to decide whether the Food and Drug Administration possessed authority to regulate tobacco products as customarily marketed. While this Court fully recognizes that the present case, unlike *Brown & Williamson*, does not involve "an administrative agency's construction of a statute," thereby triggering the two-step *Chevron* analysis,[11] 120 S.Ct. at 1300 (citing *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)), the general analytical approach followed in *Brown & Williamson* as it relates to statutory construction and congressional intent is nevertheless instructive and illuminating. Like the Supreme Court in *Brown & Williamson*, this Court's obligation is to ascertain congressional intent by viewing a particular statute in the context of relevant congressional action taken during and subsequent to its enactment. Accordingly, there are significant principles articulated by the *Brown & Williamson* Court that speak to how the instant case should be resolved.

[2] One such principle is that subsequent legislative action may shed light on congressional intent. "At the time a statute is enacted, it may have a range of plausible meanings. Over time, however, subsequent acts can shape or focus those meanings." 120 S.Ct. at 1306.[12] In adopting subsequent statutes, Congress is presumed to act "against the backdrop" of agency statements regarding the parameters of the agency's authority to act under the original statute. *Id.* at 1306–07.

10. FEHBA is codified at 5 U.S.C. § 8901 *et seq.*

11. Even assuming that the Department of Justice should be considered an "agency" for purposes of *Chevron* analysis, it is entitled to no deference for its interpretation of MCRA, FEHBA or Medicare, because it is not the agency entrusted to administer those statutes. "[W]hen an agency interprets a statute other than that which it has been entrusted to administer, its interpretation is not entitled to

deference." *Illinois Nat'l Guard v. Federal Labor Relations Authority*, 854 F.2d 1396, 1400 (D.C.Cir.1988) (citations and internal quotations omitted).

12. To the extent that the Government contends that the question presented can be resolved by resort to MCRA's language alone, *see* Govt's Opp'n at 14–15, its argument is flatly inconsistent with *Brown & Williamson*'s requirement that statutes like MCRA be viewed in the context of "subsequent acts."

**140**        **116 FEDERAL SUPPLEMENT, 2d SERIES**

[3] Another such principle is that agency "interpretations and practices" should be given "considerable weight where they involve the contemporaneous construction of a statute and where they have been in long use." *Davis v. United States*, 495 U.S. 472, 484, 110 S.Ct. 2014, 109 L.Ed.2d 457 (1990). In fact, congressional action (or inaction) can, in certain circumstances, be viewed by courts as having "effectively ratified" an agency's longstanding position. 120 S.Ct. at 1307.[13]

A final principle announced by the Supreme Court—and one which has more concrete application in the instant case—is that Congress, "for better or for worse, has created a distinct regulatory scheme for tobacco products." 120 S.Ct. at 1315. In conjunction with this scheme, "Congress has persistently acted to preclude a meaningful role for any administrative agency in making policy on the subject of tobacco and health." *Id.* at 1313; *see also id.* at 1309 (Congress' intent was to "preclude any administrative agency from exercising significant policymaking authority on the subject of smoking and health"); *id.* at 1315 (Congress has "repeatedly acted to preclude any agency from exercising significant policymaking authority in the area").

[4] The principles delineated above lead this Court to the conclusion that Congress did not intend MCRA to cover Medicare or FEHBA expenses.

**1. Legislative History**

Recourse to MCRA's legislative history cannot by itself answer the question presented (*i.e.*, whether MCRA applies to Medicare and FEHBA expenses), since the record relating to the statute's enactment is virtually non-existent. Nevertheless, even the sliver of legislative history that does exist provides the Court with

"guidance" in understanding how Congress meant MCRA to be interpreted. *See National Wildlife Federation v. Snow*, 561 F.2d 227, 237 (D.C.Cir.1976); *American Soc'y of Travel Agents v. Blumenthal*, 566 F.2d 145, 166 (D.C.Cir.1977) ("Legislative history can be and often is an important instrument in the determination of congressional intent.") (Bazelon, C.J., dissenting).

The parties agree, and the legislative history confirms, that MCRA was enacted in response to a 1947 Supreme Court decision, *United States v. Standard Oil Co.*, 332 U.S. 301, 67 S.Ct. 1604, 91 L.Ed. 2067 (1947), which held that the Government lacked a common law cause of action to recover from tortfeasors expenses the Government had incurred in treating military personnel under its health care programs. *Id.* at 314–16, 67 S.Ct. 1604. *Standard Oil* narrowly construed the Government's authority to recover such expenditures and directed Congress to enact appropriate legislation if it wished to provide the Government with more expansive authority. *Id.* at 315–16, 67 S.Ct. 1604.

For over a decade, Congress apparently ignored *Standard Oil* and did nothing to provide the Government with a statutory cause of action to recover the medical expenses resulting from care it had provided. Finally, in 1960, thirteen years after *Standard Oil* was handed down, the Comptroller General of the United States submitted a Report to Congress entitled "Report On Review Of The Government's Rights And Practices Concerning Recovery Of The Cost Of Hospital And Medical Services In Negligent Third–Party Cases." *See* Govt's Opp'n, Appendix ("App.") at 5. The Report's purpose was to "ascertain the extent, adequacy, and consistency of the rights and practices of the Government to

---

**13.** *Brown & Williamson* was certainly not the first occasion in which the Supreme Court expressed such a view. In *FTC v. Bunte Bros*, 312 U.S. 349, 352, 61 S.Ct. 580, 85 L.Ed. 881 (1941), the Court stated: "just as established practice may shed light on the extent of power conveyed by general statutory language, so

the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred." *See also Bankamerica Corp. v. United States*, 462 U.S. 122, 130, 103 S.Ct. 2266, 76 L.Ed.2d 456 (1983).

recover" the costs of health care it furnished to tort victims. *Id.* In particular, the Report reviewed the ability of four government agencies to recover their medical costs: the Department of Defense, the Veterans Administration, the Department of Health Education and Welfare's Public Health Service, and the Labor Department's Bureau of Employees' Compensation. *Id.* at 6.

The Report explicitly referred to *Standard Oil* and what the Comptroller General determined the consequence of that decision to be, namely, that "each year the Government is not recovering several million dollars of costs in negligent third-party cases." *Id.* at 14. The Report labeled this outcome "inequitable" and declared that "the Government should have the right in all cases to recover its costs of treating those injured as a result of the negligence of third parties." *Id.* at 10. The Comptroller General therefore recommended that Congress adopt one of two options for remedying the problem: enact legislation "in the form of either a general bill" or amend the statutes governing "the specific agencies involved." *Id.* at 10, 20–21. It should be remembered that Medicare, enacted in 1965, did not exist when the Comptroller General issued his report, in 1960, but FEHBA did.

In response to the Comptroller General's Report, Congress chose the alternative of enacting "a general bill" rather than amending statutes agency by agency. According to the Senate Report on MCRA, the statute's "purpose" was to

provide for the recovery by the United States from negligent third persons for the cost of hospital, medical, surgical, or dental care and treatment furnished by the United States, pursuant to authority or requirement of law, to a person who is injured or suffers a disease under circumstances creating a tort liability upon such third person.

S.Rep. No. 87–1945 (1962), *reprinted in* 1962 U.S.C.C.A.N. 2637, 2637 (under heading "Purpose"). Both the House and Senate Reports state that MCRA would enable the Government to recover expenses under "[s]tatutes providing for care by the Department of Defense to military personnel and their dependents, the Public Health Service to Coast Guard personnel and other classes of persons, and the Veterans' Administration to veterans." *Id.* at 2639; H. Rep. No. 87–1534, at 5 (1962).

While this language would, by itself, suggest an intent to limit MCRA to the cost of health care provided to members of the military, the very next paragraph of the Senate Report discusses the manner in which the Government would be able to recover payments made under the Federal Employees' Compensation Act ("FECA").[14] Since that statute covers civilian employees, it is clear that MCRA was not meant to be restricted to the military.

The three documents described above (the Comptroller General's Report, the Senate Report and the House Report) constitute MCRA's entire legislative history. However, even more significant than what the legislative history does contain (very little) is what it does not. Despite the fact that the Comptroller General's Report expressly refers to FECA—which both parties agree is covered under MCRA—nowhere in the Report is any mention made of FEHBA, the wide-ranging civilian health insurance program which had been enacted several years earlier, and which the Government now claims is also covered by MCRA. Nor did the Senate or House Reports refer to FEHBA, even in passing. These omissions are, if not in direct conflict, at least in sharp tension with the Government's position that MCRA applies to FEHBA. Surely, Congress knew of FEHBA's existence, especially since that

14. FECA is codified at 5 U.S.C. § 8132, and provides for unemployment compensation

benefits.

**142**           **116 FEDERAL SUPPLEMENT, 2d SERIES**

statute had been enacted only five years before MCRA.

Although the legislative history, and particularly Congress' failure to make any mention of FEHBA after specifically mentioning other programs covered by the statute, would by itself suggest that MCRA was not meant to apply to FEHBA, the paucity of legislative history necessitates a review of other considerations relating to congressional intent.[15]

**2. Agency Interpretations**

Another tool for ascertaining congressional intent is to examine the statements, rulings and interpretations of government agencies—particularly those agencies entrusted to administer the relevant statute. Because the Health Care Financing Administration ("HCFA") is the agency charged with administering MCRA, its approach to enforcing that statute should be given special attention.

As an initial matter, it cannot be overlooked that HCFA has issued no MCRA-specific regulations providing for recovery of Medicare or FEHBA costs. In contrast, agencies that do have, and have always had, an undisputed and established right to recovery under MCRA, such as those governing the armed services, do have such regulations in place. See 32 C.F.R. § 199.12 (Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS") MCRA regulations); 32 C.F.R. §§ 842.115–842.125 (Air Force MCRA regulations); 32 C.F.R. §§ 757.11–757.20 (Navy MCRA regulations); 33 C.F.R. § 25.131 (Coast Guard MCRA regulations).[16] No such structure has ever been established by HCFA to collect Medicare or FEHBA expenses under the general MCRA framework.

Moreover, several agencies have explicitly concluded that MCRA does not provide the Government with a cause of action

---

15. The Government contends that there is an additional piece of legislative history relating to Medicare, not MCRA, which supports its interpretation of MCRA. The Senate Report accompanying the original Medicare Act states that Medicare will not pay "for any item or service furnished an individual if neither the individual nor any other person (such as a prepayment plan) has a legal obligation to pay for or provide the services," and that under such a circumstance, "the third-party liability statute 42 U.S.C. §§ 2651–2653 [MCRA] would not apply." S.Rep. No. 89-404, at 48 (1965), reprinted in 1965 U.S.C.C.A.N.1943, 1989. Although the Government argues that this is a clear indication that Congress intended MCRA to apply to Medicare expenses, Govt's Opp'n at 17, the Court finds this "oblique reference" to the MCRA statute inconclusive at best, especially when it is evaluated in the larger context of near total congressional silence concerning any connection between MCRA and the mammoth Medicare program. See Regular Common Carrier Conference v. United States, 820 F.2d 1323, 1328 (D.C.Cir.1987) (finding that "it strains credulity to suggest … that [a] Senate Report's oblique reference" to a certain exemption "reflects an otherwise unarticulated intent" to apply that exemption in a way never otherwise mentioned in the legislative history).

16. For example, the regulations governing MCRA-recovery of expenses incurred under

CHAMPUS require any person furnished care and treatment under CHAMPUS

(i) To provide complete information regarding the circumstances surrounding an injury as a condition precedent to the processing of a CHAMPUS claim involving possible third-party liability.

(ii) To assign in writing to the United States his or her claim or cause of action against the third person to the extent of the reasonable value of the care and treatment furnished, or to be furnished, or any portion thereof;

(iii) To furnish such additional information as may be requested concerning the circumstances giving rise to the injury or disease for which care and treatment are being given and concerning any action instituted or to be instituted by or against a third person;

(iv) To notify the responsible recovery judge advocate, the CHAMPUS fiscal intermediary or General Counsel, OCHAMPUS, or other officer who is representing the interests of the government at the time, of a settlement with, or an offer of settlement from a third person; and,

(v) To cooperate in the prosecution of all claims and actions by the United States against such third person.
32 C.F.R. § 199.12(e)(2). None of the above mentioned actions is required of recipients of health care under Medicare or the FEHBA program.

**U.S. v. PHILIP MORRIS INC.**    **143**
Cite as 116 F.Supp.2d 131 (D.D.C. 2000)

to recover Medicare costs. First, in 1968, the General Counsel of the Federal Bureau of Health Insurance (which administered Medicare at that time) issued an Opinion to that effect, stating that Medicare payments are "insurance benefits," as distinguished from the health care "provided directly by the federal government" to which MCRA clearly applied. *See Subrogation Rights Under Medicare,* For the Defense, Apr. 1970, at 44 (Defs.' Mem., App. J at 67). Second, in 1979, HCFA issued a ruling that, in cases in which the Government was liable for an injury under the Federal Tort Claims Act ("FTCA") and Medicare paid the medical expenses, the victim could retain all payments the Government made to her under the FTCA. *See* HCFA Ruling 79–4 (1979), *reprinted in* 52 Fed.Reg. 26,088, 26,090 (1987). The rationale underlying this ruling (that Medicare was not to receive any reimbursement for the care it had provided to the injured person) was that Medicare was "in the nature of social insurance." *Id.*

Since MCRA's enactment in 1962, neither HCFA nor any other administrative agency has ever indicated, or even suggested, that MCRA applies to Medicare or FEHBA expenses. These agency statements and silences, taken in conjunction with the absence of regulations that would formalize and facilitate the Government's recovery of Medicare or FEHBA costs under MCRA, lend further credence to Defendants' position that MCRA was never meant to apply to Medicare or FEHBA expenses.

### 3. Application of the *Brown & Williamson* Principles

Having considered both the legislative history and agency interpretations of MCRA, the Court's final task is to apply the *Brown & Williamson* principles enunciated in Section IV.A.1 to discern what Congress' intent was in enacting MCRA in 1962 and amending it in 1996. Based on this examination, the Court must conclude that MCRA does not provide the Government with a cause of action to recover Medicare or FEHBA expenses. The legislative history and relevant agency conduct, when taken together, overwhelmingly support the notion that MCRA was never intended to be used in the way the Government now advocates.

First, it is significant that even though FEHBA existed *before* MCRA's enactment, MCRA makes *no* reference to FEHBA—either in the statute itself, in the legislative history or in agency interpretations.

[5, 6] Second, it is striking that the Government had never, prior to the initiation of this lawsuit in 1999, attempted to recover Medicare or FEHBA costs under MCRA. Although the Government is correct that mere nonuse of a statute cannot cause the Government to forfeit powers granted thereunder, *see United States v. Morton Salt Co.,* 338 U.S. 632, 647–48, 70 S.Ct. 357, 94 L.Ed. 401 (1950), nonuse can be highly significant. When, despite many opportunities to do so, a government agency refuses to take advantage of the wide-ranging powers seemingly implicated by a statute's plain language, courts may presume that Congress did not intend the statute to be given the meaning that its language, in a vacuum, might imply. *See Brown & Williamson,* 120 S.Ct. at 1306–07; *see also Bankamerica Corp.,* 462 U.S. at 130–31, 103 S.Ct. 2266 (holding that where Government had not applied a statute in a particular way in 60 years, it had effectively acknowledged that it lacked authority to do so); *Bunte Bros.,* 312 U.S. at 352, 61 S.Ct. 580; *National Classification Comm. v. United States,* 746 F.2d 886, 892 (D.C.Cir.1984). This is particularly true in this instance, where the broader interpretation of MCRA (*i.e.,* that every conceivable type of government expenditure, even under Medicare and FEHBA, can be recovered under MCRA) had *never* been advanced by any government entity until thirty-seven years after the statute's enactment.

Third, Congress is presumed to act "against the backdrop" of HCFA's interpretations of the statutes HCFA is entrusted to administer. *See Brown & Wil-*

liamson, *120 S.Ct. at 1306–07. HFCA consistently indicated that it did not understand MCRA to cover Medicare or FEHBA expenses, and Congress never expressed any disapproval with HFCA's readings of MCRA. In fact, Congress' enactment of the 1996 amendment to MCRA, which the parties agree codified the existing manner in which MCRA was being enforced, can be viewed as a ratification of HFCA's consistent and narrow interpretation of that statute. 120 S.Ct. at 1307. Congress had the opportunity to express its displeasure with the restrictive way in which MCRA was being enforced, but it did not do so.*

Finally, given Congress' intense involvement in legislative regulation of tobacco,[17] and its keen awareness of "tobacco's health hazards and its pharmacological effects," 120 S.Ct. at 1313, it is simply impossible to conclude that the Government's current interpretation of MCRA, either in its original or in its 1996 amended form, is one that Congress intended. In fact, the Government's reading is in direct tension with Congress' recognized intent to create a "distinct scheme to regulate the sale of tobacco products, focused on labeling and advertising, and premised on the belief that the FDA lacks such jurisdiction under the FDCA." *Id.* at 1313. It is therefore particularly difficult to believe that Congress would have intended to subject tobacco companies to extraordinary financial liability under MCRA, when those entities are not even subject to rudimentary FDA regulation.

Congress has, through hearings and legislation, closely monitored the cigarette industry. While, over the years, it may not have adopted the aggressive, pro-consumer and pro-health stance that many activists have continually fought so hard for, the inescapable fact is that Congress chose, as a legislative body, to use only limited measures to regulate tobacco products and minimize their health hazards to the public. In light of all these considerations, it is simply inconceivable that the executive branch possessed for so many years (thirty-seven for FEHBA and thirty-four for Medicare) a statutory weapon that could wield the economic, and therefore regulatory, clout MCRA would carry if enforced as the Government advocates. This is especially true given that there has never been any congressional recognition that this substantial power existed or congressional demand that it be utilized. Congress' total inaction for over three decades "preclude[s] an interpretation" of MCRA that would permit the Government to recover Medicare and FEHBA expenses.[18] *See Brown & Williamson*, 120 S.Ct. at 1312.

Accordingly, the Government's MCRA claim must be dismissed.

**B. The Government's Medicare Secondary Payer Provisions Claim**

The Medicare Secondary Payer provisions ("MSP"), a series of amendments to Medicare enacted in 1980 and further amended thereafter,[19] provide the Govern-

---

**17.** For a detailed chronology of congressional action in this area, *see Brown & Williamson*, 120 S.Ct. at 1305–12.

**18.** There is an additional reason that the Court reaches this conclusion. When Congress enacted the 1996 amendment, there was an existing body of case law concerning the "collateral source" doctrine in which federal and state courts have consistently and uniformly declared Medicare to be a separate and distinct "social insurance" fund into which citizens contribute. *See, e.g., District of Columbia v. Jackson*, 451 A.2d 867, 871–872 (D.C.1982); *Molzof v. United States*, 6 F.3d 461, 466 (7th Cir.1993); *Titchnell v. United States*, 681 F.2d 165, 174–76 (3d Cir.1982).

According to these cases, it is not the Government, but rather individuals, who "pay for" Medicare. If this Court were to rule in favor of the Government on the MCRA Count, it would effectively be declaring that the Government "pays for" Medicare, thus undermining the viability of a substantial and long-standing body of case law to the contrary.

**19.** Pub.L. No. 97–35, § 988, 95 Stat. 604 (1981). The amendments are codified at 42 U.S.C. § 1395y, which provides in pertinent part:

In order to recover payment under this subchapter for such an item or service, the United States may bring an action against

**U.S. v. PHILIP MORRIS INC.**    **145**
Cite as 116 F.Supp.2d 131 (D.D.C. 2000)

ment with statutory authority to obtain reimbursement for certain Medicare expenditures. MSP essentially makes Medicare a "secondary" payer where another entity is required to pay under a "primary plan" for an individual's health care. *See* 42 U.S.C. § 1395y(b)(2). If the "primary" payer has an obligation to pay for such costs, but does not and cannot "reasonably be expected" to do so, Medicare may make a "conditional payment" and later demand reimbursement from the primary plan. 42 U.S.C. § 1395y(b)(2)(A) and (B)(ii). If the entity administering the primary plan refuses to reimburse, the Government may then bring suit against it to recover the Medicare payments.

A "primary plan" is defined in the statute as "a group health plan or large group health plan, ... a workmen's compensation law or plan, an automobile or liability insurance policy or plan (*including a self-insured plan*) or no fault insurance ..." 42 U.S.C. § 1395y(b)(2)(A) (emphasis added). A "self-insured plan" is in turn defined in the implementing regulations as an "*arrangement,* oral or written ... to provide health benefits or medical care or [to] assume legal liability for injury or illness" under which an entity "carries its own risk instead of taking out insurance with a carrier." *See* 42 C.F.R. §§ 411.21 (defining the term "plan") (emphasis added) and 411.50(b) (defining the term "self-insured plan").

It is this last phrase—"self-insured plan"—on which the Government rests its legal basis for Count 2 of this lawsuit. The Government's theory, as expressed in its Opposition to Defendants' Motion to Dismiss, is that Defendants have themselves assumed the liability stemming from tobacco-related tort suits and, therefore, as

"self-insured" entities, may be sued under MSP.

To survive a motion to dismiss, a complaint "must allege all the material elements of [a] cause of action." *Taylor v. FDIC,* 132 F.3d 753, 761 (D.C.Cir.1997) (internal citations omitted); *see also Croixland Properties Ltd. Partnership v. Corcoran,* 174 F.3d 213, 215 n. 2 (D.C.Cir. 1999); *Alicke v. MCI Communications Corp.,* 111 F.3d 909, 912 (D.C.Cir.1997).

The MSP Count of the Government's Complaint states simply that "defendants are required and responsible to make payment for the health care costs of Medicare beneficiaries that were caused by defendants' tortious and unlawful conduct, which costs have been and will be unlawfully shifted to the United States." Compl. at ¶ 170. The Complaint does allege, in other words, that Defendants are "required or responsible ... to make payment" for certain health care costs, thus tracking a portion of the statute's language. *See* 42 U.S.C. § 1395y(b)(2)(B)(ii).

However, there are a number of "material elements" [20] of an MSP cause of action conspicuously absent from the Complaint. First, the Complaint does not allege, in even the most conclusory fashion, the existence of any "primary plan" under which Defendants pay health care costs, despite the fact that the statute on which the Government bases its claim applies only to entities required to make payment "under a primary plan." *See* 42 U.S.C. § 1395y(b)(2)(B)(ii). In fact, the Complaint does not even allege the existence of any *elements* of a "primary plan," such as a "plan" or an "arrangement." *See* 42 C.F.R. § 411.21. Even if the Complaint had made such allegations, it still fails to allege, or even suggest, that Defendants specifically maintain any form of "*self-insured* plan" (emphasis added), even though this is the *only* theory on which the Government bases Defendants' liability.[21] In-

---

any entity which is required or responsible (directly, as a third-party administrator, or otherwise) to make payment with respect to such item or service (or any portion thereof) under a primary plan ...
42 U.S.C. § 1395y(b)(2)(B)(ii).

**20.** *See Taylor,* 132 F.3d at 761.

**21.** Although the Government argues *in its brief* that Defendants are a "self-insured plan," it does not make this allegation in the Complaint. In fact, the term "self-insured" appears only once in the entire Complaint. *See* Compl. at ¶ 168 (MSP provisions "provide that the Medicare Program will not pay for the cost of medical care if certain third par-

deed, the Complaint does not allege that Defendants are "self-insured" in any way.

In those instances in which the Government has used MSP to seek recovery from entities that are unquestionably providers of insurance, as is certainly the typical factual scenario,[22] there has been no dispute regarding whether defendants maintain a "primary plan," since that term expressly includes a "group health plan," a "liability insurance policy or plan," and other traditional forms of insurance. *See* 42 U.S.C. § 1395y(b)(2). In those cases, the Government's allegation that defendants are "responsible" for certain health care payments is sufficient to state an MSP claim, as it gives "sufficient information to suggest that there exists some recognized legal theory upon which relief can be granted." *See Wells v. United States*, 851 F.2d 1471, 1473 (D.C.Cir.1988) (internal citations and quotations omitted).

[7] In the instant case, however, the claim of "responsibility" to make health care payments is entirely conclusory, since Defendants are clearly not insurance entities and the Complaint is devoid of any allegation that they have established a "plan" or "arrangement" under which they would be considered self-insured entities subject to MSP's reach. Without alleging the existence of such a "plan" or "arrangement," the Complaint's assertion that Defendants are "required and responsible to make payment" for certain health care

costs fails to give Defendants even the most rudimentary notice of the Government's theory of liability. *See Wells*, 851 F.2d at 1473. Accordingly, the MSP count must be dismissed.

### C. The Government's Racketeer Influenced and Corrupt Organizations Claim

[8] The Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, prohibits individuals or entities from engaging in racketeering activity associated with an "enterprise."[23] To successfully state a RICO claim, the Government must allege "(1) the conduct (2) of an enterprise (3) through a pattern of racketeering activity." *Salinas v. United States*, 522 U.S. 52, 62, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997) (citing *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)).

An enterprise includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981) (quoting 18 U.S.C. § 1961(4)). "Racketeering activity" includes, among other things, acts prohibited by any one of a number of criminal statutes. 18 U.S.C. § 1961(1). A "pattern" is demonstrated by two or more instances of "racketeering activity" ("predicate acts")

---

ties—such as liability insurance plans, including self-insured plans—have paid, or can reasonably be expected to pay promptly for those costs). Indeed, the entire MSP Count occupies only slightly more than one page of the 87–page Complaint.

**22.** Courts have uniformly recognized that the statute's clear purpose was to grant the Government a right to recover Medicare costs from insurance entities. *See, e.g., Perry v. United Food and Commercial Workers Dist. Unions 405 and 442*, 64 F.3d 238, 243 (6th Cir.1995); *Baptist Memorial Hosp. v. Pan Am. Life Ins. Co.*, 45 F.3d 992, 998 (6th Cir.1995); *Evanston Hosp. v. Hauck*, 1 F.3d 540, 544 (7th Cir.1993); *see also Health Ins. Ass'n of Am. v. Shalala*, 23 F.3d 412, 427 n. * (D.C.Cir.1994) ("[T]he MSP statute plainly intends to allow

recovery only from an insurer.") (Henderson, J., concurring). What little legislative history exists is consistent with this interpretation. *See* H.R. Conf. Rep. No. 96–1479 (1980), *reprinted in* 1980 U.S.C.C.A.N. 5903, 5924. As of this time, there are no reported decisions in which the Government has sued a tortfeasor under MSP. One case, in which a private party has brought such a suit, is currently being litigated. *See Mason v. American Tobacco Co.*, Civ. No. 7–97CV–293–X (N.D.Tex.).

**23.** Although RICO was originally enacted to "combat organized crime," its application has expanded far beyond that arena. *See, e.g., H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 248, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989).

that occur within ten years of one another. 18 U.S.C. § 1961(5). In this case, the alleged predicate acts are violations of 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud).

The Government brings its RICO counts (Counts 3 and 4) under two specific subsections of § 1962. Count 3 is brought under subsection (c), which makes it unlawful to "conduct or participate, directly or indirectly," in an enterprise through a "pattern of racketeering activity." Count 4 is brought under subsection (d), which makes it unlawful to "conspire to violate" subsection (c).

RICO provides both legal and equitable remedies. Plaintiffs may seek treble damages—that is, three times the value of the damages inflicted on them by a defendant's unlawful racketeering activity. 18 U.S.C. § 1964(c). In addition, the Court may in its discretion order equitable remedies, "including but not limited to" restricting defendants from taking future actions and even dissolving or restructuring the "enterprise." [24] In the instant case, the Government seeks to "disgorge" Defendants' past profits associated with and derived from their alleged unlawful racketeering activity, and to enjoin them from committing future RICO violations. [25]

### 1. Future Injunctive Relief

Except for Liggett, [26] Defendants do not dispute that the Government has adequately alleged the elements of a RICO claim (i.e., "enterprise," "racketeering activity," and "pattern"). What they do dispute is whether the Government has adequately alleged that Defendants' racketeering activity will continue into the future, so as to warrant the broad equitable relief sought.

The Government contends that the pattern of the past four decades in which the tobacco companies have made countless false and deceptive statements, concealed and destroyed documents, and improperly asserted legal privileges to evade legitimate civil discovery and government requests, establishes a "reasonable likelihood," *SEC v. Steadman*, 967 F.2d 636, 647 (D.C.Cir.1992), that Defendants will continue to violate the law. Accordingly, the Government requests equitable relief in the form of disgorgement of the profits they have realized from their criminal activities, for the purpose of deterring De-

---

24. Section 1964(a) states in full:
The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, *including, but not limited to:* ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, *including, but not limited to*, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons.
18 U.S.C. § 1964(a) (emphasis added).

25. Specifically, the Government requests that the Court issue a "permanent injunction" to prohibit Defendants and their agents, employees and successors from (1) associating with persons known "to be engaged in [similar] acts of racketeering"; (2) participating in the management or control of CTR or TI; (3) making misleading statements concerning

cigarettes; and (4) engaging in "any public relations endeavor that misrepresents, or suppresses information concerning, the health risks associated with cigarette smoking or the addictive nature of nicotine." Compl. § VII.B.2.

The Government also requests that Defendants be ordered to (1) fund, but have no influence or control over, "a legitimate and sustained corrective public education campaign"; (2) disclose and disseminate documents relating to the targeting of children; (3) make "corrective statements regarding the health risks of cigarette smoking and the addictive properties of nicotine"; (4) fund, but have no influence or control over, "sustained [cigarette smoking] cessation programs"; and (5) fund, but have no influence or control over, "a sustained educational campaign devoted to the prevention of smoking by children. *Id.*

26. Liggett's separate arguments will be addressed in Section V of this Opinion.

fendants and others from committing such acts in the future. Govt's Opp'n, at 92.

Defendants concede that "past allegations may be relevant to whether … a 'reasonable likelihood' exists" that such acts will continue into the future, Defs.' Mem. at 65, but argue that the Government's exclusive reliance on these past violations and its speculative allegations of future misconduct are too "conclusory" to justify equitable relief. Defs.' Mem. at 68. Defendants contend that, under the law of this Circuit, the Government may not rely solely on allegations of earlier unlawful activity to warrant the imposition of equitable relief. Defs.' Mem. at 66 n.* (citing *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1228 (D.C.Cir.1989)). Defendants also argue that, because the RICO predicate acts in this case involve mail and wire fraud, the command of Federal Rule of Civil Procedure 9(b) that allegations of fraud be made with "particularity" is applicable, and that the Government has failed to make the particularized showing required by this Rule. Defs.' Mem. at 67–68.

Finally, Defendants argue that the Master Settlement Agreement ("MSA") which they entered into with the States enjoins Defendants from engaging in the same unlawful activity which the Government believes will occur in the future. Defendants point to various specific M.S.A. § provisions that they contend will make equitable relief in this action unnecessary and unwarranted. Accordingly, they argue that their "business" (manufacturing, selling and marketing tobacco products) will not present "opportunities to violate the law in the future," Defs.' Mem. at 66 n.* (citing *First City*, 890 F.2d at 1228).

The Government responds that, applying the three factors announced in *First City*, there is indeed a "reasonable likelihood" that Defendants' past unlawful conduct will continue into the future. Govt's Opp'n at 86. The Government maintains it would be able to prove at trial that the past conduct alleged "would provide strong support for an inference of a risk of future wrongdoing," and that, to the extent that Defendants argue that the Government is required to make such a showing now, at the motion to dismiss stage, rather than at trial, they are simply mistaken. Govt's Opp'n at 87.T h e Government also denies that it is required to plead the likelihood of Defendants' future acts of fraud with particularity under Fed.R.Civ.P. 9(b). It argues that the core purpose of 9(b) is to protect defendants from reputational harm and "strike" suits, and to provide them with "sufficient information to respond to plaintiff's claims." *Firestone v. Firestone*, 76 F.3d 1205, 1211 (D.C.Cir.1996). Finally, the Government contends that Defendants' reading of Rule 9(b) would "demand access to a crystal ball," Govt's Opp'n at 90, because it would force plaintiffs to describe the detailed contours of acts which have not yet occurred.

**[9]** To obtain injunctive relief in this Circuit, a plaintiff must show that the defendant's past unlawful conduct indicates a "'reasonable likelihood of further violation(s) in the future.'" *SEC v. Kenton Capital, Ltd.*, 69 F.Supp.2d 1, 15 (D.D.C. 1998) (Kollar–Kotelly, J.) (quoting *SEC v. Savoy Ind., Inc.*, 587 F.2d 1149, 1168 (D.C.Cir.1978)); *SEC v. Bilzerian*, 29 F.3d 689, 695 (D.C.Cir.1994).

**[10]** To determine whether there is a "reasonable likelihood" of future violations, the following factors must be considered: "[1] whether a defendant's violation was isolated or part of a pattern, [2] whether the violation was flagrant and deliberate or merely technical in nature, and [3] whether the defendant's business will present opportunities to violate the law in the future." *First City*, 890 F.2d at 1228 (citing *Savoy Indus.*, 587 F.2d at 1168); *Bilzerian*, 29 F.3d at 695. None of these three factors is determinative; rather, "the district court should determine the propensity for future violations based on the totality of circumstances." *First City*, 890 F.2d at 1228 (citing *SEC v. Youmans*, 729 F.2d 413, 415 (6th Cir.1984)).

[11]  The Government has clearly and overwhelmingly satisfied each of the three *First City* factors. First, Defendants cannot possibly claim that their alleged conspiratorial actions were "isolated." On the contrary, the Complaint describes more than 100 predicate acts spanning more than a half-century. Second, Defendants cannot contend that the alleged RICO violations are "technical in nature." The Government alleges that Defendants' numerous misstatements and acts of concealment were made intentionally and deliberately, rather than accidentally or negligently, as part of a far-ranging, multifaceted, sophisticated conspiracy. Third, Defendants' business of manufacturing, selling and marketing tobacco products clearly "present[s] opportunities to violate the law in the future." *First City*, 890 F.2d at 1228. As the Government points out, as long as Defendants are in the business of selling and marketing tobacco products, they will have countless "opportunities" and temptations to take unlawful actions, just as it is alleged they have done since 1953. Govt's Opp'n at 87.

[12]  Defendants' contention that the M.S.A. § precludes such opportunities is not persuasive. *See* Defs.' Mem. at 70–77. In arguing that the M.S.A. § obviates the need for injunctive relief, Defendants implicitly ask the Court to make the following two assumptions: that Defendants have complied with and will continue to comply with the terms of the MSA, and that the M.S.A. § has adequate enforcement mechanisms in the event of non-compliance. Even assuming the Court could take judicial notice of the MSA, that document's existence certainly does not mean that the Court can or should assume that the M.S.A. § will be fully enforced or otherwise accomplish its intended objectives.

Further, the decisions Defendants cite for the proposition that past allegations of wrongdoing alone cannot warrant injunctive relief are inapposite, because those cases all discuss the standard for *proving* a reasonable likelihood of future violations, not for *pleading* it at the motion to dismiss stage. *See, e.g., SEC v. Commonwealth Chem. Secs,* 574 F.2d 90, 100 (2d Cir.1978); *SEC v. Blatt,* 583 F.2d 1325, 1334 (5th Cir.1978).

Indeed, the sole decision cited by Defendants which does address the injunctive relief standard appropriate for a motion to dismiss, *SEC v. Cassano,* 61 F.Supp.2d 31 (S.D.N.Y.1999), clarifies the distinction between those two very different legal standards. In *Cassano,* the court recognized that it was "obliged to accept the truth" of the Government's allegation that defendants are "likely to violate securities laws in the future," "for purposes of this motion to dismiss, and so this aspect of the defendants' motion must be denied. Whether the [Government] can prove the allegation remains to be seen." *Id.* at 34. The same can be said of the instant case.

[13]  Finally, Defendants' contention that the Government "must allege 'a 'reasonable likelihood' of future violations—future frauds—with the specificity required by Rule 9(b)," Defs.' Mem. at 67, simply defies common sense. It is difficult to see how a plaintiff could ever allege with "particularity" an offense which has not yet happened. Defendants are able to cite only two decisions, both of which are from other circuits, in support of this contention: *Menasco, Inc. v. Wasserman,* 886 F.2d 681 (4th Cir.1989) and *Continental Realty Corp. v. J.C. Penney Co.,* 729 F.Supp. 1452 (S.D.N.Y.1990).

In *Menasco,* the defendant's actions "involved a limited purpose," "one perpetrator," "one set of victims," and the racketeering transaction "took place over approximately one year." 886 F.2d at 684. The court specifically held that defendant's acts, as alleged, did not "suggest a 'distinct threat of long-term racketeering activity, either implicit or explicit.' " *Id.* (quoting *H.J. Inc.,* 492 U.S. at 242, 109 S.Ct. 2893). It was on this basis, and these facts, that the court determined that plaintiff's allegations of on-going fraud missed the Rule 9(b) mark. In

**150**          **116 FEDERAL SUPPLEMENT, 2d SERIES**

*Continental Realty,* the court observed that plaintiff's attempt to "infer a threat of repeated fraud from a single alleged scheme would in effect render [RICO's] pattern requirement meaningless." 729 F.Supp. at 1455. Therefore, the court declared that plaintiff's allegations did not pass Rule 9(b) muster.

In neither decision—nor any other decision cited by Defendants, for that matter—did the plaintiff allege as many predicate acts (116), as long a duration of racketeering activity (45 years), as many significant participants (11 entities, which together control virtually the entire tobacco products market), as many victims (hundreds of millions of individuals, scores of government entities, the federal government) or as much money derived from the racketeering acts (hundreds of billions of dollars).

Based on the sweeping nature of the Government's allegations, and the fact that the parties have barely begun discovery to test the validity of these allegations, it would be premature for the Court to rule on the propriety of injunctive relief in this case. At a very minimum, the Government has stated a claim for injunctive relief; whether the Government can prove it, "remains to be seen."

### 2. The Specific Equitable Relief of Disgorgement

Defendants contend that even if the Government has alleged the likelihood of future illegal activity, it is still not entitled to the remedy of disgorgement,[27] because that particular remedy is never available under a civil RICO count. Defendants contend that civil RICO remedies must be forward-looking, while disgorgement is, by its very nature, backward-looking. *See* Defs.' Mem. at 80. They argue that the Government is impermissibly attempting to convert its civil RICO count into a criminal one by asking for disgorgement, which is akin to criminal forfeiture of the

proceeds of unlawful activity (and permitted only under criminal, not civil, RICO suits). Defendants contend that RICO is to be "read *in pari materia* with the Clayton Act, from which it is in large part derived," Defs.' Mem. at 80, and that disgorgement is not permitted under that act. Finally, Defendants argue that disgorgement in this case would be "impermissibly punitive" and would constitute a double recovery, since the Government already seeks billions of dollars in damages under the Complaint's MCRA and MSP counts. Defs.' Mem. at 82.

The Government argues that disgorgement is an available and appropriate remedy for civil violations of RICO, and that Defendants' claims to the contrary are, in addition to being legally incorrect, premature at this stage. The Government argues that RICO's plain language does not foreclose disgorgement, and that the Supreme Court has held disgorgement generally available unless a particular statute, "by a necessary and inescapable inference, restricts the court's jurisdiction in equity." *Porter v. Warner Holding Co.,* 328 U.S. 395, 398–99, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946). The Government rejects Defendants' argument that disgorgement is backward-looking and punitive, arguing that it is in fact remedial and may properly serve as a deterrent to Defendants and others who may contemplate committing similar offenses. In addition, the Government contends that disgorgement in this case would in fact serve a forward-looking purpose, namely, to prevent Defendants from using proceeds from prior illegal activities as "capital available for the purpose of funding or promoting [future] illegal conduct." Govt's Opp'n at 98 n. 70 (quoting *United States v. Private Sanitation Indus. Ass'n,* 914 F.Supp. 895, 901 (S.D.N.Y.1996)).

The only court of appeals to consider the question of whether disgorgement is an

---

27. The Government seeks to disgorge all the profits that Defendants derived from past unlawful conduct related to the alleged RICO

enterprise, beginning in 1953 and continuing to the present.

**U.S. v. PHILIP MORRIS INC.**     **151**
Cite as 116 F.Supp.2d 131 (D.D.C. 2000)

appropriate civil RICO remedy, the Second Circuit, has answered in the affirmative. *See United States v. Carson,* 52 F.3d 1173 (2d Cir.1995). The Second Circuit concluded, based on § 1964's plain language [28] and its legislative history, that disgorgement is permitted in civil RICO suits. The court stated that "the legislative history of § 1964 indicates that the equitable relief available under RICO is intended to be 'broad enough to do all that is necessary.'" *Id.* at 1181–82 (quoting S.Rep. No. 617, 91st Cong., 1st Sess. at 79 (1969)).

[14] Even before the Second Circuit's decision in *Carson,* district courts within the Second Circuit had reached the same conclusion. *See United States v. Bonanno Organized Crime Family of La Cosa Nostra,* 683 F.Supp. 1411, 1442–49 (E.D.N.Y. 1988), *aff'd on other grounds,* 879 F.2d 20 (2d Cir.1989); *United States v. Private Sanitation Indus. Ass'n,* 793 F.Supp. 1114, 1151–52 (E.D.N.Y.1992); *United States v. Int'l Bhd. of Teamsters,* 708 F.Supp. 1388, 1408 (S.D.N.Y.1989). Given that the only circuit to have addressed the issue has declared, in a well-reasoned and persuasive opinion, that disgorgement is permissible in civil RICO claims, and given that Defendants cannot point to a single federal court that has declared otherwise, this Court is not inclined to categorically rule out that remedy at the motion to dismiss stage.

Defendants argue that because RICO was modeled after the Clayton Act, 15 U.S.C. § 26, and because a judge of this District Court has declared disgorgement to be unavailable under the Clayton Act, *FTC v. Mylan Labs., Inc.,* 62 F.Supp.2d 25, 40–42 (D.D.C.1999) (Hogan, J.), disgorgement should likewise be unavailable under civil RICO. Defendants do not explain, however, why this Court should rely on non-binding federal district court case law under a different statute, when there is persuasive case law—albeit from another circuit—on the precise statute at issue.

Further, the Supreme Court has not, as Defendants contend, declared that the Clayton Act and RICO should be read "*in pari materia.*" [29] Defs.' Mem. at 80. Rather, the Supreme Court has held that while the "Clayton Act analogy is *generally* useful in civil RICO cases," particular case law interpreting the Clayton Act "may not apply without modification in every civil RICO case." *Klehr v. A.O. Smith Corp,* 521 U.S. 179, 180, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997) (emphasis added). Equally important is the fact that Judge Hogan's primary concern in *Mylan Labs*—the possibility of "duplicative recoveries"—is not applicable in this case, since the Court is granting Defendants' motion to dismiss the non-RICO claims. Accordingly, the Government is provided with only one "route to defendants' allegedly ill-gotten gains," namely, its civil RICO suit. 62 F.Supp.2d at 41.

[15, 16] The Court of Appeals in *Carson* observed that whether disgorgement is appropriate in a particular case depends on whether there is a "*finding* that the gains are being used to fund or promote the illegal conduct, or constitute capital available for that purpose." 52 F.3d at 1182 (emphasis added). This Court has not made such a finding, nor could it at this stage. So long as disgorgement is permitted in civil RICO suits as a matter of law, as the Court so concludes, it would not be appropriate to ask, at the present stage, whether the Government has proved that it has an adequate basis for seeking such a remedy. Accordingly, the Court will permit the Government to pursue the

---

28. *See supra* note 24 for the relevant text of § 1964.

29. In fact, this Latin phrase, which roughly translated means "on the same matter," and which would suggest that the Clayton Act and RICO should be read in a way to avoid incon-

sistencies in their respective interpretations, is not even used in either *Klehr v. A.O. Smith Corp.,* 521 U.S. 179, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997), or *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992), the two Supreme Court decisions Defendants cite.

**152**        **116 FEDERAL SUPPLEMENT, 2d SERIES**

remedy of disgorgement and the motion to dismiss as to this claim must be **denied**.

### V. Liggett's Motion To Dismiss RICO Counts

Although Liggett joins the other Defendants' "broad arguments of general applicability to the Complaint," Memorandum of Liggett in Support of Motion to Dismiss the Complaint ("Liggett Mem.") at 1, it has filed its own motion to dismiss the Complaint's RICO counts, advancing some additional grounds in support thereof.

#### A. The RICO Elements

Liggett argues that the Government has not sufficiently alleged, as to it, two of the four elements required for a RICO claim: "enterprise" and "pattern of racketeering activity".[30]

##### 1. RICO's "Enterprise" Element

[17] As defined earlier, an "enterprise," as that term is used in a RICO claim, is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *Turkette*, 452 U.S. at 580, 101 S.Ct. 2524. It need not have a formal hierarchy or framework, "so long as it involves some structure, to distinguish an enterprise from a mere conspiracy." *United States v. Richardson*, 167 F.3d 621, 625 (D.C.Cir. 1999) (internal citations and quotations omitted). The three elements necessary to establish an enterprise are: "(1) a common purpose among the participants, (2) organization, and (3) continuity." *United States v. Perholtz*, 842 F.2d 343, 362 (D.C.Cir.1988).

Liggett argues that the Government has not adequately alleged the existence of an enterprise. Specifically, Liggett contends that the Government has failed to show that the putative enterprise had the requisite "organization." According to Liggett, the Complaint makes only conclusory allegations, without describing how the enterprise operated, who its leaders were, or

how its decision-making process functioned. *See* Liggett Mem. at 25–26.

[18] The Court concludes that the Complaint properly alleges the existence of an enterprise, and Liggett's involvement therein. "It is clear an enterprise can be established through an informal group of people who come together for the common purpose of obtaining financial gain through criminal activity." *United States v. Cooper*, 91 F.Supp.2d 60, 68 (D.D.C.2000) (Joyce Green, J.) (citations omitted). The enterprise can be as simple as an "amoeba-like infra-structure that controls a secret criminal network." *United States v. Elliott*, 571 F.2d 880, 898 (5th Cir.1978).

[19] Liggett's argument that the Government must spell out the mechanics or logistics of the enterprise is unsupported by the case law. Numerous courts, in this Circuit and others, have established that the kind of allegations contained in the Government's Complaint are easily sufficient to survive a Rule 12(b)(6) motion. For example, in *Perholtz*, the complaint stated: "Defendant … constituted an enterprise … to wit, a group of individual, partnerships, and corporations associated in fact to unjustly enrich themselves from the proceeds of government contracts …" 842 F.2d at 351, n. 12. And in *Private Sanitation Ind. Ass'n*, 793 F.Supp. 1114, the complaint stated that the enterprise was "a group composed of, but not limited to" 112 defendants "associated-in-fact for the purpose of controlling the waste disposal industry in Long Island." *Id.* at 1126. In both cases, the allegations were deemed sufficient to survive a motion to dismiss. In the instant case, the Complaint alleges that Defendants decided on a joint objective to "preserve and expand the market for cigarettes and to maximize" their profits and "agreed that the strategy they were implementing was a 'long-term one' that required defendants to act in concert with each other on the current health controversy, as well as on issues

---

**30.** *See supra* Section IV.C, at 33–35.

that would face them in the future." Compl. at ¶¶ 33–34. The nature of these allegations is at least as detailed as those made in *Perholtz* and *Private Sanitation,* if not more so. Accordingly, the Government has adequately pleaded the enterprise element.

### 2. RICO's "Pattern Of Racketeering Activity" Element

A "pattern of racketeering activity" is defined as "at least two acts of racketeering activity" committed within a ten year period. In this case, as already noted, the Government relies on violations of 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud) as the "predicate acts" which transform Defendants' alleged misconduct into "racketeering activity." 18 U.S.C. § 1961(5). The mail fraud statute [31] provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting so to do," mails or causes the mailing of any matter, is guilty of mail fraud. 18 U.S.C. § 1341.

[20] Liggett argues that the Complaint does not allege convergence between the party deceived (individual smokers) and the party whose property was injured (the Government); according to Liggett, it was the Government that suffered economic injury, not individual smokers. Liggett Mem. at 29–30. Liggett's convergence argument misstates the relevant case law. A defendant who uses the mail with the *intent* of defrauding someone of property is guilty (or in this case, liable), whether the attempt succeeds or not. *See, e.g., Carpenter v. United States,* 484 U.S. 19, 26–27,

108 S.Ct. 316, 98 L.Ed.2d 275 (1987); *United States v. Pollack,* 534 F.2d 964, 971 (D.C.Cir.1976). According to the Complaint's allegations, Defendants did *intend* to defraud individual smokers of their property (*i.e.,* the money they spent on cigarettes).[32] Moreover, the Complaint also alleges—though it need not—that Defendants *succeeded* in defrauding individual smokers. *See* Compl. at ¶¶ 204(b)—(d).

Liggett also argues that the Complaint fails to meet the pleading standard of Federal Rule of Civil Procedure 9(b), which requires that "the circumstances constituting fraud . . . shall be stated with particularity." To satisfy this standard, a complaint must specify "the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud." *Firestone,* 76 F.3d at 1211 (internal quotations and citation omitted).

[21] The Appendix to the Complaint does describe the time, place, and content of each allegedly fraudulent act, states the fact(s) misrepresented, and names the particular Defendants involved. *See* Appendix at ¶¶ 13, 17, 22, 28, 31, 44, 66, 67, 70, 73, 77, 88, and 112. Although each allegation does not, in its body, include a statement of "what was retained or given up as a consequence of the fraud," *Firestone,* 76 F.3d at 1211, the Complaint does allege elsewhere that the item "given up" was the money the Government spent on tobacco-related health care. *See* Compl. at ¶ 6. Accordingly, the Complaint alleges the mail fraud acts with sufficient particularity.

---

**31.** The mail fraud and wire fraud statutes are construed identically. *See, e.g., United States v. Lemire,* 720 F.2d 1327, 1335 n. 6 (D.C.Cir. 1983) (citations omitted). At any rate, since thirteen of the fourteen acts of racketeering alleged against Liggett are mail fraud, and since a "pattern of racketeering activity" requires two or more acts, it is the mail fraud, not the wire fraud, analysis which is dispositive in this case.

**32.** The Complaint states: "Defendants and others known and unknown did knowingly and intentionally devise and intend to devise a scheme and artifice to defraud, and obtain money and property from, members of the public." Compl. at ¶ 204(a).

**B. Liggett's Alleged Withdrawal From the Conspiracy**

Liggett also argues that, regardless of whether the Government has generally satisfied the RICO elements, Liggett has "withdrawn" from the enterprise, and accordingly the Complaint fails to adequately allege the "enterprise" element as to Liggett and/or the need for injunctive relief against it.

Liggett contends that the "public record" amply demonstrates that it is no longer acting in concert with the other Defendants, and that there is no reasonable likelihood it will commit unlawful acts in the future to warrant injunctive relief. Even if the Court were precluded from considering these outside sources, Liggett contends that it is "plain from the face of the Complaint that Liggett poses no risk of committing future acts of racketeering activity" and that the Complaint "does not, and indeed cannot, make any allegation that Liggett poses a risk of any future violations of RICO." Liggett Mem. at 19.

The Government responds that this Court is "limited to consideration of the facts alleged in the four corners of the complaint," which do not indicate that Liggett has withdrawn. Opp'n to Liggett at 10. The Government also contends that it would be premature, at this early stage, for the Court to determine whether Liggett threatens to commit future illegal acts or not.

**[22]** Although courts may take the "public record" into account when deciding motions to dismiss,[33] that record includes only certain official documents, not mere newspaper articles.[34] Liggett's evidentiary support for its claim to have withdrawn from the enterprise consists almost exclusively of quotations from newspaper articles or from government reports that are neither part of a public record nor matters for judicial notice.[35] *See* Liggett Mem. at 5–10. Accordingly, the Court may not take these documents into account.

**[23, 24]** Without reference to the sundry newspaper clippings Liggett cites, its claim to have withdrawn from the enterprise is wholly unpersuasive. To establish that it is no longer a member of the enterprise, Liggett must show that it "withdrew from the conspiracy by an affirmative act designed to defeat the purpose of the conspiracy." *See In Re Corrugated Container Antitrust Litig.*, 662 F.2d 875, 886 (D.C.Cir.1981). Because withdrawal is an affirmative defense, the affirmative acts listed above must "clearly appear[ ] on the face of the complaint." *Fortner v. Thomas*, 983 F.2d 1024, 1028 (11th Cir.1993).

The Complaint is devoid of any affirmative acts by Liggett that would indicate its withdrawal from the RICO enterprise. On the contrary, the Complaint expressly states that "[f]rom at least the early 1950's and *continuing up to and including the date of the filing of this complaint* . . . Liggett . . . did unlawfully, knowingly and intentionally" conduct and participate in, and conspire to participate in, the enterprise's affairs. Compl. at ¶¶ 172, 201 (emphasis added).

---

33. *See, e.g., Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1222, 1226 n. 6 (D.C.Cir.1993); *Phillips v. Bureau of Prisons*, 591 F.2d 966, 969 (D.C.Cir.1979).

34. Public records are "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report . . . or (C) in civil actions and proceedings . . ., factual findings resulting from an investigation made pursuant to authority granted by law." Fed.R.Evid. 803(8).

35. The Court is aware of only one relevant document cited by Liggett which is possibly part of the public record: a report issued by the Federal Trade Commission entitled "Competition and the Financial Impact of the Proposed Tobacco Settlement" (Sept.1997). *See* Liggett Mem. at 3. However, Liggett does not quote from the report or indicate in any way how it would establish Liggett's withdrawal from the enterprise.

Despite Liggett's attempt to use the Complaint's language to show that it is now a fully law-abiding corporate citizen, the above quoted language from the Complaint adequately alleges that Liggett is likely to commit certain racketeering acts in the future. In addition, given the complex nature of the Government's allegations, and the fact that numerous allegations simply refer to "Defendants"—without expressly excluding Liggett[36]—it would be premature at this time to preclude the Government from pursuing injunctive relief.

Accordingly, Liggett's separate motion to dismiss the Government's RICO Count must be **denied.**

### V. Conclusion

For the reasons stated at length above, Certain Defendants' Motion to Dismiss for Failure to State a Claim [# 72] is **granted in part and denied in part.** The motion is **granted** as to Count 1 (the Medical Care Recovery Act claim), **granted** as to Count 2 (the Medicare Secondary Payer claim), and **denied** as to Counts 3 and 4 (the Racketeer Influenced and Corrupt Organization Act claims). The Liggett Group Inc.'s Motion to Dismiss for Failure to State a Claim [# 70] is **denied.**

An Order will issue with this Opinion.



**CONFEDERATED TRIBES OF COOS, LOWER UMPQUA & SIUSLAW INDIANS, Plaintiff,**

**v.**

**Bruce H. BABBITT Secretary United States Department of the Interior,**

**and**

**Kevin Gover, Assistant Secretary for Indian Affairs United States Department of the Interior, Defendants.**

No. Civ.A. 99–2517(JHG).

United States District Court,
District of Columbia.

Sept. 29, 2000.

Indian tribe sought judicial review of determination by Secretary of Interior that gaming was prohibited on particular parcel of land. On cross motions for summary judgment, the District Court, Joyce Hens Green, J., held that: (1) exception to statutory prohibition against gaming on land acquired into trust after October 17, 1988, allowing gaming on adjacent parcels, was not applicable, but (2) exception for land taken into trust as part of restoration of federal recognition was not limited to land taken into trust at time of tribe's restoration.

Motions denied; case remanded.

**1. Administrative Law and Procedure**
⟜676

Court's review of agency decision challenged as arbitrary, capricious, or abuse of discretion is based on full administrative record that was before agency at time it made its decision. 5 U.S.C.A. § 706(2)(A).

---

**36.** See, e.g., Compl. at ¶ 208 ("After a span of more than forty-five years of deception and fraud, it would be unreasonable to believe that *defendants* will voluntarily cease their

unlawful conduct, or that their pattern of racketeering activity will cease without intervention by this Court.") (emphasis added).

# EXHIBIT 6

149 Cong.Rec. S8499-02
149 Cong. Rec. S8499-02, 2003 WL 21467391 (Cong.Rec.)

Congressional Record --- Senate
Proceedings and Debates of the 108th Congress, First Session
Wednesday, June 25, 2003

**\*S8499** PRESCRIPTION DRUG AND MEDICARE IMPROVEMENT ACT OF 2003-CONTINUED

Mr. BAUCUS.

I have been explaining various provisions in the bill that I think largely
address concerns that some on the Democrat side have and I suppose on the Republican
side of the aisle, too; namely, potential premium variation. Premiums that seniors
pay might vary. Much confusion might occur for seniors and anyone else involved in
prescription drug benefits that would be distributed under this legislation.

As I mentioned, the actuaries say there should not be much change. Also, the risk
pool will include all Medicare beneficiaries, ensuring an adequate number of low-
drug-cost beneficiaries will be able to subsidize the few beneficiaries with the
high drug costs. Already, there is a huge risk pool. There is kind of a cross
subsidization. Those with very low drug costs will help pay for those much higher
costs of other seniors. The larger risk pool will prevent premium variation because
we use the whole pool.

In addition, the bill will calculate Federal contributions toward plan premiums
based on the national average of all plan bids. This contribution is then adjusted
geographically for differences in prices. This is a so-called geographic adjustor.
We want to make sure one part of the country is not discriminated against compared
to another part of the country or vice versa, and we included the geographic
adjustment on prices.

We have not included so far, because it is difficult to calculate, geographic
adjustment based on utilization. As we know, in some parts of the country there is
more utilization. That is a fancy term for saying there is a lot more care given to
people than in other parts of the country. More care, the greater utilization, tends
to be in parts of the country with more hospitals, more specialty health care
providers.

There is an interesting study I urge my colleagues to read by Dr. Wennberg. I
have not found anyone who refutes it. Looking at the country as a whole, there are
parts of the country where utilization is twice as high and more than twice as high
as other parts of the country. People, because of where they live, get twice as much
health care in some parts of the country than in other parts of the country. This is
adjusted for age, for race, for gender. It is adjusted for all the factors that can
possibly be thought of.

The more interesting part of this study, even though some parts of the country
get twice as much health care as other parts of the country-and it is because there
are twice as many doctors or hospitals in some parts of the country as in others-the
interesting part of the study is, the actual care given is no better, and in fact in
some cases it is worse. That is, if you get twice as much health care, that is,
twice as many visits to the doctor or the hospital, particularly for chronic
diseases, you will not be twice as healthy; you will not be any healthier, on

*  *  *  *

disabilities out of institutions and nursing homes and into community living.

The problem is that the cost of this to the States is very high for the first
year. You can understand and appreciate, taking people out of an institution, out of
a nursing home, means the State has to find housing; it has to find, perhaps,
qualified personnel to help, maybe attendant services. So there are a lot of
preliminary things a State has to do in order to provide for this transition from an

149 Cong.Rec. S8499-02

149 Cong. Rec. S8499-02, 2003 WL 21467391 (Cong.Rec.)

**(Cite as: 149 Cong. Rec. S8499-02)**

institution to community-based living. Many States simply cannot afford it.

The good news is that States want to do this because it has been shown, in the States that have done this already, they save a lot of money. It is much cheaper to have a person with a disability in a community-based or home-based setting than in an institution or a nursing home-much cheaper. In fact, in a couple or three States that have already done this, we have had savings of over $40 million or$50 million a year to those States.

Again, the hurdle is that first year, getting people out of these institutions and into community-based living. What the President had requested in his budget was $350 million over 5 years as an enticement to States to do this. What the Federal Government would do is it would provide 100 percent of the funds per Medicaid beneficiary for that first year. After the first year, then the State would go back to the Federal/*S8535 State Medicaid match that the State had before. So, let's say a State had a 60/40 Federal/State match on Medicaid right now. During the first year, the State would have to come up with no money; the Federal Government would take 100 percent, would provide 100 percent. The State could use that money, then, that extra money, to set up community-based living systems for people and institutions and nursing homes. After that first year, then the State would go back to the 60/40 split it had before.

That is what this amendment is. It is called "Money Follows The Person," and that is what President Bush called it in his proposed budget also.

What our amendment would do would be to provide, in the 5-year program, $300 million in the first year and then $350 million in each of the following 4 years. Then that would be the end of it. It would be 2004 to 2008.

Again, it has been 13 years since the Americans With Disabilities Act was passed. We will celebrate that on July 26 this year. In the Americans With Disabilities Act, we as a Congress, as a country, said no to segregation of people with disabilities. The Americans With Disabilities Act said: We are going to integrate people with disabilities into our society. No longer are we going to exclude and segregate them. However, our Medicaid Program today, 13 years later, still says yes to segregation.

Here is what I mean by that. Recent data indicates that 70 percent of Medicaid funds are spent on institutional care and only 30 percent to pay for community services. The thrust of our Medicaid spending today is for institution-based care. Our Medicaid system kind of flies in the face of the Americans With Disabilities Act in which we as a country committed ourselves to desegregate people with disabilities, fully integrating them in our society.

I have been trying for the last 10 years to get this change made. It is a bipartisan effort. I am not the first to do this. Others have tried it also. I do commend President Bush for putting it in his budget proposal for this year. It is the right thing to do, and I commend the President for doing that.

Now, again, I want to make it clear, this amendment is about choice. No one will be moved out of an institution who does not choose to be moved. This is not mandatory. Under this amendment, a State will be required to ensure that individuals and their representatives have the necessary information to make an informed choice as to whether they want to live in community-based situations or whether they would prefer to remain in an institution.

Now, again, regarding the offset, our amendment is fully offset by a Medicare secondary payer provision that is supported by the Department of Justice and was included in the House bill.

Mr. President, I have a letter, dated June 17, from William E. Moschella, Assistant Attorney General. It is to the chairman of the House Committee on Energy and Commerce, Congressman TAUZIN. The letter states:

149 Cong.Rec. S8499-02
149 Cong. Rec. S8499-02, 2003 WL 21467391 (Cong.Rec.)
**(Cite as: 149 Cong. Rec. S8499-02)**

This is to advise you of the Department's support for a provision in the Medicare Prescription Drug and Modernization Act-

Which we are about now-

set forth in Title III, Section 301, which would protect the integrity of the Medicare Trustee Fund by clarifying that Medicare must be reimbursed whenever another insurer's responsibility to pay has been established. The Section is consistent with the litigation positions taken by this Department and the Department of Health and Human Services in numerous court cases.

So the Department of Justice, speaking for the administration, is in favor of this offset.

Mr. President, I ask unanimous consent to have printed in the RECORD the letter from William E. Moschella, Assistant Attorney General.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

U.S. DEPARTMENT OF JUSTICE, OFFICE OF LEGISLATIVE AFFAIRS, OFFICE OF THE ASSISTANT ATTORNEY GENERAL.

Washington, DC, June 17, 2003.
Hon.
   W.J. (Billy) Tauzin,

Chairman, Committee on Energy and Commerce, U.S. House of Representatives, Washington, DC.
   DEAR MR. CHAIRMAN: This is to advise you of the Department's support for a provision in the Medicare Prescription Drug and Modernization Act, set forth in Title III, Section 301, which would protect the integrity of the Medicare Trust Fund by clarifying that Medicare must be reimbursed whenever another insurer's responsibility to pay has been established. The Section is consistent with the litigation positions taken by this Department and the Department of Health and Human Services ("HHS") in numerous court cases.

Congress enacted the Medicare Secondary Payer ("MSP") statute in 1980 to protect the fiscal integrity of the Medicare program by making Medicare a secondary, rather than a primary, payer of health benefits. To ensure that Medicare would be secondary, Congress precluded it from making payment when a primary plan has already made payment or can reasonably be expected to pay promptly. Congress recognized, however, that in contested cases, payments under such plans would be delayed. To protect providers, suppliers, and beneficiaries, Congress authorized Medicare to make a "conditional" payment when prompt resolution of a claim cannot reasonably be expected. The Medicare Trust Fund must be reimbursed, however, once the primary insurer's obligation to pay is demonstrated.

Some recent court decisions have held, however, that Medicare has no right to reimbursement unless the primary insurer could reasonably have been expected to make prompt payment at the outset. See, e.g., Thompson v. Goetzmann, 315 F.3d 457 (5th Cir. 2002). These rulings make the statute's **reimbursement mechanism inoperative** in some jurisdictions. Section 301 of this legislation would end this costly litigation and provide clear legislative guidance regarding Medicare's status as a secondary payer of health benefits. The technical changes in Section 301 make clear that Medicare may make a conditional payment when the primary plan has not made or is not reasonably expected to make prompt payment.

The technical amendments of Section 301 clarify other provisions of the MSP statute, as well. They make clear that a primary plan may not extinguish its obligations under the MSP statute by paying the wrong party (i.e., by paying the Medicare beneficiary or the provider instead of reimbursing the Medicare Trust Fund. The Section clarifies that a primary plan's responsibility to make payment with

149 Cong.Rec. S8499-02

149 Cong. Rec. S8499-02, 2003 WL 21467391 (Cong.Rec.)
**(Cite as: 149 Cong. Rec. S8499-02)**

respect to the same item or service paid for by Medicare may be demonstrated, among other ways, by a judgment, or a payment conditioned upon the recipient's compromise, waiver or release of items or services included in the claim against the primary plan or its insurer; no finding or admission of liability is required. In addition, Section 301 makes clear that an entity will be deemed to have a "self-insured plan" if it carries its own risk, in whole or in part. Finally, the Section makes clear that the Medicare program may seek reimbursement from a primary plan, from any or all of the entities responsible for or required to make payment under a primary plan, and additionally from any entity that has received payment from the proceeds of a primary plan's payment. These provisions of Section 301 will resolve contentious litigation and are designed to protect the fiscal integrity of the Medicare program.

We hope that this information is helpful. The Office of Management and Budget has advised that there is no objection to this report from the standpoint of the Administration's program. Please let us know if we may be of additional assistance.

Sincerely,

WILLIAM E. MOSCHELLA,
Assistant Attorney General.
Mr. HARKIN.

So again, we have an amendment that is exactly what the President had in his 2004 budget request. We have an offset supported also by the administration. So this is truly a bipartisan effort.

This amendment Senator

Smith and I have offered is widely supported by older Americans and people with disabilities. AARP, the Consortium of Citizens with Disabilities, ADAPT, the National Council on Independent Living, the National Council on the Aging, and the National Association of Area Agencies on Aging all support this amendment.

Both parts of this amendment-the Money Follows Program and the offsets-are about fairness and justice. If this amendment is adopted, private insurers will pay their fair share of Medicare costs and people with disabilities will have the opportunity to live in their own communities.

I will just talk about a constituent of mine, Ken Kendall. Ken was injured in an accident and has a serious spinal cord injury. When he lost his health insurance, he was forced to go on Medicaid, and his only choice was a nursing home almost 2 hours from his friends and family.

Ken recently wrote to me that he went to dinner and a movie for his 30th birthday. No big deal, except he had not been to dinner and a movie in the 2 years since he went into a nursing home. He said: "I was almost in tears. I felt like I had a real life again."

This amendment would give people like Ken a real life again, and not just on their birthdays. Individuals with *S8536 disabilities should not have to continue waiting to enjoy the opportunities all other Americans take for granted.

So again, that is the essence of the amendment.

AMENDMENT NO. 991, AS MODIFIED

Mr. President, I ask unanimous consent that the amendment be modified with the modification I send to the desk. This is a modification to amendment No. 991.

The PRESIDING OFFICER.

Is there objection?

149 Cong.Rec. S8499-02
149 Cong. Rec. S8499-02, 2003 WL 21467391 (Cong.Rec.)
**(Cite as: 149 Cong. Rec. S8499-02)**


Without objection, the amendment is so modified.

The amendment (No. 991), as modified, is as follows:

At the appropriate place, insert the following:

# EXHIBIT 7

**FILED**

2004 JUL -7 P 3: 51

CLERK US DISTRICT COURT
M            F           A

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

GENEVA GLOVER and JAMES GILLINS,  )
as private attorneys general,     )
                                  )
            Plaintiffs,            )        Case No. 3:04-cv403-J-32MMH
                                  )
        v.                        )        JURY TRIAL DEMANDED
                                  )
                                  )
PHILIP MORRIS USA, and            )
LIGGETT GROUP, INC.,              )
                                  )
            Defendants.           )

## FIRST AMENDED COMPLAINT

### THE NATURE OF THE CASE

1.    Plaintiffs, Geneva Glover and James Gillins, bring this action as

"private attorneys general" pursuant to the private cause of action provisions of the

Medicare as Secondary Payer ("MSP") statute, 42 U.S.C. § 1395y(b)(3)(A), seeking

to recover for the Medicare program all the expenditures it made from May 26, 1998

to the present for the health care services rendered in the State of Florida to

Medicare's beneficiaries for the treatment of diseases attributable to cigarette

smoking, including, but not limited to, coronary heart disease, chronic obstructive

pulmonary disease ("COPD"), lung cancer, emphysema, and atherosclerosis.

2.    The MSP statute's function is straightforward: to relieve Medicare of

the obligation to pay a beneficiary's medical expenses if payment for covered

services has been or is reasonably expected to be made by someone else, called the

"primary payer" or the "primary plan."

3.      The defendants are corporations that engage in the business of
manufacturing and selling many of the cigarettes purchased in this country.  The
defendants have operated their businesses pursuant to plans and arrangements by
which they have taken out insurance with carriers who carry all or part of the risk
of liability for torts resulting from the operation of the defendants' businesses,
including torts resulting from smoking the defendants' cigarettes  As such, the
defendants have liability insurance policies or plans that are "primary plans" within
the meaning of the MSP statute.  To the extent that the defendants have not taken
out such liability insurance with carriers or such liability insurance is no longer in
force, or to the extent that the liability insurance they have taken out with carriers
does not provide payment for all the tort liability resulting from the defendants'
products, the defendants operate their businesses pursuant to plans and
arrangements by which they carry their own risk of liability for such torts.  As such,
the defendants constitute self-insured liability plans that are "primary plans"
within the meaning of the MSP statute.

4.      The nicotine in cigarettes is an addictive drug.  While the defendants
were aware of this fact, their customers, including the Medicare beneficiaries who
have suffered from or are suffering from diseases attributable to cigarette smoking,
were not.  Addiction is the key to the injury inflicted by the defendants' cigarettes
because it is the prolonged use of cigarettes that commonly causes these diseases.
The defendants not only intentionally concealed this addictive character of their
cigarettes, but sought to discredit any information that might bring this
addictiveness to light.  At the same time, the defendants knowingly manipulated

2

the addictiveness of their cigarettes to enhance its impact on their customers.  The

Medicare beneficiaries who have suffered from or are suffering from diseases

attributable to smoking the defendants' cigarettes did not consent to being exposed

to the addictive properties of the defendants' cigarettes.  Consequently, the

defendants are liable in tort, specifically battery, for the health care expenses of the

Medicare beneficiaries who have suffered from or are suffering from diseases

attributable to smoking the defendants' cigarettes.

5.     As a result of this battery, the defendants are entities that have or had

a responsibility under the MSP statute to pay for the health care expenses of the

Medicare beneficiaries necessitated by these diseases attributable to smoking the

defendants' cigarettes; that is, their primary plans have failed to provide for

primary payment or appropriate reimbursement to Medicare for such expenses.

Accordingly, Medicare has been unlawfully and unnecessarily forced to pay

enormous sums to diagnose and treat the diseases of Medicare beneficiaries

attributable to smoking the defendants' cigarettes.

6.     The role of the plaintiffs as "private attorneys general" reflects the

public importance of this case, especially to the Medicare program and its

beneficiaries.

(a)     The 2004 Annual Report of the Medicare Boards of Trustees observes

that "[t]he Medicare program is the second-largest social insurance program in the

United States, with 41 million beneficiaries and total expenditures of $280.8 billion

3

in 2003." Thus the importance of Medicare as a source of health care funding for tens of millions of Americans cannot be disputed.

(b)     The 2004 Report of the Trustees of Medicare also warns that "the projected financial status of Medicare has taken a major turn for the worse" in just the last year.  By 2019, according to the Medicare Trustees, the Medicare Hospital Insurance Trust Fund will be bankrupt.

(c)     The MSP regime was codified by Congress in the 1930s to reduce Medicare expenditures, a role all the more essential with Medicare's financial status in such precarious straits.  However, enforcement of the MSP regime, especially reimbursement of improper Medicare expenditures from other parties that should have been primary payers, has been disappointing.  The Government Accounting Office ("GAO") has reported the lack of progress that has been made in collecting MSP debts, which "arise when Medicare covers expenses related to accidents, malpractice, workers' compensation, or other items not associated with group health plans that are subsequently determined to be the responsibility of another payer."  According to the GAO, Medicare "lacks information on the total dollar amount of eligible debts not covered by its current referral instructions to Medicare contractors, and it has not developed a detailed plan or specific time frame for referring these debts."  Moreover, Medicare does not even try to collect older MSP debts because it believes it is "not cost-effective to collect them."  Indeed, the Justice Department simply does not have the resources to pursue these reimbursement cases on behalf of Medicare.

(d)     Accordingly, Congress added the private right of action for double damages to the MSP statute "to save the government money by giving private citizens incentives to recover funds erroneously paid by Medicare." Even when Medicare itself lacks the information necessary to collect an MSP debt, that information nevertheless exists in the hands of each Medicare beneficiary who may be a tort victim and who, with the incentive provided by the double damages provision of the MSP statute, can be motivated to sue as a "private attorney general" to collect that debt even if it is not cost-effective for Medicare to make the effort, and even if the more cumbersome federal bureaucracy is slow to take action.

(e)     The MSP private right of action, like the *qui tam* provision of the False Claims Act, empowers private citizens to prosecute cases in which the federal government has overpaid. There have been hundreds of *qui tam* cases filed under the False Claims Act each year. In FY 2003, a record $2.1 billion was recovered under the False Claims Act (a 75% increase from FY 2002), and of that sum a staggering 70% was recovered not in suits brought by the government itself but in *qui tam* actions brought by citizens. This case – with reimbursements legally owing to Medicare of billions of dollars – suggests that the promise of the MSP private right of action for recovery of improper Medicare payments may be even greater than the impact of the *qui tam* statute.

(f)     Indeed, Congress has long been committed to the MSP statute having exactly such an impact, as was underscored by the retroactive clarification of the MSP statute Congress just enacted as part of the Medicare Prescription Drug,

5

Improvement, and Modernization Act of 2003. Congress' clarification (retroactive to 1980 when "self-insured plan" was first added to the MSP statute) provides that "[a]n entity that engages in a business, trade, or profession shall be deemed to have a self-insured plan if it carries its own risk (whether by a failure to obtain insurance or otherwise) in whole or in part."

(g)     As the Chair of the Senate Finance Committee (which has jurisdiction over Medicare), Sen. Charles E. Grassley, explained, "when a Medicare beneficiary is injured by wrongful conduct of another entity, that entity's liability insurance or the entity itself, if it has no insurance, or it might be self-insured, is always required to pay first instead of having the taxpayers pay." The defendants here caused Medicare beneficiaries to be injured by their wrongful conduct, and this case seeks to recover from the defendants the money taxpayers wrongly had to pay for the medical care of those beneficiaries.

<u>JURISDICTION AND VENUE</u>

7.     This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 1395y(b)(3)(A), 28 U.S.C. § §1331, 1332, and 1367. Venue is proper in this district pursuant to 28 U.S.C. § 1391.

<u>THE PARTIES</u>

8.     The plaintiffs are Geneva Glover, who is 78 years old, and James Gillins, who is 76 years old, both citizens of Jacksonville in Duval County Florida. The plaintiffs are both Medicare beneficiaries who have been cigarette smokers, who have purchased and smoked the cigarettes sold by the defendants, and who

have required health care services for diseases attributable to smoking the defendants' cigarettes that have been paid by Medicare.

9.      Defendant Philip Morris USA is a Virginia corporation with its principal place of business at 120 Park Avenue, New York, New York.  At all relevant times, Philip Morris manufactured, advertised, and sold cigarettes, including Philip Morris, Merit, Cambridge, Collector's Choice, Commander, Marlboro, Benson & Hedges, Virginia Slims, Alpine, Dunhill, English Ovals, Galaxy, Players, Saratoga, Basic, Bristol, Bucks, Chesterfield, Lark, L&M, B&H Menthols, and Parliament cigarettes, throughout the United States.

10.     Defendant Liggett Group, Inc. (f/k/a Liggett & Myers) is a Delaware corporation with its principal place of business at 100 Maple Lane, Mebane, North Carolina.  At all relevant times, Liggett manufactured, advertised, and sold cigarettes, including Chesterfield, Decade, L & M, Pyramid, Dorado, Eve, Stride, Generic and Lark cigarettes, throughout the United States

<u>GENERAL ALLEGATIONS</u>

A. THE MEDICARE AS SECONDARY PAYER REGIME

11.     Under the Medicare program, the federal government pays for certain health care expenses of the aged (persons over 65 years old), the disabled, and persons suffering from end stage renal disease.

12.     From its inception in 1965 until 1980, Medicare generally acted as the primary payer for all covered health care services rendered to eligible beneficiaries. That is, Medicare was the payer of first resort, even where some other entity might

have been legally obligated to pay for the health care expenses in a particular case.

The sole exception up to 1980 was where payment for the health care services had

been made or could "reasonably be expected to be made" under a state or federal

workers' compensation scheme. In such a case, any Medicare payment for the

services was conditioned on reimbursement from the involved workers'

compensation plan.

13.    Beginning in 1980, in response to burgeoning expenditures, Congress

enacted a series of amendments now known collectively as the Medicare as

Secondary Payer ("MSP") statute. The MSP statute was designed to reduce

Medicare's obligation to make primary payment for covered services – and so

conserve the dwindling Medicare Trust Funds -- when another person or entity had

a legal obligation to provide or pay for health care services needed by a Medicare

beneficiary.

14.    In general, under the terms of the MSP statute, Medicare is a

secondary payer to two groups of entities: a) entities who have "a responsibility to

make payment" for a Medicare beneficiary's health care costs because of a legal

obligation voluntarily assumed, and b) entities who have "a responsibility to make

payment" for a Medicare beneficiary's health care costs because of a legal obligation

imposed by operation of law. In either case, any Medicare payment already made

must be reimbursed by the entity that legally has the "responsibility to make

payment," that is, where that entity has, or is, a "primary plan" that should have

paid for the medical expense before Medicare.

15.    A "primary plan" in the context of a legal obligation to pay medical expenses that is voluntarily assumed mainly refers to the health care coverage provided to employees as a benefit of their employment.  That is, when an employer establishes a "group health plan" to pay for certain medical expenses of employees and their families, that group health plan is a "primary plan" under the MSP statute and must pay before Medicare on behalf of the employer.

16.    A "primary plan" in the context of a legal obligation to pay medical expenses that is imposed by operation of law includes "a workmen's compensation law or plan, an automobile or liability insurance policy or plan (including a self-insured plan) or no fault insurance."

17.    The MSP statute expressly provides that "[a]n entity that engages in a business, trade, or profession shall be deemed to have a self-insured plan if it carries its own risk (whether by a failure to obtain insurance or otherwise) in whole or in part."

18.    The Centers for Medicare and Medicaid Services of the Department of Health and Human Services ("CMS"), formerly known as the Health Care Financing Administration ("HCFA"), the agency to whom Congress has delegated the responsibility to administer and interpret the MSP statute, has by lawful rulemaking provided that "'[p]lan' means any arrangement, oral or written, by one or more entities, to provide health benefits or medical care or assume legal liability for injury or illness."

19.    CMS has by lawful rulemaking also provided that "' s]elf-insured plan'
means a plan under which an individual, or a private or governmental entity,
carries its own risk instead of taking out insurance with a carrier."

20.    Reflecting the remedial purpose of the MSP statute, CMS has further
provided by lawful rulemaking that a "liability insurance paymer.t" that should be
primary to Medicare includes out-of-pocket payments made by an entity that
carries liability insurance or is covered by a self-insured plan.  CMS recognized that
such out-of-pocket payments might be made to avoid reporting ar incident to a
liability insurer, to pay a required deductible, or for other reasons.  CMS expressly
concluded that it was not consistent with the MSP statute to allow such payments
to escape the mandate of the MSP statute.

21.    Thus, a "self-insured plan" within the meaning of the MSP statute and
the governing regulations includes a corporation that has decided not to buy
insurance for the legal liabilities or obligations that might be imposed on it,
whether or not that decision is written down, and whether or not the corporation
has established reserves to cover such liabilities or obligations.

22.    The MSP statute provides no limitation on the kind of "liability" that
might create an obligation to pay for the health care expenses of a Medicare
beneficiary, and so makes the entity on whom such liability has been imposed a
payer primary to Medicare.  CMS has by lawful rulemaking provided that
"'[l]iability insurance' means insurance (including a self-insured plan) that provides
payment based on legal liability for injury or illness or damage to property."

10

23.    To help enforce compliance with the MSP statute and to assure that Medicare would not improperly pay for health care costs that were lawfully the responsibility of other entities like the defendants here, Congress authorized private parties like the plaintiff to bring suit for damages against entities, like these defendants, which have not properly paid primary for the health care costs of Medicare beneficiaries. In the MSP statute, Congress expressly required recovery in such a private action of damages in an amount double the expenditures of Medicare that should have been paid by such primary plans.

### B. THE DEFENDANT CORPORATIONS ARE PRIMARY PLANS

24.    On information and belief, each of the defendants has or had a liability insurance policy or plan (including a self-insured plan), within the meaning of the MSP statute, that covers liability to Medicare beneficiaries for the health care services required by their tobacco-related illnesses.

25.    Insurance in any amount, however, cannot limit the liability the law might impose, and so the purchase of insurance does not fully protect the defendants or their assets from the liability that might be imposed, particularly where, as here, the intentionally wrongful conduct of the defendants is at issue. As a result, even a defendant which had purchased insurance from a third party is self-insured to the extent that insurance does not fully cover a liability imposed by law.

26.    In addition, some defendants at various times obtained insurance under the best terms they could, such as one policy under which defendant Philip Morris retained the risk of $1 million for each occurrence, with an overall cap on the

11

liability insured of $10 million. At other times, the cost of insurance was, from the perspective of some of the defendants, prohibitively expensive in light of what they saw to be their risks, compared to what insurance underwriters saw as the defendants' risks.

27.     To the extent that the defendants are not insured for the liability claimed in this action, they are entities "that engage[] in a business, trade, or profession" which "carr[y their] own risk (whether by a failure to obtain insurance or otherwise)," and so "are deemed to have a self-insured plan" under the express terms of the MSP statute.

28.     In addition, there is significant other evidence that the defendants are self-insured plans by virtue of their *ex ante*, deliberate choice to carry the risk of liability for tobacco-related illnesses, including the following:

(a)     By the early 1950s, scientific researchers were publishing findings that indicated a relationship between cigarette smoking and various illnesses, including lung cancer. As early as 1954, this growing scientific knowledge triggered litigation brought to hold the defendants liable for tobacco-related illnesses  Since that time, the pace of litigation has increased, while regulatory and legislative bodies have taken a variety of actions addressing tobacco-related illnesses. For example, in 1964, the Surgeon General of the United States declared cigarettes to be a health hazard.

(b)    The executives of the defendants, and others in their employ, were, and continue to be, fully aware of the significant risk that the defendants would be held legally liable for the injury or illness caused by their cigarettes.

(c)    The executives of the defendants had and continue to have fiduciary duties to the shareholders of the defendant corporations to make prudent arrangements to protect their corporations from the legal liability to which their cigarettes expose them. Such arrangements could include the purchase of insurance to cover, at least in part, the liability they might face. However, the risks involved have made many insurers reluctant to write liability insurance for defendants, and, where they did so, often insurers required a high deductible and a cap on the overall amount insured.

(d)    Knowing the risks of legal liability that their cigarettes generated, the defendants made business decisions to continue to produce and market cigarettes, while vigorously contesting every case brought against them seeking to impose legal liability for tobacco-related illnesses.

(e)    Accordingly, the defendants have deliberately chosen and planned to self-insure for risks of product liability and other tort claims inherent in their business, that is, they have planned to pay such claims from self-insured funds or retained earnings.

(f)    The defendants have routinely admitted in reports filed with the federal government that they planned to rely on their own cash flows or retained earnings to fund their obligations in the event of liability. For instance, Philip

Morris has stated: "It is possible that the Company's results of operations or cash flows could be materially affected by an ultimate unfavorable outcome of certain pending litigation. Management believes, however, that the ultimate outcome of all pending litigation should not have a material adverse effect on the Company's financial position." Philip Morris, Inc., 10-K, at 23 (Dec. 31, 1996).

(g)    The Liggett Group Inc. has similarly stated, "it is possible that Liggett's financial position, results of operations and cash flows could be materially adversely affected by an ultimate unfavorable outcome in any of such pending litigation." Liggett Group Inc., 10-K, at 19 (Dec. 31, 1996).

(h)    As far back as 1986 it was reported that tobacco "industry sources say the companies are now self-insuring," as "the cost of liability insurance has 'gone through the roof,' according to one tobacco marketer." Nancy Giges, *Marketers Feel Product Liability Pressure; Risks Crimp Launch of New Items*, ADVERTISING AGE (May 12, 1986).

(i)    Over a dozen years ago it had already become well-known in the insurance industry that "[p]roduct liability insurance covering health risk has been largely unavailable to most cigarette makers for roughly a decade and several large companies now self-insure their product exposures." Douglas McLeod, *Tobacco Award Raises Insurance Questions*, BUSINESS INSURANCE (June 20, 1988).

(j)    The prevailing practice in the tobacco industry to have self-insurance plans for liability coverage is evident from the statements of other entities involved in the cigarette business. For example, Core Mark International, Inc. is a

distributor of various consumer goods, including cigarettes.  As it pointed out in a

prospectus filed with the SEC, it "is particularly dependent on the leading

producers of cigarettes," which, as of 1997, included Philip Morris.  Core Mark

International, Inc., Prospectus Filed Pursuant to Rule 424 (B)(1), at 16 (filed Jan.

10, 1997).  In its Prospectus, Core Mark went on to explain:

> In light of the claimed health risks related to the use of
> cigarettes and other tobacco products, there can be no assurance that
> product liability claims will not be asserted against the tobacco
> industry or the Company in the future.  Such lawsuits, if asserted
> against the tobacco industry or the Company and adversely
> determined, could have a material adverse effect on the Company's
> business and financial position.  The Company carries general liability
> insurance, but *self-insures against liability in respect of health-related
> claims, which management believes is consistent with industry practice.*

*Id.* at 18 (emphasis added).

(k)     The defendants' choice to pay liability claims from their cash flows or

retained earnings, that is, to carry their own risk of legal liability for tobacco-

related illnesses rather than taking out insurance with a carrier, relies in part on

behavior patterns of consumers that indicate that increases in the price of

cigarettes will not significantly decrease the volume of purchases of these products

(in economics parlance, price-inelasticity), evidencing a peculiarly stable demand

due to the addiction of customers and the effectiveness of massive advertising; and

on a sophisticated body of knowledge that has been developed to estimate the

liability risks they carry.

(l)     Defendant Philip Morris illustrated how this mechanism works in

practice in its 1998 10-K, in which it detailed that "[o]perating companies income

for 1998 decreased . . . due primarily to higher tobacco-related settlement charges ($1.9 billion) . . . partially offset by price increases, net of cost increases ($1.8 billion)." Philip Morris, Inc., 10-K, at 27 (March 18, 1999).

29.    As entities that engage in a business, trade, or profession, the defendants have self-insured plans and are primary plans within the meaning of the MSP statute if they simply have failed to obtain insurance for their tort liabilities, for whatever reasons or even lack of reasons. However, the defendants surpass that basic statutory threshold because they have adopted deliberate, *ex ante* plans to carry their own risk of tort liability, and so have adopted plans of self-insurance and are primary plans within the meaning of the MSP statute.

C. THE DEFENDANTS ARE LIABLE IN TORT FOR THE TOBACCO-RELATED ILLNESSES OF MEDICARE BENEFICIARIES.

1. DEFENDANTS CONCEALED, DENIED, AND MANIPULATED THE ADDICTIVE PROPERTIES OF THEIR CIGARETTES.

30.    In the latter half of the twentieth century, some 10 million Americans were killed by tobacco-related illnesses. As the Surgeon General confirmed in a report on the health consequences of smoking issued in 2004, "tobacco use remains the leading preventable cause of disease and death in the United States, causing approximately 440,000 deaths each year and costing approximately $157 billion in annual health-related economic losses." It has been estimated that the medical expenses needed to treat diseases attributable to smoking totaled approximately $75.5 billion per year between 1995 and 1999.

31.    Diseases attributable to smoking the defendants' cigarettes include coronary heart disease, COPD, lung cancer, emphysema, atherosclerosis, leukemia, and cancers of the larynx, oral cavity, esophagus, pancreas, bladder, kidney, stomach, and cervix.

32.    Cigarettes contain nicotine, which, among other effects, activates areas of the brain that are involved in producing feelings of pleasure and reward. At the same time, nicotine causes physical dependence and a withdrawal syndrome after abstinence from it. Nicotine thus is an addictive drug. The addictive nature of nicotine is directly related to the harm caused by cigarettes, because the health risks of smoking increase with prolonged use. The primary factor that prevents cigarette smokers from quitting smoking is their addiction to nicotine and their need for continuing intake of nicotine to avoid nicotine withdrawal.

33.    The defendants and their agents have long known that nicotine is a powerful pharmacological agent – that is, a drug – with significant psychoactive effects. Most importantly for purposes of this action, defendants have long recognized that nicotine is addictive, and that addiction is what preserves the market for cigarettes and ensures their profits.

34.    In contrast, the public at large has not been aware of the addictive properties of nicotine, and have believed that smoking and – most importantly for the health consequences of smoking -- *continuing* to smoke are largely matters of choice for which the individual is responsible. Most beginning smokers –

particularly youngsters – falsely believe that they will be able to quit after smoking for a few years and thereby avoid the illnesses caused by smoking.

35.    The defendants not only have been fully aware of this popular misconception of the addictive properties of nicotine; they have sought to perpetuate it by concealing the facts concerning nicotine's addictiveness. Indeed, the defendants have deliberately understood and manipulated the addictive properties of nicotine in their cigarettes to undermine the ability of consumers to freely choose to refrain from smoking. The defendants have consciously pursued a clandestine business strategy that relies on creating and maintaining a market of captive consumers by virtue of the defendants' control over, and manipulation of, the nicotine in their cigarettes.

36.    The defendants have understood nicotine's addictive properties since at least the early 1960s. More than 30 years ago, a report was completed for one of the defendants that specifically addressed the mechanism of nicotine addiction in smokers. The researchers concluded that chronic intake of nicotine, such as that which occurs in regular cigarette smokers, creates a need for ever-increasing levels of nicotine to maintain the desired action: "[u]nlike other dopings, such as morphine, the rate of increasing demand for greater dose levels is relatively slow for nicotine." The report continues:

> A body left in this unbalanced state craves for renewed drug intake in order to restore the physiological equilibrium. This unconscious desire explains the addiction of the individual to nicotine.

37.    Forty three years ago, in 1959, the research department of Philip Morris stated the fact of the matter quite baldly: "Why do people smoke? . . . Addiction."

38.    Developing their understanding of the addictive attributes of nicotine became a key effort for the defendants, as was reflected in a 1980 memorandum from a Philip Morris official:

> *Nicotine is a powerful pharmacological agent* with multiple sites of action *and may be the most important component of cigarette smoke. Nicotine and an understanding of its properties are important to the continued well being of our cigarette business* since this alkaloid has been cited often as the reason for smoking and theories have been advanced for nicotine titration by the smoker. Nicotine is known to have effects on the central and peripheral nervous system as well as influencing memory, learning, pain perception, response to stress and level of arousal.

(Emphasis added.)

39.    Much of the defendants' inquiries into the attributes of nicotine reflected an appreciation of the role of nicotine in creating new consumers of the defendants' cigarettes. For example, in 1974, Philip Morris researchers began a study designed to test their theory that hyperkinetic children take up smoking in adolescence because nicotine may perform the same pharmacological function as prescription medications used to treat hyperkinesis:

> It has been found that amphetamines, which are strong stimulants, have the anomalous effect of quieting these children down . . . Many children are therefore regularly administered amphetamines throughout grade school years. . . . *We wonder whether such children may not eventually become cigarette smokers in their teenage years as they discover the advantage of self-stimulation via nicotine.* We have already collaborated with a local school system in identifying some such children in the third grade.

(Emphasis added.)

40.    The commercial value of the addictive attributes of nicotine – that is,
the properties of their cigarettes that help to create a captive market – were not lost
on the defendants.  For example, a 1971 secret internal report distributed to Philip
Morris executives showed that tobacco executives knew the powerfully addictive
nature of nicotine in cigarettes.  The report studied persons who had tried to stop
smoking and concluded that only 28 percent of those who tried to quit were still
non-smokers eight months later:

> Even after eight months quitters were apt to report having neurotic
> symptoms, such as feeling depressed, being restless and tense, being
> ill-tempered, having a loss of energy, being apt to doze off. They were
> further troubled by constipation and weight gains which averaged
> about five pounds per quitter . . . This is not the happy picture painted
> by the Cancer Society's anti-smoking commercial which shows an
> exuberant couple leaping into the air and kicking their heels with joy
> because they've kicked the habit.  A more appropriate commercial
> would show a restless, nervous, constipated husband bickering
> viciously with his bitchy wife who is nagging him about his slothful
> behavior and growing waistline.

41.    As one presenter at a tobacco company conference summed up the
results of studies of smokers who attempted to quit:  "Although intentions and
attempts to quit are relatively high (30-40% of smokers [in a given year]), the actual
success rate of quitting is relatively low and stable."

42.    Notwithstanding the facts concerning the addictiveness of nicotine
established by the defendants' own studies, the defendants concealed their research
and continued to deny the addictiveness of nicotine.

43.    For example, a 1977 Philip Morris study on the withdrawal effects of nicotine was permitted to proceed only if the results were favorable. If not, as a Philip Morris researcher explained, "we will bury it."

44.    For example, in March 1980, a Philip Morris scientist produced an internal memorandum discussing company research into the pharmacology of nicotine. The research was "aimed at understanding that specific action of nicotine which causes the smoker to repeatedly introduce nicotine into his body." The internal memorandum noted that it was "a highly vexatious topic' that company lawyers did not want to become public because nicotine's drug properties, if known, would support regulation of tobacco by the federal Food and Drug Administration. Consequently, the memorandum observed, "[o]ur attorneys . . . will likely continue to insist on a clandestine effort in order to keep nicotine the drug in low profile."

45.    For example, in the early 1980s, Philip Morris hired Victor DeNoble and Paul Mele to study the effects of nicotine on the behavior of rats and to research and test potential nicotine analogues. DeNoble and Mele's research demonstrated that nicotine was addictive and that, in terms of addictiveness, "nicotine looked like heroin." In August 1983, Philip Morris ordered DeNoble to withdraw a research paper on nicotine that had already been accepted for publication after full peer review by the respected journal, PSYCHOPHARMACOLOGY. Less than a year later, Philip Morris abruptly closed DeNoble's research lab. Philip Morris executives threatened DeNoble and Mele with legal action if they published or talked about their nicotine research. Their research animals were killed, the equipment was removed, and all traces of the former lab were eliminated.

46.     For example, in 1988, when the Surgeon General concluded, based on non-industry research, that nicotine is addictive, agents of the defendants disputed that conclusion, saying that "claims that cigarettes are addictive contradict common sense. . . . The claim that cigarette smoking causes physical dependence is simply an unproven attempt to find some way to differentiate smoking from other behaviors."

47.     For example, in a 1992 pamphlet, Philip Morris claimed, "Those who term smoking an addiction do so for ideological – not scientific – reasons."

48.     As late as 1994, in an appearance before Congress, the chief executive officers of the defendant corporations were asked by Rep. Ron Wyden: "Do you believe nicotine is not addictive?"  Under oath, they replied:

William Campbell (Philip Morris):  "I believe that nicotine is not addictive, yes."

James Johnston (Reynolds):  "Congressman, cigarettes and nicotine clearly do not meet the classic definition of addiction."

Andrew Tisch (Lorillard):  "I believe that nicotine is not addictive."

Edward Horrigan (Liggett):  "I believe that nicotine is not addictive."

Thomas Sandefur (Brown & Williamson):  "I believe that nicotine is not addictive."

Donald Johnson (American Tobacco):  "And I, too, believe that nicotine is not addictive."

49.     At the same time that they were denying the addictiveness of nicotine, the defendants not only knowingly continued to produce and market cigarettes with the addicting properties of nicotine, but they were developing and using highly sophisticated technologies designed to deliver nicotine to smokers in ways intended

to create and sustain addiction in the vast majority of individuals who smoke

regularly. This manipulation of the nicotine content of cigarettes is achieved

through selective breeding and cultivation of plants for nicotine content, and careful

tobacco leaf purchasing and blending plans. The manipulation of nicotine delivery

(that is, the amount of nicotine absorbed by the smoker) is achieved by various

design and manufacturing techniques. As a 1973 internal document from the R.J.

Reynolds Tobacco Company explained:

> Methods which may be used to increase smoke pH and/or nicotine
> "kick" include: (1) increasing the amount of (strong) burley in the
> blend, (2) reduction of casing sugar used on the burley and/or blend, (3)
> use of alkaline additives, usually ammonia compounds, to the blend,
> (4) addition of nicotine to the blend, (5) removal of acids from the
> blend, (6) special filter systems to remove acids from or add alkaline
> materials to the smoke, and (7) use of high air dilution filter systems.
> Methods 1-3, in combination, represent the Philip Morris approach,
> and are under investigation [by Reynolds].

50.    Common among the chemical manipulations of tobacco to enhance the

effect of nicotine is the use of ammonia.

51.    Thus the denial and concealment of the addictiveness of nicotine is a

central element of this case, at the core of defendants' tortious conduct. As a 1980

memorandum from the industry's Tobacco Institute conceded, "We can't defend

continued smoking as 'free choice' if the person was addicted."

52.    However, at least one defendant, Philip Morris, has now abandoned

that strategy of denial and concealment of which it was a part for so many decades,

coinciding with its support for legislation, now pending in Congress, that would

provide for FDA regulatory authority over tobacco products. While Philip Morris

states that such regulation would provide for "greater consistency in tobacco policy,"

and "more predictability for the tobacco industry," other observers conclude that "selling cigarettes under government supervision would improve its public relations and legal atmosphere and would enable it to roll out 'reduced risk' cigarettes with the apparent approval of government scientists."

53.    On its website, Philip Morris now says, "We agree with the overwhelming medical and scientific consensus that cigarette smoking is addictive."

54.    No longer does Philip Morris dismiss the Surgeon General's warnings about the health effects and addictiveness of cigarette smoking as ideologically motivated, but describes the Surgeon General as "the nation's leading spokesperson on matters of public health," and the Philip Morris website provides a direct link to the very Surgeon General Report on nicotine addictiveness it sought to discredit.

55.    The Philip Morris website also provides a direct link to the Centers for Disease Control ("CDC") website, which emphasizes, "[N]icotine is a very addictive drug. For some people, it can be as addictive as heroin or cocaine."

56.    Philip Morris now "agree[s] with the overwhelming medical and scientific consensus that cigarette smoking causes lung cancer, heart disease, emphysema and other serious diseases in smokers."

2. DEFENDANTS' CONDUCT CONSTITUTES A BATTERY

57.    The risk of a cigarette smoker contracting a disease attributable to cigarette smoking greatly increases with prolonged use of cigarettes.

58.    Smoking cigarettes is addictive.

59.    The addictive properties of cigarettes cause or significantly contribute to the prolonged use of cigarettes.

60.    The addictive properties of smoking cigarettes are caused by the nicotine in or added to the tobacco.

61.    The addictive properties of the defendants' cigarettes pose a hazard distinct from the direct physical dangers of smoking.

62.    At all relevant times, the defendants were aware of the addictive quality of the nicotine in their cigarettes.

63.    At all relevant times, the defendants attempted to manipulate the levels of nicotine in their cigarettes to maintain or increase the addictive properties of their cigarettes.

64.    At all relevant times, the defendants denied and attempted to conceal the addictive properties of the nicotine in their cigarettes.

65.    The exposure of a person to the addictive properties of nicotine in the defendants' cigarettes constitutes a harmful or offensive contact with that person.

66.    The defendants intended to cause the exposure of the persons who became Medicare beneficiaries to the addictive properties of nicotine in the defendants' cigarettes, that is, the defendants intended to cause this harmful or offensive contact with those persons.

67.    This harmful or offensive contact with persons who became Medicare beneficiaries, that is, the exposure of the persons who became Medicare beneficiaries to the addictive properties of nicotine in the defendants' cigarettes, directly or indirectly resulted from the acts of the defendants.

68.    The persons who became Medicare beneficiaries did not consent to this harmful or offensive contact, that is, they did not consent to exposure to the addictive properties of nicotine in the defendants' cigarettes.

69.    This harmful or offensive contact constitutes a battery.

70.    As a result of this battery, these persons who became Medicare beneficiaries contracted diseases attributable to smoking the defendants' cigarettes.

71.    The defendants are liable for the medical expenses incurred to treat the diseases attributable to smoking the defendants' cigarettes of these persons who are the victims of the defendants' battery.

72.    From the time the victims of the defendants' battery became Medicare beneficiaries, Medicare paid for the medical expenses necessitated by their diseases attributable to smoking the defendants' cigarettes.

<u>CAUSE OF ACTION</u>

73.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 72, as though fully set forth herein.

74.    As a result of their battery, each defendant was and is an entity which has or had a responsibility to pay for the costs of the health care services provided to Medicare beneficiaries to treat their diseases attributable to smoking the defendants' cigarettes, within the meaning of the MSP statute.

75.    Under the terms of the MSP statute, each defendant was and is, with respect to the costs of the health care services provided to Medicare beneficiaries to treat their diseases attributable to smoking the defendants' cigarettes, a primary

plan and so required to be the payer primary for those costs, while Medicare was to be only the secondary payer.

76.    None of the defendants paid for, or in any other way provided for primary payment of, these costs of the health care services provided to Medicare beneficiaries to treat their diseases attributable to smoking the defendants' cigarettes, in violation of the MSP statute.

77.    Due to this wrongful conduct of the defendants, Medicare became and continues to be the primary payer for these costs of the health care services provided to Medicare beneficiaries to treat their diseases attributable to smoking the defendants' cigarettes, in violation of the MSP statute.

78.    Under the terms of the MSP statute, Medicare's payments for these costs of the health care services provided to Medicare beneficiaries to treat their diseases attributable to smoking the defendants' cigarettes were conditioned on reimbursement from the correct primary payer, which each defendant is.

79.    As a result, under the MSP statute, damages from the defendants should be awarded in an amount twice that of Medicare's payments for the costs of the health care services provided to Medicare beneficiaries to treat their diseases attributable to smoking the defendants' cigarettes.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs respectfully pray that the Court enter judgment against the defendants, and each of them, jointly and severally:

27

a.    awarding the plaintiffs damages in an amount double the amount paid by Medicare for the health care services provided to Medicare beneficiaries in the State of Florida to treat their diseases attributable to smoking the defendants' cigarettes, for which treatment the defendants were "required or responsible . . . to make payment" under the Medicare as Secondary Payer Act;

b.    awarding the plaintiffs attorneys' fees and their costs of this litigation, including interest; and

c.    granting such other and further relief as the Court may deem just and proper.

Dated July 7, 2004

Respectfully submitted,

_Norwood Wilner_
Norwood S. Wilner
   Trial Counsel
Florida Bar Number 222194
Spohrer Wilner Maxwell & Matthews, P.A.
701 W. Adams St.
Jacksonville, Florida 32201
Telephone: (904) 354-8310
Fax: (904) 358-6889
E-mail: nswilner@swmmlaw.com

Daniel M. Cohen
   Trial Counsel
Bar Number 0797472
Jonathan W. Cuneo
Cuneo, Waldman & Gilbert
317 Massachusetts Avenue, N.E., Suite 300
Washington, D.C. 20002
Telephone: (202) 789-3960
Fax: (202) 789-1813

E-mail: danielc@cuneolaw.com

Robert J. Cynkar
  Trial Counsel
Joseph R. Egan
Charles J. Fitzpatrick
Egan, Fitzpatrick, Malsch & Cynkar
7918 Jones Branch Drive, Suite 200
McLean, VA 22102
Telephone: (703) 918-4946
Fax: (703) 918-4943
E-mail: rcynkar@nuclearlawyer.com

Mark B. Hutton
  Trial Counsel
Derek S. Casey
Chan P. Townsley
Hutton & Hutton Law Firm, L.L.C.
P.O. Box 638
Wichita, KS 67201-0638
Telephone: (316) 688-1166
Fax: (316) 686-1077
E-mail: Mark.Hutton@huttonlaw.com

Gary L. Richardson
  Trial Counsel
Fred Stoops
Keith Ward
Charles L. Richardson
Richardson, Stoops, Richardson & Ward
The Richardson Building
6555 S. Lewis Avenue
Tulsa, OK 74136
Telephone: (918) 492-7674
Facsimile: (918) 493-1925
E-mail: glrichardson@rsrwlaw.com

Attorneys for Plaintiffs

**Service List**
Glover etc. vs. Philip Morris

Mark R. Miller, etc.
Ford Miller & Wainer
1200 Riverplace Blvd. Suite 600
Jacksonville FL 32207
*attorneys for plaintiffs*

Mark Hutton, etc.
Hutton & Hutton
PO Box 638
Wichita KS 67201-0638
*attorneys for plaintiffs*

Daniel M. Cohen
The Cuneo Law Group
317 Massachusettes Ave. Ne
Washington DC 20002
*attorney for plaintiffs*

Robert J. Cynkar, etc.
Egan Fitzpatrick Malsch & Cynkar
7918 Jones branch Dr. Suite 200
McLean VA 22102
*attorneys for plaintiffs*

Gary L. Richardson, etc.
Richardson Stoops Richardson & Ward
The Richardson Building
6555 S. Lewis Ave.
Tulsa OK 74136
*attorneys for plaintiffs*

Norwood S. Wilner
Spohrer Wilner Maxwell & Matthews
701 W Adams St.
Jacksonville FL 32204
*attorneys for plaintiffs*

Charles C. Howell III
Howell & O'Neal
200 Laura St. Suite 1100
Jacksonville FL 32202
*attorney for Liggett*

Murray R. Garnick, etc.
Arnold & Porter
555 12th St.
Washington DC 20004
and
Daniel F. Molony
Shook Hardy & Bacon LLP
PO Box 898
Tampa FL 33602-5810
*attorneys for Philip Morris*

# EXHIBIT 8

FILED

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

2004 MAY 26  P 3: 37

GENEBA GLOVER and JAMES GILLINS,       )
individually as private attorneys general,   )
or alternatively on behalf of a class of all   )
others similarly situated,                     )
                                              )
                    Plaintiffs,               )     Case No.
                                              )     3:04-cv-403-J-16 mmH
          v.                                  )     JURY TRIAL DEMANDED
                                              )
PHILIP MORRIS USA, R.J. REYNOLDS       )
TOBACCO COMPANY, BROWN &               )
WILLIAMSON TOBACCO CORPORATION,        )
individually and as the successor to           )
THE AMERICAN TOBACCO COMPANY,          )
LORILLARD TOBACCO COMPANY, INC.,       )
and LIGGETT GROUP, INC.,                )
                                              )
                    Defendants.               )

## COMPLAINT

### THE NATURE OF THE CASE

1.      Plaintiffs, Geneba Glover and James Gillins, bring this action as "private

attorneys general" pursuant to the private cause of action provisions of the Medicare as

Secondary Payer ("MSP") statute, 42 U.S.C. § 1395y(b)(3)(A), seeking to recover for the

Medicare program all the expenditures it made from May 26, 1998 to the present for the health

care services received by Medicare beneficiaries for the treatment of certain tobacco-related

diseases, including, but not limited to, lung cancer, heart disease, emphysema, and chronic

obstructive pulmonary disease ("COPD").  Alternatively, the plaintiffs brings this action

individually and on behalf of all members of a proposed class, consisting of Medicare

beneficiaries who have received or are receiving health care services for the treatment of those

tobacco-related illnesses, to recover for the Medicare program all the expenditures it made

from May 26, 1998 to the present for the treatment of those tobacco-related diseases.

2.      The MSP statute's function is straightforward: to relieve Medicare of the

obligation to pay a beneficiary's medical expenses if payment for covered services has been or

is reasonably expected to be made by someone else, called the "primary payer" or the

"primary plan."

3.      The defendants are corporations that engage in the business of manufacturing

and selling almost all of the cigarettes purchased in this country.  The defendants have operated

their businesses pursuant to plans and arrangements by which they have taken out insurance

with carriers who carry all or part of the risk of liability for torts resulting from the operation

of the defendants' businesses, including torts resulting from smoking the defendants' cigarettes.

As such, the defendants have liability insurance policies or plans that are "primary plans"

within the meaning of the MSP statute.  To the extent that the defendants have not taken out

such liability insurance with carriers or such liability insurance is no longer in force, or to the

extent that the liability insurance they have taken out with carriers does not provide payment

for all the tort liability resulting from the defendants' products, the defendants operate their

businesses pursuant to plans and arrangements by which they carry their own risk of liability

for such torts.  As such, the defendants constitute self-insured liability plans that are "primary

plans" within the meaning of the MSP statute.

4.      The nicotine in cigarettes is an addictive drug.  While the defendants were

aware of this fact, their customers, including the Medicare beneficiaries who have suffered

from or are suffering from certain tobacco-related diseases, were not.  Addiction is the key to

the injury inflicted by the defendants' cigarettes because it is the prolonged use of cigarettes

2

that commonly causes these diseases. The defendants not only intentionally concealed this addictive character of their cigarettes, but sought to discredit any information that might bring this addictiveness to light. At the same time, the defendants knowingly manipulated the addictiveness of their cigarettes to enhance its impact on their customers. The Medicare beneficiaries who have suffered from or are suffering from certain tobacco-related diseases as a result of smoking the defendants' cigarettes did not consent to being exposed to the addictive properties of the defendants' cigarettes. Consequently, the defendants are liable in tort, specifically battery, for the health care expenses of the Medicare beneficiaries who have suffered from or are suffering from certain tobacco-related diseases.

5.     As a result of this battery, the defendants are entities that have or had a responsibility under the MSP statute to pay for the health care expenses of the Medicare beneficiaries necessitated by these tobacco-related diseases; that is, their primary plans have failed to provide for primary payment or appropriate reimbursement to Medicare for such expenses. Accordingly, Medicare has been unlawfully and unnecessarily forced to pay enormous sums to diagnose and treat the tobacco-related diseases of Medicare beneficiaries.

6.     The role of the plaintiffs as "private attorneys general" reflects the public importance of this case, especially to the Medicare program and its beneficiaries.

(a)     The 2004 Annual Report of the Medicare Boards of Trustees observes that "[t]he Medicare program is the second-largest social insurance program in the United States, with 41 million beneficiaries and total expenditures of $280.8 billion in 2003." Thus the importance of Medicare as a source of health care funding for tens of millions of Americans cannot be disputed.

(b)     The 2004 Report of the Trustees of Medicare also warns that "the projected financial status of Medicare has taken a major turn for the worse" in just the last year.  By 2019, according to the Medicare Trustees, the Medicare Hospital Insurance Trust Fund will be bankrupt.

(c)     The MSP regime was codified by Congress in the 1980s to reduce Medicare expenditures, a role all the more essential with Medicare's financial status in such precarious straits.  However, enforcement of the MSP regime, especially reimbursement of improper Medicare expenditures from other parties that should have been primary payers, has been disappointing.  The Government Accounting Office ("GAO") has reported the lack of progress that has been made in collecting MSP debts, which "arise when Medicare covers expenses related to accidents, malpractice, workers' compensation, or other items not associated with group health plans that are subsequently determined to be the responsibility of another payer." According to the GAO, Medicare "lacks information on the total dollar amount of eligible debts not covered by its current referral instructions to Medicare contractors, and it has not developed a detailed plan or specific time frame for referring these debts."  Moreover, Medicare does not even try to collect older MSP debts because it believes it is "not cost-effective to collect them."  Indeed, the Justice Department simply does not have the resources to pursue these reimbursement cases on behalf of Medicare.

(d)     Accordingly, Congress added the private right of action for double damages to the MSP statute "to save the government money by giving private citizens incentives to recover funds erroneously paid by Medicare."  Even when Medicare itself lacks the information necessary to collect an MSP debt, that information nevertheless exists in the hands

4

of each Medicare beneficiary who may be a tort victim and who, with the incentive provided

by the double damages provision of the MSP statute, can be motivated to sue as a "private

attorney general" to collect that debt even if it is not cost-effective for Medicare to make the

effort, and even if the more cumbersome federal bureaucracy is slow to take action.

(e)    The MSP private right of action, like the *qui tam* provision of the False Claims

Act, empowers private citizens to prosecute cases in which the federal government has

overpaid.  There have been hundreds of *qui tam* cases filed under the False Claims Act each

year.  In FY 2003, a record $2.1 billion was recovered under the False Claims Act (a 75%

increase from FY 2002), and of that sum a staggering 70% was recovered not in suits brought

by the government itself but in *qui tam* actions brought by citizens.  This case – with

reimbursements legally owing to Medicare of billions of dollars – suggests that the promise of

the MSP private right of action for recovery of improper Medicare payments may be even

greater than the impact of the *qui tam* statute.

(f)    Indeed, Congress has long been committed to the MSP statute having exactly

such an impact, as was underscored by the retroactive clarification of the MSP statute

Congress just enacted as part of the Medicare Prescription Drug, Improvement, and

Modernization Act of 2003.  Congress' clarification (retroactive to 1980 when "self-insured

plan" was first added to the MSP statute) provides that "[a]n entity that engages in a business,

trade, or profession shall be deemed to have a self-insured plan if it carries its own risk

(whether by a failure to obtain insurance or otherwise) in whole or in part."

(g)    As the Chair of the Senate Finance Committee (which has jurisdiction over

Medicare), Sen. Charles E. Grassley, explained, "when a Medicare beneficiary is injured by

wrongful conduct of another entity, that entity's liability insurance or the entity itself, if it has

no insurance, or it might be self-insured, is always required to pay first instead of having the

taxpayers pay." The defendants here caused Medicare beneficiaries to be injured by their

wrongful conduct, and this case seeks to recover from the defendants the money taxpayers

wrongly had to pay for the medical care of those beneficiaries.

### JURISDICTION AND VENUE

7.      This Court has jurisdiction over this matter pursuant to 42 U.S.C. §

1395y(b)(3)(A), 28 U.S.C. § §1331, 1332, and 1367. Venue is proper in this district pursuant

to 28 U.S.C. § 1391.

### THE PARTIES

8.      The plaintiffs are Geneba Glover, who is 78 years old, and James Gillins, who

is 76 years old, both citizens of Jacksonville in Duval County Florida. The plaintiffs are both

Medicare beneficiaries who have been cigarette smokers, who have purchased and smoked the

cigarettes sold by the defendants, and who have required health care services for tobacco-

related illnesses that have been paid by Medicare.

9.      Defendant Philip Morris USA (Philip Morris) is a Virginia corporation with its

principal place of business at 120 Park Avenue, New York, New York. At all relevant times,

Philip Morris manufactured, advertised, and sold cigarettes, including Philip Morris, Merit,

Cambridge, Collector's Choice, Commander, Marlboro, Benson & Hedges, Virginia Slims,

Alpine, Dunhill, English Ovals, Galaxy, Players, Saratoga, Basic, Bristol, Bucks,

Chesterfield, Lark, L&M, B&H Menthols, and Parliament cigarettes, throughout the United

States.

10.     Defendant R.J. Reynolds Tobacco Company ("RJR" or "Reynolds") is a Delaware corporation with its principal place of business at 401 North Main Street, Winston-Salem, North Carolina. At all relevant times, RJR manufactured, advertised, and sold cigarettes, including Camel, Vantage, Now, Doral, Winston, Sterling, Magna, Monarch, More, Century, Bright Rite, Eclipse, and Salem cigarettes, throughout the United States.

11.     Defendant Brown & Williamson Tobacco Corporation ("B&W") is a Delaware corporation with its principal place of business at 200 Brown & Williamson Tower, Louisville, Kentucky. At all relevant times, B&W manufactured, advertised, and sold cigarettes, including Kool, Raleigh, Barclay, BelAir, Capri, Richland, Laredo, Eli Cutter, GPC, GOC Lights, and Viceroy cigarettes throughout the United States. As a result of its acquisition of American Tobacco Company, B&W has succeeded to the liabilities of American Tobacco either by operation of law, or as a matter of fact. At all relevant times, American Tobacco manufactured, marketed, and sold cigarettes, including, Lucky Strike, Pall Mall, Tareyton, American, Malibu, Montclair, Newport, Misty, Iceberg, Silk Cut, Silva Thins, Sobrania, Bull Durham, and Carlton cigarettes, throughout the United States

12.     Defendant Lorillard Tobacco Company ("Lorillard") is a Delaware corporation with its principal place of business at 714 Green Valley Road, Greensboro, North Carolina. At all relevant times, Lorillard manufactured, advertised, and sold cigarettes, including Old Gold, Kent, Triumph, Satin, Maverick, Max, Spring, Newport and True cigarettes, throughout the United States

13.     Defendant Liggett Group, Inc. (f/k/a Liggett & Myers) is a Delaware corporation with its principal place of business at 100 Maple Lane, Mebane, North Carolina. At all relevant times, Liggett manufactured, advertised, and sold cigarettes, including

7

Chesterfield, Decade, L & M, Pyramid, Dorado, Eve, Stride, Generic and Lark cigarettes,

throughout the United States

### CLASS ACTION ALLEGATIONS

14.    The named plaintiffs brings this action as "private attorneys general" under the

MSP statute.  Alternatively, the plaintiffs brings this action as a representative party on behalf

of themselves and on behalf of the following Class of similarly situated plaintiffs, who are the

Class Members:

(a)    all Medicare beneficiaries who, between May 26, 1998 and the present, have

received medical treatment for tobacco-related illnesses, the costs of which care and treatment

were paid in part or whole by Medicare; and

(b)    all persons or entities (including estates, representatives, spouses, children, and

relatives and others) who, independently or derivatively because of their personal or legal

relationship with a person described in subparagraph (a) above, may assert claims against the

defendants for reimbursement of cost of treatment for tobacco-related illnesses provided by

Medicare.

15.    Excluded from the Class are the defendants herein, any entity in which any of

the defendants has a controlling interest, any officers, directors or employees of any of the

defendants, and legal representatives, heirs, successors, and assignees of any of the defendants.

16.    The Class of plaintiffs is so numerous that the individual joinder of all its

members is impracticable.  During each year at issue in this action, there were approximately

39 million Medicare beneficiaries.  Of these, at least several million received medical

treatment for tobacco-related illnesses, the costs of which care and treatment were paid in part

or whole by Medicare.

8

17.     Common questions of law and fact exist as to all Class Members.

18.     The representative party's claims are typical of the claims of the Class Members, all of whom have suffered from tobacco-related illnesses, and subsequently received benefits in the form of medical care and treatment for such illnesses paid by Medicare. The representative party adequately represents the Class because he is a member of the Class and his interests do not conflict with the interests of the Class he seeks to represent. He has retained counsel competent and experienced in the prosecution of complex consumer tort and products liability class actions, and who are also experienced in the litigation of actions under the MSP statute. The representative party intends to prosecute this action vigorously for the benefit of the Class. The interests of the Class Members will be fairly and adequately protected by the representative party and his counsel.

19.     The questions of law or fact common to the Class Members predominate over any questions affecting only individual members. A class action is superior to other available methods for the fair and efficient adjudication of the controversy because

(a)     the interest of the Class Members in individually controlling the prosecution of separate actions is minimal, in large measure because the damages to be awarded are not a function of the individualized injuries of each Class Member;

(b)     this litigation concerns the recovery of sums certain, that is, expenditures made by Medicare, that are distinct from any other claims or remedies to which Class Members may be entitled for individual injuries caused by the defendants;

(c)     the desirability of concentrating the litigation of the claims involved in this case in this forum is high given that the statutory damages sought are based on identifiable expenditures made by Medicare, and securing the complete reimbursement to which the

9

Medicare program is entitled in one action is more efficient, and responds more effectively to Medicare's needs, than seeking this reimbursement piecemeal as part of litigation brought by individual Class Members, and

(d)     the difficulties likely to be encountered in the management of a class action are minimal given the distinct attributes of this statutory cause of action as a device for securing reimbursement of funds expended by Medicare.

20.     Accordingly, if a class action is required for this case at all, the proposed Class is subject to certification as a class pursuant to Fed. R. Civ. P. 23(b)(3).

GENERAL ALLEGATIONS

A. THE MEDICARE AS SECONDARY PAYER REGIME

21.     Under the Medicare program, the federal government pays for certain health care expenses of the aged (persons over 65 years old), the disabled, and persons suffering from end stage renal disease.

22.     From its inception in 1965 until 1980, Medicare generally acted as the primary payer for all covered health care services rendered to eligible beneficiaries. That is, Medicare was the payer of first resort, even where some other entity might have been legally obligated to pay for the health care expenses in a particular case. The sole exception up to 1980 was where payment for the health care services had been made or could "reasonably be expected to be made" under a state or federal workers' compensation scheme. In such a case, any Medicare payment for the services was conditioned on reimbursement from the involved workers' compensation plan.

23.     Beginning in 1980, in response to burgeoning expenditures, Congress enacted a series of amendments now known collectively as the Medicare as Secondary Payer ("MSP")

statute. The MSP statute was designed to reduce Medicare's obligation to make primary

payment for covered services – and so conserve the dwindling Medicare Trust Funds -- when

another person or entity had a legal obligation to provide or pay for health care services needed

by a Medicare beneficiary.

24.     In general, under the terms of the MSP statute, Medicare is a secondary payer

to two groups of entities: a) entities who have "a responsibility to make payment" for a

Medicare beneficiary's health care costs because of a legal obligation voluntarily assumed, and

b) entities who have "a responsibility to make payment" for a Medicare beneficiary's health

care costs because of a legal obligation imposed by operation of law. In either case, any

Medicare payment already made must be reimbursed by the entity that legally has the

"responsibility to make payment," that is, where that entity has, or is, a "primary plan" that

should have paid for the medical expense before Medicare.

25.     A "primary plan" in the context of a legal obligation to pay medical expenses

that is voluntarily assumed mainly refers to the health care coverage provided to employees as

a benefit of their employment. That is, when an employer establishes a "group health plan" to

pay for certain medical expenses of employees and their families, that group health plan is a

"primary plan" under the MSP statute and must pay before Medicare on behalf of the

employer.

26.     A "primary plan" in the context of a legal obligation to pay medical expenses

that is imposed by operation of law includes "a workmen's compensation law or plan, an

automobile or liability insurance policy or plan (including a self-insured plan) or no fault

insurance."

11

27.    The MSP statute expressly provides that "[a]n entity that engages in a business, trade, or profession shall be deemed to have a self-insured plan if it carries its own risk (whether by a failure to obtain insurance or otherwise) in whole or in part."

28.    The Centers for Medicare and Medicaid Services of the Department of Health and Human Services ("CMS"), formerly known as the Health Care Financing Administration ("HCFA"), the agency to whom Congress has delegated the responsibility to administer and interpret the MSP statute, has by lawful rulemaking provided that "'[p]lan' means any arrangement, oral or written, by one or more entities, to provide health benefits or medical care or assume legal liability for injury or illness."

29.    CMS has by lawful rulemaking also provided that "'[s]elf-insured plan' means a plan under which an individual, or a private or governmental entity, carries its own risk instead of taking out insurance with a carrier."

30.    Reflecting the remedial purpose of the MSP statute, CMS has further provided by lawful rulemaking that a "liability insurance payment" that should be primary to Medicare includes out-of-pocket payments made by an entity that carries liability insurance or is covered by a self-insured plan. CMS recognized that such out-of-pocket payments might be made to avoid reporting an incident to a liability insurer, to pay a required deductible, or for other reasons. CMS expressly concluded that it was not consistent with the MSP statute to allow such payments to escape the mandate of the MSP statute.

31.    Thus, a "self-insured plan" within the meaning of the MSP statute and the governing regulations includes a corporation that has decided not to buy insurance for the legal liabilities or obligations that might be imposed on it, whether or not that decision is written

down, and whether or not the corporation has established reserves to cover such liabilities or obligations.

32.    The MSP statute provides no limitation on the kind of "liability" that might create an obligation to pay for the health care expenses of a Medicare beneficiary, and so makes the entity on whom such liability has been imposed a payer primary to Medicare. CMS has by lawful rulemaking provided that "'[l]iability insurance' means insurance (including a self-insured plan) that provides payment based on legal liability for injury or illness or damage to property."

33.    To help enforce compliance with the MSP statute and to assure that Medicare would not improperly pay for health care costs that were lawfully the responsibility of other entities like the defendants here, Congress authorized private parties like the plaintiff to bring suit for damages against entities, like these defendants, which have not properly paid primary for the health care costs of Medicare beneficiaries. In the MSP statute, Congress expressly required recovery in such a private action of damages in an amount double the expenditures of Medicare that should have been paid by such primary plans.

### B. THE DEFENDANT CORPORATIONS ARE PRIMARY PLANS

34.    On information and belief, each of the defendants has or had a liability insurance policy or plan (including a self-insured plan), within the meaning of the MSP statute, that covers liability to Medicare beneficiaries for the health care services required by their tobacco-related illnesses.

35.    Insurance in any amount, however, cannot limit the liability the law might impose, and so the purchase of insurance does not fully protect the defendants or their assets from the liability that might be imposed, particularly where, as here, the intentionally wrongful

13

conduct of the defendants is at issue. As a result, even a defendant which had purchased

insurance from a third party is self-insured to the extent that insurance does not fully cover a

liability imposed by law.

36.    In addition, some defendants at various times obtained insurance under the best

terms they could, such as one policy under which defendant Philip Morris retained the risk of

$1 million for each occurrence, with an overall cap on the liability insured of $10 million. At

other times, the cost of insurance was, from the perspective of some of the defendants,

prohibitively expensive in light of what they saw to be their risks, compared to what insurance

underwriters saw as the defendants' risks.

37.    To the extent that the defendants are not insured for the liability claimed in this

action, they are entities "that engage[] in a business, trade, or profession" which "carr[y their]

own risk (whether by a failure to obtain insurance or otherwise)," and so "are deemed to have

a self-insured plan" under the express terms of the MSP statute.

38.    In addition, there is significant other evidence that the defendants are self-

insured plans by virtue of their *ex ante*, deliberate choice to carry the risk of liability for

tobacco-related illnesses, including the following:

(a)    By the early 1950s, scientific researchers were publishing findings that indicated

a relationship between cigarette smoking and various illnesses, including lung cancer. As early

as 1954, this growing scientific knowledge triggered litigation brought to hold the defendants

liable for tobacco-related illnesses. Since that time, the pace of litigation has increased, while

regulatory and legislative bodies have taken a variety of actions addressing tobacco-related

illnesses. For example, in 1964, the Surgeon General of the United States declared cigarettes to be a health hazard.

(b)     The executives of the defendants, and others in their employ, were, and continue to be, fully aware of the significant risk that the defendants would be held legally liable for the injury or illness caused by their cigarettes.

(c)     The executives of the defendants had and continue to have fiduciary duties to the shareholders of the defendant corporations to make prudent arrangements to protect their corporations from the legal liability to which their cigarettes expose them. Such arrangements could include the purchase of insurance to cover, at least in part, the liability they might face. However, the risks involved have made many insurers reluctant to write liability insurance for defendants, and, where they did so, often insurers required a high deductible and a cap on the overall amount insured.

(d)     Knowing the risks of legal liability that their cigarettes generated, the defendants made business decisions to continue to produce and market cigarettes, while vigorously contesting every case brought against them seeking to impose legal liability for tobacco-related illnesses.

(e)     Accordingly, the defendants have deliberately chosen and planned to self-insure for risks of product liability and other tort claims inherent in their business, that is, they have planned to pay such claims from self-insured funds or retained earnings.

(f)     The defendants have admitted that they have specifically planned *ex ante* to self-insure. Thus, for example, in a June 17, 1963 letter, William R. Lybrook of R.J. Reynolds responded to the inquiry of a current or prospective Reynolds shareholder as follows:

15

This is to acknowledge your recent letter in which you inquired as to whether this Company has products liability insurance.

We have never carried such insurance but have chosen to be self-insurers in this field.

(g)    Some time after the 1963 letter quoted above, defendant R.J. Reynolds

apparently did carry products liability insurance, and then chose to again become self-insured.

As the company itself explained in its May 30, 1991 10-K:

RJRN previously had maintained product liability insurance covering certain of these tobacco-related legal actions, proceedings and claims. As of April 13, 1990, RJRN became wholly self-insured for existing tobacco-related litigation risks.

(h)    In 1999, Seth Moscowitz, a representative of R.J. Reynolds, "asserted that R.J.

Reynolds Tobacco was self-insured" and explained that "product hazard exclusions" and

"health hazard exclusions" have existed in their outside insurance policies for decades. Dan

Lonkevich, *Fed's Tobacco Suit Might Prompt Ins. Claims*, NATIONAL UNDERWRITER,

PROPERTY & CASUALTY/RISK & BENEFITS MANAGEMENT 42 (September 27, 1999).

(i)    Similarly, "A spokesman told [World Insurance Report] that Brown &

Williamson's product liability insurance exclusion *and consequent self-insurance arrangement*

extends to legal costs." *Kicking Butts*, WORLD INSURANCE REPORT (April 4, 1997). A

spokesman for Brown & Williamson's parent BAT had earlier told the same publication that

"like most tobacco companies, BAT's tobacco product liability is entirely self-insured."

*Tobacco Makers Concede Over Litigation*, WORLD INSURANCE REPORT (February 21, 1997).

(j)    The defendants have routinely admitted in reports filed with the federal

government that they planned to rely on their own cash flows or retained earnings to fund their

obligations in the event of liability. For instance, Philip Morris has stated: "It is possible that

the Company's results of operations or cash flows could be materially affected by an ultimate

unfavorable outcome of certain pending litigation.  Management believes, however, that the

ultimate outcome of all pending litigation should not have a material adverse effect on the

Company's financial position."  Philip Morris, Inc., 10-K, at 23 (Dec. 31, 1996).

(k)    The Liggett Group Inc. has similarly stated, "it is possible that Liggett's

financial position, results of operations and cash flows could be materially adversely affected

by an ultimate unfavorable outcome in any of such pending litigation."  Liggett Group Inc.,

10-K, at 19 (Dec. 31, 1996).

(l)    As far back as 1986 it was reported that tobacco "industry sources say the

companies are now self-insuring," as "the cost of liability insurance has 'gone through the

roof,' according to one tobacco marketer."  Nancy Giges, *Marketers Feel Product Liability

Pressure; Risks Crimp Launch of New Items*, ADVERTISING AGE (May 12, 1986).

(m)    Over a dozen years ago it had already become well-known in the insurance

industry that "[p]roduct liability insurance covering health risk has been largely unavailable to

most cigarette makers for roughly a decade, and several large companies now self-insure their

product exposures."  Douglas McLeod, *Tobacco Award Raises Insurance Questions*, BUSINESS

INSURANCE (June 20, 1988).

(n)    The prevailing practice in the tobacco industry to have self-insurance plans for

liability coverage is evident from the statements of other entities involved in the cigarette

business.  For example, Core Mark International, Inc. is a distributor of various consumer

goods, including cigarettes.  As it pointed out in a prospectus filed with the SEC, it "is

particularly dependent on the leading producers of cigarettes," which, as of 1997, included

RJR, Philip Morris, and Brown & Williamson.  Core Mark International, Inc., Prospectus

Filed Pursuant to Rule 424 (B)(1), at 16 (filed Jan. 10, 1997).  In its Prospectus, Core Mark

went on to explain:

> In light of the claimed health risks related to the use of cigarettes and
> other tobacco products, there can be no assurance that product liability claims
> will not be asserted against the tobacco industry or the Company in the future.
> Such lawsuits, if asserted against the tobacco industry or the Company and
> adversely determined, could have a material adverse effect on the Company's
> business and financial position.  The Company carries general liability
> insurance, but *self-insures against liability in respect of health-related claims,
> which management believes is consistent with industry practice.*

*Id.* at 18 (emphasis added).

(o)     The defendants' choice to pay liability claims from their cash flows or retained

earnings, that is, to carry their own risk of legal liability for tobacco-related illnesses rather

than taking out insurance with a carrier, relies in part on behavior patterns of consumers that

indicate that increases in the price of cigarettes will not significantly decrease the volume of

purchases of these products (in economics parlance, price-inelasticity), evidencing a peculiarly

stable demand due to the addiction of customers and the effectiveness of massive advertising;

and on a sophisticated body of knowledge that has been developed to estimate the liability risks

they carry.

(p)     Defendant Philip Morris illustrated how this mechanism works in practice in its

1998 10-K, in which it detailed that "[o]perating companies income for 1998 decreased . . .

due primarily to higher tobacco-related settlement charges ($1.9 billion) . . . partially offset by

price increases, net of cost increases ($1.8 billion)."  Philip Morris, Inc., 10-K, at 27 (March

18, 1999).

18

39.     As entities that engage in a business, trade, or profession, the defendants have

self-insured plans and are primary plans within the meaning of the MSP statute if they simply

have failed to obtain insurance for their tort liabilities, for whatever reasons or even lack of

reasons. However, the defendants surpass that basic statutory threshold because they have

adopted deliberate, *ex ante* plans to carry their own risk of tort liability, and so have adopted

plans of self-insurance and are primary plans within the meaning of the MSP statute.

### C. THE DEFENDANTS ARE LIABLE IN TORT FOR THE TOBACCO-RELATED ILLNESSES OF MEDICARE BENEFICIARIES.

#### 1. DEFENDANTS CONCEALED, DENIED, AND MANIPULATED THE ADDICTIVE PROPERTIES OF THEIR CIGARETTES.

40.     In the latter half of the twentieth century, some 10 million Americans were

killed by tobacco-related illnesses. In 2001, and every year into the foreseeable future, nearly

one-half million Americans have died, or are expected to die, prematurely due to disease

caused by cigarette smoking.

41.     Tobacco-related illnesses include leukemia, emphysema, COPD, and cancers of

the lung, larynx, oral cavity, esophagus, pancreas, bladder, kidney, stomach, and cervix.

42.     At least 90 percent of cases of lung cancer in men are attributable to smoking.

43.     At least 79 percent of cases of lung cancer in women are attributable to

smoking.

44.     At least 81 percent of cases of cancer of the larynx in men are attributable to

smoking.

45.     At least 87 percent of cases of cancer of the larynx in women is attributable to

smoking.

46.    At least 92 percent of cases of cancer of the oral cavity in men is attributable to smoking.

47.    At least 61 percent of cases of cancer of the oral cavity in women is attributable to smoking.

48.    At least 78 percent of cases of cancer of the esophagus in men is attributable to smoking.

49.    At least 75 percent of cases of cancer of the esophagus in women is attributable to smoking.

50.    At least 29 percent of cases of cancer of the pancreas in men is attributable to smoking.

51.    At least 34 percent of cases of cancer of the pancreas in women is attributable to smoking.

52.    At least 47 percent of cases of cancer of the bladder in men is attributable to smoking.

53.    At least 37 percent of cases of cancer of the bladder in women is attributable to smoking.

54.    At least 48 percent of cases of cancer of the kidney in men is attributable to smoking.

55.    At least 12 percent of cases of cancer of the kidney in women is attributable to smoking.

56.    At least 17 percent of cases of cancer of the stomach in men is attributable to smoking.

57.     At least 25 percent of cases of cancer of the stomach in women is attributable to smoking.

58.     At least 20 percent of cases of leukemia in men is attributable to smoking.

59.     At least 20 percent of cases of leukemia in women is attributable to smoking.

60.     At least 31 percent of cases of cancer of the cervix is attributable to smoking.

61.     At least 80 to 90 percent of emphysema is attributable to smoking.

62.     At least 80 to 85 percent of COPD is attributable to smoking.

63.     Cigarettes contain nicotine, which, among other effects, activates areas of the brain that are involved in producing feelings of pleasure and reward. At the same time, nicotine causes physical dependence and a withdrawal syndrome after abstinence from it. Nicotine thus is an addictive drug. The addictive nature of nicotine is directly related to the harm caused by cigarettes, because the health risks of smoking increase with prolonged use. The primary factor that prevents cigarette smokers from quitting smoking is their addiction to nicotine and their need for continuing intake of nicotine to avoid nicotine withdrawal.

64.     The defendants and their agents have long known that nicotine is a powerful pharmacological agent – that is, a drug – with significant psychoactive effects. Most importantly for purposes of this action, defendants have long recognized that nicotine is addictive, and that addiction is what preserves the market for cigarettes and ensures their profits.

65.     In contrast, the public at large has not been aware of the addictive properties of nicotine, and have believed that smoking and – most importantly for the health consequences of smoking -- *continuing* to smoke are largely matters of choice for which the individual is responsible. Most beginning smokers – particularly youngsters – falsely believe that they will

21

be able to quit after smoking for a few years and thereby avoid the illnesses caused by smoking.

66.    The defendants not only have been fully aware of this popular misconception of the addictive properties of nicotine; they have sought to perpetuate it by concealing the facts concerning nicotine's addictiveness. Indeed, the defendants have deliberately understood and manipulated the addictive properties of nicotine in their cigarettes to undermine the ability of consumers to freely choose to refrain from smoking. The defendants have consciously pursued a clandestine business strategy that relies on creating and maintaining a market of captive consumers by virtue of the defendants' control over, and manipulation of, the nicotine in their cigarettes.

67.    The defendants have understood nicotine's addictive properties since at least the early 1960s. More than 30 years ago, a report was completed for one of the defendants that specifically addressed the mechanism of nicotine addiction in smokers. The researchers concluded that chronic intake of nicotine, such as that which occurs in regular cigarette smokers, creates a need for ever-increasing levels of nicotine to maintain the desired action: "[u]nlike other dopings, such as morphine, the rate of increasing demand for greater dose levels is relatively slow for nicotine." The report continues:

> A body left in this unbalanced state craves for renewed drug intake in order to restore the physiological equilibrium. This unconscious desire explains the addiction of the individual to nicotine.

68.    Forty three years ago, in 1959, the research department of Philip Morris stated the fact of the matter quite baldly: "Why do people smoke? . . . Addiction."

69.     Lorillard similarly noted: "The consensus of opinion derived from a review of the literature on the subject indicates the most probable reason for the addictive properties of the smoke is nicotine."

70.     In 1962, Sir Charles Ellis, a scientific advisor to the board of directors of BAT Industries, asserted in a meeting attended by Brown & Williamson representatives, that "smoking is a habit of addiction." Similarly, a year later Brown & Williamson general counsel Addison Yeaman pointed out that "nicotine is addictive," and concluded, logically, "We are, then, in the business of selling nicotine, an addictive drug." In the early 1980s researchers at Brown & Williamson echoed the point: "Nicotine is the addicting agent in cigarettes."

71.     Similarly, Reynolds, understanding the importance of retaining sufficient nicotine to maintain dependence on its so-called "low tar/low nicotine" cigarettes, internally proposed in 1971 that the company undertake research into determining more exactly the "habituating level of nicotine." Developing their understanding of these attributes of nicotine became a key effort for the defendants, as was reflected in a 1980 memorandum from a Philip Morris official:

> *Nicotine is a powerful pharmacological agent* with multiple sites of action *and may be the most important component of cigarette smoke. Nicotine and an understanding of its properties are important to the continued well being of our cigarette business* since this alkaloid has been cited often as the reason for smoking and theories have been advanced for nicotine titration by the smoker. Nicotine is known to have effects on the central and peripheral nervous system as well as influencing memory, learning, pain perception, response to stress and level of arousal.

(Emphasis added.)

23

72.     Much of the defendants' inquiries into the attributes of nicotine reflected an

appreciation of the role of nicotine in creating new consumers of the defendants' cigarettes.

For example, in 1974, Philip Morris researchers began a study designed to test their theory

that hyperkinetic children take up smoking in adolescence because nicotine may perform the

same pharmacological function as prescription medications used to treat hyperkinesis:

> It has been found that amphetamines, which are strong stimulants, have the
> anomalous effect of quieting these children down . . .  Many children are
> therefore regularly administered amphetamines throughout grade school years.
> . . .  *We wonder whether such children may not eventually become cigarette
> smokers in their teenage years as they discover the advantage of self-
> stimulation via nicotine.*  We have already collaborated with a local school
> system in identifying some such children in the third grade.

(Emphasis added.)

73.     The commercial value of the addictive attributes of nicotine – that is, the

properties of their cigarettes that help to create a captive market – were not lost on the

defendants.  For example, a 1971 secret internal report distributed to Philip Morris executives

showed that tobacco executives knew the powerfully addictive nature of nicotine in cigarettes.

The report studied persons who had tried to stop smoking and concluded that only 28 percent

of those who tried to quit were still non-smokers eight months later:

> Even after eight months quitters were apt to report having neurotic symptoms,
> such as feeling depressed, being restless and tense, being ill-tempered, having a
> loss of energy, being apt to doze off. They were further troubled by constipation
> and weight gains which averaged about five pounds per quitter . . .  This is not
> the happy picture painted by the Cancer Society's anti-smoking commercial
> which shows an exuberant couple leaping into the air and kicking their heels
> with joy because they've kicked the habit.  A more appropriate commercial
> would show a restless, nervous, constipated husband bickering viciously with
> his bitchy wife who is nagging him about his slothful behavior and growing
> waistline.

74.    As one presenter at a tobacco company conference summed up the results of studies of smokers who attempted to quit:  "Although intentions and attempts to quit are relatively high (30-40% of smokers [in a given year]), the actual success rate of quitting is relatively low and stable."

75.    Notwithstanding the facts concerning the addictiveness of nicotine established by the defendants' own studies, the defendants concealed their research and continued to deny the addictiveness of nicotine.

76.    For example, a 1977 Philip Morris study on the withdrawal effects of nicotine was permitted to proceed only if the results were favorable.  If not, as a Philip Morris researcher explained,  "we will bury it."

77.    For example, an internal 1978 Brown & Williamson memorandum discussed the addictiveness of nicotine and characterized nicotine as a poison, while noting that most consumers were unaware of this:  "Very few consumers are aware of the effects of nicotine, i.e., its addictive nature and that nicotine is a poison. . . . [H]ardly any consumers use nicotine numbers as a basis for their purchase."

78.    For example, in March 1980, a Philip Morris scientist produced an internal memorandum discussing company research into the pharmacology of nicotine.  The research was "aimed at understanding that specific action of nicotine which causes the smoker to repeatedly introduce nicotine into his body."  The internal memorandum noted that it was "a highly vexatious topic" that company lawyers did not want to become public because nicotine's drug properties, if known, would support regulation of tobacco by the federal Food and Drug Administration.  Consequently, the memorandum observed, "[o]ur attorneys . . . will likely continue to insist on a clandestine effort in order to keep nicotine the drug in low profile."

25

79.    For example, in the early 1980s, Philip Morris hired Victor DeNoble and Paul Mele to study the effects of nicotine on the behavior of rats and to research and test potential nicotine analogues. DeNoble and Mele's research demonstrated that nicotine was addictive and that, in terms of addictiveness, "nicotine looked like heroin." In August 1983, Philip Morris ordered DeNoble to withdraw a research paper on nicotine that had already been accepted for publication after full peer review by the respected journal, PSYCHOPHARMACOLOGY. Less than a year later, Philip Morris abruptly closed DeNoble's research lab. Philip Morris executives threatened DeNoble and Mele with legal action if they published or talked about their nicotine research. Their research animals were killed, the equipment was removed, and all traces of the former lab were eliminated.

80.    For example, in 1988, when the Surgeon General concluded, based on non-industry research, that nicotine is addictive, agents of the defendants disputed that conclusion, saying that "claims that cigarettes are addictive contradict common sense. . . . The claim that cigarette smoking causes physical dependence is simply an unproven attempt to find some way to differentiate smoking from other behaviors."

81.    For example, in a 1992 pamphlet, Philip Morris claimed, "Those who term smoking an addiction do so for ideological – not scientific – reasons."

82.    As late as 1994, in an appearance before Congress, the chief executive officers of the defendant corporations were asked by Rep. Ron Wyden: "Do you believe nicotine is not addictive?" Under oath, they replied:

> William Campbell (Philip Morris): "I believe that nicotine is not addictive, yes."

26

James Johnston (Reynolds): "Congressman, cigarettes and nicotine clearly do not meet the classic definition of addiction."

Andrew Tisch (Lorillard): "I believe that nicotine is not addictive."

Edward Horrigan (Liggett): "I believe that nicotine is not addictive."

Thomas Sandefur (Brown & Williamson): "I believe that nicotine is not addictive."

Donald Johnson (American Tobacco): "And I, too, believe that nicotine is not addictive."

83.    At the same time that they were denying the addictiveness of nicotine, the

defendants not only knowingly continued to produce and market cigarettes with the addicting

properties of nicotine, but they were developing and using highly sophisticated technologies

designed to deliver nicotine to smokers in ways intended to create and sustain addiction in the

vast majority of individuals who smoke regularly.  This manipulation of the nicotine content of

cigarettes is achieved through selective breeding and cultivation of plants for nicotine content,

and careful tobacco leaf purchasing and blending plans.  The manipulation of nicotine delivery

(that is, the amount of nicotine absorbed by the smoker) is achieved by various design and

manufacturing techniques.  As a 1973 internal Reynolds document explained:

Methods which may be used to increase smoke pH and/or nicotine "kick" include: (1) increasing the amount of (strong) burley in the blend, (2) reduction of casing sugar used on the burley and/or blend, (3) use of alkaline additives, usually ammonia compounds, to the blend, (4) addition of nicotine to the blend, (5) removal of acids from the blend, (6) special filter systems to remove acids from or add alkaline materials to the smoke, and (7) use of high air dilution filter systems.  Methods 1-3, in combination, represent the Philip Morris approach, and are under investigation [by Reynolds].

84.    Common among the chemical manipulations of tobacco to enhance the effect of

nicotine is the use of ammonia.  As a handbook from Brown & Williamson explains:

> Ammonia, when added to a tobacco blend, reacts with the indigenous nicotine
> salts and liberates free nicotine. As a result of such change, the ratio of
> extractable nicotine to bound nicotine in the smoke may be altered in favor of
> extractable nicotine. As we know, extractable nicotine contributes to impact in
> cigarette smoke and this is how ammonia can act as an impact booster.

85.    Thus the denial and concealment of the addictiveness of nicotine is a central

element of this case, at the core of defendants' tortious conduct. As a 1980 memorandum from

the industry's Tobacco Institute conceded, "We can't defend continued smoking as 'free

choice' if the person was addicted."

86.    However, at least one defendant, Philip Morris, has now abandoned that

strategy of denial and concealment of which it was a part for so many decades, coinciding with

its support for legislation, now pending in Congress, that would provide for FDA regulatory

authority over tobacco products. While Philip Morris states that such regulation would provide

for "greater consistency in tobacco policy," and "more predictability for the tobacco

industry," other observers conclude that "selling cigarettes under government supervision

would improve its public relations and legal atmosphere and would enable it to roll out

'reduced risk' cigarettes with the apparent approval of government scientists."

87.    On its website, Philip Morris now says, "We agree with the overwhelming

medical and scientific consensus that cigarette smoking is addictive."

88.    No longer does Philip Morris dismiss the Surgeon General's warnings about the

health effects and addictiveness of cigarette smoking as ideologically motivated, but describes

the Surgeon General as "the nation's leading spokesperson on matters of public health," and

the Philip Morris website provides a direct link to the very Surgeon General Report on nicotine

addictiveness it sought to discredit.

28

89.    The Philip Morris website also provides a direct link to the Centers for Disease Control ("CDC") website, which emphasizes, "[N]icotine is a very addictive drug. For some people, it can be as addictive as heroin or cocaine."

90.    Philip Morris now "agree[s] with the overwhelming medical and scientific consensus that cigarette smoking causes lung cancer, heart disease, emphysema and other serious diseases in smokers."

## 2. DEFENDANTS' CONDUCT CONSTITUTES A BATTERY

91.    The risk of a cigarette smoker contracting a tobacco-related illness greatly increases with prolonged use of cigarettes.

92.    Smoking cigarettes is addictive.

93.    The addictive properties of cigarettes cause or significantly contribute to the prolonged use of cigarettes.

94.    The addictive properties of smoking cigarettes are caused by the nicotine in or added to the tobacco.

95.    The addictive properties of the defendants' cigarettes pose a hazard distinct from the direct physical dangers of smoking.

96.    At all relevant times, the defendants were aware of the addictive quality of the nicotine in their cigarettes.

97.    At all relevant times, the defendants attempted to manipulate the levels of nicotine in their cigarettes to maintain or increase the addictive properties of their cigarettes.

98.    At all relevant times, the defendants denied and attempted to conceal the addictive properties of the nicotine in their cigarettes.

99.    The exposure of a person to the addictive properties of nicotine in the defendants' cigarettes constitutes a harmful or offensive contact with that person.

100.    The defendants intended to cause the exposure of the persons who became Medicare beneficiaries to the addictive properties of nicotine in the defendants' cigarettes, that is, the defendants intended to cause this harmful or offensive contact with those persons.

101.    This harmful or offensive contact with persons who became Medicare beneficiaries, that is, the exposure of the persons who became Medicare beneficiaries to the addictive properties of nicotine in the defendants' cigarettes, directly or indirectly resulted from the acts of the defendants.

102.    The persons who became Medicare beneficiaries did not consent to this harmful or offensive contact, that is, they did not consent to exposure to the addictive properties of nicotine in the defendants' cigarettes.

103.    This harmful or offensive contact constitutes a battery.

104.    As a result of this battery, these persons who became Medicare beneficiaries contracted certain tobacco-related illnesses.

105.    The defendants are liable for the medical expenses incurred to treat the tobacco-related illnesses of these persons who are the victims of the defendants' battery.

106.    From the time the victims of the defendants' battery became Medicare beneficiaries, Medicare paid for the medical expenses necessitated by their tobacco-related illnesses.

## CAUSE OF ACTION

107.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 106, as though fully set forth herein.

30

108.    As a result of their battery, each defendant was and is an entity which has or had a responsibility to pay for the costs of the tobacco-related health care services of Medicare beneficiaries, within the meaning of the MSP statute.

109.    Under the terms of the MSP statute, each defendant was and is, with respect to the costs of the tobacco-related health care services of Medicare beneficiaries, a primary plan and so required to be the payer primary for those costs, while Medicare was to be only the secondary payer.

110.    None of the defendants paid for, or in any other way provided for primary payment of, these costs of the tobacco-related health care services of Medicare beneficiaries, in violation of the MSP statute.

111.    Due to this wrongful conduct of the defendants, Medicare became and continues to be the primary payer for these costs of the tobacco-related health care services of Medicare beneficiaries, in violation of the MSP statute.

112.    Under the terms of the MSP statute, Medicare's payments for these costs of the tobacco-related health care services of Medicare beneficiaries were conditioned on reimbursement from the correct primary payer, which each defendant is.

113.    As a result, under the MSP statute, the plaintiffs, or, alternatively the plaintiff Class, is entitled to an award of damages from the defendants in an amount twice that of Medicare's payments for the costs of the tobacco-related health care services of Medicare beneficiaries.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs or, alternatively, the plaintiff Class, respectfully prays that the Court enter judgment against the defendants, and each of them, jointly and severally:

a.     awarding the plaintiffs, or, alternatively, the plaintiff Class, damages in an

amount double the amount paid by Medicare to reimburse health care providers for tobacco-

related health care services provided to Medicare beneficiaries, for which treatment the

defendants were "required or responsible . . . to make payment" under the Medicare as

Secondary Payer Act;

b.     awarding the plaintiffs, or, alternatively the plaintiffs Class, attorneys' fees and

their costs of this litigation, including interest; and

c.     granting such other and further relief, including punitive damages, as the Court

may deem just and proper.

Respectfully submitted,

s/Mark Miller
Bar Number 0935883
Ford, Miller & Wainer, P.A.
1200 Riverplace Blvd., Suite 600
Jacksonville, FL 32207
Telephone:  (904) 390-1970
Fax: (904) 390-1975
E-mail: miller@fordmiller.com

Daniel M. Cohen
  Trial Counsel
Bar Number 0797472
Jonathan W. Cuneo
Cuneo Waldman & Gilbert, LLP
317 Massachusetts Avenue, N.E., Suite 300
Washington, D.C. 20002
Telephone: (202) 789-3960
Fax: (202) 789-1813

Robert J. Cynkar
  Trial Counsel
Joseph R. Egan

Charles J. Fitzpatrick
Egan, Fitzpatrick, Malsch & Cynkar, PLLC
7918 Jones Branch Drive, Suite 200
McLean, VA 22102
Telephone: (703) 918-4946
Fax: (703) 918-4943

Mark B. Hutton
  Trial Counsel
Derek S. Casey
Chan P. Townsley
Hutton & Hutton Law Firm, L.L.C.
P.O. Box 638
Wichita, KS 67201-0638
Telephone: (316) 688-1166
Fax: (316) 686-1077

Gary L. Richardson
  Trial Counsel
Fred Stoops
Charles L. Richardson
Richardson, Stoops, Richardson & Ward
The Richardson Building
6555 S. Lewis Avenue
Tulsa, OK 74136
Telephone: (918) 492-7674
Facsimile: (918) 493-1925

Attorneys for Plaintiffs

# EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

JACKSONVILLE DIVISION


GENEBA GLOVER,                    Jacksonville, Florida
et al.,

        Plaintiffs,              Case No. 3:04-cv-403-J-32MMH


vs.                              February 25, 2005


PHILIP MORRIS USA,              10:00 a.m.
et al.,

        Defendants.              Courtroom No. 10B




MOTION HEARING

BEFORE THE HONORABLE TIMOTHY J. CORRIGAN

UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S

PLAINTIFFS' COUNSEL:

NORWOOD S. WILNER, ESQ.
Spohrer, Wilner, Maxwell & Matthews, P.A.
701 West Adams Street, Suite 2
Jacksonville, Florida  32204


ROBERT J. CYNKAR, ESQ.
Egan, Fitzpatrick, Malsch & Cynkar, PLLC
The American Center at Tysons Corner
8300 Boone Boulevard, Suite 340
Vienna, Virginia  22182


JONATHAN W. CUNEO, ESQ.
DANIEL M. COHEN, ESQ.
The Cuneo Law Group
317 Massachusetts Avenue, Northeast
Suite 300
Washington, D.C.  20002


GARY L. RICHARDSON, ESQ.

Richardson, Stoops, Richardson & Ward

The Richardson Building

6555 South Lewis Avenue

Tulsa, Oklahoma  74136



DEBORAH B. MCILHENNY, ESQ.

Hutton & Hutton

8100 East 22nd Street, North, Building 1200

Wichita, Kansas  67226-2312

Page 3

DEFENSE COUNSEL:

            CHARLES C. HOWELL, III, ESQ.
            Howell & O'Neal, P.A.
            One Independent Drive, Suite 2902
            Jacksonville, Florida  32202


            DAVID S. BRECHER, ESQ.

            Smith, Gambrell & Russell, LLP

            50 North Laura Street, Suite 2600

            Bank of America Tower

            Jacksonville, Florida  32202


            MURRAY R. GARNICK, ESQ.

            Arnold & Porter

            555 Twelfth Street, Northwest

            Washington, D.C.  20004


COURT REPORTER:

            Shannon M. Bishop, RMR, CRR


(Proceedings reported by microprocessor stenography;

transcript produced by computer.)

1                    P R O C E E D I N G S

2     February 25, 2005                         10:00 a.m.

3                          - - -

4          THE COURT:  How is everybody doing?

5          Well, I don't know exactly why y'all decided to

6     bring this road show here.  But if it was for the southern

7     hospitality, I'm sure we can give you that.  If it was for

8     the weather, it looks like you're kind of out of luck.

9          So we are here in the case of Geneba Glover and

10    James Gillins, plaintiffs, versus Philip Morris USA and

11    Liggett Group, Inc.

12         The case is numbered 3:04-cv-403-J-32MMH.  And

13    there are no shortage of attorneys who have filed

14    appearances in the case.

15         Mr. Wilner, will you do the honors, please, and

16    introduce your side of the table.

17         MR. WILNER:  I will ask each to stand, because I

18    don't have all my lists.  But, thank you, Your Honor, I

19    appreciate it.

20         THE COURT:  All right.

21         MR. WILNER:  I'm Norwood Wilner, here for the

22    plaintiffs, as local counsel.

23         THE COURT:  Okay.

24         MR. WILNER:  Thank you.

25         MR. CYNKAR:  I'm Bob Cynkar, Your Honor, from

Page 5

1    Virginia.  Good morning.

2              THE COURT:  Morning.

3              MR. CUNEO:  I'm Jonathan Cuneo, Your Honor.

4    Washington, D.C.  I'm sorry about my throat and you have to

5    listen to it.

6              THE COURT:  All right.

7              MR. RICHARDSON:  Gary Richardson.  Tulsa,

8    Oklahoma.

9              MS. MCILHENNY:  Good morning, Your Honor, I'm

10   Deborah McIlhenny, from Wichita, Kansas.

11             MR. COHEN:  Morning, Your Honor.  Daniel Cohen,

12   Washington, D.C., now.  Used to be here in Jacksonville,

13   Florida, also.

14             THE COURT:  Okay.  I've got a little bit of a cold

15   myself.  So you may hear my voice go in and out from time to

16   time.

17             Mr. Howell, you want to do the honors on your side

18   of the table?

19             MR. HOWELL:  Your Honor, I'll be glad to.  I'm

20   Charlie Howell.  I represent Liggett in this case.  And to

21   my right is Dave Brecher.  And to his right is Murray

22   Garnick, who represents Philip Morris.

23             THE COURT:  Okay.  Good to see you all.

24             MR. BRECHER:  Morning, Judge.

25             MR. GARNICK:  Morning.

1      THE COURT:  All right.  We are here today on a

2  motion to dismiss the amended complaint filed by the

3  plaintiffs in this case.

4      In preparation for this hearing, I have read the

5  voluminous filings in the case, which includes the

6  plaintiffs' -- I mean, I'm sorry, the defendants' motion and

7  supporting memorandum, the plaintiffs' response thereto, the

8  first amended complaint itself, the memorandum of amicus

9  curiae, Senator Charles Grassley, in opposition to the

10  defendants' motion to dismiss, and a reply in support of

11  defendants' motion to dismiss that was filed as well.

12      And I have attempted to familiarize myself with

13  the key cases which are cited by the parties and the

14  attachments.  But I won't be able to honestly tell you that

15  I have the cases memorized.  So if there's a particular

16  portion of them that is of great interest, you might want to

17  mention that.

18      What we're going to do today is to have an

19  argument on this motion.  And I'm sure you've got some

20  things you want to say.  I know you've said a lot in your

21  briefs.

22      But I'm sure there's things you want to say.  And

23  I'll try to listen to you.  If I feel like I need to ask

24  questions, I won't hesitate to do that.  And you ought to

25  expect that.

Page 7

1          I don't have a specific budget for this hearing,

2   although I expect it to last less than two hours.  So let's

3   go ahead and get started, unless there's any preliminary

4   matters.  And since it's the defendants' motion, I'll hear

5   from the defendants first.

6          And just so I'm clear -- it's Mr. Garnick; is that

7   correct?

8          MR. GARNICK:  Garnick, yes.

9          THE COURT:  Is it Garnick?

10         MR. GARNICK:  Yes.

11         THE COURT:  With an N.  Okay.  Are you going to be

12  making the argument on behalf of both defendants, or are the

13  defendants going to split up the argument in some way?  How

14  are y'all intending to proceed?

15         MR. GARNICK:  I'm going to be making the argument

16  on behalf of all the defendants.

17         THE COURT:  All right.  Go ahead, sir.

18         MR. GARNICK:  May it please the court.  Murray

19  Garnick for Philip Morris USA, on behalf of all defendants.

20         Your Honor, before I get started, there's a number

21  of slides.  And instead of bringing a big board into the

22  courtroom, what I've done is created a handout, which I've

23  given to the plaintiff, of the slides I would like to direct

24  the court's attention to through my argument.

25         THE COURT:  All right, sir.  You can give that to

Page 8

1    Mr. Perconte.

2         MR. GARNICK:   There are approximately three

3    million Medicare recipients living in the state of Florida,

4    almost 20 percent of the population.

5         Under plaintiffs' theory of law, which no court

6    anywhere has ever accepted, any tort claim of a Medicare

7    recipient for medical expenses against a corporation, or any

8    other entity, can be brought in federal court irrespective

9    of diversity, irrespective of amount in controversy, and, if

10   successful, result in award of double damages.

11        What this means is that if a hypothetical

12   Mr. Smith slip and fell at a local grocery store and

13   sustained $5,000 in medical costs paid for by Medicare,

14   Mr. Smith could bring that slip-and-fall case into federal

15   court and, if successful, obtain $10,000.

16        In fact, the plaintiffs go one step further.   And

17   if Mr. Smith doesn't want to bring the claim, or if he can't

18   get to the courthouse fast enough, his neighbor, Mr. Jones,

19   who has no connection to the tort, can bring the cause of

20   action and collect the $10,000.   That can't be the law.   It

21   doesn't make any sense.   And it's not.

22        Plaintiffs' interpretation of the Medicare as

23   Secondary Payer Act, or MSP, would federalize tort law.   It

24   would radically expand the jurisdiction of this court.   And

25   it would virtually double the liability of manufacturers

1    overnight.  And it would do all that contrary to the express

2    language of the MSP itself, as amended, and its legislative

3    history.

4           With leave of court, I'd like to cover four basic

5    areas this morning.  First, I want to talk for a few minutes

6    about the plaintiffs' claim.  That's something that we

7    really do not deal with very much in the briefs.

8           Second, the history of the MSP and the 2003

9    amendments.

10          Third, the legal viability of the plaintiffs'

11   cause of action, or lack thereof.

12          And, fourth, procedural problems in this case.

13          Turning to the plaintiffs' claim -- there are two

14   plaintiffs -- they brought this action as private attorney

15   generals, and they seek to recover all medical expenses paid

16   for by Medicare, from 1998 to, presumably, today, to treat

17   medical conditions caused by smoking.  And there are a

18   number of aspects of this I'd like to bring to the court's

19   attention.

20          First, this is not a class action.  These are not

21   class representatives.  They're not government officials.

22   They're suing to recover medical care provided to thousands

23   of unidentified Medicare recipients.  They assert only the

24   interest in the federal government in obtaining these funds.

25          Second, they recover double damages.  Even before

1    we get to double damages, they would assert that the amount

2    of medical expenses paid for by Medicare to treat

3    smoking-related conditions amount to billions of dollars.

4    Well, let's say hypothetically it's two billion dollars.

5              That means they're seeking to recover double

6    damages, or four billion dollars.  And under their version

7    of the law, if they were to recover four billion dollars,

8    two billion would go to the federal government, and these

9    two plaintiffs would keep the other two billion dollars.

10             They are seeking the greatest windfall in American

11   juris prudence.  They're asserting one underlying cause of

12   action, battery.

13             They say the sale of cigarettes without disclosure

14   that cigarettes are addictive is a battery.  They're trying

15   to convert a failure-to-warn claim into a battery claim.

16   And they appear to do it because they feel that if they

17   assert a battery claim there are no individual issues.  But,

18   of course, there are.

19             There's the issue of consent.  If you buy a

20   cigarette knowing it's addictive, then you've consented to

21   this battery.

22             There's choice of law, since 70 percent of

23   Floridians lived outside of the state at some point.

24   There's causation.  There's statute of limitations.

25             Many individual issues, which we didn't move on

1    because of other fundamental flaws with what they're doing.

2              Let me turn to the MSP.  The theory of the MSP is

3    very simple.  And I'm referring right now to the pre-2003

4    amendments.

5              Medicare is to be the medical provider of last

6    resort.  If a Medicare recipient incurred medical costs, the

7    notion is that his or her insurance company should first pay

8    those costs.  And only if there's no other payer should the

9    Medicare recipient go to Medicare.  And the insurance

10   company of the Medicare recipient is called the primary

11   plan.

12             Now, Medicare recognizes that often medical care

13   has to be provided right away.  So what Medicare does is it

14   provides a conditional payment.  And then it expects under

15   the MSP the primary plan, or the insurance company, to repay

16   it within a certain amount of days.

17             Now, the primary plan -- the definition of the

18   primary plan before the 2003 amendments go beyond just an

19   insurance company.

20             And this is Tab A of the printout to the court.

21   And all Tab A is is the definition of primary plan before

22   the 2003 amendments.

23             And there the court will see that it includes

24   health plans and large group health plans, workers'

25   compensation plans, liability insurance.  And it also

1   includes what is called a self-insured plan, which is going

2   to be very meaningful as to what a self-insured plan means a

3   little bit later.

4          But, essentially, what this comes down to is that

5   an MSP claim has three elements.  And we've identified those

6   in Tab B.

7          First, the defendant must be a primary plan.

8          Second, the primary plan must have a

9   responsibility to pay Medicare.

10         And, third, the primary plan must fail to pay

11  Medicare.  Very simple.  Primary plan, responsibility to

12  pay, failure to pay.

13         All right.  In the mid-to-late 1990s, the federal

14  government began to bring MSP claims when a manufacturer

15  would engage -- would enter into a large mass tort

16  settlement.

17         And the federal government argued that, okay, the

18  first element is primary plan.  A manufacturer who is

19  funding a settlement is a primary plan because the funds

20  from that settlement comes from the manufacturer's assets.

21  And, therefore, it is a self-insured plan.  That was the

22  government's theory.

23         And the government said that the manufacturer had

24  the responsibility to make a payment because it was assuming

25  that responsibility by entering into the settlement.

1          And then if the settlement failed to pay Medicare,

2     it fulfilled the third responsibility, the third element of

3     Medicare.

4          Now, a number of courts were very hostile to this

5     theory of the federal government.  In fact, the Fifth

6     Circuit rejected it in Thompson versus Goetzmann.  And what

7     the Fifth Circuit said was this:  to be a self-insured plan

8     you have to do more than pay liability out of your general

9     assets.  You need a set-aside fund.  You need a fiduciary.

10    You need all the indicia of the insurance function that you

11    would assume for yourself.

12         The Eleventh Circuit disagreed in United States

13    versus Baxter.  In United States versus Baxter the

14    manufacturer settled a mass tort claim, put into a

15    settlement fund a hundred million dollars.

16         And the federal government came in and said, You

17    are a primary plan because you are paying this out of your

18    assets and, therefore, you are a self-insured plan.  You

19    have assumed the responsibility to make the payment.  And

20    the settlement is not paying Medicare.  And the Eleventh

21    Circuit agreed with that.

22         So at this point there was a conflict between the

23    Eleventh Circuit and the Fifth Circuit.

24         At the same time this was going on, the federal

25    government was bringing a huge lawsuit against the tobacco

05a81d25-78ec-4ba6-8a5d-075b28ae3ed0

Page 14

1    company in the Federal District Court for the District of

2    Columbia, before Judge Kessler.

3         One of the claims was an MSP claim, where they

4    asserted that the tobacco companies were primary plans

5    because they were self-insurers.

6         And with respect to the responsibility to make

7    payment, their theory was this:  We're going to assert an

8    unadjudicated tort claim.  And the unadjudicated tort claim

9    shows that you are responsible to make the payments.

10         Judge Kessler rejected that.  Judge Kessler -- and

11   we provided a quote in Tab C -- said that the practical

12   effects of the government's conception of the MSP liability

13   would transform that statute meant primarily for use against

14   insurers into the very across-the-board procedural vehicle

15   for suing tortfeasors, which this court has already declared

16   impermissible.

17         The federal lawsuit is going forward, it's in

18   trial now, on a RICO claim.  The federal government has

19   preserved its ability to appeal the dismissal of the MSP

20   claim at the end, and upon entry of final judgment.

21         Now, a little bit earlier than this --

22         THE COURT:  Do you have any idea why they wouldn't

23   have certified the appeal?

24         MR. GARNICK:  No.  They never addressed that

25   issue.  And I would not speculate.

1    A little earlier, private parties, represented by

2  many of these same lawyers, brought a claim identical to

3  this one called Mason, except that Mason was a class-action

4  and it was seeking reimbursement of all federal expenditures

5  for smoking-related diseases on a national basis, including

6  the state of Florida.

7    And eventually that was transferred to Judge

8  Weinstein in the Eastern District of New York.  And Judge

9  Weinstein dismissed it on the merits, on the pleadings.

10    And at Tab D what Judge Weinstein said is this:

11  As sought to be applied by plaintiffs, the statute would

12  distort the federal state substantive tort balance by

13  creating a harsh double-recovery shadow federal tort action

14  in any case where Medicare payments were made.

15    The Mason plaintiffs appealed that to the Second

16  Circuit.  And the Second Circuit affirmed the dismissal.

17  And the Second Circuit did it on two grounds.  We go back to

18  the elements, Tab B.

19    First, the Second Circuit said the tobacco

20  companies were not primary payers.  Just because they would

21  pay any liability from general assets does not make them

22  primary payers.

23    But, most importantly, the Second Circuit gave an

24  alternative basis for the ruling.  And the alternative basis

25  for the ruling was that an unadjudicated tort claim didn't

Page 16

1    trigger the responsibility to pay Medicare.

2           And Tab E is what the Second Circuit said, which

3    is -- in the last sentence in Tab E, In sum, the defendants

4    are clearly correct when they assert that the trigger for

5    bringing an MSP claim is not the pendency of a disputed tort

6    claim, but the established obligation to pay medical costs

7    pursuant to a preexisting arrangement.

8           THE COURT:  Well, wasn't that alternative, if it

9    be one -- wasn't that alternative statement by the Second

10   Circuit, nevertheless, in the context of their first

11   holding, which was that the defendants were not primary

12   under the statute?

13          Don't you have to read what they're saying in that

14   context and not as just a separate issue, which it appears

15   to be in this case, because in this case we now have an

16   amendment that, at least for purposes of analysis -- and I

17   think you've even conceded it for purposes of this case,

18   takes that primary plan issue out of the mix.  And now we're

19   focused squarely on, I take it, if we reach the merits, the

20   issue of whether this reaches alleged tortfeasors or not.

21          And is it fair to read the Second Circuit's

22   holding as an abstract holding in that regard?  Or is it not

23   premised on the initial holding, which now has been

24   essentially amended by statute?

25          MR. GARNICK:  I think it is fair, because of what

1   the Second Circuit did after the amendments were brought to

2   its attention, which --

3          THE COURT:  You mean that letter that the -- where

4   they say that they're treating it as a motion to recall the

5   mandate?

6          MR. GARNICK:  Yes.

7          THE COURT:  And do you view that as a full and

8   fair adjudication of that issue?

9          MR. GARNICK:  I do.  And I do because the

10   plaintiffs filed a letter brief and brought the amendments

11   to the court's attention.  We responded.

12         They filed a reply.  They never asked for

13   supplemental briefing.  And the court -- the holding of the

14   Second Circuit, very clearly, was -- as the court said, as

15   the defendants' appellees point out, the new amendments

16   clarify only that an entity shall be deemed to have a

17   self-insured plan if it carries its own risk, but do not

18   alter the principle previously recognized, that MSP

19   liability attaches only to an entity that is required or

20   responsible to pay under a primary plan, a principle

21   inapplicable to the alleged tortfeasors.

22         So I think clearly that the Mason court at that

23   point was telling us that it was recognizing previously the

24   principle that an unadjudicated tort claim didn't give rise

25   to MSP liability.

1          I would take the Second Circuit at its word when

2     it says that it does not --

3          THE COURT:  And if that be so, if that be what

4     they were doing, is what you're saying is that issue is now

5     precluded for all time by any party because every party

6     would be in the same position that those parties would have

7     been in in the Second Circuit?

8          In other words, there's nobody else -- there's no

9     nonprivity party that could now assert this issue and not

10    have it be held to be collateral estoppel in the entire

11    United States of America?

12         MR. GARNICK:  Yes.  But let me clarify what I

13    think you're asking.  If the question is:  Can another

14    plaintiff bring for the third time the same federal interest

15    to recover these same costs, then I would say that's

16    collateral estoppel.  The federal government --

17         THE COURT:  When you say the third time, you're

18    counting the U.S. Government's?

19         MR. GARNICK:  Absolutely.  Because they were the

20    same -- asserting the same federal interests to obtain the

21    same costs.  And there's no other basis for these

22    plaintiffs' standing, constitutional standing.

23         They're not asserting their own injury.  Their

24    bounty that they're trying to get does not give them

25    constitutional standing.  It's not legally cognizable.

1      They're asserting the federal interest to recover

2  the Medicare Florida funds.  And it's the third time that my

3  client has to defend itself against the same federal

4  interest.  So do I think that's the subject of collateral

5  estoppel?  Yes, I do.

6      Now, if another plaintiff go after another

7  defendant and it's the same legal issue, that's different.

8  That's different.  Because there there's not mutuality.  And

9  there there is an exception for collateral estoppel for the

10  federal government and for state governments when there's

11  not mutuality.

12      But when they're going after the same -- yes, I

13  don't think when this case is dismissed, if it's dismissed,

14  that these same lawyers can go pack up and file the

15  identical suit in the Ninth Circuit as in the Seventh

16  Circuit as in the Eighth Circuit and in the Sixth Circuit.

17  I think that it would be collaterally estopped.

18      What the plaintiffs rely here on is -- they say

19  that there's a conflict between Mason and Baxter and that

20  what the statute, in fact, did, the amendments did, is to

21  codify Baxter.

22      But the Mason court -- and the Baxter court didn't

23  see a conflict for this very reason.  Let's see what the

24  Mason court said.  And this is Tab F.

25      And this further addresses your court's question

1   about whether this was an alternative basis.  In Mason, the

2   court said the instant case is clearly distinguishable from

3   Baxter through the establishment of a settlement fund.

4   Baxter defendants had assumed obligations to pay for the

5   medical costs of plaintiffs class members.

6          The instant case presents a far different

7   situation.  Here, the plaintiffs are asserting claims under

8   the MSP statute against alleged tortfeasors, who have yet to

9   assume the medical costs of any identifiable group of

10  individuals.

11         So the way that the Mason court distinguished

12  Baxter was not to talk about primary plan, but to talk about

13  the second element of responsibility to pay.

14         And that further supports what I think is an

15  alternative basis for the court's ruling, that they found

16  lack of alternative to pay.  If they didn't do that, they

17  could not distinguish Baxter like they did.

18         THE COURT:  And just so I'm clear, your position

19  is not that the Second Circuit's reasoning and holding

20  regarding that issue, if it be that, is something I ought to

21  follow, it's that I have to follow it?  In other words, I

22  have to find this barred by collateral estoppel?

23         MR. GARNICK:  We think that -- yes, we think that

24  as one of the basis of collateral estoppel, this is binding

25  on the court.

1        We also think that Mason, of course, is -- if your

2    court rejects the collateral estoppel argument, is also

3    important in setting up what the statutes mean.

4        THE COURT:  Now, of course, what your opponents

5    say is -- and I know one answer you have is that the

6    appellate court issued that letter ruling after the

7    amendments.

8        But your opponents say that the amendments changed

9    the calculus so that the issue that's in front of me is

10   really a different issue than was in front of the Second

11   Circuit.

12       And what's your position on that?

13       MR. GARNICK:  My position is that if we were

14   saying that this court was bound by the Second Circuit's

15   handling of the primary plan element, that might have some

16   validity.

17       But what we're saying is key here, as the court

18   has recognized, is the second element, whether there's a

19   responsibility to pay.

20       And the amendments, if they did anything, has

21   codified the Mason's court's position on that.  There has

22   not been an intervening change of law on that.  And,

23   therefore, that's not an exception here.

24       Even the Baxter court, in -- recognizing, approved

25   of the Mason case.  And this we have at Tab G.  We see no

Page 22

1    tension between our position and that in the cases cited by

2    the defendants, citing both Judge Kessler's decision in the

3    Federal District Court for the District of Columbia and the

4    Mason decision.

5            So there is no conflict between Baxter and Mason.

6    This case is identical to Mason.  And even under Baxter, it

7    should be dismissed.  But let's get to the 2003 amendments.

8            As I said, the purpose of the 2000 amendments was

9    to codify Baxter, not to reverse Mason.  And we know this

10   by --

11           THE COURT:  You just said 2000.  Do you mean 2003

12   amendments?

13           MR. GARNICK:  I mean 2003.  Thank you.  Excuse me.

14           And we know this by looking at the language of the

15   amendments themselves and the legislative history.

16   Plaintiffs point to the primary plan provision, which is in

17   our Tab H.

18           And, there, what Congress did was to further

19   define self-insured plan by indicating that an entity can be

20   a self-insured plan whether by a failure to obtain insurance

21   or otherwise.

22           And this provision clearly was intended to reverse

23   the Fifth Circuit's decision in Thompson versus Goetzmann

24   and codify Baxter.

25           Plaintiffs, however, ignore the provision that we

Page 23

1    cite to the court, which is in our Tab I.  And this

2    provision states that a primary plan shall reimburse the

3    appropriate trust fund for any payment made by the secretary

4    if it is demonstrated that such a primary plan has or had a

5    responsibility to make payment with respect to such items or

6    service.

7           So responsibility is clearly an element.  Then the

8    statute says, A primary plan's responsibility for such

9    payment may be demonstrated by a judgment, a payment

10   condition upon the recipient's compromise, waiver or

11   release, whether or not there is a determination or

12   admission of liability, a payment for items or services, and

13   it goes on.  And then it says, Or by other means.

14          If the Congress intended an unadjudicated tort

15   claim by itself to create a responsibility, it would not

16   have listed judgment as the first element.

17          THE COURT:  Now, how does that work with respect

18   to -- because doesn't that language -- doesn't that

19   amendatory language cover the entirety of the statute, so

20   that, for example -- what does that mean in the context of a

21   private cause of action under MSP against a group health

22   plan, or something like that?  Is it still the same

23   analysis, or not?

24          MR. GARNICK:  I think that it is, because, against

25   a group health plan, a group health plan has already assumed

05a81d25-78ec-4ba6-8a5d-075b28ae3ed0

Page 24

1   a duty -- as in Baxter, has assumed a duty to pay.

2            THE COURT:  But what if the group health plan --

3   and I'm positing a situation I'm not sure would occur, but I

4   want to understand what the difference is here.

5            Your primary point, as I understand it, is the

6   reason that you can't get there under this statute is

7   because the tort liability, which is alleged, has not been

8   established.  And so it's essentially an unliquidated or

9   inchoate -- whatever term you want to use -- and even the

10   plaintiffs acknowledge that if you have to go forward in

11   this suit, they're going to have to establish that tort

12   liability before this suit can get relief.

13            But I'm trying to understand the difference

14   between that, which you say cannot occur under the statute,

15   and any other private cause of action under this statute,

16   which is -- some type of private cause of action is clearly

17   authorized.

18            So let's say it's a group health plan or some

19   medical insurance company who disputes whether they owed the

20   money or not.  And that's the issue.

21            And so the suit is filed.  And it turns out they

22   did.  And it turns out that then the -- Medicare gets

23   reimbursed and the private cause of action has vindicated

24   the Medicare law.

25            So if that's what -- if that's a possible kind of

1   suit, what's different about that kind of suit than this

2   kind of suit?

3           MR. GARNICK:  I would say that the statute creates

4   that difference, if there is a difference under the

5   amendment.  I don't think even that issue has been

6   adjudicated under the amendments.

7           But to the extent there is a difference, that

8   difference is inherent in the statute itself, that to the

9   extent that you have an insurance company that has gone one

10  step further than an unadjudicated tort claim against a

11  manufacturer and said, We're in the business of providing

12  medical insurance, and we're engaging in a contract with the

13  Medicare recipient, and the only issue is some detail about

14  coverage, then that is a lot closer to an established

15  responsibility than simply to assert an unadjudicated tort

16  claim against a manufacturer.

17          THE COURT:  I'm not saying it's not -- I'm not

18  saying that a person who was without benefit of a written

19  statute and want to say is there a difference between those

20  two things, that a person might say, Yeah, that seems

21  different somehow.

22          What I'm asking you is:  Does the statute

23  contemplate that difference?  And if you're relying on

24  language that says you have to have a judgment or a

25  settlement or that type of thing, and if I -- unless I'm

1    wrong, that same language applies to all private causes of

2    action -- then how does that square with the notion that if

3    the private health plan says, We don't owe the money, that's

4    not a judgment or a settlement, but we still have a

5    potential suit under the statute?  Is the statute consistent

6    in that regard?  Is it explainable?  How do you answer that?

7            MR. GARNICK:  I think it's clear -- well, I guess

8    I have two answers.  Number one, I don't think the statutory

9    language makes that distinction.

10            And it could be that with this new amendment there

11    is no distinction.  And, first, there needs to be a finding

12    of liability against the insurance company.

13            But I would suggest to the court that the

14    legislative history clearly reflects a distinction between

15    the two.  And the court decisions, such as Mason, clearly

16    reflects a distinction between the two.

17            THE COURT:  But you've just told me Mason -- Mason

18    has to be looked at in light of these new amendments.  And

19    what the plaintiff wants to focus on on the new amendments

20    is the fact that it's now apparently clear that self-insured

21    companies, such as your clients, would possibly be within

22    the reach of this statute.

23            What you want to emphasize to me under the new

24    amendments is that now the words judgment and settlement and

25    so forth are put in there.

Page 27

1       And I don't know how you can just take that

2   language and say, Well, that means judgment and settlements

3   and so forth in a tort case, but it doesn't mean judgment,

4   settlement, or so forth, in a contractual medical case.

5       MR. GARNICK:  Well, the issue -- because of the

6   word judgment, I think it is absolutely clear that an

7   unadjudicated tort claim doesn't do it, and by other means

8   doesn't do it, because you have to interpret that consistent

9   with the other examples.

10      THE COURT:  By other means -- but you cite law

11  that says when words like that are used they're not given an

12  expansive definition, they're given a definition that means

13  related to the things that we've already listed.

14      MR. GARNICK:  Right.  And the Supreme Court has

15  adopted that.  And we've cited cases.  And there's even

16  Latin words that describe that, which I won't burden the

17  court with my pronunciation of.

18      Now, in dealing with an insurance company that is

19  contesting coverage, I would suggest there that the issue is

20  whether there was an assumption of the liability, whether

21  the company has agreed to undertake the liability.

22      And if it has agreed to undertake the liability,

23  then it is subject to the MSP claim.  So I would say that

24  under those circumstances you could bring an MSP claim

25  against an insurance company, because there the issue is

Page 28

1    whether there was an assumption.

2        Otherwise, if you follow this reasoning too far,

3    you get the Baxter situation.  And what if -- with respect

4    to any particular claim, the settlement fund in Baxter says,

5    No, that goes outside the reach of the contract.

6        Once there is an acknowledged assumption of

7    liability, as there is in the insurance contract and in the

8    settlement contract, and the issue is only whether this fits

9    within the assumption, whether it does or whether it does

10   not, that's an issue that can be litigated in the MSP.

11       You are asserting, in fact, that there is a

12   compromise.  You are asserting, in fact, that there is a

13   contract.

14       And if you're asserting that, then you can bring

15   the action under the MSP.  If these plaintiffs wanted to

16   come to court and say that there was a judgment, and the

17   issue is is there a judgment or not, that could be decided

18   in the context of the MSP.  But they don't allege a

19   judgment, just like they don't allege a settlement fund.

20   And so that --

21       THE COURT:  Describe for me a scenario in which a

22   judgment which -- and I'm not suggesting -- I'm asking you

23   to assume a scenario where the plaintiffs have done what

24   you've suggested, which they have gone to -- they filed a

25   different lawsuit in perhaps a different forum, and they

1    have achieved a result that says there's liability against

2    the tobacco companies.

3              If they can't go in under this statute, how would

4    they do that?  And then how would that then translate -- how

5    would that judgment then be applied to this statute?

6              MR. GARNICK:  Okay.  First of all, they could not

7    represent -- they could not adjudicate Medicare recipients'

8    battery claims without a class action or some basis for

9    standing.

10             And, you know, irrespective of the MSP, if they

11   first have to establish tort liability, they don't have any

12   standing right now, and they haven't alleged class action to

13   adjudicate the claims.

14             THE COURT:  Well, I guess they started out to,

15   right, and then they --

16             MR. GARNICK:  They amended the complaint and then

17   they took them out.

18             THE COURT:  Right.  Okay.

19             MR. GARNICK:  But let's maybe reduce the size of

20   this a bit.  And let's say you have one Medicare recipient

21   who would bring a tort claim and obtain a judgment in state

22   court, or a settlement.

23             Then if a defendant pays the Medicare recipient,

24   or doesn't pay the Medicare recipient, but doesn't pay

25   Medicare, there would be an MSP claim.

Page 30

1          THE COURT:  Is it the defendants' responsibility

2    to do that in the garden variety so-called case -- is it the

3    defendants' direct responsibility to pay Medicare, or does

4    the defendant pay the plaintiff and then there's some kind

5    of subrogation or lien or something like that?  How does it

6    really work?

7          MR. GARNICK:  Both.  Let me direct the court's

8    attention to Tab O, which is regulation 42, C.F.R., Section

9    411.24.

10          Reimburse -- and I have the slide first, but then

11   I have attached the actual regulation.  Reimbursement to

12   Medicare.

13          If the beneficiary or other party receives a

14   third-party payment, the beneficiary or other party must

15   reimburse Medicare.  Fine.

16          Then it goes on, though, and it says, If Medicare

17   is not reimbursed, as required, the third-party payer must

18   reimburse Medicare even though it has already reimbursed the

19   beneficiary or other party.

20          So there would be an --

21          THE COURT:  Which is why in litigation you

22   normally get release agreements, settlement agreements,

23   which specifically reserve or provide for the payment of

24   liens.

25          MR. GARNICK:  Precisely.  And if the question is:

1   What was the 2003 amendments for, the 2003 amendments were

2   for -- to codify Baxter and reverse Thompson versus

3   Goetzmann.  That's clear in the legislative history.

4           You know, we have the amicus brief from Senator

5   Grassley.  But with all due respects to the senator, he

6   doesn't cite the legislative history in his amicus brief.

7   And the Supreme Court has recognized that post enactment

8   statements of a legislator are not part of the legislative

9   history.

10          He was amicus in Mason.  He could have said the

11  purpose of this is to reverse Mason.  If one looks at the

12  legislative history, one sees a statement from the

13  Department of Justice setting forth the purpose of these

14  amendments.

15          And we have that in Tab K, where they said, Some

16  recent court decisions have held, however, that Medicare has

17  no right to reimbursement unless the primary insurer could

18  reasonably have been expected to make prompt payment.  And

19  they cite Thompson versus Goetzmann and Fanning versus

20  United States.

21          And then the section by the DOJ goes ahead and

22  emphasizes that for responsibility that there has to be a

23  judgment or a payment conditioned upon a recipient's

24  compromise, waiver or release.

25          Senator Grassley, in floor debate, said one thing

Page 32

1    about this provision, which we provided the court on Tab L,

2    which was, In addition, when a Medicare beneficiary is

3    injured by wrongful conduct of another entity, that entity's

4    liability insurance, or the entity itself, if it has no

5    insurance, or it might be self-insured, is always required

6    to pay first, instead of having the taxpayers pay.

7          That's fine.  It doesn't speak to -- it doesn't

8    address what triggers the responsibility to pay, the

9    assertion of an unadjudicated tort claim or a judgment, as

10   the statute provides.

11         Senator Grassley, who was in Mason, could have

12   just said, you know, I want to reverse Mason, or explain how

13   this would affect the cases.

14         Our bottom line is this:  Before this court

15   interprets the MSP to essentially federalize tort claims and

16   expand its jurisdiction, and double the liability of

17   manufacturers for daring to defend itself against a tort

18   claim, there has to be a clear indication of legislative

19   intent, if one looks at the statute and one sees only a

20   requirement that there be a judgment or something along

21   those lines.  And the legislative history doesn't give the

22   court anything either.

23         THE COURT:  Thank you.  I'm going to ask you to

24   wrap up, because I've given you 45 minutes.  And I know I

25   asked a lot of questions.  But I'm going to do the same of

1   them.   And I want to give you some time to come back at the

2   end.

3            MR. GARNICK:   Okay.   Just to wrap up is besides

4   from the merits and collateral estoppel, we also would ask

5   the court to consider transferring this as duplicative

6   litigation with the DOJ claim, which the federal government

7   is free to appeal upon the entry of final judgment.   It's

8   the federal government's interest.

9            They filed their lawsuit five years ago.   This one

10  was just filed.   It can't be right that whenever the federal

11  government files an MSP claim, private plaintiffs five years

12  later, can file the identical one in another court.

13           Thank you.

14           THE COURT:   Thank you.

15           MR. CYNKAR:   Give me one second, Your Honor, to

16  get this stuff up here, and I'll be --

17           THE COURT:   Sure.

18           MR. CYNKAR:   Your Honor, good morning.   Again, my

19  name is Bob Cynkar.

20           The plaintiffs here are two lifelong Jacksonville

21  residents who are bringing this case on behalf of the

22  federal government on behalf of Medicare, specifically under

23  a very specialized statute, which you have discussed with

24  Mr. Garnick.   And so I'm not going to go over that.

25           But it is a case that focuses on securing

1    reimbursement to Medicare for Medicare's expenditures in

2    Florida for certain smoking attributable diseases.

3            Now, we're, obviously, not at that stage in this

4    case.  But we certainly -- if we are able to present

5    evidence to Your Honor, we're not going to be necessarily

6    trying to address every potential disease under the sun.

7            Our focus is going to be on the major diseases

8    that epidemiology links quite directly with smoking.  So

9    we're not going to be grabbing for secondhand smoke and all

10    that stuff.

11            THE COURT:  I did have a question.  And, you're

12    right, we're probably not there.  But we are in a way, I

13    guess.

14            MR. CYNKAR:  Sure.

15            THE COURT:  If this suit were to go forward,

16    you've recognized the requirement that you would have to

17    prove underlying tort liability before the responsibility

18    under MSP would kick in.  And it's not entirely clear to me

19    how you would intend to do that.

20            For example, how do you prove that something is as

21    a result of smoking and not something else?

22            And then how do you prove what part Medicare paid?

23    And how do you identify your plaintiffs?  I mean, I just --

24    I have a conceptual.  And, of course, I'm generally familiar

25    with tobacco litigation from around the country.  But I

Page 35

1   haven't actually had a case.

2        But it just conceptually seems like a hard thing

3   to get my head around.  How do you prove these cases?

4        MR. CYNKAR:  Your Honor, obviously, we do have to

5   produce all that proof.  But the answer, I think, is

6   remembering that Medicare Secondary Payer is focusing only

7   on Medicare's interests.  So we're not going to have

8   individual plaintiffs.

9        The plaintiff is, in a sense, Medicare being

10  represented by our plaintiffs here as private attorneys

11  general.

12       And, in a sense, what we are seeking is a kind of

13  liquidated damages, because Medicare is -- Your Honor may be

14  familiar with the diagnostic codes, the DRG codes, for

15  medical expenses.

16       The way we will prove these expenditures has to do

17  with getting the data from Medicare which shows their

18  expenses for certain treatments that are linked with certain

19  diseases, and using epidemiological and other expert

20  testimony to show what amounts of money Medicare spent for

21  the treatment of certain diseases in Florida.  And much of

22  the case will be presented by expert testimony.

23       THE COURT:  Well, for example, let's take

24  emphysema, which may have its own code, I don't know, but --

25  and let's say you could show in the last six years, or

1    whatever your -- I guess we're talking about a longer period

2    than that, the last seven or eight years, that Medicare in

3    Florida has paid out three million dollars for emphysema.

4         How does that tell me that what portion of that

5    payment had to do with, because -- that was caused by

6    smoking?

7         MR. CYNKAR:  Well, for example, it is -- and I

8    used to know this number on the tip of my tongue.  And I

9    apologize.  But, for example, we will have epidemiologists

10   testify that it is very well established that -- I think the

11   figure was about 89 percent of emphysema in men is caused by

12   smoking, that that is rock solid expert testimony.

13        Now, obviously, the defendants are free to contest

14   that.  But that, really, is how this case is going to be

15   presented.  And then focusing on the percentages --

16        THE COURT:  So you're going to look for the total

17   dollars paid by Medicare to Florida --

18        MR. CYNKAR:  In Florida services.

19        THE COURT:  -- folks under certain DRGs, and then

20   have testimony that tells me that 90 percent of that is

21   going to be attributable to smoking, or something like that?

22        MR. CYNKAR:  Yes, sir.  Yes, sir.  And then, of

23   course, obviously, that has to be focused on the particular

24   defendants here, similar way.

25        THE COURT:  All right.  Well, obviously, I have no

1   comment on the merits of that or anything.  I just wanted

2   to -- it helps me to understand -- you know, it's easy to

3   get focused on a motion to dismiss, but we also have a

4   lawsuit.

5           And I wanted to understand what -- at least have a

6   better understanding than I did five minutes ago as to how

7   that lawsuit would be prosecuted.

8           But, all right, go ahead, sir.

9           MR. CYNKAR:  And there's one other part of the

10  answer to your question, Your Honor, which has to do with

11  the underlying liability.  You referred to the tort

12  liability.

13          I was sort of focusing on damages, though,

14  obviously, there's a liability part there, too.  But, again,

15  as we've said in our brief, the point of bringing battery

16  here is that there is voluminous evidence concerning the

17  addictiveness of nicotine, the fact that the tobacco

18  companies knew that nicotine was biochemically addictive, I

19  mean, not just habit forming, as people used to say.

20          THE COURT:  What are the elements of a battery

21  claim?

22          MR. CYNKAR:  I think it's -- basically, it's an

23  unlawful touching, Your Honor, without consent.

24          THE COURT:  And I know from just local lore that

25  Mr. Wilner has prosecuted some individual cases against

1    tobacco companies.  And I certainly know there's litigation

2    settlements and all kinds of things that have occurred over

3    the last 10 or 15 years.

4          But is that a theory of liability that has been

5    established against any tobacco company, to date?

6          MR. CYNKAR:  No.  And I don't know the reason why.

7    I would suggest that that may be because most of the cases

8    that have proceeded to trial are individual cases.

9          And so there are issues of fraud and a broader

10   range of perhaps sexier claims than just simple battery.

11   And we felt in the context of Medicare's interests and its

12   effort to get its money, that battery was the most efficient

13   tort to proceed on.

14         And so the notion is that the coming in contact

15   with this addictive property of nicotine is the unlawful

16   touching.  And I think that is fairly well-established in

17   tort law, that kind of thing.

18         THE COURT:  And what is the unlawful touching

19   here?

20         MR. CYNKAR:  The coming in contact with the

21   addictive properties of nicotine.  For example, Your Honor,

22   one of the examples in the restatement of torts that they

23   used for the -- the way this concept of unlawful touching

24   has expanded in the law, it involved a situation of

25   consensual sexual contact.  But one of the parties had AIDS,

1    or a sexual disease, and the other party didn't know that.

2           And so the hypothetical in the restatement says

3    that the person consented to consensual sex but did not

4    consent to being exposed to that disease.

5           And so the same principle is here, Your Honor.

6    Another way that I put it is that if -- well, I'm a Maker's

7    Mark drinker.  And if you are at the Maker's Mark

8    Distillery, and if you put cyanide in the Maker's Mark

9    bottles and it goes off around the country, irrespective of

10   whether people know that's in there or not, they have not

11   consented to be exposed to cyanide.  And that's a battery.

12   It's the same sort of theory we'd be using here.

13          What's particularly poignant about this, though,

14   here, Your Honor, is this, is that for the longest period of

15   time the tobacco companies -- and we will have evidence of

16   this effect, not only denied the addictiveness of nicotine,

17   but they accused the Surgeon General, essentially, of being

18   a political hack in '88, when he came out with his testimony

19   concerning the addictiveness of nicotine.

20          And in '94, in the very famous episode on the

21   Hill, all the tobacco companies, CEO's swore under oath that

22   they did not believe that nicotine was addictive, yet now

23   Philip Morris is running ads and has its website saying how

24   nicotine is addictive, and it has a link directly to that

25   Surgeon General's report that they used to call a political

1    hack job.

2           So I think -- and, obviously, the point I make is

3    not precisely a legal one.  But I think from a justice

4    perspective, there's a certain poignancy to the tort we're

5    talking about here and why I think, at least, the court

6    should hear it.

7           But Your Honor made one observation earlier.  And

8    I wanted to tell you why we're here and why we're here now.

9    And we are here because this matter is in Florida.

10           Nine percent, roughly, and -- of Medicare's

11    expenditures are related to smoking attributable diseases.

12    In Florida, for 1998, that's $1.5 billion.  And that is the

13    money we're going after.

14           We are here because, quite logically, Florida

15    has -- the community in Florida has a big Medicare

16    population.  And so it is very logical, in terms of trying

17    to recover this money from Medicare, to come here to

18    Florida.

19           In addition, as Mr. Garnick and Your Honor were

20    discussing, frankly, for a period of time, the courts have

21    been in disarray in interpreting MSP and its scope of what

22    self-insured plan means.  And all the cases that we cite in

23    our briefs go to that.

24           But the Eleventh Circuit got it right.  They

25    understood what Congress meant.  And so that's why we're

 1    here, too, because the governing circuit got it right.

 2              And then, finally, Your Honor, we're here, now,

 3    because of Congress' clarification, which retroactively

 4    said, effectively, as I think Mr. Garnick said, Baxter got

 5    it right.

 6              Now, Your Honor, what I propose to do, to sort

 7    of -- rather than give you a set-piece argument, to engage

 8    the discussion you had with Mr. Garnick, I, first of all,

 9    want to just correct what I think are just wrong statements

10    about the cases and the case law.  Then I was going to

11    discuss collateral estoppel and then the alleged tortfeasor

12    argument.  And, obviously, I can change that to suit Your

13    Honor, but that's --

14              THE COURT:  Well, go ahead and get started.  And I

15    won't hesitate to interrupt you.

16              MR. CYNKAR:  Okay.  First of all, Your Honor, I

17    think there's a couple of things to keep in mind with

18    respect to Mr. Garnick's citations and, indeed, some of the

19    things the Second Circuit said.

20              First of all, starting in -- not in any particular

21    place, Mr. Garnick's Tab G is a citation from U.S. versus

22    Baxter, basically saying it sees no tension between its

23    position and that cited by defendants.

24              Now, there are two things that are wrong about

25    this that I have to underscore.  First of all, in United

1    States versus Philip Morris, which is the D.C. District

2    Court case, there were two opinions in that case.

3              The court only cites the first one.  And in the

4    first one, Judge Kessler dismissed the complaint because the

5    government hadn't made sufficient allegations of what a

6    self-insured plan was.

7              And the second opinion is when she came out and

8    saying you had to have all these bells and whistles, you had

9    to have a separate fund, an independent fiduciary and so

10   forth.

11             So I think it is not a fair reading of this text

12   from Baxter to say that the Eleventh Circuit agreed with

13   Judge Kessler and Philip Morris.

14             And, Your Honor, there's plenty of citations.  I

15   mean, Baxter is a very thoughtfully reasoned opinion.  But

16   over and over again, particularly when Baxter is talking

17   about the Fifth Circuit's case in Goetzmann, it says, you

18   know, you don't need to have all those bells and whistles.

19   You cannot read Baxter and say that Baxter agrees with Judge

20   Kessler.  You just can't.  There's no fair reading that

21   works that way.

22             Secondly, with respect to the reference to Mason,

23   Your Honor, in Mason we advanced two theories.  One was that

24   the defendants were self-insured plans by virtue of being

25   corporations, that the corporate structure was like an

Page 43

1    insurance device, to protect them from liability.   And then

2    we also alleged various facts that they have self-insured

3    plans for these reasons.

4           So the court in the Eleventh Circuit is mistaken

5    here when they say plaintiffs' claim rested solely on the

6    theory that a large corporation without insurance,

7    et cetera, et cetera -- that was one of our theories.

8           And that's correct, that Baxter does not agree

9    with that theory.

10           But Baxter does not refer to our second theory,

11    which is really the core of our case at that time.   So I

12    would say that Tab G cannot have the significance to Your

13    Honor's thinking that Mr. Garnick has suggested.

14           Secondly, in Tab F, Your Honor, is a quote from

15    the Mason case itself, the Second Circuit case,

16    characterizing -- again, this is another effort to say that

17    Baxter and Mason are not different.

18           Tab G tries to do that.   And I say you can't get

19    there from here.

20           Tab F is another way of trying to say that Baxter

21    and Mason are the same, except this way it's going from the

22    Mason perspective and it quotes Mason.

23           The problem is is that the Second Circuit, as,

24    obviously, we think, just mischaracterized Baxter.   Because

25    what it says here is that Baxter says that a settlement fund

Page 44

1    constitutes an assumption of obligations to pay medical

2    costs, and so that can be a -- a self-insured plan, and

3    that's different than what we have here.

4           But that's precisely the opposite of what Baxter

5    said.  And I particularly refer Your Honor to page 897.

6    That's 345 F.3d, page 897, where, in discussing Goetzmann,

7    the court points out that the only issue in Goetzmann was

8    whether a single discrete settlement by a tortfeasor with a

9    single plaintiff, whereby the tortfeasor paid the plaintiff

10   with its own funds, without more, constituted a self-insured

11   plan.

12          We agreed with this holding.  We agreed that a

13   settlement cannot be a self-insured plan, because it didn't

14   have the attributes of planning, what the court called the

15   ex ante arrangement.  So the Second Circuit's statement on

16   Tab F is just wrong.  It just is wrong.

17          THE COURT:  Well, they do say, though, here the

18   plaintiffs are asserting claims under the MSP statute

19   against alleged tortfeasors who have yet to assume the

20   medical costs of any identifiable group of individuals.

21          And isn't that the question?  I mean, isn't it

22   clear from that statement and from what they did on your

23   rehearing that they aren't buying that?

24          MR. CYNKAR:  Right.  And that goes to the alleged

25   tortfeasors question.

Page 45

1          THE COURT:  Right.

2          MR. CYNKAR:  And my point on that -- and that's,

3     frankly, a nice segue into the collateral estoppel point,

4     Your Honor, is that that's wrong.

5          I mean, we'll talk about alleged tortfeasors in a

6     second.  But, basically, alleged tortfeasors are

7     self-insured plans.  It is verbal legerdemain to try to

8     separate the two and doesn't advance the legal analysis at

9     all.

10          THE COURT:  Well, wait, wait, wait.  And, you

11     know, obviously, your study of these cases is, at this

12     point, more learned than mine, because y'all have been

13     living this.

14          But, conceptually, just take the actual facts of

15     the case.  Isn't there a difference between a settlement

16     fund which has been specifically set up to pay claims, as in

17     Baxter, and what we have here, which is not any idea at all

18     whether there's liability or not?  Because we don't know

19     yet.  We haven't adjudicated it.  Aren't those two things

20     different from each other?

21          MR. CYNKAR:  No.

22          THE COURT:  All right.  Tell me why.

23          MR. CYNKAR:  And I'll tell you why.  And if I

24     may -- let's talk about alleged tortfeasor, because that's

25     where we are.  And I'll walk you through it.  Because I

1    think that understanding the statute -- and this is just

2    sections of the statute, Your Honor.  You have copies there.

3            THE COURT:  Right.  I think I have copies.

4            MR. CYNKAR:  I've offered them to the defendants,

5    also, and so forth.  First of all -- and, indeed, I guess

6    one specific point that would be useful to make is to point

7    out that Baxter agrees with me in the notion that MSP covers

8    self-insured tortfeasors.  And that can be found most

9    specifically on page 898 of the decision.

10           THE COURT:  And, you know, I don't mean to -- I

11   don't mean to take you anywhere you don't want to go.

12           MR. CYNKAR:  Sure.

13           THE COURT:  But it seemed to me that in your

14   briefing you were fighting a fight that didn't need to be

15   fought.

16           In other words, I didn't understand your

17   opponent -- I understood your opponents to be conceding, at

18   least for purposes of this motion, that the argument that

19   they used to make that they weren't primary -- they weren't

20   a primary plan, they couldn't make any more under the

21   statute.

22           And so when you say we're now at alleged

23   tortfeasors, isn't that really where we're at?  And so to

24   keep referring back to the fact that they're wrong about the

25   primary plan, I don't really think that that -- I understood

Page 47

1    that to be essentially conceded for purposes of this motion,

2    isn't it?

3          MR. CYNKAR:  Well, no, Your Honor.  And that's

4    part of the sort of word jumble here.  So that's why I want

5    to walk you through it --

6          THE COURT:  That's fine.

7          MR. CYNKAR:  -- so you can understand.  And I

8    deliberately said what I said to be provocative, because I

9    think --

10          THE COURT:  All right.  Well, you succeeded.  Go

11    ahead.

12          MR. CYNKAR:  Thank you, Your Honor.  And, you

13    know, when we walked through this statute, I noticed in one

14    of the handouts that Mr. Garnick had, he referred to these

15    various Latinisms.  And I have to say that since my

16    pre-Vatican to altar boy days, my Latin has gone down the

17    toilet.  But I don't think that this really matters -- all

18    that stuff matters.

19          First of all, I think at the 50,000-foot level,

20    the problem with the defendants' argument is that the

21    question here is whether someone can be sued.

22          At the end of the day, we have to prove that

23    someone is a tortfeasor for them to pay money.  But I think

24    that's part of what's happening here.  What's conflating

25    here is that you can't have a situation where alleged

1  tortfeasors can't be sued under MSP.

2       We have to prove before they pay that they're

3  tortfeasors.  But, first of all, I think conceptually that's

4  the problem that's happening here.  But, really, I think

5  both the statute --

6       THE COURT:  Well, except, doesn't the statute, if

7  that's all there is to it -- and I understand what you're

8  saying.  You're saying that we are mixing up whether you can

9  sue somebody and whether you can prove it or not.  I

10  understand that.

11       But does this statute not give pretty special

12  advantages here that you don't get in your average garden

13  variety tort case?

14       You don't get to be a private attorney general,

15  and maybe not even -- maybe not even have any injuries

16  yourself, and to come in and to try to prove somebody else's

17  tort.  You don't get double damages, necessarily.

18       So the issue of whether somebody can be sued or

19  not, and the issue of the framework, the statutory framework

20  that's given here, is pretty important.

21       So it's not just as easy as saying, is it, that,

22  Well, it's not really an issue of whether we can sue them,

23  it's an issue of whether we can win or not.

24       MR. CYNKAR:  Well, Your Honor, I don't -- I think

25  what you said with the special advantages of the MSP don't

1    go to the proving of the tort, because the damages involved,

2    as I say, are Medicare's money out.

3         We're not proving damages of the victims, you

4    know, how they were injured, their loss on consortium, and

5    all the other possible PI damages they could get.

6         So I think for purposes of the tort case, per se,

7    I would disagree with Your Honor that those were the special

8    advantages.

9         THE COURT:  And that is a point I wanted to ask

10   you about.  Your opponent characterizes these double damages

11   as a double recovery.  You're saying that the damages which

12   are doubled are limited to the actual medical expenditures

13   of Medicare itself.

14        MR. CYNKAR:  And those are doubled.  Those are

15   doubled.

16        THE COURT:  I understand that.  But that would not

17   include other items you could recover in a traditional tort

18   action.

19        MR. CYNKAR:  Exactly right.  That's why I said,

20   Your Honor -- earlier I referred to it as the kind of

21   liquidated damages.  It's the Medicare data about what they

22   spent, is sort of the baseline from which you work to

23   calculate damages.  So that's where I'm coming from.

24        But I think that one of the reasons why we have to

25   be careful about this notion of who you can sue and all that

Page 50

1    is essentially what -- the tort here is a predicate

2    offense -- a predicate element of the MSP claim, just like

3    in, for example, RICO you have other indictable offenses

4    that are predicates to RICO in Section 1983 cases.

5         You have -- malicious prosecution, for example, is

6    another case, another example we cited in our briefs, which

7    is a state tort.

8         THE COURT:  Well, it's been a while since I've

9    done a RICO case.  I used to do them in private practice.

10   We don't get too many of them anymore.  But aren't those

11   predicate acts actually in the statute?

12        I mean, don't they tell you what they are, as

13   opposed to here there's nothing listed that tells you what

14   predicate underlying torts or actions you have to prove, is

15   there?

16        MR. CYNKAR:  Yes, there is.  It's right here, Your

17   Honor.

18        THE COURT:  Tell me.

19        MR. CYNKAR:  Let's walk through it.  I mean, first

20   of all, RICO has a number of different things, a number of

21   different offenses, but the proposition is the same, is that

22   you could say because the person doesn't have to be

23   convicted of those offenses before you proceed with RICO.

24        But the listing -- let's say it lists extortion.

25   Okay?  I forget.  I used to be a prosecutor, but I've

1    forgotten the list.  It says extortion.

2         According, I think, to the defendants' theory,

3    they're only an alleged extortionist when you bring your

4    RICO case.

5         And so according to them, under that theory of

6    juris prudence, you would have to go convict them of

7    extortion before you could proceed with RICO.

8         And that's not the law.  You don't have -- it just

9    has to be an indictable offense.  Similarly I was going to

10   make the example of Section 1983.  One of the wrongful acts

11   there that you can bring, which is not set out in the

12   statute, is malicious prosecution.

13        That's a state claim.  And we cited Your Honor to

14   the authority that you don't have to go convict someone of

15   malicious prosecution in the state courts before you proceed

16   with a Federal Civil Rights action under 1983.

17        So, first of all, I would say the notion of

18   predicate offenses that are part of other bigger causes of

19   action is not something that's foreign to the law.  And

20   that's really what's going on here.

21        Now, the liability -- the phrase that is key here

22   for our case is payment being made under a liability

23   insurance policy or plan, including a self-insured plan.

24        Now, there is no doubt a liability insurance

25   policy -- it's not health care.  It's liability insurance --

Page 52

1    that that insures the tortfeasor.

2         If someone hurt someone else and they've got a

3    liability insurance, liability insurance pays.  And that's

4    why Baxter says that this language includes self-insured

5    tortfeasors.

6         So that if I'm a corporation and I have liability

7    insurance and I -- my truck hits a Medicare beneficiary, my

8    liability insurance is supposed to be the primary payer.

9         If I am self-insured, then I'm supposed to still

10   pay.  That's what this self-insured plan provision says

11   here.

12        And the reason why we talk about primary plan is

13   because the statute uses primary plan regularly in the

14   working -- in how it works out.  It has this definition.

15        This language here is the language that came from

16   the clarification, An entity that engages in a business,

17   trade, or profession shall be deemed to have a self-insured

18   plan, and so forth.  If it's self-insured for any reason

19   whatsoever, including it just forgot to get insurance, a

20   business entity is now a self-insured plan.  That's the

21   black letter law that I don't think anyone can get around.

22        And this is just the provision that says Medicare

23   will go ahead and make payments so that providers get paid.

24   And then their money is reimbursable.

25        Now, the key answer is -- to your question about

Page 53

1    alleged tortfeasor comes right here, Your Honor.  It says, A

2    primary plan -- that's why, again, we talk about primary

3    plan.

4           Remember, a primary plan here includes a

5    self-insured plan, which, in the logic I was just giving

6    you, is a corporation accused of being -- a self-insured

7    corporation that's accused of being a tortfeasor, has to

8    reimburse when it has demonstrated -- if it has demonstrated

9    that it had the responsibility to make payment.

10          In the liability insurance context, responsibility

11   to make payment happens when you cause a tort.  So if it is

12   demonstrated that a primary plan is responsible for a tort,

13   they have to pay.

14          And this provision, which actually also was added

15   in the most recent statutory amendment, that responsibility

16   can be demonstrated by all these things or by other means.

17          By other means certainly includes suing under this

18   private action, or the United States suing here to

19   demonstrate that the primary plan is the tortfeasor is

20   responsible for a tort.

21          Now, this other part here, Your Honor -- just as a

22   sort of footnote, really, why that is there, has to do with

23   exactly the situation of Goetzmann and the thing that Baxter

24   disagreed with, was that some courts said that if you had a

25   tort settlement the government couldn't come and get its MSP

Page 54

1   reimbursement from that tort settlement because no one had

2   admitted to guilt.  And that's normal.

3           And that's why there's also this stuff that -- you

4   know, this responsibility to reimburse can be demonstrated

5   and arranged in different ways, including a settlement of a

6   tort case, even where the tortfeasor hasn't admitted to

7   guilt.

8           But I think that, Your Honor, there's no way you

9   can get around this by other means.  Even if this weren't

10  here, as I would say, the logic of the statute is such that

11  there's nothing that excludes alleged tortfeasor here.

12          THE COURT:  Well, but aren't all those other

13  things things that -- judgment, payment condition upon,

14  compromise, waiver of release, those are indications that

15  the liability has either been established or it has been

16  compromised.

17          And isn't it kind of a stretch then to say "or by

18  other means"?  It doesn't have anything to do with that.  It

19  has to do with actually going out and trying to prove your

20  case.

21          MR. CYNKAR:  No.  I don't think so, Your Honor,

22  because that refers to the particular situation I was

23  talking about.  But "by other means" is open-ended.  I mean,

24  I don't -- I don't see how you can say "by other means".

25  What other means bring the lawsuit here?

1    But I think one of the reasons why you can't read

2    it that way is because what would happen -- and as the

3    traditional can in the statutory instruction, if the

4    defendants' theory was applied to the statute, you would

5    start to gut clear provisions of the statute.  And that's

6    why you can't embrace, I think, what Your Honor was

7    suggesting.

8    First of all, as I think your discussion with

9    Mr. Garnick was indicating, we're talking about liability

10   insurance here.

11   But there's an earlier reference -- and I didn't

12   have it in here -- to the group health care coverage.  MSP

13   and, indeed, frankly, much of the litigation in MSP, which

14   I've been involved in, has included group health plans,

15   where older folks are still working, they're getting

16   employment -- an employment benefit.  They're getting health

17   insurance from work.

18   And Congress has said those health care benefits

19   for health insurance should pay before Medicare.  And so

20   what you'll find is that this predicate that I'm saying for

21   liability insurance is a tort, that predicate occurs all

22   through the MSP statute.

23   So, for example, if -- and if I am a health

24   insurer and my insured -- my Medicare beneficiary insured

25   has some treatment done, I have to cover that.

1              But the health insurer can dispute that.  I mean,

2      if you look through the case law -- and I don't do a lot of

3      insurance litigation.  But if you look at the litigation

4      under insurance policies, just the notion of what's

5      medically necessary, I mean, that phrase is in so many

6      insurance contracts there's the exclusion of experimental

7      stuff that merely because you have a health insurance

8      policy, as opposed to a liability insurance policy, doesn't

9      mean that anything is more certain.

10             That notion that there is liability under a health

11     care policy is every much a predicate to how MSP is supposed

12     to work as tort liability is for a liability insurance

13     policy.

14             And there's no way to separate those two.  So if

15     the defendants' theory was right, that means you would have

16     to go -- the government -- or a private attorney general

17     would have to go sue a private insurer to determine that

18     their coverage -- that their insurance policy covered the

19     particular Medicare beneficiary, and then bring an MSP case.

20     And that's just crazy.

21             I mean, why would you have all this enforcement

22     mechanism here if you had to do that?  And, Your Honor, as

23     Your Honor knows, that in most situations the -- under the

24     collateral source rule, if you bring a personal injury

25     action against someone, that the damages include the medical

1    expenses of the victim, even if those had been paid for by

2    insurance.

3              And the collateral source rule is not only the

4    law, generally speaking, across the United States, but the

5    defendants cited that -- New York State's example, where

6    they have tinkered with the collateral source rule, New York

7    CPLR 4545, I think it is, well, quite interestingly enough,

8    Your Honor, if you go and read that statute, what you find

9    is that, indeed, in most situations New York has cut back on

10   the collateral source rule, except if the collateral source

11   is Medicare.

12             So, in other words, that example from the

13   defendants doesn't really support their point.  And, indeed,

14   Florida -- we cited it in our briefs.  Florida has a

15   particular statute that basically says, Payments by Medicare

16   to a victim of a tort are not to be taken into account in

17   the awarding of damages in Florida courts.

18             THE COURT:  Let me ask you this.  One thing that

19   struck me about this argument -- I'll call it the alleged

20   tortfeasor argument -- from both of you all is that you're

21   making arguments from the statute, from the legislative

22   history, and even putting aside any case law about this --

23   let's assume we're on a clean slate without any intervening

24   case law.

25             You're making arguments that are by implication,

1  by, Well, if they said this, they must have meant this, or,

2  If they didn't say this, they must have not meant that.

3         Wouldn't something like this, wouldn't the

4  liability -- wouldn't the ability to bring a claim under

5  this statute for undetermined tort liability, wouldn't that

6  have been very clearly written in the statute, especially

7  when it was amended in the face of all this litigation that

8  was going on in D.C. and New York?

9         And if that's what Congress had meant to do,

10  wouldn't they have -- wouldn't they have said so without

11  having to try to go through it and have the other side cite

12  me to things and you cite me to things, none of which

13  directly answers the question.

14         You're having to make arguments, which is what

15  lawyers do.  But I guess I'm struck by the idea that if this

16  is what Congress really meant, then they sure could have

17  said so clearly.

18         MR. CYNKAR:  Well, Your Honor, I think -- I think

19  they did.  And I think that the reason why is that you have

20  to make that link, which I would say the statute drives you

21  to, that a self-insured plan is an alleged tortfeasor.

22  Okay?

23         Because, in fact, I don't see how you could say

24  otherwise.  Because if the notion is that you can sue a

25  self-insured plan for Medicare money, okay, a self-insured

Page 59

1  plan in that -- in the context of liability insurance, by

2  definition, is an accused tortfeasor.  And so this notion

3  that an alleged --

4      THE COURT:  Well, it wouldn't have to be.  I mean,

5  wouldn't you be able to -- just because you're self-insured

6  doesn't mean -- for example, a judgment could be entered

7  against you for which you're responsible, right?  And you're

8  self-insured.  That means there's no insurance to pay for

9  it.  But a judgment's been entered that says you're liable.

10  I mean, why do you equate self-insured with alleged

11  tortfeasor, as opposed to adjudicated tortfeasor?

12      MR. CYNKAR:  Well, it could include that,

13  obviously.  But the point is if you're an adjudicated

14  tortfeasor, as I said, you will have already paid for the

15  health expenses of the victim.

16      And if Medicare hasn't been compensated -- as

17  you've noted, Medicare has the provision in MSP of going

18  after the person who's received the payment.

19      You'd really never have to sue that person because

20  the payment's already been made.  And MSP would provide that

21  you go after the beneficiary who has received the money and

22  get it back from them.

23      And that whole process is discussed in the Zinman

24  case.  It's a Ninth Circuit case which we've just briefly

25  referred to but don't get into it, Your Honor.  So I would

1    say, no, I don't see -- and that's part of this -- the

2    statutory construction argument that we were just going

3    through, Your Honor, is that the statute just doesn't work

4    when you impose the defendants' theory on it, because I --

5    otherwise, you know, why would you have to have that

6    lawsuit?

7            I think -- two other statutory construction,

8    points I think, weigh against the defendants' arguments.

9    First of all, if you have to have all these individual tort

10   actions, remember, the interest here is not the interests of

11   the victims, it's the interest of Medicare has its own

12   victims for these health care expenses.

13           If you have to have individual tort actions all

14   across the country, then the government's ability to make

15   the Medicare whole is the function of the individual

16   litigation judgments of individuals all across this country.

17           And when you're talking about mass torts, the most

18   acute place where this statute needs to be used, that means,

19   for example -- I mean, you could have an individual who just

20   does not want to mount a case against Philip Morris.  And I

21   can understand that.

22           And so suddenly you have -- the public interest is

23   hostage to a lot of individual calculuses that are not bad

24   in their own right.  But that's what you're driven to.

25           THE COURT:  Were you involved in the New York

Page 61

1   case?

2             MR. CYNKAR:  Yes, sir.

3             THE COURT:  And that was a class action?

4             MR. CYNKAR:  Well, no.  We actually initially,

5   frankly, as a safety measure, brought it as a class action.

6   And it was on the motion to certify the class.  Judge

7   Weinstein also heard a motion to dismiss.  And he denied

8   class certification because of his dismissal of the case.

9             But he said you really you don't need a class here

10  by the Attorney General, even though he said I could certify

11  one.  But his opinion is very clear in that.

12            THE COURT:  And then you came down here and you

13  initially filed as a class action, right?

14            MR. CYNKAR:  No, no.  No, we did not.  We filed it

15  for -- for Medicare's expenses nationwide.  And then we cut

16  it back to both just Florida and, also, to just these

17  defendants.

18            THE COURT:  That was the import of your amended

19  complaint?

20            MR. CYNKAR:  Yes, sir.  Yes, sir.  Yes, sir.  But,

21  finally, the other thing that I wanted to say about why the

22  theory of the defendants just doesn't work with the statute

23  is -- and, actually, frankly, Your Honor, the point you were

24  just making underscores what I'm about to say, because in

25  which case if -- if you had to have all these individual

1    tort cases brought, then, at best, you need to have a class

2    action.

3                And a class action -- to efficiently litigate all

4    that -- all those cases.  And as Your Honor knows, in the

5    tobacco world -- and, frankly, I mean, the class-action

6    device to make it nationwide is a very difficult thing, or

7    even statewide is very difficult, because of the individual

8    issues that you have in the private personal injury action

9    cases that you don't have here.

10               And so that would mean that you basically are

11   gutting the whole ability to have private attorney general,

12   to have one person on behalf of the United States recover a

13   group of payments on behalf of Medicare.

14               THE COURT:  And does that person have to have even

15   been injured by the activity, or could it just be anybody?

16               MR. CYNKAR:  I believe just like in the qui tam

17   world, it can be anybody, Your Honor.

18               THE COURT:  So you don't have to really have --

19   the private attorney general can be anybody, whether or not

20   they have any connection whatsoever to the controversy?

21               MR. CYNKAR:  Yes.  Yes.  Now, our plaintiffs here

22   are smokers and have illnesses and all that sort of thing,

23   as we've alleged in our complaint.  So that's not the

24   posture here.  But I think, Your Honor, you know, that what

25   you see here in this case --

Page 63

1      THE COURT: So Congress intended that a person off

2  the street could file this suit, and if a four billion

3  dollars judgment was entered, that that person who had no

4  connection to the controversy at all would get two billion?

5      MR. CYNKAR: Yes, sir. Yes, sir. That's exactly

6  right. And, Your Honor, you know, the -- one of the points

7  that Mr. Garnick said that I wanted to address is this whole

8  notion of the harshness here.

9      And I think that there is -- I would -- to not use

10 up time here, I would respectfully refer you to the section

11 of Senator Grassley's amicus brief here that addresses this

12 whole point.

13      Because there's been lots of litigation in the

14 world of the False Claims Act and qui tam lawsuits. And I

15 don't know what Your Honor's experience is in that world,

16 but there you have a private person suing on behalf of the

17 United States. And the damages there are triple damages.

18 And there has been --

19      THE COURT: It's generally true, is it not, in

20 those cases -- those are usually more in the nature of a

21 whistleblower, right?

22      Those are people that know something. They can

23 help prosecute the case. Because they actually are the

24 inside or they were fired or something. They are more

25 generally directly involved in the situation, right?

Page 64

1        MR. CYNKAR:  Yes.  I think that's true, Your

2   Honor.  But I would say that that's what you have here.  I

3   mean, realistically speaking, who is going to be aware of a

4   problem that would create an MSP case?

5        You know, you would have the person whose health

6   care plan from their employer is not paying primary.  You'd

7   have the person who knows that, because, otherwise, how

8   would the lawsuit be brought?

9        And, indeed, that, frankly, is the point that

10  Senator Grassley makes in his brief, is that the reason why

11  MSP, like False Claims Act, is so important is that there's

12  no way the Medicare system can know -- have all the

13  knowledge -- sort of on-the-ground knowledge of either torts

14  being committed or a group health plan not paying the way

15  they should.

16       And what this device does is take advantage of

17  this private knowledge, just like -- I mean, we have

18  Medicare beneficiaries who are ill because of smoking here

19  before this court.  I mean, who else would care,

20  necessarily?

21       Now, in most cases under MSP, I think you're going

22  to have people who know something about what's going on.

23  That's the whole point.

24       THE COURT:  Okay.  I didn't mean to get you off on

25  that too much.  Go ahead.

Page 65

1    MR. CYNKAR:  No.  But I guess my only point that

2  we were talking about this harshness thing is that in the

3  False Claims Act you have triple damages.

4    THE COURT:  Yeah.  You know, I'm not really too

5  concerned about harshness.  I saw that Senator Grassley is

6  very concerned about judges bringing their own policy or

7  other considerations to this decision.

8    I don't necessarily -- and I'm certainly not

9  implying or stating that the other courts have done that at

10  all.  I'm not saying that.

11    But I can tell you that that's not what I'm about.

12  What I'm about is determining what this law says, either on

13  its face or by looking at legislative history.  And if I

14  can't figure it out from there, then I would go to the next

15  step of whatever the statutory construction rules tell me to

16  do.

17    And so I want to be clear with you about that.

18  And so whether it's a harsh result for somebody, or a

19  nonharsh result, or -- that doesn't -- I mean, whatever

20  Congress intended, assuming that they were within their

21  purview -- and I assume they are.  Nobody's said

22  otherwise -- then it will be my best effort to try to apply

23  that statute faithfully.

24    And having said that, it's a -- I think, clearly,

25  an issue over which lawyers and courts have grappled

1    greatly.  And I expect I'll be doing some of that, too.  And

2    so -- but I just want to be clear about that with you, and

3    with everybody.

4            MR. CYNKAR:  No.  I understand, Your Honor.  And,

5    obviously, his concern was from a policy perspective in why

6    he said that.  I guess, to sum up, Your Honor, our view is

7    that when you walk through the statute carefully and --

8            THE COURT:  I notice also, just so I can -- and

9    this is -- I noticed that very often judicial activism is in

10   the eye of the beholder; that is, that the amicus says that

11   if I don't rule the way that he's suggesting, it essentially

12   would be judicial activism, judicial policy making.

13           I noticed that your opponents say if I don't rule

14   for them it will be by judicial fiat, because I will

15   essentially be creating a statutory remedy that doesn't

16   exist.

17           And so as is very often the case, what is and is

18   not judicial activism is very much in the eye of the

19   beholder, I would say to you.

20           MR. CYNKAR:  Your Honor, and I think that's true

21   about so many issues in court.  But that's sort of why

22   you're up there and I'm down here.

23           Again, Your Honor, bottom line on this alleged

24   tortfeasor thing, when you walk through the statute

25   carefully, you come out where Baxter did, that the statute

1    shows you that for purposes of this statute, self-insured

2    plans are alleged tortfeasors.  We have to prove that.

3              And, also, that their theory -- from the

4    perspective of traditional statutory construction of their

5    theory has to work and not erase parts of the statute erases

6    the statute.

7              Now, Your Honor, my time is up.  The only thing --

8    we haven't talked about collateral estoppel.  I don't know

9    if you want to hear me on that.

10             THE COURT:  Why don't you give me your five-minute

11   version on that.  And then I'll turn to your opponent here.

12             MR. CYNKAR:  Okay.  Basically, Your Honor, there

13   are, I think, four basic reasons why collateral estoppel

14   doesn't apply here.  First of all, remembering -- two

15   things.  One is is that collateral estoppel is an equitable

16   proposition in the first place.  It's not hard-and-fast

17   formulas.

18             And, number two, which is really the most

19   important thing here, is that even the Second Circuit in

20   Mason pointed out -- this is an issue of statutory

21   construction, as you've just said, and there's been no

22   factual adjudication here.

23             So in that context, when you have an issue of law

24   that has been decided, and then the legal context changes,

25   which is what the language that the restatement of judgment

1  uses, that collateral estoppel shouldn't apply.

2      That's logical.  Why give conclusive effect to

3  something that now has been changed?

4      Number two, is that even if you didn't have that,

5  where you have inconsistent prior determinations of --

6  again, in this narrow area of issues of law, no factual

7  adjudications that collateral estoppel appropriately does

8  not apply.

9      And, indeed, when you think about it, how else

10  would you get conflicts among the circuits to go up to the

11  Supreme Court to justify Supreme Court review?  I mean,

12  there's got to be conflict somewhere that aren't precluded

13  by collateral estoppel.

14      THE COURT:  Well, the difference, I guess, that

15  would be argued here is that there's mutuality and privity,

16  so that you've actually got essentially -- by argument, at

17  least, you've got the same folks coming down here that were

18  up there.

19      MR. CYNKAR:  Well, but the law is very clear that

20  the same lawyers don't qualify as the same folks.  So I

21  think that's very important.

22      THE COURT:  Well, but in a case where the -- you

23  say that the plaintiffs here stand in the shoes of the

24  government, right?

25      MR. CYNKAR:  Right.

Page 69

1          THE COURT:  So the government filed suit in D.C.

2    you filed suit in New York, with two -- I guess two

3    plaintiffs, or however many had private attorneys general,

4    both of those were lost on the MSP issue.  And so now you're

5    here.

6          So while I'm not at all indicating what I think

7    about the collateral estoppel issue, what I am saying to you

8    is the difference between a split in the circuits and what

9    this is, there is a difference.

10         MR. CYNKAR:  I understand, Your Honor.  And that's

11   a fair point.  I think, though, that even if we were in

12   identical privity, the change in law issue is -- trumps

13   this.  I mean, that's the end of it.

14         And with respect to this

15   full-and-fair-adjudication point, again, since I was very

16   intimately involved with Mason, Your Honor, in Mason the

17   Second Circuit had ruled against us.  We filed a petition

18   for rehearing, a suggestion for rehearing en banc.  While

19   that was pending, Congress acted.

20         Now, we knew Congress was going to act.  And I can

21   tell you, you know, that the clerk in the Second Circuit was

22   in contact with us.  We told them what was coming down the

23   pipe.  We hand-carried that 28J letter that is in the record

24   to the clerk's office.  And it went into the cone of

25   silence.

Page 70

1              And the next thing we knew was several weeks

2       later, summarily, our petition for rehearing was denied with

3       no reference to the clarification.  That was the end of it.

4              And so we just assumed, Okay, we lost.  It's

5       strange that a court would not do what the Fourth Circuit

6       did when that happened in the Brown case, which we've cited

7       Brown versus Thompson, in which the Fourth Circuit asked for

8       supplemental briefing.

9              So at that point, we just think that the court has

10      ruled and we're out of there and it would go up to the

11      Supremes.

12             Then suddenly in January we get this odd order

13      which addresses this in passing, characterizing our

14      perfectly appropriate 28J letter as a motion to open the

15      mandate, when it was filed before the mandate.  And we had

16      during the course of that litigation -- both sides had filed

17      plenty of 28Js.

18             I, in my experience of over 25 years of law

19      practice, have never seen a court behave like that, Your

20      Honor, is the nicest way for me to put that.

21             So to say that a 28J letter, with 350 words,

22      constitutes full and fair adjudication, it just -- that

23      cannot fly under any collateral estoppel principles I know.

24             THE COURT:  Thank you, sir.

25             MR. CYNKAR:  Thank you.

1      MR. GARNICK:  It is difficult to believe that in

2  passing the 2003 amendments what Congress wanted to do is to

3  allow a Medicare recipient to sue a corporate defendant on

4  behalf of thousands, and recover billions of dollars merely

5  because of an assertion of tort liability, contrary to the

6  Second Circuit, contrary to what the Baxter court said in

7  dealing with Mason.  And no one mentions it in the

8  legislative history.

9      They mention the settlement issue, Thompson versus

10  Goetzmann.  Are they shooting squirrels when there are bears

11  in the woods?  There's no mention of it.  Let's look at the

12  legislative language.

13      A primary plan's responsibility for such a payment

14  may be demonstrated by a judgment or by any other means.

15  Plaintiffs would say that what this means is that it can be

16  demonstrated by a judgment, or you don't need a judgment,

17  just an assertion of liability.

18      If it's just an assertion of liability, what's the

19  point of using the word judgment?  Or by any other means,

20  plaintiff say means anything.  But that's not the way courts

21  interpret statutes.

22      The Supreme Court, where general words follow

23  specific words in a statutory enumeration, the general words

24  are construed to embrace only objects similar in nature to

25  those objects enumerated by the preceding specific words.

1    The Kepler case, 2003 -- we cited other cases, all stand for

2    the same proposition.

3            The purpose of the 2003 amendment are clear from

4    the legislative history.  They were to reverse Thompson

5    versus Goetzmann.  They were to inshrine Baxter.

6            Now, the plaintiffs say that Baxter and Mason are

7    inconsistent.  And when Baxter said that they were

8    consistent, Baxter got it wrong.  And when Mason said it was

9    consistent, Mason got it wrong.

10           Clearly both courts felt that the other one had

11   got it right.  And that's consistent with the legislative

12   history and it's consistent with the legislative language.

13           Would plaintiffs consider -- the nature of the

14   claim here, where a single Medicare recipient, or anyone,

15   asserts this type of claim, and they're saying it's for $1.5

16   billion, so doubled would be three billion, and the Medicare

17   recipient would then keep $1.5 billion, we're not arguing

18   that as a matter of policy the court should reject it.

19   We're arguing that the statutory interpretation and the

20   results are so farfetched that it's hard to believe that

21   Congress would intend it.

22           And it's harder to believe that Congress would

23   intend it without anyone saying a word about it.  No one

24   believes that.

25           On the consent issue -- on the battery issue --

1          THE COURT:  Well, I'm not sure nobody believes it.

2    The amicus, Senator Grassley, who is the -- according to the

3    amicus brief, is the chair of the Senate Finance Committee

4    which has exclusive jurisdiction over Medicare in the

5    Senate, his brief would indicate he believes it.

6          MR. GARNICK:  Well, maybe he believes it.  And so

7    I stand corrected.  Maybe he believes it.  Certainly there's

8    nothing in the language or the legislative history that

9    reflects that anyone was thinking about it when this bill

10   was enacted.

11          I also want to address this assumption that the

12   plaintiffs make, that even under their theory they could

13   bring this kind of aggregate battery claim.  That's no -- no

14   such claim has ever been brought.

15          Would plaintiffs assert that if a person goes into

16   a store and buys a pack of cigarettes today knowing that

17   they're addictive that there's a battery?

18          Is consent just written out?  Should we rely on

19   the diagnostic codes and forget about issues of fraud and

20   diagnostic error?  Are there no individual issues that these

21   battery claims can be asserted en masse and Congress

22   intended that?  I see no indication of that.

23          There's nothing in the legislative history.

24   There's -- or even Senator Grassley's brief, that talks

25   about how to deal with these aggregate claims and what

Page 74

1    Congress intended.  It just wasn't addressed.  And there's

2    no history in the case law to address those.

3              At the end of the day, what is the purpose of the

4    amendments?

5              Again, in trying Baxter, not to -- not to reverse

6    Mason.  And as I -- I showed the court the regulations.

7    Medicare is going to go after established tortfeasors who

8    have been found to be responsible to pay when the money

9    doesn't get to them.

10             If the money goes to the injured plaintiff and the

11   money doesn't get to them, they can go directly to -- then

12   to the tortfeasor.  It doesn't leave Medicare without

13   remedies.  Medicare still has subrogated remedies.  Medicare

14   still has liens.  I note on collateral estoppel --

15             THE COURT:  What would be a -- again, just a total

16   hypothetical, what would be a circumstance that would be an

17   appropriate application of this statute in a hypothetical

18   scenario where, through a class action, through some other

19   means, liability had been established against the tobacco

20   companies for Florida residents who had been reimbursed by

21   Medicare for what had been determined to be tobacco-related

22   illnesses?

23             Let's say there had been an adjudication, there

24   had been a settlement, there had been something, would --

25   what would this -- how would this statute then apply?

1          MR. GARNICK:  Let us suppose the facts of Baxter.

2     Let us suppose that there was a settlement in a class-action

3     case where the tobacco companies put a hundred million

4     dollars for the payment of medical expenses into a fund.  No

5     provision was made for the payment of Medicare.

6          At that point we assume for purposes of this

7     motion that tobacco companies are acting as primary plans.

8     They have assumed the responsibility for medical costs by

9     putting payments for medical costs into a settlement fund.

10    And that would trigger an MSP claim, just like it did in

11    Baxter.

12         THE COURT:  Would that MSP claim be available to a

13    private attorney general claim?

14         MR. GARNICK:  Yes.  Under the terms of the

15    statute, it would be.  But I think it would be for that

16    Medicare recipient's claim for medical expenses alone.  I

17    don't see it as allowing a stranger to come up and to assert

18    an aggregate lawsuit to recover expenses to which he has

19    no -- or she has no connection with.

20         THE COURT:  All right.  You said a word about

21    collateral estoppel.

22         MR. GARNICK:  Yes.  Collateral estoppel.

23    Plaintiffs came in -- they filed their 28J letter.  And they

24    said -- they didn't say, By the way, the court should know

25    about this amendment.  We've provided the 28J letters.  They

1    came in and they said, The court must change its result.

2           The plaintiffs were very confident.  The

3    plaintiffs didn't ask for a supplemental briefing.  They had

4    every opportunity and every right to ask for supplemental

5    briefing.

6           We responded.  They then filed a reply letter.

7    And the court ruled.  What is required is an opportunity to

8    adjudicate.  They didn't take that opportunity.

9           But quite apart from that, the 2003 amendment

10   didn't change the law with respect to what the court is

11   calling the alleged tortfeasor issue.  So collateral

12   estoppel does apply.  The notion of dismissing this case

13   under the Colorado River case also applies.

14          How many times do we need to defend ourselves

15   against the identical federal interests to recover the

16   identical federal funds?  These are the exact same funds at

17   issue in Mason and DOJ.

18          Sure.  The claims there were broader, but they

19   included all the dollars at issue here.  Are they then going

20   to go to California and Washington State and Oregon and New

21   Jersey?  Is this never going to stop, their continuing

22   filing a lawsuit?

23          They filed the lawsuit here.  They waited until

24   they lost Mason completely in the U.S. Supreme Court and

25   then they filed the lawsuit here, because this is the

Page 77

1    jurisdiction that decided Baxter.  But Baxter, in fact,

2    supported Mason.

3              Thank you.

4              THE COURT:  Thank you, sir.

5              I'm going to -- because, obviously, this is an

6    important issue.  And I wanted to make sure I gave everybody

7    as much chance as I could to say everything, at least they

8    could try to say, in the time we had.  I'm going to allow

9    five minutes of surreply, if y'all want to -- if y'all have

10   anything left.

11             MR. CYNKAR:  My wiser heads at counsel table, Your

12   Honor, have given me a few ideas to --

13             THE COURT:  Well, as long as you can do it in five

14   minute, go.

15             MR. CYNKAR:  Okay.  Couple of things to point out.

16             First of all, it's important, Your Honor,

17   obviously, to not have the motion before you obscured with

18   other issues.

19             You know, whether the MSP statute, whether

20   someone -- a private plaintiff who is unrelated to the case

21   could bring -- bring the case, I mean, we discussed that.

22   And I had my point of view.  But we have people who are

23   Medicare beneficiaries who are injured.  That's not an issue

24   here.

25             Second, I think that Mr. Garnick inadvertently

1    misspoke about characterizing the statute in a couple of

2    different ways that I want to be sure we're clear on.

3            One is that the demonstrating responsibility to

4    make payment is proving the tort.  We don't say that we

5    demonstrate their tort by saying it.

6            We have to -- we're knocking at the courthouse

7    door so we can do that right here.  And so it's not our

8    assertion of their liability that demonstrates it.  It's our

9    proof in front of this court.

10            Secondly, this does not say by similar means.  It

11    says by other means.  And so there's no -- that link is just

12    not there.  That is much broader.

13            Second of all, Your Honor -- third of all,

14    whatever, you know, in this state, actually, as Your Honor

15    may know, there has been a partial settlement of the Engel

16    class, where Philip Morris is paying seven hundred million

17    dollars.

18            So the liability issues here can get a little more

19    complicated than that.  But at the end of the day, you know,

20    the damages that could be paid here, get paid if we prove

21    that these companies have committed a tort and Medicare is

22    out dollars.

23            You know, we, the plaintiffs, don't get our double

24    damages unless that happens.  There's no free ride.  But

25    what we are doing here is -- the United States, is work.

1  And I think one thing that's important along those lines to

2  understand, again, what I think, ultimately, at the end of

3  the day, is a policy judgment, about what's the best way to

4  create incentives for private litigants to invest literally

5  the millions of dollars you have to to bring these cases, is

6  most recently Congress amended the tax code.

7          And they amended the tax code -- and I'm not a tax

8  lawyer.  Frankly, I hated tax in law school.  So I speak

9  about it tentatively.

10          But they amended the tax code to change how the

11  alternative minimum tax is created.  Because what was

12  happening is that when litigants, as MSP private plaintiffs,

13  or as plaintiffs in qui tam cases, would recover money, and

14  they would pay their lawyers, they would have to pay tax on

15  the amount they paid their lawyers.  There was no deduction

16  involved.

17          And so Congress, just in October of last year,

18  changed that to create a deduction so that those people

19  would not get hit with that tax liability.

20          And I mention that, Your Honor, because what we

21  have seen through the whole MSP statute history, which is

22  recounted in all the briefs, Senator Grassley's activity,

23  the invitation of the Second Circuit for Senator Grassley to

24  go do something with the law, which he did, is that Congress

25  is serious about this.

Page 80

1        We are here for the exact purposes that Congress

2   wants us to be here for.  There's nothing improper about it.

3   And it is very important, given the amount of money that

4   Medicare needs.

5        I mean, that bill that this clarification was in

6   added that pharmacy benefit that now, as government

7   accounting, you know, is -- is in Never-Neverland.  Now it's

8   estimated that the cost of the pharmacy benefit is now twice

9   what they first said.  It's over a trillion dollars.

10       This is important stuff, Your Honor.  And our

11   bottom line is that if you read that statute carefully, we

12   at least deserve our day to put on that evidence, to show

13   that these folks are tortfeasors.

14       Thank you.

15       MR. GARNICK:  Your Honor, I just want to correct

16   that there is no settlement of the Engel claim.

17       THE COURT:  All right.  Well, I don't know -- all

18   I know about that is what I read in the paper.  And I don't

19   read much of it, in terms of -- I certainly don't read in

20   detail what's going on in other courts, because I got my own

21   hands full with my court.

22       So, all right, what I'm going to do, obviously, is

23   take this under advisement.  I'm not prepared to rule from

24   the bench on this.  And I will enter a written opinion.

25       I want to reiterate to you on this record that

1  while, understandably, both parties have made arguments to

2  me that I think are based more on policy and whether --

3  whether the statute has wisdom or not, my job as a judge,

4  unlike the job of a legislator, is to determine the meaning

5  of the statute as best I can, using established rules of

6  statutory construction.  And you-all, as lawyers, know what

7  those rules are.

8          But, obviously, you start with the plain language

9  of the statute.  And then you move on from there, to the

10  various rules of statutory construction, which includes

11  legislative history and others, if you need it.  And that's

12  what I will be trying to do.

13          I will not, in any respect, be trying to judge the

14  wisdom of any particular statutory enactment.  It's not my

15  job to do it.  That's Congress's job.

16          But I will be trying to understand what Congress

17  said and what they meant, and to apply that to the facts of

18  this case.

19          And so that's what you will get from me.  I

20  appreciate the participation of Senator Grassley as an

21  amicus, because it's helpful -- anytime a court can get

22  additional information which bears on a difficult issue

23  before the court, it's always helpful.  And so I appreciate

24  that assistance.

25          I also appreciate the assistance of the parties,

Page 82

1  who, obviously, have spent great time and effort briefing

2  these issues and are also intimately familiar with them, so

3  that I'm sure I have the best possible basis to make a

4  decision in a difficult area.

5          And, of course, I also have in mind that my word

6  likely would not be the last word on this matter, but that,

7  nevertheless, still requires me to give it my best and

8  considered judgment.

9          I do have one practical question.  I hesitate to

10  ask it, because I don't want it to be any indication of how

11  I'm leaning, because I am not leaning one way or the other

12  at the moment.  I'm going to go back and look at this.

13          And I cannot promise you when I'll issue a written

14  decision, only that I'll do it as soon as I can.  But it's

15  obviously not something that can be done shortly.

16          But I will be working on it diligently, consistent

17  with my other duties.  But I did have one practical

18  question.  And I ask it without prejudice to any result I

19  might reach, because it does not indicate my thinking at

20  all.

21          But the question I have -- and I guess I'll

22  address it to the plaintiffs.  If this case were to be

23  dismissed, I had a concern -- obviously, there's an interest

24  on y'all's part to appeal it.  So that requires a final

25  judgment.

1          But I had some concern when I was looking at it,

2     if that ended up being the court's result, I -- I would

3     hesitate to dismiss claims with prejudice because they have

4     not actually been adjudicated.

5          And so have y'all thought about that?  And how

6     would the court go about that, if that turned out to be the

7     court's decision on the statute?

8          MR. CYNKAR:  Well, Your Honor, I think that you

9     would be essentially adjudicating the claim with prejudice,

10    because you'd be saying we don't have a right to bring an

11    MSP case here, that these are not appropriate defendants.

12    That's the thrust of the --

13         THE COURT:  But that would not implicate the

14    ability of these clients or other persons to seek relief for

15    the same tort claims in a different forum?

16         MR. CYNKAR:  That's correct.  Because they would

17    be seeking their damages.  This is Medicare's claim.  You

18    would be saying that Medicare doesn't have a right to be

19    compensated by these folks.

20         THE COURT:  And, please, you know -- whenever you

21    say something like that, everybody worries that's what I'm

22    thinking about doing.  But that's not necessarily at all

23    what I'm thinking about doing.

24         I view this as an evenly matched case right now.

25    And I'm going to go back and give it my best judgment.  So

Page 84

1     please don't take my question as anything other than an

2     interest in making sure that, whatever I do, I do it

3     properly.

4               And the only other thing that I would say to you

5     is if there are any other developments in this area of the

6     law, either statutory or case developments, while I have

7     this under consideration, I would ask you to promptly notify

8     me by way of supplemental authority, so that I have

9     everything in front of me when I do make my ruling.

10              And other than that, I can't think of anything

11    else.  I appreciate the presentations.  Is there anything

12    else from the plaintiffs' side this morning?

13              MR. CYNKAR:  Nothing, Your Honor.

14              THE COURT:  Okay.  What about from the defense?

15              MR. GARNICK:  Nothing, Your Honor.  Thank you.

16              THE COURT:  Again, thank y'all for your

17    participation.  And I'll get you an opinion as soon as I

18    can.  But I'm not going to make you any time frame promises,

19    because I would end up probably being wrong.  I'll just do

20    it as quickly as I can.  Thank you.

21              COURT SECURITY OFFICER:  All rise.

22              (The proceedings concluded at 11:58 a.m.)

23                             - - -

24

25

CERTIFICATE

UNITED STATES DISTRICT COURT )
                             )
MIDDLE DISTRICT OF FLORIDA   )

        I hereby certify that the foregoing transcript is

a true and correct computer-aided transcription of my

stenotype notes taken at the time and place indicated

herein.

            DATED this 16th day of August 2005.

            Shannon M. Bishop, RMR, CRR