## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED SENIORS ASSOCIATION, INC., as a private attorney general, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | **CASE NO. 05-11623 RGS** |
| PHILIP MORRIS, USA, R.J. REYNOLDS TOBACCO COMPANY, BROWN & WILLIAMSON TOBACCO CORPORATION, individually and as the successor to THE AMERICAN TOBACCO COMPANY, LORILLARD TOBACCO COMPANY, INC., and LIGGETT GROUP, INC., | ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS OR TRANSFER

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES.............................................................................................iii

GLOSSARY .............................................................................................................vii

PRELIMINARY STATEMENT ...................................................................................... 1

BACKGROUND........................................................................................................ 5

       1.     Overview of MSP .................................................................... 5
       2.     MSP Enforcement................................................................... 8
       3.     The MMA ................................................................................ 9
       4.     Litigation Since the MMA.................................................... 10
       5.     This Case............................................................................... 11

ARGUMENT .......................................................................................................... 13

    I.     USA HAS STATED A VALID MSP CLAIM ..................................................... 13

       A.  The Text of MSP Does Not Support the Two-Lawsuit Theory.......... 13

       B.  The Two-Lawsuit Theory Would Make MSP Enforcement
           Provisions Superfluous ...................................................... 20

       C.  The Regulatory History of the MSP Does Not Support
           The Two-Lawsuit Theory .................................................... 23

       D.  Prior Case Law Does Not Support the Two-Lawsuit Theory............. 25

    II.    U.S.A. HAS STANDING ............................................................................. 28

       A.  USA Has Constitutional Standing .........................................28

       B.  Prudential Standing Requirements Do Not Apply to a Statutory
           Private Attorney General Like USA ..................................... 31

    III.   THIS CASE SHOULD NOT BE DISMISSED OR TRANSFERRED ON EITHER A
       PRECLUSION OR "DUPLICATION" THEORY.....................................32

       A.  No Preclusion Principle Bars This Case ............................... 32

B. No Interest of Justice Warrants Disturbing
the Choice of This Forum ......................................................................... 34

CONCLUSION.................................................................................................................... 35

## TABLE OF AUTHORITIES

CASES

*Atlantic Fish Spotters Ass'n v. Evans,* 321 F.3d 220 (1st Cir. 2003) ........................................ 19

*Bennett v. Spear,* 520 U.S. 154 (1997) ................................................................................. 32

*Bragdon v. Abbott,* 524 U.S. 624, 642 (1998) ...................................................................... 23

*Brooks v. Blue Cross and Blue Shield of Florida,* 116 F.3d. 1364 (11th Cir. 1997) ......... 30, 34

*Brown v. Thompson,* 374 F.3d 253 (4th Cir. 2004) ........................................................ 1, 2, 7,19

*Chickasaw Nation v. U.S.,* 122 S.Ct. 528 (2001)........................................................................ 19

*Cochran v. HCFA,* 291 F.3d 775 (11th Cir. 2002) ........................................................... 5, 6, 25

*Cole v. Blue Cross Blue Shield of Mass.,* 738 F.Supp.42 (D. Mass. 1990) ............................. 23

*Connecticut Nat'l Bank v. Germain,* 503 U.S. 249 (1992)........ ..................................19

*Cooper v. Blue Cross Blue Shield Of Mass.* 738 F.Supp.42 (D.Mass. 1990)...................17

*Denekas v. Shalala,* 943 F.Supp. 1073 (S.D. Iowa 1996)............................................25

*In re: Diet Drugs Prod. Liab. Lit.,* 2001 WL 283163 (E.D.Pa. 2001)..............................9

*Doe v. Travelers Ins. Co.,* 167 F.3d 53 (1st Cir. 1999)............................................................ 23

*In re: Dow Corning Corp.,* 250 B.R. 298 (Bank. E.D. Mich. 2000) ............................... passim

*England v. Reinauer Transp. Cos., L.P.* 194 F.3d 265 (1st Cir. 1999).................................... 20

*Estate of Foster by Foster v. Shalala,* 926 F. Supp. 850 (N.D. Iowa 1996) .................... ......25

*Frazer v. CNA Insurance Co.* 374 F.Supp.2d 1067 (N.D. Alaska 2005)........................29

*Glover v. Philip Morris USA,* 380 F.Supp.2d 1279 (M.D.Fla. 2005), *appeal pending,* No. 05-14219 (11th Cir. 2005)............................................................................................................ passim

*Gonzalez v. Banco Central Corp.,* 27 F.3d. 751 (1st Cir. 1994) .............................................. 33

*Gordon v. Commissioner,* 766 F.2d 293 (7th Cir. 1985) ........................................................ 17

*Gorski v. New Hampshire Dep't of Corr.,* 290 F.3d. 466 (1st Cir. 2002) ................................ 12

*HIAA v. Shalala,* 23 F.3d 412 (D.C.Cir. 1994)......................................................................... 4

*Hughes v. Boston Mut. Life Ins. Co.,* 26 F.3d 264 (1st Cir. 1994)........................................ 23

*Ivens v. Guidant Corp.,* No. 05-CJ-01491-DWF-AJB (D.Minn. filed July 22, 2005) ........... 10

*Jobe v. ATR Marketing, Inc.,* 87 F.3d 751 (5th Cir. 1996) ..................................................... 16

*Joyner v. The News Journal,* 1999 WL 33220037 (D.Del. Aug. 18, 1999) ............................ 30

*In re Lupron Marketing and Sales Practices Litigation,* 228 F.R.D. 75 (D.Mass. 2005) ...... 35

*Manning v. Utilities Mut. Ins. Co.*, 254 F.3d 387 (2d Cir. 2001) ................................... *passim*

*Mason v. American Tobacco Co.*, 212 F.Supp.2d 88 (E.D.N.Y. 2002) ...................................... 4

*Mason v. American Tobacco Co.*, 346 F.3d 36 (2d Cir. 2003) ...................................... 9, 26, 27

*McNutt ex rel. United States v. Haleyville Medical Supplies, Inc.,*
423 F.3d 1256 (11th Cir. 2005) .............................................................................. 18

*In re Medomak Canning,* 922 F.2d 895 (1st Cir. 1990) ............................................................ 34

*Mercier v. Sheraton Intern., Inc.,* 981 F.2d 1345 (1st Cir. 1992) ............................................ 35

*Metropolitan Washington Coalition for Clean Air v. District of Columbia,*
511 F.2d. 809 (D.C. Cir. 1975) ........................................................................................ 32

*Navarro v. Pfizer Corp.*, 261 F.3d 90 (1st Cir. 2001) ............................................................... 15

*Norfolk & Western Ry. Co. v. American Train Dispatchers Ass'n,* 499 U.S. 117 (1991) ...... 19

*New Hampshire Motor Transport Ass'n v. Town of Plaistow,* 67 F.3d 326 (1st Cir. 1995) ... 33

*NLRB v. Donna-Lee Sportswear Co. Inc.,* 836 F.2d. 31 (1st Cir. 1987) ..................................... 34

*Nowak v. Tak How Investments, Ltd.,* 94 F.3d 708 (1st Cir. 1996) ........................................... 34

*In re: Orthopedic Bone Screw Pro. Liab. Lit.*, 202 F.R.D. 154 (E.D.Pa. 2001), *rev'd on other
grounds sub nom. Fanning v. United States,* 346 F. 3d 386 (3d. Cir. 2003) .................. 9

*Olmstead v. Zimring,* 527 U.S. 581 (1999) ........................................................................... 23

*Ozonoff v. Berzak,* 744 F.2d. 224 (1st Cir. 1984) .................................................................. 32

*People v. Pomykala,* 784 N.E. 2d 784 (Ill. 2003) .................................................................. 15

*Perez-Guzman v. Gracia,* 346 F.3d 229 (1st Cir.2003) ........................................................... 33

*In re Pharmaceutical Industry Average Wholesale Price Litigation,*
321 F.Supp.2d 187 (D.Mass. 2004) .................................................................................. 35

*Pixel Enhancement Laboratories, Inc. v McGee,* 1998 WL 518187 (D.Mass. 1998) ............ 35

*Provident Life & Accident Ins. Co. v. United States,*
740 F. Supp. 492 (E.D. Tenn. 1990) ...................................................................... 6, 8, 21, 26

*In re Reading Co.,* 404 F.Supp. 1249 (E.D. Pa. 1975) ........................................................... 16

*Richards v. Jefferson County, Alabama,* 517 U.S. 793 (1996) ............................................... 33

*Santiago Clemente v. Executive Airlines, Inc.,* 213 F.3d 25 (1st Cir. 2000) ........................... 23

*Sierra Club v. Morton,* 405 U.S. 727 (1972) ........................................................................ 32

*Smith v. Salish Kootenai College,* 378 F.3d 1048 (9th Cir. 2004) ........................................... 16

*Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999) ............................................................. 15

*Thompson v. Goetzmann*, 337 F.3d 489 (5th Cir. 2003) ........................................................ 9, 26

*Tuttle v. Eats and Treats Operations, Inc.*,
  2005 U.S. Dist LEXIS 15302 (D. Kan. May 23, 2005) ......................................................... 15

*United States v. Baxter Int'l*, 345 F.3d 866 (11th Cir. 2003) ........................................... *passim*

*United States v. Benson*, 548 F.2d 42 (2d Cir. 1977) ............................................................... 17

*United States v. Blue Cross & Blue Shield of Mich.*, 726 F.Supp. 1517 (E.D.Mich. 1989) ..... 8

*United States v. Mead Corp.*, 533 U.S. 218 (2001) ................................................................. 23

*United States v. Meade*, 175 F.3d 215 (1st Cir. 1999) ............................................................ 19

*United States v. Philip Morris, Inc.*, 116 F.Supp. 2d 131 (D.D.C. 2000) ............................... 26

*United States v. Philip Morris, Inc.*, 156 F.Supp.2d 1(D.D.C. 2001) ....................... 9, 26, 31

*United States v. Ramirez-Ferrer*, 82 F.3d 1131 (1st Cir. 1996) ............................................. 20

*United States ex rel. Kreindler & Kreindler v. United Technologies Corp.*,
  985 F.2d. 1148 (2d Cir. 1993) ......................................................................................... 32, 34

*United States ex rel. LeBlanc v. Raytheon Co.*, 913 F.2d. 17 (1st Cir. 1990) .......................... 28

*United States ex rel. Milam v.University of Texas M.D.Anderson Cancer Center*,
  961 F.2d 46 (4th Cir. 1992) .......................................................................................... 28, 32

United States ex rel. Plumbers & Steamfitters Local Union No. 38 v. C.W. Roen Constr. Co.,
  83 F.3d 1088 (9th Cir. 1999) ................................................................................................. 18

*United States ex rel. Taxpayers Against Fraud v. General Electric Co.*,
  41 F.3d 1032 (6th Cir. 1994) ................................................................................................. 28

*United States ex rel Thompson v. Columbia/HCA Healthcare Corp.*
  20 F.Supp.2d 1017 (S.D.Tex. 1998) ...................................................................................... 18

*United States ex rel. Yankton Sioux Tribe v. Gambler's Supply, Inc.*,
  925 F.Supp. 658 (D.S.D. 1996) .............................................................................................. 34

*Vermont Agency of Natural Res. v. United States ex. rel. Stevens*,
  529 U.S. 765 (2000) ................................................................................................... 4, 14, 29

*Warth v. Seldin*, 422 U.S. 490 (1975) ...................................................................................... 31

*Wheeler v. Travelers Ins. Co.*, 22 F.3d 534 (3d Cir. 1994) ...................................................... 30

STATUTORY MATERIAL

18 U.S.C. § 1961(1) .................................................................................................................. 18

18 U.S.C. § 1961(5) ................................................................................................................ 18
28 U.S.C. § 1404(a) ................................................................................................................ 34
31 U.S.C. § 3730(b)(5) ........................................................................................................... 31
31 U.S.C. § 3730(d) .................................................................................................................. 9
42 U.S.C. § 1395y(b)(1)(A) ...................................................................................................... 6
42 U.S.C. § 1395y(b)(2)(A) ............................................................................................ 1, 5, 22
42 U.S.C. § 1395y(b)(2)(A)(i) ............................................................................................... 5,6
42 U.S.C. § 1395y(b)(2)(A)(ii) ..................................................................................... 5, 6, 7,12
42 U.S.C. § 1395y(b)(2)(B) ...................................................................................................... 1
42 U.S.C. § 1395y(b)(2)(B)(ii) ..................................................................................... 14, 19, 22
42 U.S.C. § 1395y(b)(2)(B)(iii) ........................................................................................ passim
42 U.S.C. § 1395y(b)(2)(B)(iv) ........................................................................................ passim
42 U.S.C. § 1395y(b)(3)(A) .............................................................................................. passim
42 U.S.C. § 1983 ..................................................................................................................... 17

Deficit Reduction Act of 1984, Pub. L. No. 98-369
   § 2344, 98 Stat. 1095 ......................................................................................................... 8

Omnibus Budget Reconciliation Act of 1986, Pub. L. No. 99-509
   § 9319, 100 Stat. 1874 ....................................................................................................... 8

Medicare Prescription Drug, Improvement and Modernization Act of 2003,
Pub. L. No. 108-173
   § 301 ................................................................................................................................. 10

149 Cong. Rec. S15585 (2003) ................................................................................................ 7

N.Y.C.P.L.R. §4545(c) .......................................................................................................... 20

## REGULATORY MATERIAL

42 C.F.R. § 411.24(b) ............................................................................................................ 22
42 C.F.R. § 411.24(e) ............................................................................................................ 22
42 C.F.R. § 411.50(b) ........................................................................................................... 6, 7

47 Fed.Reg. 21,103 (May 17, 1982) ...................................................................................... 23
48 Fed.Reg. 14,802 (April 5, 1983) .................................................................................. 8, 24
54 Fed.Reg. 41,716 (Oct. 11, 1989) .............................................................................. 7, 22, 25

## OTHER AUTHORITY

Annotation, *What Services, Equipment, or Supplies are "Medically Necessary" for Purposes of Coverage under Medical Insurance*, 75 A.L.R.4th 763 (2005) ......................................... 23

1 COUCH ON INSURANCE 3d § 1.34 ............................................................................... 22

WILLIAM L. PROSSER, HANDBOOK ON THE LAW OF TORTS §9 (4th ed. 1971)........................... 12

WILLIAM L. PROSSER, HANDBOOK ON THE LAW OF TORTS §18 (4th ed. 1971)........................ 12

RESTATEMENT (SECOND) OF JUDGMENTS § 28 (2)(b) ................................................................. 3

RESTATEMENT (SECOND) OF TORTS § 18(1) ........................................................................... 12

RESTATEMENT (SECOND) OF TORTS § 892B ........................................................................... 12

RESTATEMENT (SECOND) OF TORTS § 920A(2)....................................................................... 20

W. Rubinstein, *On What a "Private Attorney General" Is – And Why It Matters,*
57 VAND.L.REV. 2129 (2004)................................................................................................... 28

2004 ANNUAL REPORT OF THE BOARD OF TRUSTEES OF THE FEDERAL HOSPITAL INSURANCE
AND FEDERAL SUPPLEMENTARY MEDICAL INSURANCE TRUST FUNDS, *available at*
http://www.cms.hhs.gov/publications/trusteesreport/2004/tr.pdf............................................ 1

## GLOSSARY

| | |
|---|---|
| Compl. | Complaint |
| DEFRA | Deficit Reduction Act of 1984, Pub. L. No. 98-369, 98 Stat. 1095 |
| Defs. Br.. | Memorandum of Law in Support of Defendants' Motion to Dismiss or Transfer |
| Defs. Ex. | An exhibit submitted with the Memorandum of Law in Support of Defendants' Motion to Dismiss or Transfer |
| EGHP | Employer group health plan |
| FCA | False Claims Act, 31 U.S.C. §3729 *et seq.* |
| HCFA | Health Care Financing Administration (The name of HCFA, the component of the Department of Health and Human Services responsible for administration of Medicare, was recently changed to |

|       | the Centers for Medicare and Medicaid Services. Because relevant regulations and other government documents were promulgated by HCFA under that name, in this brief we will refer to that agency under its old acronym.) |
|-------|------|
| MCRA  | Medical Care Recovery Act, 42 U.S.C. §2651 |
| MMA   | Medicare Prescription Drug, Improvement and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066 (2003) |
| MSP   | Medicare as Secondary Payer Statute, 42 U.S.C. § 1395y(b) |
| OBRA  | Omnibus Budget Reconciliation Act of 1986, Pub. L. No. 99 509, 100 Stat. 1874 |
| USA   | United Seniors Association, Inc. |
| USA Ex. | An exhibit submitted with Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss or Transfer |

## PRELIMINARY STATEMENT

Four decades ago, Medicare marked a revolutionary federal commitment to the health care of seniors and the disabled. Medicare has become "the second-largest social insurance program in the United States, with 41 million beneficiaries and total expenditures of $280.8 billion in 2003."[1] By 1980, facing skyrocketing Medicare costs, Congress recognized that employers who provided health insurance benefits to employees, and liability insurers who paid when people were injured, typically deferred to Medicare when an employee or a tort victim was 65, and had Medicare pay the medical bills first, as the "primary payer." Congress enacted MSP to end this passing of the buck to Medicare, requiring the "primary plans" that are responsible to pay a Medicare beneficiary's medical bills -- EGHPs, the liability insurance of tortfeasors, self-insured tortfeasors, and the like – to pay *before* Medicare pays.[2] In practice, Medicare "conditionally" pays, and then seeks to recover its money from the responsible primary plan.[3]

"Congress has repeatedly clarified and augmented the Government's powers to recoup conditional Medicare payments from primary sources,"[4] most prominently in the mid-1980s by allowing the government or private attorneys general to sue the primary payer, prove that payer's responsibility to pay, and recoup Medicare's money, all in one MSP recovery action.[5] Most recently, in the MMA, Congress clarified MSP enforcement provisions in the face of "disagreement among the courts as to [MSP's] proper interpretation"[6] that had produced "counter-intuitive and tortured results."[7] Congress made the MMA clarification retroactive to

---

[1] 2004 ANNUAL REPT. OF THE BD. OF TRUSTEES OF THE FED'L HOSP. INS. AND FED'L SUPP. MEDICAL INS. TRUST FUNDS, *available at* http://www.cms.hhs.gov/publications/trusteesreport/2004/tr.pdf.

[2] 42 U.S.C. §1395y(b)(2)(A).

[3] §1395y(b)(2)(B)

[4] *United States v. Baxter Int'l*, 345 F.3d 866, 877 (11th Cir. 2003)

[5] §1395y(b)(2)(B)(iii), (iv) & (3)(A).

[6] *Brown v. Thompson*, 374 F.3d 253, 260 (4th Cir. 2004).

[7] *Id.* at 261

the original enactment of MSP, not as a substantive amendment, but as a congressional declaration of what the law has always been.[8]

The present MSP action is a straightforward application of these well-established principles to a mass tort committed by defendants. We have alleged -- and will prove -- that defendants have engaged in a calculated act of battery upon thousands of victims, and that intentional tort has imposed staggering costs upon Medicare. The whole point of MSP is that Medicare is not to be a tortfeasor's insurance policy. This action is the delivery of the taxpayers' bill to the alleged tortfeasor – nothing more, nothing less. If defendants are not liable, they will have ample opportunity to demonstrate that to the factfinder. But what defendants cannot do is pervert the plain meaning of the legislation that calls them to account in the first place. As we will demonstrate, their attempts to do just that are unavailing, and their Motion to Dismiss must be denied.

Defendants' arguments here are a throwback to the "counter-intuitive and tortured" reasoning that Congress repudiated. Defendants say that an MSP claim cannot even be *asserted* against a tortfeasor who has victimized a Medicare beneficiary until that tort liability is established in state court and the tortfeasor does not pay that state court judgment,[9] trivializing MSP enforcement into a federal action to execute state court judgments. Congress was not simply "federalizing" the enforcement of state court judgments, or entrusting the preservation of Medicare's financial integrity – surely one of the most massive and costly *federal* programs funded by *federal* taxpayers – to the state courts.

Defendants say that the premise of this case – that MSP provides for adjudication of a primary plan's responsibility to pay a Medicare beneficiary's medical expenses in an MSP action

---

[8] *Id.* at 259-61.
[9] Defs. Br. 3.

2

– has been rejected by "every court that has considered it."[10]  Not only is this false, but it was precisely the misguided reasoning of some (but not all) courts interpreting MSP that necessitated Congress's MMA clarification.[11]

Defendants contend that this case is just the latest effort of a roving band of lawyers trying to sell a discredited bill of goods, and that preclusion principles bar this case.[12]  The implication that USA's interpretation of MSP is some concoction of plaintiffs' lawyers is certainly refuted by the intervention of Congress to confirm what the law has always been, contrary to *defendants'* arguments, by the merits of USA's faithful interpretation of MSP, and by the repeated appearance of Senator Charles E. Grassley as *amicus curiae*.  The Senator is Chair of the Finance Committee, an author of the MSP clarification statute, and the leading advocate in Congress of using private attorneys general to recoup misspent money for the federal Treasury. If defendants' reading of the statute is correct, that would mean that the author of the legislation doesn't understand the law he drafted.  The other alternative, of course, is that defendants are conveniently misreading the statute.[13]

The MSP clarification alone constitutes a material change in the legal context that forecloses any preclusion based on pre-clarification cases.[14]  In addition, USA has never been in privity with any party to any other MSP litigation, including the *Glover* plaintiffs, the one other

---

[10] *Id.* 1.

[11] *Baxter*, 345 F.3d at 875 (Before the MMA, MSP "produced considerable confusion among courts attempting to construe it."); *Brown*, 374 F.3d at 261 (MMA provided a "welcome" clarification of MSP.).

[12] Defs. Br. 4.

[13] Defendants offer an array of somewhat hysterical policy objections to buttress the two-lawsuit theory by which they would close the doors of the federal courthouse to MSP actions. Defs. Br. 2, 14-15. Nothing is more the business of the federal courts than the adjudication of a congressionally created cause of action to recover sizeable sums for the federal Treasury. While this obviously is not the forum to entertain defendants' policy objections, Sen. Grassley, author of the MMA clarification and *amicus curiae* here, may wish to address such questions.

[14] *See* RESTATEMENT (SECOND) OF JUDGMENTS § 28 (2)(b) (1980).

post-clarification case.[15]  The fact that *some* of the lawyers representing USA have been involved in other MSP litigation has no significance for preclusion purposes.  Even the *Glover* Court rejected defendants' preclusion claim.[16]  Likewise, defendants' forum-shopping alternative -- transferring this case to the Middle District of Florida, where *Glover* originated – is utterly without merit.  No interest of justice or judicial efficiency could be remotely served by such a transfer.  Defendants simply want to ship this case to a District Judge who has already ruled in their favor.

Equally flawed is defendants' argument that USA lacks standing as a constitutional or statutory matter.[17]  The Supreme Court has definitively upheld the constitutionality of the FCA's *qui tam* action,[18] and, contrary to defendants' unsupported claim, there is no legally significant difference between a *qui tam* action and an MSP private action for purposes of standing.[19]  As a statutory matter, defendants are simply wrong to claim that MSP limits the universe of potential MSP private attorneys general to Medicare beneficiaries.[20]

In fact, this Court will be only the second to adjudicate defendants' two-lawsuit theory.  In *Glover,* the district court erroneously adopted that theory, and the appeal from that ruling is awaiting oral argument in the Eleventh Circuit.  As we will show, the two-lawsuit theory of MSP enforcement does not survive careful scrutiny of the statute, the case law, or its practical implications.

---

[15] *See Glover v. Philip Morris USA*, 380 F.Supp.2d 1279 (M.D.Fla. 2005), *appeal pending,* No. 05-14219 (11th Cir. 2005).
[16] *Id.* at 1283-88.
[17] Defs. Br. 3-4.
[18] *Vermont Agency of Natural Res. v. United States,* 529 U.S. 765 (2000).
[19] *See Manning v. Utilities Mut. Ins. Co.,* 254 F.3d 387, 394-95 (2d Cir. 2001)(comparing FCA and MSP private actions); *Mason v. American Tobacco Co.,* 212 F.Supp.2d 88, 94 (E.D.N.Y. 2002)(same).
[20] §1395y(b)(3)(A)("There is established a private cause of action . . ."); *HIAA v. Shalala,* 23 F.3d. 412, 415 (D.C. Cir. 1994)("[A] private party or the federal government can sue for double damages."); *Mason,* 212 F.Supp.2d at 94 (MSP "authorizes a civil proceeding similar to a *qui tam* action where anyone can bring a claim on behalf of the United States government and receive a bounty.")

Congress has made it clear that, notwithstanding past judicial confusion, MSP really means what it says. Those who wrongly injure Medicare beneficiaries – not the taxpayers who fund Medicare – should pay for the medical care their torts necessitate. When they don't, the federal courthouse is open to the government or to private citizens to bring them to account without the hurdles defendants would create. In short, they need not prevail twice to recover once. Accordingly, defendants' motion should be denied.

BACKGROUND

1. **Overview of MSP.** The "universally accepted" purpose of MSP is "to make Medicare's obligation secondary to that of designated primary obligors, with the intention of reducing federal health care costs."[21] MSP was created by a series of amendments that makes Medicare the secondary payer in certain circumstances where another entity is responsible to a Medicare beneficiary to pay the beneficiary's medical expenses. [22] Such responsibilities to pay can be those of an EGHP for an employed beneficiary's medical bills because that beneficiary got sick,[23] or those of a workmen's compensation scheme, no-fault insurance, automobile insurance, or a "liability insurance policy or plan (including a self-insured plan)" because that party has injured a beneficiary.[24] An entity with such a responsibility is called a "primary plan."[25]

Where a primary plan has a responsibility to pay a beneficiary's medical bills, Congress has simply told Medicare, "Thou shalt not pay."[26] Yet Congress did not want to burden beneficiaries, doctors, and others in the health care system when these other responsibilities were

---

[21] *Baxter*, 345 F.3d at 888.

[22] *Baxter*, 345 F.3d at 877  *See also id* at 877 & n. 6 (summarizing evolution of MSP); *Cochran v. HCFA*, 291 F.3d 775, 777 (11th Cir. 2002).

[23] §1395y(b)(2)(A)(i).

[24] §1395y(b)(2)(A)(ii).

[25] *Id*

[26] *See* §1395y(b)(2)(A)("Payment under this subchapter may not be made . . . .").

5

disputed or when "that other source is not expected to pay promptly,"[27] which is defined as within 120 days. (Defendants' incorrectly assert that an MSP enforcement action may not be brought until 120 days after a primary plan fails to reimburse Medicare.[28] But as the applicable regulation makes clear, the 120 day period means nothing of the sort; it merely sets the timeframe in which Medicare must make its initial payment.[29]) So Congress authorized Medicare to pay conditioned on reimbursement to Medicare.[30] That reimbursement is due "if it is demonstrated that [a] primary plan has or had a responsibility to make payment with respect to such item or service."[31]

Defendants are also incorrect in two critical respects when they characterize MSP as providing that, "[i]f a Medicare beneficiary has other medical insurance, the other insurance – and not Medicare – is supposed to pay the beneficiary's medical bills."[32] First, the other source of payment that must "foot the bill" is not limited to "insurance" *of the Medicare beneficiary.* Indeed, for purposes of this case, insurance of the beneficiary is not involved at all. Though MSP does cover the health insurance an employed beneficiary might have through an EGHP,[33] the relevant MSP provision here makes Medicare secondary to a "liability insurance policy or plan (including a self-insured plan)."[34]   As HCFA has explained, liability insurance "is not a contractual arrangement between a beneficiary and an insurer; it is a contractual arrangement between a policyholder (i.e., the tortfeasor) and an insurer, which is intended to protect the

---

[27] *Cochran,* 291 F.3d at 777; §1395y(b)(2)(B)(i).

[28] Defs. Br.5.

[29] 42 C.F.R. §411.50(b).

[30] *See Cochran,* 291 F.3d at 777; *Provident Life & Accid. Ins. Co. v. United States,* 740 F.Supp. 492, 498 (E.D Tenn. 1990).

[31] §1395y(b)(2)(B)(ii).

[32] Defs. Br. 4-5. *See also id.* 13("The MSP was enacted to ensure that, when a Medicare beneficiary has private insurance, the insurer – and not Medicare – foots the bill.").

[33] *See* §1395y(b)(1)(A), 2(A)(i).

[34] §1395y(b)(2)(A)(ii) (emphasis added). *See Baxter*, 345 F.3d at 877 (automobile, liability, and no-fault insurance provision predates the MSP coverage of health insurance).

policyholder from potential financial loss resulting from a tort for which he or she is responsible."[35]

Second, MSP is not limited only to that situation in which someone "has" insurance. MSP also expressly makes "self-insured plans" primary payers.[36] Under the MMA clarification, any "entity that engages in a business, trade, or profession shall be deemed to have a self-insured plan if it carries its own risk (whether by a failure to obtain insurance, or otherwise) in whole or in part."[37] In short, a "self-insured tortfeasor" – that is, an entity *without* insurance -- is clearly within the scope of MSP.[38] If that entity disputes that tort liability, and so resists reimbursing Medicare, it is obviously an "alleged tortfeasor" against which either the government,[39] or a private party,[40] may bring suit to have the claim of tort liability adjudicated and the amount of any Medicare recovery determined.

This mischaracterization serves defendants' effort to mask their two-lawsuit theory from its most obvious vulnerability: it would utterly undermine MSP's enforcement provisions for all primary payers, not just tortfeasors. Defendants go on to argue that liability under an insurance contract (which a Medicare beneficiary does not have with a tortfeasor) is the kind of pre-existing liability that can be pursued under MSP, and so health insurance would escape the two-

---

[35] 54 Fed Reg. 41,716, 41,727 (Oct. 11, 1989).

[36] §1395y(b)(2)(A)(ii)

[37] *Id.* As the Senate sponsor of this clarification, Finance Committee Chair Sen. Charles Grassley, explained, "when a Medicare beneficiary is injured by the wrongful conduct of another entity, that entity's liability insurance or the entity itself, if it has no insurance, or it might be self-insured, is always required to pay first instead of having the taxpayers pay." 149 Cong. Rec. S15585 (Nov. 22, 2003) (statement of Sen. Grassley). *See also Brown,* 374 F.3d at 262 ("With this language – stating that a business can create a self-insured plan through its failure to obtain liability insurance – Congress has plainly indicated that the term 'self-insured plan' should be given a relatively broad definition, unrestricted by formalistic requirements."); 42 C.F.R. §411.50(b) (an entity has a self-insured plan when it "carries its own risk instead of taking out insurance with a carrier").

[38] *Baxter,* 345 F.3d at 898 n.26.

[39] §1395y(b)(2)(B)(iii).

[40] §1395y(b)(3)(A).

lawsuit rule.[41]  But, as we have just shown, the text and structure of the MSP draw no distinction between various ways in which a primary payment responsibility may arise.

    **2. MSP Enforcement.**  Until 1984, there was no express enforcement provision in MSP. Nevertheless, it was recognized that MSP provided an implied right of action, and HCFA accordingly promulgated regulations setting out its enforcement regime.  With respect to the liability insurance relevant here, HCFA's 1983 rule provided:  "If payment is not received from the insurer or the responsible party, HCFA may bring an action against the insurer or the responsible party, and the beneficiary must cooperate in HCFA's action."[42]  A nearly identical provision governed reimbursement from an EGHP.[43]

    In 1984, DEFRA "conferred on the Government a direct right of action to recover its payments from any entity 'which would be responsible for payment' under a 'law, policy, plan or insurance,' and provided that the Government would be subrogated to the right of any individual or entity to receive payment."[44]

    Two years later, in OBRA, Congress added the MSP private enforcement action,[45] which, like the *qui tam* provisions of the FCA, empowers "private attorneys general" to aid enforcement of MSP; that is, it "allow[s] individual citizens  . . . to sue in order to right an economic wrong done to the government." [46]  Unlike a *qui tam* action in which the successful relator gets a percentage of the recovery, Congress provided that a successful private MSP litigant secures

---

[41] Defs. Br. 20-21.

[42] 48 Fed Reg. 14,802, 14,810 (April 5, 1983)(publishing 42 C.F.R. §405.324).

[43] *See id.* at 14,812 (publishing 42 C.F.R. §405.329).  *See also Provident Life*, 740 F.Supp. at 506 ("[T]he Government had an implied right of action under the MSP laws prior to [the addition of an express action] as established by the Secretary's regulations."); *United States v. Blue Cross & Blue Shield of Michigan*, 726 F. Supp. at 1521 (E.D. Mich. 1989)("[A]n implied right of recovery for Medicare overpayments can be found in the MSP laws prior to 1984. This is evidenced by the Secretary's regulations made pursuant to those prior amendments.").

[44] *Baxter*, 345 F.3d at 877; §1395y(b)(2)(B)(iii) & (iv).

[45] *Baxter*, 345 F.3d at 878; §1395y(b)(3)(A) ("There is established a private cause of action for damages (which shall be in an amount double the amount otherwise provided) in the case of a primary plan which fails to provide for primary payment (or appropriate reimbursement) in accordance with paragraphs (1) and (2)(A).").

[46] *Manning*, 254 F.3d. at 394 (2d Cir. 2001).

double damages, half of which goes to Medicare to make it whole, and half of which the private attorney general keeps.[47]

**3. The MMA.** Two of the MMA's clarifications of MSP are relevant here. First, the Fifth Circuit, and other courts, had found that a settlement agreement without an admission of liability could not create a responsibility to pay triggering MSP.[48] Second, the Second and Fifth Circuits held that, to be a "self-insured plan" under MSP, an entity could not simply be uninsured, but must set aside funds to cover its tort risk and establish formal procedures to pay claims on those funds.[49]

In contrast, the Eleventh Circuit concluded that, though a self-insured plan must be an "*ex ante* arrangement," no "set-aside of the funds and formal procedures" were required. [50] Moreover, in its analysis, the *Baxter* Court acknowledged that any construction of MSP needed to recognize "that portion of the MSP statute imposing liability on an entity 'required or responsible' to pay under a 'primary plan' of self-insurance – *i.e.,* a self-insured tortfeasor."[51]

Notably, both the Second and the Fifth Circuits invited congressional intervention if MSP was not to be construed as they had opined.[52] In the MMA, Congress accepted that invitation.

The MMA clarification revised the MSP's language governing reimbursement from a primary plan to make it clear that:

---

[47] *Compare* 31 U.S.C. § 3730(d) *with* 42 U.S.C. § 1395y(b)(3)(A).
[48] *See Thompson v Goetzmann,* 337 F.3d 489, 492, 493 (5th Cir. 2003); *In re Diet Drugs Prod. Liab Lit*, 2001 WL 283163, at *2 (E.D.Pa. 2001); *In re Dow Corning Corp*, 250 B.R. 298, 341 (Bank. E.D.Mich. 2000).
[49] *See Mason v The American Tobacco Co*, 346 F.3d 36, 41 (2d Cir. 2003); *Goetzmann,* 337 F.3d at 498-99. *See also United States v Philip Morris,* 156 F.Supp.2d 1, 6 (D.D.C. 2001)("*PMII*"); *In re Orthopedic Bone Screw Prod. Liab Lit*, 202 F.R.D. 154, 166 (E.D.Pa. 2001), *rev'd on other grounds sub nom. Fanning v United States,* 346 F.3d 386 (3d Cir. 2003); *Diet Drugs,* 2001 WL 283163, at *10-11; *Dow Corning,* 250 B.R. at 338 n.24. Contrary to defendants' implication, Defs. Br. 10, *Mason* was actually the first case to make an MSP claim (along with other claims) against the tobacco companies. The government filed its own MSP, RICO, and other claims against the tobacco companies in *Philip Morris* nearly two years later, on September 22, 1999, in the District of Columbia.
[50] *Baxter,* 345 F.3d at 898.
[51] *Id* at 898 n.26.
[52] *See Mason,* 346 F.3d at 43; *Goetzmann,* 337 F.3d at 503-04.

9

> A primary plan ... shall reimburse [Medicare] for any payment ... if it is
> demonstrated that such primary plan has or had a responsibility to make [that]
> payment.... A primary plan's responsibility for such payment may be
> demonstrated by a judgment, a payment conditioned upon the recipient's
> compromise, waiver, or release (whether or not there is a determination or
> admission of liability) of payment for items or services included in a claim against
> the primary plan or the primary plan's insured, or by other means.[53]

With respect to the requirements for a self-insured plan, the MMA succinctly added: "An entity that engages in a business, trade, or profession shall be deemed to have a self-insured plan if it carries its own risk (whether by a failure to obtain insurance, or otherwise) in whole or in part."[54]

**4. Litigation Since the MMA.** To our knowledge, there are now pending three MSP cases involving mass torts that were filed after the MMA clarification. In one case, involving allegedly defective pacemakers, dispositive motions are being briefed.[55] The other two cases involve tobacco defendants. *Glover*, now on appeal in the Eleventh Circuit, is an MSP suit against Philip Morris and Liggett for recovery of Medicare's expenditures for health care services rendered in Florida for the treatment of certain diseases attributable to cigarette smoking.[56] The second is this case, in which MSP reimbursement is sought from five cigarette companies for Medicare's expenditures for the treatment of certain diseases attributable to cigarette smoking, excluding the reimbursement sought in *Glover*.[57]

The *Glover* defendants claimed that the plaintiffs were precluded from raising their MSP claim because of prior adjudications of the government's MSP claim in the *Philip Morris* case in the District of Columbia and of the private MSP claim in *Mason*.[58] They also argued for

---

[53] MMA, §301(b)(2)(A), 117 Stat. 2066, 2222 (codified at §1395y(b)(2)(B)(ii)).
[54] *Id*, §301(b)(1), 117 Stat. at 2222(codified at §1395y(b)(2)(A)(ii)).
[55] *Ivens v. Guidant Corp*, No. 05-CJ-01491-DWF-AJB (D. Minn. filed July 22, 2005).
[56] *See* Defs. Ex. 7 (¶1).
[57] Compl. ¶ 1.
[58] 380 F.Supp.2d at 1283.

10

dismissal, or a transfer to the District of Columbia, on the ground that it was "duplicative" of the government's case there.[59]    The district court rejected both of these arguments, concluding that, in light of the intervening effect of the MMA, the claim here did not duplicate the government's,[60] and that, even if the plaintiffs were in privity with the *Mason* plaintiffs, they were not precluded from proceeding here because the *Mason* plaintiffs "did not have a full and fair opportunity to litigate the effect of the MMA amendments before the Second Circuit."[61]    The *Glover* defendants did not appeal this ruling.

The *Glover* court did dismiss that case based on defendants' second claim that "the MSP only provides a private cause of action to recoup Medicare costs against a tortfeasor after that tortfeasor has already been found liable in a previous action or has settled claims against it."[62] The court assumed, without explanation, that the MSP recovery actions that had existed for 20 years did not already provide for adjudication of the underlying responsibility to pay, and so the premise of the case was an "expansion" of the MSP.[63]    From this assumption, the *Glover* court moved to conclude that this "expansion" could not be found in the MMA, solely relying on an application of the *ejusdem generis* canon to one phrase from the MMA to reach this result.[64]    The *Glover* court thus fell into error at the outset, and its subsequent analysis was flawed in every respect.    *Glover* is on appeal in the Eleventh Circuit, has been fully briefed, and is awaiting oral argument.    We address *Glover* in detail in our Argument section.

**5. This Case.**    USA, acting as an MSP private attorney general, filed this case on August 4, 2005, "seeking to recover for the Medicare program all the expenditures it made from August

---

[59] *Id* at 1285.
[60] *Id* at 1285-86.
[61] *Id* at 1288.
[62] *Id*
[63] *Id* at 1294.
[64] *Id* at 1291-92.

4, 1999 to the present for the health care services rendered to Medicare's beneficiaries for the treatment of diseases attributable to cigarette smoking."[65]  Defendants come within the scope of the MSP regime because they have MSP "primary plans," either in the form of liability insurance policies or plans, or in the form of self-insured plans.[66]

Second, these primary plans had a responsibility to be the primary payer for these cigarette-related medical expenditures because those expenditures were caused by a battery perpetrated by these companies.  Specifically, we contend that the nicotine in cigarettes is an addictive drug; that while these companies  were aware of this fact, their customers were not; that addiction is the key to the injury inflicted because it is the prolonged use of cigarettes that commonly causes the diseases at issue; and that these companies not only intentionally concealed this addictive character of their cigarettes, but sought to discredit any information that might bring this addictiveness to light, *and* knowingly manipulated the addictiveness of their cigarettes to enhance its impact on their customers.[67]

Defendants argue that "innumerable problems" will bedevil the trial of this case.[68]  But we are here on a motion to dismiss, where the "factual allegations of the complaint are to be accepted as true, and all reasonable inferences that might be drawn from them are indulged in favor of" the plaintiff.[69]  "[T]he issue is not 'whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims.'"[70]  This utterly irrelevant and inappropriate argument serves only to distract.  For example, defendants speak of

---

[65]Compl. ¶1.  No recovery is sought in this case for "health care services rendered in Florida for the treatment of diseases attributable to smoking the cigarettes of Philip Morris USA and the Liggett Group, Inc." *Id.*
[66] *See* §1395y(b)(2)(A)(ii);  ¶¶ 3, 28-33.
[67] *See* Compl. ¶¶ 4-5, 34-79; RESTATEMENT (SECOND) OF TORTS § 18(1), § 892B cmt. e, illus. 5; WILLIAM L. PROSSER, HANDBOOK ON THE LAW OF TORTS §§9, 18 (4th ed. 1971).
[68] Defs. Br. 12.
[69] *Gorski v. New Hampshire Dep't of Corr.*, 290 F.3d. 466, 473 (1st Cir. 2002).
[70] *Id.* (citation omitted).

"the general awareness of the addictive properties of smoking" as a "given."[71]  How "general"
was this "awareness" if the CEOs of these defendants in 1994 testified under oath before
Congress that nicotine is not addictive?[72]  How "general" was this "awareness" if in 1992 Philip
Morris scoffed, "Those who term smoking an addiction do so for ideological – not scientific –
reasons"?[73]  And in 1998, counsel for defendant tobacco companies in *Mason* dodged the court's
direct question – "are [cigarettes] addictive?" – with: "I think that depends on your definition....
[T]here are definitions that are used today ... under which it might be deemed addictive.  But the
definition is so liberal it doesn't describe what the impact is." [74]

*     *     *     *

The time has arrived for defendants to account for their prevarications.  As we will
demonstrate, this action is precisely what Congress authorized, and indeed wanted, when it
repeatedly strengthened and expanded the MSP regime in its application to alleged tortfeasors.
Contrary to defendants' Motion, it is defendants themselves who are the ones attempting to twist
Congress's words to reach a result that comports with their own pecuniary interests.

ARGUMENT

I.     USA HAS STATED A VALID MSP CLAIM.

A.     The Text of MSP Does Not Support the Two-Lawsuit Theory.

1.  It is an unnatural reading of a statute creating a cause of action to conclude (without
specific statutory language to that effect) that one of the elements of that cause of action must be
proven in a separate, preceding case – defendants' two-lawsuit theory.[75]  The two lawsuit theory

---

[71] Defs Br. 12.
[72] Compl. ¶55.
[73] *Id* ¶54.
[74] USA Ex. A.  Philip Morris now agrees that nicotine is "a very addictive drug."  Compl  ¶62
[75] Defs. Br. 14

13

springs only from defendants' imaginative attempt to avoid what MSP plainly says. Indeed, MSP's enforcement provisions say nothing about the two-lawsuit notion. Both the government's right of action and the private attorney general action are straightforward causes of action designed "to recoup from the rightful primary payer … if Medicare pays for a service that was, or should have been, covered by the primary insurer."[76]

From these provisions, it is clear, first, that Medicare's interest under MSP is derivative of the responsibility of a third party to pay a Medicare beneficiary. If a third party is not responsible to pay a beneficiary's medical bills, no MSP issue arises.[77] Second, MSP does not create that third party's responsibility to pay. What it does do is direct the flow of dollars to reimburse Medicare. Third, the MSP private right of action, like a *qui tam* suit under the False Claims Act, is derivative of (or effects a partial assignment of) Medicare's interest in reimbursement.[78]

Fourth, nothing carves out of the MSP rights of action a third party's primary payment responsibility (whether arising from tort or some other duty). Neither formulation MSP uses to describe that underlying responsibility – "entities that are or were required or responsible" to pay,[79] or a primary plan that "has or had a responsibility to make payment"[80]– suggests that, in

---

[76] *Baxter*, 345 F.3d at 875. *See* §1395y(b)(2)(B)(iii)(authorizing the government to sue "any and all entities that are or were required or responsible … to make payment" (against which the government may recover double damages) and to sue "any entity that has received payment from a primary plan or from the proceeds of a primary plan's payment to any entity."); §1395y(b)(2)(B)(iv)(subrogating Medicare to the right of the Medicare beneficiary to have his medical bills paid by a third party); §1395y(b)(3)(A)("establish[ing] a private cause of action for damages (which shall be in a amount double the amount otherwise provided) in the case of a primary plan which fails to provide for primary payment (or appropriate reimbursement) in accordance with paragraphs (1) and (2)(A)"); *Dow Corning*, 250 B.R. at 335-49 (explaining elements of an MSP action).

[77] *See Dow Corning*, 250 B.R. at 346 (A "primary plan's potential liability flows entirely from its obligations to the Medicare beneficiary.")

[78] *See Manning*, 254 F.3d at 394 ("[B]oth [the FCA and MSP] allow individual citizens, as well as the government, to sue in order to right an economic wrong done to the government."); *Vermont Agency*, 529 U.S. at 773.

[79] §1395y(b)(2)(B)(iii).

[80] §1395y(b)(2)(B)(ii).

giving the government and a private attorney general authority to sue, Congress withheld the authority to prove that third-party responsibility in the MSP lawsuit.[81]

Quoting *Glover,* defendants say that "[a]s a matter of logic and common sense, 'it cannot be 'demonstrated' that an alleged tortfeasor, which has neither been adjudicated as liable nor has agreed to settle a tort claim, 'has' an existing 'responsibility' to reimburse Medicare or 'had' a previous responsibility to do so.'"[82] But the exact opposite is true: as a matter of logic, basic grammar, and common sense, this reasoning does not withstand scrutiny.

If Congress had intended that an MSP action could be brought only after a previous adjudication of third party responsibility, the legislation would have been written in the past perfect subjunctive tense – *i.e.*, a primary plan would be required to reimburse Medicare only "if it *had been demonstrated* that such primary plan is responsible."[83] Congress's decision to use the present subjunctive tense ("if it is demonstrated") conveys the idea that the demonstration of third-party liability need not have been accomplished before the MSP action can be pursued; it can occur during the MSP action itself.[84]

Congress's use of present subjunctive tense explains why the statute includes the phrase "such primary plan *has or had* a responsibility[.]" If *Glover 's* reading were correct, there would be no need to use both the present-tense term "has" and the past-tense term "had"; after all, under

---

[81]Defendants incorrectly claim that the issue here concerns whether a responsibility to pay primary could be demonstrated "by merely alleging that the defendant engaged in wrongdoing." Defs. Br. 18. The issue here is whether primary payment responsibility can be demonstrated, that is, proved, in an MSP action, not whether an MSP defendant can be held liable for a Medicare reimbursement simply on a plaintiff's allegations.

[82] Defs. Br. 15 (quoting 380 F.Supp.2d at 1290).

[83] *Cf Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 482 (1999)(relying on Congress' choice of verb tense to construe a statute); *Navarro v. Pfizer Corp.,* 261 F.3d 90, 100-01 (1st Cir. 2001)(same).

[84] This grammatical construction is entirely familiar. For example, courts frequently state that a particular outcome is required "if it is demonstrated" that a certain showing is made, meaning that the showing must be made presently– not that it must have been made in some earlier proceeding. *See, e.g., People v. Pomykala,* 784 N.E. 2d 784, 791 (Ill. 2003) ("An error in a jury instruction is harmless if it is demonstrated that the result of the trial would not have been different had the jury been properly instructed."); *Tuttle v. Eats and Treats Operations, Inc.,* 2005 U.S. Dist. LEXIS 15302 at *1-*2 (D. Kan. May 23, 2005) ("Summary judgment is proper if it is demonstrated that the movant is entitled to judgment as a matter of law on the basis of facts to which there is no genuine dispute.").

the district court's reading, the tortfeasors' liability would already be a foregone conclusion, either through (1) a previous adjudication or (2) a settlement. Why then bother with both terms? Neither *Glover* nor defendants confront this question. The answer, of course, is that Congress's decision to include both terms makes perfect sense if an alleged tortfeasor's responsibility can be demonstrated in a third, prospective way – *i.e.*, in the context of the MSP enforcement litigation itself.

Legal common sense confirms this grammatical analysis. When a statute gives someone a right of action to sue Joe when he has done "X," and says nothing more, it is commonly understood that the plaintiff must prove all the elements establishing that Joe has in fact done "X" when bringing that action. Put another way, when a statute authorizes a party to bring a lawsuit when a wrong *has* been committed or some act *has* occurred, it naturally speaks in just that way because when the plaintiff brings the case the wrong or act will already *have* occurred.

The law reflects this reality in that "the rights and liabilities of the parties are fixed at the moment of the accident with respect to a cause of action sounding in tort."[85] The responsibility of a primary payer in tort arises when "all the elements of the cause of action exist."[86]

When Congress establishes a right of action to recover Medicare's money from such an entity that has primary payment responsibility due to a tort, then, that responsibility already exists, and an MSP suit can be brought directly against such a responsible primary payer, even if another court has not already ordered the payment of damages. In other words, the tort of battery is complete (and liability is triggered) when the unpermitted contact takes place, not when the tortfeasor refuses to pay for his misconduct. The statute's natural reading is that USA will have

---

[85] *In re Reading Co.*, 404 F. Supp. 1249, 1251 (E.D. Pa. 1975)
[86] *Smith v. Salish Kootenai College*, 378 F.3d 1048, 1054 (9th Cir. 2004). *See also Jobe v. ATR Marketing, Inc.*, 87 F.3d 751, 753 (5th Cir. 1996).

to prove that the defendants were responsible to pay for Medicare beneficiaries' tobacco-related medical bills because of their battery.[87]

On the other hand, the two-lawsuit theory *is* bizarre. It is an extraordinarily strained interpretation that says that there must be something more in MSP to allow the underlying third-party payment responsibility to be tried in an MSP recovery action. Based on the text and the traditional understandings of the law, there *already is* such explicit provision in MSP in the form of the rights of action set out there since the mid-1980s.

Defendants offer no examples of other statutes where state court adjudication is necessary before a federal enforcement action may proceed. In effect, defendants claim that Congress created a federal action in MSP simply to execute a state court judgment. If defendants are correct, given the unusual character of such an arrangement, and the history of Congress' expansion of MSP enforcement, defendants should be able to point to express statutory language creating that scheme.[88] They cannot because Congress did not.

2. Moreover, in MSP Congress employed a model it had used before. For example, a public employee can be sued for damages for malicious prosecution under 42 U.S.C. §1983, but that malicious prosecution (which is defined by state law) need not be first established in a separate lawsuit. Similarly, the false character of a claim under the FCA often rests on attributes that could have been independently adjudicated, but the FCA has not been construed to require such an adjudication before an FCA case can be brought. For example, in *Cooper v. Blue Cross and Blue Shield of Florida,* the core allegation was that an insurer had violated the FCA by

---

[87] *See Dow Corning*, 250 B.R. at 343("Had the Government been pursuing an [MSP] action against the [liability] insurer, the Government would likely have been required to prove that the beneficiary was a tort victim of the insured and that the medical care paid for by the Government was necessitated by that tort.").

[88] *See United States v. Benson*, 548 F.2d 42, 44 (2d Cir. 1977)("Such a restricted and unusual interpretation of [the statute at issue] . . . would have to be demonstrated by clear language in the statute itself."); *Gordon v. Commissioner*, 766 F.2d 293, 297 (7th Cir. 1985)("Any other interpretation [of the regulation at issue] would be so unusual that the [agency] would . . . have made such a rare meaning clear and explicit.").

submitting its insured's claims to Medicare when the insurer knew it was required to be the primary payer under MSP.[89]    In *Cooper*, that MSP primary payment responsibility was a predicate for the FCA claim, but no one suggested it had to be established in prior litigation. (Indeed, *Cooper* also illustrates the broader havoc this new two-lawsuit rule could cause, affecting litigation outside of MSP proper.).[90]

The *Glover* court rejected the example of the pattern of racketeering under RICO, which is established by proof of predicate acts which themselves constitute crimes,[91] distinguishing RICO and MSP on the ground that RICO has an express list of predicate acts, while MSP does not.[92]    Why this should make a difference, the court did not explain.    (Contrary to the court's characterization of MSP, the statute's reference to the responsibility of liability insurance, including self-insurance, to pay by definition constitutes a reference to tort liability as a predicate for MSP recovery.)

3.    Citing *Glover*, defendants claim that while MSP reimbursement responsibility "may be demonstrated by a judgment, a payment conditioned upon the recipient's compromise, waiver, or release (whether or not there is a determination or admission of liability) of payment for items or services included in a claim against the primary plan or the primary plan's insured, or by other means," the "other means" cannot include the adjudication of that liability in an MSP enforcement action.[93]

---

[89] 19 F.3d 562, 564-65 (11th Cir. 1994).

[90] *See also McNutt ex rel. United States v. Haleyville Medical Supplies, Inc.*, 423 F.3d 1256 (11th Circ. 2005)(Violation of the Anti-Kickback Statute can form a basis for an FCA claim.); *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F.Supp.2d 1017 (S.D.Tex. 1998)(same); *United States ex rel. Plumbers & Steamfitters Local Union No. 38 v. C.W. Roen Constr. Co.*, 183 F.3d 1088, 1092 (9th Cir. 1999)(False certification that workers have been paid in compliance with the Davis-Bacon Act gives rise to FCA liability.).

[91] 18 U.S.C. §1961(1) & (5)

[92] 380 F.Supp.2d at 1293.

[93] Defs. Br. 15-18.

Applying the *ejusdem generis* canon as *Glover* did, defendants say that "by other means" really means "by other means" similar to *and* pre-existing the judgment and settlement referred to earlier in the sentence. But application of this canon is inappropriate here. Where the meaning revealed by the text "is not eccentric, courts need not consult other aids to statutory construction."[94] Given all of the relevant text of MSP, it is not unreasonable to conclude that a responsibility to pay primary can be demonstrated in an MSP recovery action.[95]

Even applying *ejusdem generis*, a judgment in an MSP action *is* a judgment (the statute says nothing about "pre-existing"), and so need not be shoe-horned into "other means." Read in this straightforward way, an MSP responsibility to pay can be demonstrated by an MSP judgment.[96] To avoid this result, defendants and the *Glover* court read their "pre-existing" requirement into MSP.

Contrary to defendants' illicit rewrite, the statute's text and structure clearly indicate that Congress was establishing these MSP causes of action *for the purpose* of "demonstrating" a third party's responsibility to pay.[97] The MSP paragraph in which "by other means" is found provides that a primary plan must reimburse Medicare "if it is demonstrated that such primary plan has or had a responsibility" to pay for a Medicare beneficiary's medical bills.[98] The provision then

---

[94] *United States v. Meade,* 175 F.3d 215, 219 (1st Cir. 1999). Canons of construction, such as *ejusdem generis,* "are not mandatory rules," *Chickasaw Nation v. U.S.,* 122 S.Ct. 528, 535 (2001), but "are no more than rules of thumb." *Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253 (1992). *See also Norfolk & Western Ry. Co. v. American Train Dispatchers Ass'n,* 499 U.S. 117, 129 (1991)( emphasizing that a "canon does not control . . . when the whole context dictates a different conclusion," and rejecting *ejusdem generis* to read the phrase "all other law" broadly).

[95] *See Atlantic Fish Spotters v. Evans,* 321 F.3d 220, 224 (1st Cir. 2003)("When the words of a statute neither create ambiguity nor lead to an entirely unreasonable interpretation, an inquiring court need not consult other aids to statutory construction.").

[96] Even if one were to consider the "other means" which must be similar to judgments and settlements, surely an MSP judgment qualifies.

[97] The Fourth Circuit in *Brown* has already dispensed with defendants' claim that our reading of the MMA additions to MSP would raise constitutional questions because it would create a new cause of action. Defs. Br. 18. 374 F.3d at 261 n.6 ("Because we find that MMA merely clarified the meaning of MSP as it existed before those amendments and are thus not applying MMA retroactively, we need not consider whether such retroactive application would pose any constitutional problems.").

[98] §1395y(b)(2)(B)(ii).

continues that such a payment responsibility "may be demonstrated" by a judgment, settlement, or "by other means."[99]  Thereafter, MSP sets out the "Action by the United States,"[100] and the "Private cause of action."[101]  Congress included no language that suggests that the judgment by which this responsibility for payment is demonstrated could not be rendered in the "Action by the United States" or the "Private cause of action."

> **B.    The Two-Lawsuit Theory Would Make MSP Enforcement Provisions Superfluous.**

1.  Under the two-lawsuit theory, a significant part of MSP would be "superfluous, void or insignificant."[102]  If a Medicare beneficiary had to successfully sue an "alleged tortfeasor" before an MSP action could be brought, that beneficiary would recover the total costs of the medical care necessitated by the defendant's tort, including expenses paid for by Medicare.[103]  As a result, if tort liability had to be established in a separate lawsuit, there would never be a circumstance in which a primary plan failed to make a primary payment (for it would have been compelled to do so in the initial tort suit), and so the private right of action enacted by Congress could never be brought when a Medicare beneficiary was the victim of a tort.  And this would be true whether or not the alleged tortfeasor was self-insured.[104]

Moreover, if this is true for MSP's private recovery action, it must also be true for the government's recovery action, which allows the United States to sue "entities that are or were

---

[99] *Id*

[100] §1395y(b)(2)(B)(iii).

[101] §1395y(b)(3)(A).

[102] *United States v. Ramirez-Ferrer,* 82 F.3d 1131, 1137 (1st Cir. 1996).

[103] *See* RESTATEMENT (SECOND) OF TORTS §920A(2)(2002) ("Payments made to . . . the injured party from other sources are not credited against the tortfeasor's liability, although they cover all or part of the harm for which the tortfeasor is liable."); *England v. Reinauer Transp. Cos., L P.* 194 F.3d 265, 273-74 (1st Cir. 1999)(describing collateral source rule under Massachusetts law).

[104] Defendants say that MSP could be used where the collateral source doctrine has been abrogated.  Defs. Br. 20. But it is hardly plausible that Congress added the private right of action (and the government's independent right of action) to MSP simply to deal with such rare gaps in state law.  This gap must be very rare indeed, for even N.Y.C.P.L.R. §4545(c), which they cite, *id*, is *not* an example of such a gap for it expressly excepts Medicare benefits from its terms.

required or responsible" to pay primary.[105]     There is nothing in MSP supporting any

discrimination in the application of the two-lawsuit theory. That theory purports to govern how

third-party responsibility to pay is to be demonstrated. As such, it goes to the heart of *any*

primary plan's MSP duty to reimburse Medicare, regardless of who might bring the MSP

action.[106] If the demonstration of a responsibility to pay must be accomplished before a private

MSP action is brought, the same must be true of the government's MSP action, and whether an

EGHP or a tortfeasor is involved. Similarly, the government is subrogated to the right of a

Medicare beneficiary to receive payments from some other source.[107] Under the two-lawsuit

theory, this "alleged" right of a beneficiary to payment must be established first in some other

forum and only then is the government subrogated to that right. But by that time there is no need

for further action by the government against the primary plan to vindicate that right.

The only conceivable use of these MSP recovery actions, then, occurs when a defendant

refuses to pay a state court judgment, and state judicial process is for some reason unable to

enforce its own courts' judgments. Even assuming this highly implausible scenario, the two-

lawsuit interpretation reduces these federal MSP recovery actions to insignificant devices to

enforce state court judgments. [108]

---

[105] §1395y(b)(2)(B)(iii).

[106] *See, e.g., Dow Corning*, 250 B.R. at 346("[A] primary plan's potential liability flows entirely from its obligations to the Medicare beneficiary."); *Provident Life*, 740 F.Supp. at 503(quoting *United States v. York*, 398 F.2d 582, 584 (6th Cir. 1968))(The primary plan sued in an MSP action "must be liable to the injured person in tort.").

[107] §1395y(b)(2)(B)(iv).

[108]Defendants also contend that the private right of action could be used when an entity pays a Medicare beneficiary, but fails to reimburse Medicare. Defs Br. 20. This still only accounts for half of the private right of action provision. A private MSP action may be brought "in the case of a primary plan which fails to provide for primary payment (or appropriate reimbursement)." §1395y(b)(3)(A). This is an example of the failure to provide "appropriate reimbursement," but it does not address the situation of the failure to "provide for primary payment," which would be utterly pointless in the two-lawsuit world.

2. Neither *Glover* nor defendants directly dispute this reasoning. Instead, they claim the two-lawsuit theory would only apply in the liability insurance context.[109] Yet there is no way to draw a principled distinction between health and liability insurance under either the MSP or its regulations. Not once does the statute hint at such a distinction as it sets out the MSP regime,[110] mandates reimbursement pursuant to that regime,[111] and establishes recovery actions.[112] Similarly, MSP regulations treat all sources of primary payment equally: "CMS may initiate recovery as soon as it learns that payment has been made or could be made under workers' compensation, any liability or no-fault insurance, or an employer group health plan."[113]

In the end, defendants make up a distinction, claiming that a health insurance contract constitutes the pre-existing, established responsibility that their two-lawsuit theory requires.[114] Yet nothing in either MSP or a health insurance contract supports the distinction defendants draw as a legal matter. The mere fact of a contract cannot have the legal significance defendants claim, for there *is* a contractual relationship in the liability insurance context, too.[115] And it is not credible to suggest that health insurance liability is so certain that it satisfies the two-lawsuit theory. A myriad of issues concerning the meaning of key provisions of health insurance policies create litigation over whether a responsibility to pay really has arisen. Such litigation

---

[109] 380 F.Supp.2d at 1294-95; Defs. Br. 20-21.

[110] §1395y(b)(2)(A).

[111] §1395y(b)(2)(B)(ii)

[112] §1395y(b)(2)(B)(iii) & (iv), & (3)(A).

[113] 42 C.F.R. §411.24(b). *See also* 42 C.F.R. §411.24(e)("CMS has a direct right of action to recover from any entity responsible for making payment. This includes an employer, an insurance carrier, plan or program, and a third party administrator."); 54 Fed.Reg. at 41,719 ("HCFA's clarified recovery rights, including subrogation and the right to intervene, apply to all payers that are primary to Medicare.").

[114] Defs. Br. 20-21.

[115] 54 Fed.Reg. at 41,727 ("Liability insurance ... is not a contractual arrangement between a beneficiary and an insurer; it is a contractual arrangement between a policyholder (i.e., the tortfeasor) and an insurer, which is intended to protect the policyholder from potential financial loss resulting from a tort for which he or she is responsible."). *See also Dow Corning,* 250 B.R. at 340(noting that "the common characteristic" of "liability insurance coverages" is "a contract obligating the insurer to cover a loss that results from its insured's liability to a third party"); 1 COUCH ON INSURANCE 3d §1.34 n.8.5 ("[L]iability insurance" means that the "insurer has agreed to indemnify the insured from liability to third persons as contrasted with coverage from losses sustained by insured.").

can concern whether a particular service was "reasonable" or "necessary,"[116] whether a service is "investigational" or "experimental,"[117] and whether a claimant is even eligible for coverage.[118]

### C.    The Regulatory History of the MSP Does Not Support the Two-Lawsuit Theory.

"We look to the well-reasoned views of the agencies implementing a statute, which 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'"[119] This, neither *Glover* nor defendants do, notwithstanding the rich regulatory history of MSP dating back to the early 1980s. That regulatory history suggests an aggressive MSP enforcement posture utterly at odds with the two-lawsuit theory.

Strikingly, even before Congress enacted an express MSP right of action, HCFA proposed regulations that claimed such a right for Medicare, reflecting HCFA's conclusion that it could pursue the MSP claim directly against "the person responsible for the injury," that is, it could sue the alleged tortfeasor.[120] As HCFA explained:

> Liability claims are usually filed against the individual or other entity *that allegedly caused the injury* rather than against a liability insurer. When the claim is settled or adjudicated, usually after protracted negotiation and possible litigation, a liability insurer may pay all or only part of the claim. A beneficiary who obtained payment, or a judgment or settlement, would be required to reimburse the program. . . . If the beneficiary did not pursue the claim, HCFA could institute its own action.[121]

---

[116] *See, e.g., Doe v. Travelers Ins. Co.*, 167 F.3d 53 (1st Cir. 1999) (litigation over whether inpatient treatment for depression was medically necessary); Annotation, *What Services, Equipment, or Supplies are "Medically Necessary" for Purposes of Coverage under Medical Insurance*, 75 A.L.R.4th 763 (2005).

[117] *See, e.g., Cole v. Blue Cross Blue Shield of Mass.*, 738 F.Supp.42 (D. Mass. 1990) (litigation over whether particular treatment for testicular cancer was "investigational").

[118] *See, e.g., Hughes v. Boston Mut. Life Ins. Co.*, 26 F.3d 264 (1st Cir. 1994) (litigation over whether prior medical treatment for MS triggered pre-existing condition exclusion).

[119] *Santiago Clemente v. Executive Airlines, Inc.*, 213 F.3d 25, 30 n.2 (1st Cir. 2000)(quoting *Bragdon v. Abbott*, 524 U.S. 624, 642 (1998). *See also Olmstead v. Zimring*, 527 U.S. 581, 598 (1999); *United States v. Mead Corp.*, 533 U.S. 218, 230-31 (2001).

[120] 47 Fed.Reg. 21,103, 21,105 (May 17, 1982).

[121] *Id.* (emphasis added)

23

Unmistakably, HCFA could sue the "entity that allegedly caused the injury" to a Medicare beneficiary as part of MSP recovery.

HCFA reiterated the same perspective in its final rule.[122] The rule provided that HCFA could make a conditional Medicare payment for "treatment of an injury or illness that was allegedly caused by another party and . . . the beneficiary has filed, or has the right to file, a liability claim against the other party."[123] Then, "[i]f payment is not received from the insurer or the responsible party, HCFA may bring an action against the insurer or the responsible party."[124] Clearly, the rule equates the party who "allegedly caused" the injury with the "responsible" party who can be sued for MSP recovery. Moreover, the rule included an identical payment and recovery mechanism for health insurance.[125] In short, HCFA understood its powers to include a direct MSP recovery action against *any* third party responsible to pay a Medicare beneficiary's medical bills in which HCFA could prove that responsibility to pay.

To take into account the subsequent additions of explicit provisions for the government's right of action, its subrogation to a Medicare beneficiary's rights, and the private right of action, HCFA restructured its regulations in 1989, creating the format for MSP regulations still operative today. The 1989 revision brought together into one section provisions for MSP recovery actions against different types of primary plans:

> § 411.24 Recovery of conditional payments
> . . .
> (b) Right to initiate recovery. HCFA may initiate recovery as soon as it learns that payment has been made or could be made under workers' compensation, any liability or no-fault insurance, or an employer group health plan.
> . . .

---

[122] *See, e g ,* 48 Fed Reg at 14,804 ("With respect to liability claims, if a direct action were necessary, HCFA would usually bring the action against both the insurer and the responsible party.").
[123] *Id* at 14,810 (publishing 42 C.F.R. §405.324(a)(1)).
[124] *Id* (publishing 42 C.F.R. §405.324(a)(3)(iii)).
[125] *Id* at 14,812(publishing 42 C F R §405 329).

> (e) Recovery from third parties. HCFA has a direct right of action to recover from any entity responsible for making primary payment. This includes an employer, an insurance carrier, plan, or program, and a third party administrator.[126]

Moreover, the regulations reflect HCFA's understanding that an MSP recovery action by its very nature requires proof of the underlying payment responsibility, providing that, "[i]f HCFA takes action to recover conditional payments, the beneficiary must cooperate in the action."[127] And "[i]f HCFA's recovery action is unsuccessful because the beneficiary does not cooperate, HCFA may recover from the beneficiary."[128] If, as the two-lawsuit theory would have it, an MSP recovery action could not adjudicate the underlying payment responsibility to the Medicare beneficiary, these provisions requiring the cooperation of a beneficiary would have been unnecessary.

Thus MSP's regulatory history confirms that the adjudication of third-party primary payment responsibility has never been carved out of MSP recovery actions. The MMA was not needed to "expand" MSP so that adjudication of alleged torts could occur in an MSP action, as *Glover* claimed,[129] and certainly that MMA text was not written to scale back on MSP recovery actions to exclude such adjudications.

### D.    Prior Case Law Does Not Support the Two-Lawsuit Theory.

1. The two-lawsuit theory was never even hinted at in the pre-MMA cases considering the application of MSP in the context of liability insurance.[130] To be sure, some courts argued

---

[126] 54 Fed.Reg. at 41,738(publishing 42 C.F.R. §411.24(b) & (e).

[127] 54 Fed.Reg. at 41,738(publishing 42 C.F.R. §411.23(a)).

[128] *Id.* (publishing 42 C.F.R. §411.23(b)).

[129] 380 F.Supp.2d at 1294.

[130] *See, e.g., Baxter,* 345 F.3d at 898 n.26 (MSP reaches "a self-insured tortfeasor"); *Cochran,* 291 F.3d at 778 (MSP applies when Medicare paid medical costs related to injuries, "thereby casting the tortfeasor as the primary payer"); *Dow Corning,* 250 B.R. at 343 (In an MSP recovery action, "the Government would likely have been required to prove that the beneficiary was a tort victim of the insured."); *Estate of Foster v. Shalala,* 926 F.Supp. 850, 865 (N.D. Iowa 1996) ("Congress has provided Medicare with a right of direct action against the tortfeasors."); *Denekas v. Shalala,* 943 F.Supp. 1073, 1080 (S.D. Iowa 1996) (under the MSP, the government "has a right to intervene in

25

that formal procedures were needed to qualify uninsured entities as "self-insured plans" to avoid making MSP an "impermissible" "across-the-board procedural vehicle for suing tortfeasors."[131] This slogan originated in the first *Philip Morris* MSP opinion,[132] but that court did not offer any authority for this conclusion, nor did any of the other courts that quoted it.

Not only was this slogan not a holding (and has subsequently been overridden by the MMA clarification), it never was extended to all situations where tort liability might generate the responsibility to reimburse Medicare, as *Glover* did, and defendants seek to do here.   For example, in *In re: Dow Corning Corp.,* the court noted that formal procedures for self-insured plans are needed to limit the reach of MSP to *uninsured* alleged tortfeasors, [133] but also concluded that an MSP recovery action involving a tort responsibility to pay would include adjudication of the tort.[134]    Similarly, *Manning,* an MSP private action, was based on an "unadjudicated" tort.[135]

    2.    Similarly, the Eleventh Circuit in *Baxter* did not endorse the two-lawsuit theory, as defendants claim.[136]   *Baxter* held that "some type of *ex ante* arrangement" was required to be an MSP self-insured plan,[137] but rejected the proposition that a set-aside of funds and other formal arrangements were also required.[138]   *Baxter* found "no tension" between its position and *PMI* because there "the Government's claim was found flawed because it merely made the conclusory allegation that the defendants were 'responsible' for payment under the MSP without advancing

---

the action against the tortfeasor"); *Provident Life,* 740 F. Supp. at 503 (MSP creates liability where Medicare "has paid for or furnished medical treatment for which . . . a third person in tort, is primarily responsible.").
[131] *PMII,* 156 F.Supp.2d at 8.  *See also Mason,* 346 F.3d at 40; *Goetzmann,* 337 F.3d at 499; *Dow Corning,* 250 B.R. at 338 n.24.
[132] *United States v. Philip Morris,* 116 F.Supp.2d 131, 135 (D.D.C. 2000)("*PMI*").
[133] 250 B.R. at 338 n.24.
[134] *Id.* 343.
[135] 254 F.3d at 391(claiming that the defendant insurance company's "fraudulent refusal to pay for [plaintiff's] medical costs caused him physical harm, emotional distress, and resulted in his receiving inferior health care").
[136] Defs. Br. 8.
[137] 345 F.3d at 895, 897.
[138] *Id.* 895, 896-98.

a basis – and, specifically, without alleging the existence of a coverage plan."[139]  Similarly, "[i]n *Mason*, the plaintiffs' claim rested solely on the theory that a large corporation without insurance that was accused of inflicting a tortuous injury was, by definition, operating a self-insured plan."[140]  Neither of these issues is present here.  Moreover, *Baxter rejected* any notion of a carve-out of tort liability from MSP recovery actions, expressly recognizing the MSP liability of a "self-insured tortfeasor."[141]

3.  Defendants wrongly describe *Mason* as having two holdings: 1) that MSP does not apply without a pre-existing obligation to pay, and 2) that the *Mason* defendants were not self-insured plans.[142]  *Mason's* consideration of MSP's scope vis-à-vis alleged tortfeasors was, like the other pre-MMA cases discussed above, part of its reasoning as to why uninsured tortfeasors could not be MSP self-insured plans.[143]  Indeed, *Glover* refused to give *Mason* preclusive effect in part because, like *PMI* and *PMII,* the intervening MMA amendment clarified the requirements for self-insured plans.[144]

Defendants also claim that the subsequent unpublished order from the *Mason* Court is authority for the two-lawsuit theory.[145]  This, too, is not a fair characterization.  As *Glover* pointed out, what provoked this order was simply a 350-word letter under FED.R.APP.P. 28(j) advising the *Mason* Court of the passage of the MMA.[146]  Accordingly, the *Glover* court held that the *Mason* unpublished order was not a product of a "full and fair opportunity to litigate," and declined to give it preclusive effect.[147]  Moreover, the order offered no new analysis, but

---

[139] *Id.* 896 n.22.
[140] *Id.*
[141] *Id.* 898 n.26.
[142] Defs.Br. 7-8.
[143] 346 F.3d at 42-43.
[144] 380 F.Supp.2d at 1287.
[145] Defs. Br. 10; Defs. Ex. 3.
[146] 380 F.Supp.2d at 1287.
[147] *Id.* at 1288.

simply pointed back to the *Mason* opinion and its string-cite of cases considering the alleged

tortfeasor point solely in the context of the "self-insured plan" issue (ultimately circling back to

the unsupported slogan from *PMI*).

## II.    USA HAS STANDING.

### A.    USA Has Constitutional Standing.

The Supreme Court clearly recognized the constitutional standing of a *qui tam* plaintiff in

*Vermont Agency,* a FCA case.   To avoid that precedent and challenge USA's standing here,

defendants claim that an MSP private action is not a *qui tam* action, and, if it is, this case must be

dismissed because the government "is maintaining" its own case in the District of Columbia in

*Philip Morris.*[148]   Both of these arguments amount to word games that mischaracterize MSP and

FCA actions and the governing standing principles.

1.   "Both [the MSP and FCA] statutes ... create 'private attorneys general.'"[149]   A *qui*

*tam* plaintiff is simply one kind of private attorney general created by Congress.[150]   "A *qui tam*

relator is essentially a self-appointed private attorney general."[151]   Of the different kinds of

private attorneys general, both the MSP private plaintiff and the FCA *qui tam* relator are a form

of "substitute attorney general."[152]   Both are not seeking compensation damages for an injury

---

[148] Defs. Br. 22-24.

[149] *Manning,* 254 F.3d, at 394.

[150] *See United States ex rel. LeBlanc v. Raytheon Co.,* 913 F.2d 17, 19 n.2 (1st Cir. 1990)("By statute a *qui tam* action allows an informer to become a 'private attorney general '"); *United States ex rel. Taxpayers Against Fraud v. General Electric Co.,* 41 F.3d 1032, 1041-42 (6th Cir. 1994)("Our current statutory framework includes many laws that authorize individuals to act as 'private attorneys general,' bringing causes of action for the common weal. ..."[Q]ui tam laws ... encourage[e] whistleblowers to act as 'private attorneys general,' too, in pursuit of an important public policy.")

[151] *United States ex rel. Milam v. University of Texas M.D. Anderson Cancer Center,* 961 F.2d 46,49 (4th Cir. 1992).

[152] *See* W. Rubinstein, *On What a "Private Attorney General" Is – And Why It Matters,* 57 VAND. L. REV. 2129, 2143 (2004)(describing three different forms of private attorney general, and noting as "familiar substitute attorneys general ... those pursuing money damages in the Microsoft or tobacco cases and compensatory damages in qui tam matters").

suffered by the plaintiff,[153] but "sue in order to right an economic wrong done to the government."[154] As a result, Defendants' insistence that MSP plaintiffs must have suffered some injury amounts to a frontal assault on the MSP private right of action. No private plaintiff could satisfy defendants' standing argument, as the only injury-in-fact involved in an MSP case is suffered by Medicare.

Like the FCA, the MSP "can reasonably be regarded as effecting a partial assignment of the Government's damages claim," a "partial" assignment because Congress did not divest the Executive Branch of the ability to pursue the claim also.[155] Article III is thus satisfied by "the doctrine that the assignee of a claim has standing to assert the injury in fact suffered by the assignor."[156]

An MSP action may not be a *qui tam* action, in the sense that it is not an FCA action, but defendants offer no authority for their bald claim that there is a legally significant difference between MSP and FCA actions for standing purposes. There are procedural differences between the FCA and MSP that Congress chose to enact,[157] and the MSP action is not styled "ex rel.," but important constitutional questions are not determined by such minutiae.

None of the cases defendants cite are apposite. *Frazer v. CNA Insurance Co.* rightly rejected an MSP claim because nothing had been, or was going to be, paid by Medicare, and so an MSP recovery action did not arise.[158] The *Frazer* footnote cited by defendants simply explains that an MSP case is not an FCA *qui tam* case,[159] while the opinion earlier also explained

---

[153] That is why defendants are in error to call this a "quasi-class action," Defs. Br. 14, for only the injury to Medicare is at issue here.

[154] *Manning,* 254 F.3d. at 394. *See also id.* at 396("[T]he [MSP] private right of action was created to save money for the Medicare system.")

[155] *Vermont Agency,* 529 U.S. at 773.

[156] *Id.*

[157] *See Manning,* 254 F.3d at 394-95(comparing MSP and the FCA).

[158] 374 F.Supp.2d 1067, 1078 (N.D.Ala. 2005).

[159] Defs Br. 23 (citing 374 F Supp. 2d at 1082 n 19).

that standing under MSP was properly based on the "injury to Medicare by reason of an overpayment or erroneous payment made by the government."[160]

The analysis in *Wheeler v. Travelers Ins. Co.*[161] has no relevance here, for, as the Eleventh Circuit has pointed out, "the plaintiff in that case was proceeding under a state insurance statute rather than directly under the MSP laws."[162] Under that statute, Wheeler not only did not have the partial assignment from MSP, but, as the Eleventh Circuit also underscored, she also could not receive any bounty, unlike an MSP plaintiff, and so did not have even that level of interest at stake in the case.[163] Similarly, defendants' reliance on *Joyner v. The News Journal*,[164] a case brought by a *pro se* plaintiff which predated *Vermont Agency,* is misplaced for it did not even consider the partial assignment analysis, and was affirmed without an opinion.[165]

2. Alternatively, defendants contend that no assignment could have occurred here since the federal government "is maintaining" its own MSP case, and so the case must be dismissed.[166] This is wrong for several reasons. First, defendants erroneously assume that a private MSP action and a governmental MSP action cannot proceed at the same time. The statute offers no basis for such an assumption, and the Supreme Court's standing analysis in *Vermont Agency* rested on precisely the opposite proposition – that standing requirements were satisfied by the *partial* assignment of the government's interest.[167] Indeed, the FCA provision cited by

---

[160] 374 F.Supp. 2d at 1081.
[161] 22 F.3d. 534 (3d Cir. 1994)(cited at Defs. Br. 23 n 6).
[162] *Brooks v. Blue Cross and Blue Shield of Florida,* 116 F.3d. 1364, 1377 (11th Cir. 1997).
[163] *Id.*
[164] 1999 WL 33220037 (D. Del. Aug. 18, 1999)(cited at Defs. Br 23 n.6).
[165] 33 Fed.Appx. 648 (Table) (3d Cir. 2002).
[166] Defs. Br. 23-24.
[167] 529 U.S. at 773.

defendants expressly provides that the government may "bring a related action" when a *qui tam* case is pending.[168]  (Of course, the FCA does not govern MSP actions.)

Second, as noted above, the private MSP action against the tobacco companies in *Mason* predated the government's MSP case in *Philip Morris* by nearly two years, and the government's MSP claim was dismissed with prejudice over four years ago.  Since then, defendants have successfully pursued an interlocutory appeal concerning the remedies available under civil RICO, and the government's RICO case against the tobacco companies has been tried and is awaiting decision.[169]  Most importantly, Congress passed the MMA clarification of MSP, and "it is uncertain whether the government will appeal the dismissal of its [pre-MMA] MSP claim." [170] Thus, as the *Glover* court recognized, this case is not "duplicative," or even "derivative," of the government's MSP claim.[171]  And, at the very least, in the face of the D.C. District Court's ruling that the "government shall not be permitted to bring a cause of action pursuant to MSP,"[172] it is incorrect to say that the government "is maintaining" any competing MSP action.

**B.    Prudential Standing Requirements Do Not Apply to a Statutory Private Attorney General Like USA.**

If constitutional standing requirements are met, as they are here, "persons to whom Congress has granted a right of action ... may have standing to seek relief on the basis of the legal rights and interests of others, and, indeed, may invoke the general public interest in support of their claim."[173]  As the First Circuit has noted, it is well-recognized that prudential standing requirements are excused where Congress has "allow[ed] a plaintiff to act as a 'private attorney

---

[168] 31 U.S.C. §3730(b)(5).

[169] *See Glover*, 380 F.Supp.2d at 1284-86.

[170] *Id.* at 1286.  Indeed, when the MMA was passed, the government did not bring the MSP clarification to the attention of the *Philip Morris* court or in any other way seek to reopen the judgment under FED.R.CIV.P. 60.

[171] *Id.*

[172] *PMII*, 156 F.Supp.2d at 8.

[173] *Warth v. Seldin*, 422 U.S. 490, 501 (1975).

general.'"[174]  Indeed, the relaxation of such standing requirements is recognized for private

attorney general actions of all kinds created by statutes that "permit enforcement by

everyman."[175]  Congress has effectively made the judgment that prudential standing

requirements will not apply to a private MSP plaintiff.

In the face of such established precedent, defendants cite no contrary precedent, but

simply offer an extended complaint that USA has not been injured.[176]  Such concerns have no

weight here.  As the Fourth Circuit responded when similar "defects" were raised in the context

of a FCA *qui tam* suit, Congress "decided that the benefits of the *qui tam* scheme outweighed its

defects.  In an event, we have no inclination or power to delve into the wisdom of the balance

Congress struck."[177]

## III.    THIS CASE SHOULD NOT BE DISMISSED OR TRANSFERRED ON EITHER A PRECLUSION OR "DUPLICATION" THEORY.

### A.    No Preclusion Principle Bars This Case.

Defendants claim that because of *Glover*, USA is "collaterally estopped from arguing that

defendants are 'required or responsible' to reimburse Medicare."[178]  Since USA was not a party

to *Glover*, and the *Glover* plaintiffs are not parties here, defendants stretch to make this

preclusion claim by contending that USA and the *Glover* plaintiffs are in privity under the theory

---

[174] *Ozonoff v. Berzak*, 744 F.2d. 224, 228 (1st Cir. 1984).  *See also United States ex rel. Kreindler & Kreindler v. United Technologies Corp.*, 985 F.2d. 1148, 1153-54 (2d Cir. 1993)(The "prudential, judicially-created limitations on standing … are not required" where Congress creates a legal interest and confers standing to assert it, such as for *qui tam* plaintiffs serving as private attorneys general.).

[175] *Bennett v. Spear*, 520 U.S. 154, 166 (1997)(upholding the Endangered Species Act's provision allowing "any person" to bring an enforcement action).  *See also Sierra Club v. Morton*, 405 U.S. 727, 732 n.3 (1972)("[W]here a dispute is otherwise justiciable, the question whether the litigant is a 'proper party to request an adjudication of a particular issue' … is one within the power of Congress to determine.")(internal citation omitted); *Metropolitan Washington Coalition for Clean Air v. District of Columbia*, 511 F.2d. 809, 814 (D.C. Cir. 1975)(rejecting a standing argument against the Clean Air Act's provision allowing enforcement actions by "any citizen").

[176] Defs. Br. 26-28.

[177] *United States ex rel. Milam*, 961 F.2d at 49.

[178] Defs. Br. 28.  To be clear, *Glover* made no merits ruling excusing defendants from an MSP reimbursement liability, but held that tort liability must be established in a previous action before an MSP case may be brought.  380 F.Supp.2d at 1288.

of "virtual representation," which, defendants say, arises solely from the "close alignment of interests" of these different parties.[179]  Under well-established precedent, this argument must fail. As the First Circuit has explained,

> [F]inding virtual representation based solely on identity of interests, and then deploying the theory to justify nonparty preclusion in a broad spectrum of cases, would threaten the core principles underpinning ... due process.... For this reason, contemporary caselaw has placed the theory of virtual representation on a short tether, significantly restricting its range.... [W]hile identity of interests remains a necessary condition for triggering virtual representation, it is not alone a sufficient condition.[180]

As the First Circuit underscored in *Gonzalez v. Banco Central Corp.*, "notwithstanding identity of interests, virtual representation will not serve to bar a nonparty's claim unless the nonparty has had actual or constructive notice of the earlier litigation, and the balance of the relevant equities tips in favor of preclusion."[181]  Here, as in *Gonzalez*, defendants have offered nothing to suggest USA was even aware of *Glover*.  The other equitable factors from *Gonzalez* decisively lean against preclusion.  The *Glover* plaintiffs are two Medicare beneficiaries in their 70s who live in Jacksonville, Florida.[182]  There is no evidence that they have ever heard of USA, much less that they were "legally responsible for, or in any other way accountable to" USA.[183] Nor is there any evidence of a "close relationship" between these parties.[184]  Certainly there is no

---

[179] Defs. Br. 30-31

[180] *Gonzalez v. Banco Central Corp.*, 27 F.3d. 751, 760 (1st Cir. 1994). *See also New Hampshire Motor Transp. Ass'n v. Town of Plaistow*, 67 F.3d 326, 328 (1st Cir. 1995)("[S]omething more is required for privity between the prior and present litigants than merely a common interest in the outcome."). *See generally Richards v. Jefferson County, Alabama*, 517 U.S. 793, 797-98 (1996) (discussing implications of preclusion for due process right to be heard).

[181] 27 F.3d at 761

[182] Defs. Ex. 7, ¶8.

[183] 27 F.3d at 762.

[184] *Id.* Whether some of the same attorneys who represent the *Glover* plaintiffs also represent USA plays no role in this analysis. *See Gonzalez*, 27 F.3d at 759; *Plaistow*, 67 F.3d at 328; *Perez-Guzman v. Gracia*, 346 F.3d 229, 234 (1st Cir.2003).

suggestion here that USA consented, either explicitly or constructively, to be bound by *Glover*.[185]

To the contrary, the interests of these parties and their lawsuits are distinct. The *Glover* plaintiffs are suing only two of the defendants here and only for Medicare's tobacco related expenses for medical services delivered in Florida.[186] USA is suing all the major cigarette companies for all of Medicare's tobacco related expenses for medical services, except those at issue in *Glover*.[187] Correspondingly, the personal stake of each of these private attorneys general – the recovery above the amount spent by Medicare they may secure[188] -- is distinct. Not only is each amount of potential private recovery different, but success by the *Glover* plaintiffs does not ensure success for USA, and vice versa. And the cases cited by defendants in which privity was found illustrate how far-removed USA and the *Glover* plaintiffs are from the relationship needed for virtual representation.[189]

### B.    No Interest of Justice Warrants Disturbing the Choice of This Forum.

Defendants alternatively move pursuant to 28 U.S.C. §1404(a) to transfer this case to the Middle District of Florida, where *Glover* originated.[190] While the adjudication of such a motion is committed to the discretion of this Court, "there is a strong presumption in favor of a plaintiff's forum choice."[191] The moving party "bears 'the burden of proving both the

---

[185] 27 F.3d. at 762.
[186] Defs. Ex. 7, ¶1.
[187] Compl. ¶1.
[188] *Cf. Brooks,* 116 F.3d. at 1377(MSP); *Kreindler & Kreindler,* 985 F.2d at 1154 (FCA).
[189] *NLRB v Donna-Lee Sportswear Co.*, 836 F.2d. 31, 35 (1st Cir. 1987)(NLRB investigating unfair labor practices case found in privity with labor union that made the complaint); *In re Medomak Canning*, 922 F.2d 895, 902 (1st Cir. 1990)(trustee in bankruptcy, who is empowered to seek equitable subordination on behalf of unsecured creditors, is the virtual representative of unsecured creditors); *United States ex rel Yankton Sioux Tribe v Gambler's Supply, Inc*, 925 F.Supp. 658, 663-64 (D.S.D. 1996)(Indian tribe and member of same tribe bringing identical *qui tam* cases in privity).
[190] Defs. Br. 31-32.
[191] *Nowak v Tak How Investments, Ltd*, 94 F.3d 708, 719 (1st Cir. 1996).

availability of an adequate alternative forum … and the likelihood of serious unfairness to the parties in the absence of a transfer to the alternative forum.'"[192]

In support, defendants say that the *Glover* court is "already fully familiar with United Seniors' claims."[193] This deliberate understatement borders on the disingenuous. This argument exposes this motion for what it is, a bald forum-shopping maneuver to get this case into a court already favorable to defendants' arguments. Far from showing any unfairness to remaining here, this argument illustrates that the interests of justice counsel *against* such a transfer. Beyond this, defendants simply recite unsupported conclusions as to the conservation of judicial resources, avoiding duplicative litigation, and so on.

In fact, this case has a nationwide scope, unlike *Glover*, which centers on medical services provided in Florida. Nothing about the Jacksonville district court suggests that it would be a superior forum from the perspective of access to proof, availability of witnesses, or any other of the practical factors that constitute the "convenience of the parties."[194] More to the point, nothing about this Court suggests that "serious unfairness" would be visited upon anyone if this case were to be tried here. To the contrary, not only is Boston a major cosmopolitan center, but this Court has had significant experience handling cases of nationwide scope and impact.[195] At bottom, nothing counsels that this Court should override USA's choice of this forum.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied.

---

[192] *Pixel Enhancement Laboratories, Inc. v McGee*, 1998 WL 518187, *3 (D.Mass. 1998)(quoting *Mercier v Sheraton Int'l, Inc.*, 981 F.2d 1345, 1349 (1st Cir. 1992)
[193] Defs. Br. 31
[194] *See Pixel*, 1998 WL 518187, *4.
[195] *See, e g ,In re Lupron Marketing and Sales Practices Litigation*, 228 F.R.D. 75 (D.Mass. 2005); *In re Pharmaceutical Industry Average Wholesale Price Litigation*, 321 F.Supp.2d 187 (D.Mass. 2004)

Respectfully submitted,

UNITED SENIORS ASSOCIATION, INC.


/s/  Raymond P. Ausrotas
**Christopher Weld, Jr.** (BBO # 522230)
**Kevin T. Peters** (BBO # 550522)
**Raymond P. Ausrotas** (BBO # 640315)
TODD & WELD LLP
28 State Street, 31st Floor
Boston, MA  02109
(617) 720-2626

-and -

/s/ Robert J. Cynkar
**Robert J. Cynkar**
**Joseph R. Egan**
**Charles J. Fitzpatrick**
(admitted *pro hac vice*)
Egan, Fitzpatrick, Malsch & Cynkar, PLLC
The American Center at Tysons Corner
8300 Boone Blvd., Suite 340
Vienna, VA 22182
Telephone: (703) 918-4946

/s/ Jonathan W. Cuneo
**Jonathan W. Cuneo**
(admitted *pro hac vice*)
Cuneo, Gilbert & LaDuca, LLP
507 C Street N.E.
Washington, DC 20002
Telephone: (202) 789-3960

Dated:        December 19, 2005

# Exhibit A

1

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
 2                  WICHITA FALLS DIVISION

 3   JAMES MASON and BILLIE JUNE   )      CIVIL ACTION NO.
     RICHIE, individually and on   )        7:97-CV-293-X
 4   behalf of a class of all      )
     others similarly situated,    )
 5                                 )
     VS.                           )      DALLAS, TEXAS
 6                                 )
     THE AMERICAN TOBACCO COMPANY, )
 7   R.J. REYNOLDS TOBACCO COMPANY,)
     BROWN & WILLIAMSON, PHILIP    )
 8   MORRIS INCORPORATED, LORILLARD)
     TOBACCO COMPANY, LORILLARD,   )
 9   INC., UNITED STATES TOBACCO   )
     COMPANY, LIGGETT GROUP, INC., )
10   LIGGETT & MYERS, INC., and    )
     BROOKE GROUP LTD.             )      MARCH 30, 1998
11
12              MOTION TO DISMISS and
            MOTION FOR CLASS CERTIFICATION
13          BEFORE THE HONORABLE JOE KENDALL
             UNITED STATES DISTRICT JUDGE
14
15   APPEARANCES:
16   For the Plaintiffs:          MARK B. HUTTON
                                  DEREK S. CASEY
17                                Hutton & Hutton
                                  P.O. Box 638
18                                Wichita, KS  67201-0638
                                  (316) 688-1166
19
                                  GARY RICHARDSON
20                                The Richardson Law Firm
                                  6846 S. Canton, Suite 200
21                                Tulsa, OK  74136
                                  (918) 492-7674
22
                                  RONALD D. WELLS
23                                Ronald D. Wells, P.C.
                                  2515 McKinney Ave., Suite 1500
24                                Dallas, TX  75201
                                  (214) 651-1121
25
```

```
 1                                  MICHAEL H. FREEMAN
                                    Freeman Law Group
 2                                  1701 South Carson Ave.
                                    Tulsa, OK  74116
 3                                  (918) 582-8100

 4                                  JONATHAN W. CUNEO
                                    The Cuneo Law Group, P.C.
 5                                  317 Massachusetts Ave., N.E.
                                    Suite 300
 6                                  Washington, DC  20002
                                    (202) 789-3960
 7
                                    CHARLES TIEFER
 8                                  Associate Professor of Law
                                    University of Baltimore
 9                                    School of Law
                                    4913 Crescent Street
10                                  Bethesda, MD  20816
                                    (301) 229-0112
11
12    For Defendant                 STEPHEN D. SUSMAN
        Philip Morris,              VINEET BHATIA
13        Incorporated:             Susman Godfrey L.L.P.
                                    5100 First Interstate Bank Plaza
14                                  1000 Louisiana
                                    Houston, TX  77002-5096
15                                  (713) 651-9366

16                                  THOMAS J. FREDERICK
                                    Winston & Strawn
17                                  35 West Wacker Drive
                                    Chicago, IL  60601-9703
18                                  (312) 558-5600

19                                  ROY T. SPARKMAN
                                    Sparkman & Davison, L.L.P.
20                                  900 Eighth Street, Suite 1102
                                    P.O. Drawer 99
21                                  Wichita Falls, TX  76307-0099
                                    (940) 766-1388
22
      For Defendant                 JEROME R. DOAK
23    R.J. Reynolds Tobacco         Jones, Day, Reavis & Pogue
        Company:                    2300 Trammell Crow Center
24                                  2100 Ross Avenue
                                    Dallas, TX  75201-2958
25                                  (214) 220-3939
```

```
1    For Defendant                DANIEL K. ZORN
      United States Tobacco       Collins, Zorn, Jones & Wagner
2     Company:                    429 N.E. 50th, 2nd Floor
                                  Oklahoma City, OK 73105-1815
3                                 (405) 524-2070

4

5    For Defendants               GARY LONG
      Lorillard Tobacco Company   Shook, Hardy & Bacon L.L.P.
6     and Lorillard, Inc.:        One Kansas City Place
                                  1200 Main Street
7                                 Kansas City, MO  64105-2118
                                  (816) 474-6550
8
                                  ROBERT A. GWINN
9                                 Gwinn & Roby
                                  Renaissance Tower
10                                1201 Elm Street, Suite 4100
                                  Dallas, TX  75270
11                                (214) 698-4100

12   For Defendants               ELLEN B. MALOW
      Liggett Group Inc.,         Kasowitz, Benson, Torres &
13    Liggett & Myers Inc.,        Friedman, L.L.P.
      and Brooke Group Ltd.:      700 Louisiana Street, Suite 2200
14                                Houston, TX  77002
                                  (713) 220-8800
15

16

17   Court Reporter:              Linda J. Robbins, CSR #890
                                  Chambers of Judge Joe Kendall
18                                1100 Commerce Street, 16th Floor
                                  Dallas, Texas  75242
19                                (214) 748-8068

20

21   Proceedings reported by mechanical stenography, transcript

22   produced by computer.

23

24

25
```

Proceedings                                                    4

1                    P R O C E E D I N G S

2                      MARCH 30, 1998

3            THE COURT:  Have a seat, please.  Have a seat.

4        This is Cause Number 7:97-CV-293, James Mason and others,

5    plaintiffs, versus the American Tobacco Company and others.

6    The Court has convened a hearing this afternoon at the request

7    of the defendants to hear oral argument.  And I also put in the

8    order if someone wants to adduce evidence, as long as we don't

9    get wild with it, I'll allow that as well on the defendants'

10   motion to dismiss and also on the issue of class certification.

11       Let me begin by saying I am not as near concerned about

12   spending a lot of our time with the motion to dismiss as I am

13   the class certification.

14       Let me start by saying that there were a number of

15   motions for admittance to practice pro hac vice.  Those are

16   all granted.  I'm assuming if the players in this case are

17   willing to hire you, you're competent enough to be here.

18       So those are all granted and there is no requirement to

19   have local counsel.  I am voiding that provision of the local

20   rules as well.

21       I will hear five minutes a side on the defendants' motion

22   to dismiss.  And if we have to take longer than that, we can.

23   And then after that we'll take up the class certification issue

24   which I think is really what I want to hear more about, anyway.

25       Who wants to speak -- Mr. Susman?

Argument - Mr. Long

1   market.  You could presume reliance so you could certify it.

2   But if reliance and proximate cause have to be shown on RICO,

3   as Judge Folsom said they did, it can't be certified.  Recall

4   that in <u>Castano</u>, the Fifth Circuit said if reliance is an

5   individual issue on a fraud claim, it simply can't be

6   certified.

7       And there's -- the other two, I just want to explain

8   briefly the other two affidavits we submitted.  One is an

9   affidavit of an historian, Professor Parrish.  And on the

10  reliance issue, that's the sole reason to submit it.  But

11  Professor Parrish has done a search of literature, things

12  that have been in the media, things that have been in books,

13  television shows, radio, et cetera, et cetera, to show the

14  widespread information that's been available to people in this

15  country in the last 50 years on the health risks of smoking.

16      And in connection with that, we've submitted an affidavit

17  of an advertising and marketing expert, Dr. Meyer.  And his

18  point is that consumers don't make decisions just based upon

19  a company's ads.  There's a wide information environment:

20  family members, peers, teachers --

21          THE COURT:  Well, are cigarettes dangerous?

22          MR. LONG:  I think that our clients -- I mean, I

23  would have to check the clients' depositions, their answers do

24  vary from time to time.  I think some of the clients have said

25  cigarettes are not safe.

Argument - Mr. Long

1            THE COURT:  Well, how about just between me and you,

2    what do you think?  Are they?

3            MR. LONG:  Off the record?

4            THE COURT:  Yes.  Well, no, we don't really go off

5    the record.

6            MR. LONG:  I think -- I think every -- well, I think

7    the answer to the question --

8            THE COURT:  That was kind of a rhetorical question,

9    wouldn't you agree?  I mean, you'd agree they're dangerous.

10           MR. LONG:  Let's put it this way.  I -- I think that

11   the American public perceives that cigarettes are dangerous,

12   and that's the point of the affidavit we've submitted.

13           THE COURT:  Okay.  And are they addictive?

14           MR. LONG:  I think that depends upon your definition.

15   There are certainly definitions out there that people use

16   today --

17           THE COURT:  Well, isn't there like a billion-dollar

18   plus industry now of Norplant and other things to --

19           MR. LONG:  Oh, sure.  I mean, there's nicotine

20   replacement.  My point is, I think there are definitions that

21   are used today that under which it might be deemed addictive.

22   But the definition is so liberal that it doesn't describe what

23   the impact is.  Does it mean you can't stop using the product?

24           THE COURT:  Well, I guess if it's dangerous and

25   addictive and you were just a 14-year-old kid or a 20 year old

Argument - Mr. Lon_

1   or a 25 year old, whatever age you start, if you knew that, A,

2   it's dangerous and could kill you, and, B, that it is addictive

3   and if you start, you probably can't stop, then why would

4   anyone ever start, any rational person ever start smoking?

5       I mean, I have known smokers all my life and they'd give

6   their right arm to stop because of the health problems, just

7   the cost and other things.

8       If it's dangerous and it's addictive -- I'm getting back

9   to the reliance.  I mean, they're arguing that the tobacco

10   industry for half a century hid the ball.  And, you know, as

11   I must, if I take that as true, why wouldn't it be more like

12   analogous to a securities fraud-on-the-market type reliance

13   claim.

14           MR. LONG:  Well, the securities fraud-on-the-market

15   theory is one that's been -- an argument that's made all the

16   time in tobacco litigation.  I'm not aware of any court that's

17   adopted it.  I mean, I can tell you from personal experience

18   having deposed a lot of plaintiffs, when you ask them why

19   they smoke, well, because Joe, my best buddy, did or because

20   I thought I was cool or things like this.

21       I mean, most of them say that.  And we've tried cases and

22   we've won trials on reliance.  I mean, the point is with the

23   affidavits that there's so much information out there, that

24   you can't assume that there is reliance.

25           THE COURT:  Would there ever be a case where a class