# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED SENIORS ASSOCIATION, INC., as a private attorney general, | ) ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| PHILIP MORRIS USA, R.J. REYNOLDS TOBACCO COMPANY, BROWN & WILLIAMSON TOBACCO CORPORATION, individually and as the successor to THE AMERICAN TOBACCO COMPANY, LORILLARD TOBACCO COMPANY, INC., and LIGGETT GROUP, INC., | ) Case No. 05-11623 RGS ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

## REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR TRANSFER

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS .................................................................................................... ii

TABLE OF AUTHORITIES ........................................................................................... iii

PRELIMINARY STATEMENT ........................................................................................1

ARGUMENT ....................................................................................................................3

I.      THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO
        STATE A CLAIM ...................................................................................................3

        A.      A Private MSP Claim Does Not Arise Unless The Defendant Has Failed
                To Make A Required Payment To Medicare .............................................3

        B.      United Seniors Cannot Demonstrate That Defendants Are Required Or
                Responsible To Make A Payment To Medicare .........................................7

        C.      Rejecting United Seniors' Claims Would Not Render The MSP
                Enforcement Provisions Superfluous........................................................13

II.     UNITED SENIORS LACKS STANDING ...........................................................15

III.    UNITED SENIORS IS COLLATERALLY ESTOPPED BY *GLOVER* ..............17

CONCLUSION................................................................................................................19

## TABLE OF AUTHORITIES

**Cases**

*Brown v. Thompson*, 374 F.3d 253 (4th Cir. 2004) .................................................................. 12

*Chisom v. Roemer*, 501 U.S. 380 (1991) .................................................................................. 12

*City of Hope Nat. Med. Ctr. v. Healthplus, Inc.*, 156 F.3d 223 (1st Cir. 1998)........................... 15

*County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295 (2d Cir. 1990)............................ 11

*Denekas v. Shalala*, 943 F. Supp. 1073 (S.D. Iowa 1996).............................................................. 5

*Estate of Foster v. Shalala*, 926 F. Supp. 850 (N.D. Iowa 1996) .................................................... 5

*Flora v. United States*, 362 U.S. 145 (1960) ................................................................................... 9

*Frazer v. CNA Ins. Co.*, 374 F. Supp. 2d 1067 (N.D. Ala. 2005)................................................. 17

*Glover v. Philip Morris USA*, 380 F. Supp. 2d 1279 (M.D. Fla. 2005)................................. passim

*Gregory v. Ashcroft*, 501 U.S. 452 (1991) .................................................................................... 11

*Liberty Cablevision of P.R., Inc. v. Caguas*, 417 F.3d 216 (1st Cir. 2005) ................................. 11

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ................................................................... 15

*Maroni v. Pemi-baker Reg'l Sch. Dist.*, 346 F.3d 247 (1st Cir. 2003) ......................................... 17

*Mason v. Am. Tobacco Co.*, 346 F.3d 36 (2d Cir. 2003) ..................................................... 1, 5, 18

*Mason v. Am. Tobacco Co.*, 541 U.S. 1057 (2004) ........................................................................ 1

*Mason v. Am. Tobacco Co.*, No. 02-7923, slip op., (2d Cir. Jan. 16, 2004) ............................. 1, 5

*Mertens v. Hewitt Assocs.*, 508 U.S. 248 (1993) .......................................................................... 11

*Munoz-Mendoza v. Pierce*, 711 F.2d 421 (1st Cir. 1983)............................................................. 16

*Nixon v. Richey*, 513 F.2d 430 (D.C. Cir. 1975)........................................................................... 16

*R.I. Hosp. Trust Nat'l Bank v. Ohio Cas. Ins. Co*, 789 F.2d 74 (1st Cir. 1986) ........................... 17

*RSA Media, Inc. v. AK Media Group, Inc.*, 260 F.3d 10 (1st Cir. 2001)...................................... 17

*Schimmels v. Schimmels*, 127 F.3d 875 (9th Cir. 1997) ............................................................... 17

*Smith v. Salish Kootenai College*, 378 F.3d 1048 (9th Cir. 2004)................................................. 7

*Southwest Airlines Co. v. Tex. Int'l Airlines, Inc.*, 546 F.2d 84 (5th Cir. 1977).......................... 17

*United States ex rel. S. Prawer & Co. v. Fleet Bank*, 24 F.3d 320 (1st Cir. 1994) ...................... 16

*United States ex rel. Yankston Sioux Tribe v. Gambler's Supply, Inc.*, 925 F. Supp.
      658 (D. S.D. 1996)............................................................................................................ 17

*United States v. Baxter Int'l, Inc.*, 345 F.3d 866 (11th Cir. 2003)...................................... 9, 13, 18

*United States v. Philip Morris Inc.*, 116 F. Supp. 2d 131 (D.D.C. 2000).................................... 18

*United States v. Philip Morris Inc.*, 156 F. Supp. 2d 1 (D.D.C. 2001).......................... 1, 5, 15, 18

*Washington State Dep't of Soc. & Health Servs. v. Guardianship Estate of
      Keffeler*, 537 U.S. 371 (2003)....................................................................................... 10

*Wheeler v. Travelers Ins. Co.*, 22 F.3d 534 (3d Cir. 1994).......................................................... 17

*Zinman v. Shalala*, 67 F.3d 841 (9th Cir. 1995) ............................................................................ 3

## Statutes

18 U.S.C. § 1962(1) ......................................................................................................................... 7

31 U.S.C. § 1329 .............................................................................................................................. 7

31 U.S.C. § 1370(b)(1) ..................................................................................................................... 7

42 U.S.C. § 1395y(b)(2)(B)(ii) ................................................................................................. passim

42 U.S.C. § 1395y(b)(2)(B)(iv) ................................................................................................. 3, 14

42 U.S.C. § 1395y(b)(3)(A)................................................................................................... 2, 3, 16

Ala. Code § 6-5-20............................................................................................................................ 14

Colo. Rev. Stat. Ann. § 13-21-111.6................................................................................................. 14

Mo. Ann. Stat. § 490.715 ................................................................................................................. 14

## Rules

N.Y. C.P.L.R. § 4545(c) ................................................................................................................... 14

**Regulations**

42 C.F.R. § 405 ................................................................................................. 5, 6

42 C.F.R. § 411.24(i) .......................................................................................... 13

42 C.F.R. § 411.50(b) .......................................................................................... 4

47 Fed. Reg. 21,103 (May 17, 1982) .................................................................... 5

48 Fed. Reg. 14,802 (Apr. 5, 1983) ...................................................................... 6

**Other Authorities**

149 Cong. Rec. S8,499-02 (2003) ....................................................................... 13

18A Charles Alan Wright, et al., *Fed. Prac. & Proc. Jurisdiction* § 4433 (2d ed. 2003) ................................................................................................... 16

18A Charles Alan Wright, et al., *Fed. Prac. & Proc. Jurisdiction* § 4458.1 (2d ed. 2002) ................................................................................................... 17

6 Am. Jur. 2d *Assignments* § 144 ....................................................................... 15

73 Am. Jur. 2d *Statutes* § 142 ............................................................................. 9

82 C.J.S. *Statutes* § 324 ..................................................................................... 9

Centers for Medicare & Medicaid Services, Medicare Enrollment, "National Trends 1966-2003," at http://www.cms.hhs.gov/MedicareEnrollment/Downloads/HI-SMI.pdf ............................ 1

# PRELIMINARY STATEMENT[1]

United Seniors asks this Court to adopt an unprecedented interpretation of the Medicare as Secondary Payer statute ("MSP") that is contrary to the statute's plain text, structure, and legislative history and has been rejected by every court to consider it.[2] United Seniors contends that the MSP authorizes a plaintiff to bring in federal court any unadjudicated, contested state-law tort claim to recoup medical costs whenever the injured victim happens to be one of the 41 million people enrolled in Medicare.[3] Moreover, according to United Seniors, such a plaintiff need not have any connection to the state-law claim and, if successful, is entitled to recover *double* damages simply because the defendant elected to contest the allegation of tort liability instead of paying the medical costs immediately. United Seniors' interpretation would convert every garden-variety tort claim involving an injured Medicare beneficiary into a potential federal suit, radically expanding federal jurisdiction and substantially federalizing state tort law.

United Seniors devotes the majority of its brief to arguing against what it calls the "two-lawsuit rule." *See* Mem. of Law in Support of Defendants' Motion to Dismiss or Transfer (filed Oct. 24, 2005) ("Defs.' Mem.") at 13-20. But United Seniors misconceives the MSP cause of action for double damages. The purpose of the MSP's private cause of action for double damages is both to make the government whole and to punish the defendant for a wrong

---

[1]    Defendants submit this Reply Memorandum of Law pursuant to this Court's September 21, 2005, endorsement of the parties' September 2, 2005, stipulation providing that defendants "shall file on or before January 9, 2006, any Reply" in support of defendants' motion to dismiss.

[2]    *See, e.g.*, *Mason v. Am. Tobacco Co.* ("*Mason* slip op."), No. 02-7923, slip op., at 2 (2d Cir. Jan. 16, 2004); *Mason v. Am. Tobacco Co.*, 346 F.3d 36, 42-43 (2d Cir. 2003), *cert. denied*, 541 U.S. 1057 (2004); *Glover v. Philip Morris USA*, 380 F. Supp. 2d 1279, 1290-91 (M.D. Fla. 2005) (*appeal docketed*, No. 05-14219 (11th Cir. Aug. 1, 2005)); *United States v. Philip Morris Inc.* ("*Philip Morris II*"), 156 F. Supp. 2d 1, 7-8 (D.D.C. 2001).

[3]    *See* Centers for Medicare & Medicaid Services, Medicare Enrollment: National Trends 1966-2003, http://www.cms.hhs.gov/MedicareEnrollment/Downloads/HI-SMI.pdf (last visited Jan. 8, 2006).

*against the government, not the Medicare beneficiary* – a "wrong" that arises when the defendant fails to discharge within 120 days an established obligation to reimburse Medicare. *See* 42 U.S.C. § 1395y(b)(3)(A); *see also Glover*, 380 F. Supp. 2d at 1290. Because defendants have never been found liable for the medical costs that United Seniors seeks to recover and have never assumed responsibility for those costs, defendants have committed no wrong against the government. Defendants cannot be liable for double damages for having "failed" to make a payment to Medicare when they have not been held to have such a responsibility in the first place. *See* 42 U.S.C. § 1395y(b)(2)(B)(ii).

United Seniors' complaint also should be dismissed for other reasons. United Seniors has no constitutional or statutory standing to maintain this suit because it has suffered no injury in fact. United Seniors argues that it has standing as an assignee of the government, but cites nothing in the text or legislative history of the statute to support its assertion. Even if United Seniors were an assignee, however, its claims still must be dismissed because the government itself already has sued these defendants under the MSP for these same costs. The government's suit bars any and all of its assignees from asserting these claims.

United Seniors' complaint also should be dismissed because United Seniors is collaterally estopped from relitigating one of the elements of its claim – whether defendants are responsible or required to make payments to Medicare. As a "private attorney general" suing on behalf of the government, United Seniors is in privity with other private attorneys general who have sued these defendants, including the plaintiffs in *Glover v. Philip Morris USA*, No. 3:04-cv-403 (M.D. Fla.). The *Glover* plaintiffs fully litigated this issue and lost. *See Glover*, 380 F. Supp. 2d at 1291. That decision is binding on United Seniors.

## <u>ARGUMENT</u>

I. **THE COMPLAINT SHOULD BE**
**<u>DISMISSED FOR FAILURE TO STATE A CLAIM</u>**

A. **A Private MSP Claim Does Not Arise Unless The Defendant**
**<u>Has Failed To Make A Required Payment To Medicare</u>**

United Seniors' interpretation of the MSP is based on a fundamental misreading of the statute's text and implementing regulations as well as the case law interpreting the MSP. The MSP creates two separate and distinct causes of action against insurers and self-insured entities. The first cause of action, which United Seniors does *not* assert, allows the government to bring a subrogation claim for *single damages* on behalf of a Medicare beneficiary for the reimbursement of health care costs paid by Medicare (the government also can seek to intervene in any suit brought by the Medicare beneficiary herself). *See* 42 U.S.C. § 1395y(b)(2)(B)(iv). With respect to such a claim, the government must prove only that the defendant committed a tort that resulted in health care costs borne by Medicare. *See Zinman v. Shalala*, 67 F.3d 841, 844-45 (9th Cir. 1995) ("[The government's] right of subrogation gives [the government] the right to be put in the legal position of the beneficiary in order to recover from third parties.").

The second cause of action, which United Seniors asserts here, allows the government or a private party to assert a claim for *double damages* against an entity that was required to make a payment to Medicare but failed to do so. *See* 42 U.S.C. § 1395y(b)(3)(A) ("There is established a private cause of action for damages (which shall be in an amount double the amount otherwise provided) in the case of a primary plan which fails to provide for primary payment."). The text of the statute makes it clear that a "primary plan . . . shall reimburse the appropriate Trust Fund for any payment made by the Secretary under this subchapter with respect to an item or service if it is demonstrated that such primary plan has or had a responsibility to make payment with respect to such item or service." 42 U.S.C. § 1395y(b)(2)(B)(ii). A "primary plan's"

responsibility for reimbursing Medicare "may be demonstrated by a judgment, a payment
conditioned upon the recipient's compromise, waiver, or release . . . of payment for items or
services included in a claim against the primary plan or the primary plan's insured, or by other
means." *Id.* To avoid liability for double damages, a primary plan must repay Medicare within
120 days of when it becomes responsible to pay for medical costs. *See* 42 C.F.R. § 411.50(b).[4]

The requirements of the private double damages cause of action are squarely at odds with
United Seniors' argument that a plaintiff may recover double damages merely by proving a tort.
*See* Plaintiff's Mem. of Law in Opposition to Defendants' Motion to Dismiss or Transfer (filed
Dec. 19, 2005) ("Pl.'s Mem.") at 26. As the statute plainly states, it is not the tort that gives rise
to double damages under the MSP – it is the failure to reimburse Medicare within 120 days after
the primary plan is legally required to do so. None of the authorities that United Seniors cites
supports its suggestion that the 120-day payment clock can begin to run before the legal
requirement of payment has been established.

      1.    **MSP Case Law.** United Seniors argues that the "two-lawsuit theory was never
even hinted at" in cases prior to the 2003 Amendments. Pl.'s Mem. at 25. But that is because
the purpose of the 2003 Amendments was to allow the government to recover from entities that
assumed the responsibility for Medicare costs by entering into settlements with Medicare
beneficiaries. *See* Defs.' Mem. at 4-13. Indeed, until recently, no plaintiff had ever brought an
MSP action asserting an unadjudicated tort claim, except against these defendants – and every

---

[4]    As discussed below, *see infra* Section II.B, the 120-day clock starts for a health insurance company when a
Medicare beneficiary incurs a claim because the company has a preexisting agreement – the contract of insurance –
to pay the beneficiary's medical costs. In the tort context, the 120-day clock begins when there is a judgment,
settlement, or similar finding of responsibility for a beneficiary's medical costs. *See id.*

one of those lawsuits was dismissed with prejudice. *See Mason* slip op., at 2; *Mason*, 346 F.3d at 42-43; *Glover*, 380 F. Supp. 2d at 1290-91; *Philip Morris II*, 156 F. Supp. 2d at 7-8.

United Seniors suggests that case law predating the 2003 Amendments undermines the "two lawsuit rule." *See* Pl.'s Mem. at 25-28. The cases that United Seniors cites, however, involve the *subrogation* single-damages claim, not the private cause of action for double damages. *See, e.g.*, *Estate of Foster v. Shalala*, 926 F. Supp. 850, 865 (N.D. Iowa 1996) (holding that Medicare's subrogation rights under the MSP did not reach money paid under a settlement for loss of consortium claims); *Denekas v. Shalala*, 943 F. Supp. 1073, 1080 (S.D. Iowa 1996) (same). In a subrogation action, the government need not prove that the defendant had a preexisting responsibility for Medicare costs because the government is asserting the beneficiary's claim for single damages.

2.    **Medicare's Regulations.**  United Seniors similarly misreads Medicare's regulations. *See* Pl.'s Mem. at 23-25. United Seniors relies on regulations applicable to the government's single-damages subrogation cause of action – not the cause of action (governmental or private) for double damages. United Seniors, for example, cites the proposed regulation Medicare Program, 47 Fed. Reg. 21,103 (May 17, 1982) (codified 42 C.F.R. § 405) (cited at Pl.'s Mem. at 23 & n.120), which provided that, "[i]f the beneficiary [does] not pursue the claim [against its insurer or person responsible for the injury], HCFA [the Health Care Financing Administration] could institute its own action against the insurer or the person responsible for the injury." *Id.* At 21,105. By its plain terms, that regulation addressed the government's subrogation action; it expressly states that "HCFA could require a beneficiary . . . to authorize HCFA to pursue the beneficiary's rights if the beneficiary fails to do so." *Id.* at 21,103. HCFA would only need the beneficiary's "authorization" to pursue a claim if it was one

5

sounding in subrogation; HCFA requires no authorization to pursue an MSP double damages claim. Because the regulations that United Seniors cites apply only to the single-damages cause of action, which does not require proof of the defendant's failure to make a requirement payment to Medicare, they do not support United Seniors' claims.[5]

In fact, the proposed regulation cited by United Seniors, 47 Fed. Reg. 21,103, fully supports defendants' reading of the MSP. It specifically provides that, "[f]or services covered under liability insurance, Medicare would . . . recover *when payment, or a judgment or settlement, was obtained.*" *Id.* at 21,103 (emphasis added). The proposed regulation thus contemplated that a liability insurer need not reimburse Medicare until there is a finding or assumption of liability. *See also id.* at 21,105 ("With respect to liability insurance . . . Medicare would . . . recover when a judgment or settlement is obtained."). If an entity fails to reimburse Medicare after it is found liable or assumes liability, a double damages claim would then arise.

**3.    Other Statutes.**  United Seniors also ignores the basic nature of the MSP statute in asserting that causes of action for malicious prosecution, false claims, and racketeering somehow demonstrate a congressional willingness to permit a private plaintiff to prove an underlying tort claim in an MSP action for double damages. *See* Pl.'s Mem. at 17-18. Unlike the MSP, these other statutes incorporate the underlying tort as part of the relevant statutory offense. For example, the gravamen of the False Claims Act ("FCA") is that the defendant has

---

[5]    The final rule adopted after the proposed regulation 47 Fed. Reg. 21,103 – Medicare Program, 42 C.F.R. § 405, discussed at Pl.'s Mem. at 24 as Medicare Program, 48 Fed. Reg. 14,802, 14,803 (Apr. 5, 1983) – provides that "if a conditional payment is to be made for services for which payment can reasonably be expected under automobile or liability insurance, HCFA may require the beneficiary to assign his or her rights against the individual responsible for the accident or the insurer." In other words, even before Congress added an express subrogation right in 1989, the government realized that its ability to recover from tortfeasors before judgment or settlement was based on subrogation.

committed a fraud against the government and should be held liable. *See* 31 U.S.C. § 1329 (imposing fines and damages for defrauding the government). To prove a FCA claim, the plaintiff must therefore prove the underlying fraud. *See* 31 U.S.C. § 1370(b)(1). By contrast, the thrust of an MSP cause of action is the failure to pay Medicare 120 days *after* the responsibility to do so has been established. Thus, unlike the FCA or RICO, the MSP addresses the collateral consequences of tort liability after it has been established.[6]

### B.    United Seniors Cannot Demonstrate That Defendants Are Required Or Responsible To Make A Payment To Medicare

United Seniors next argues that, even if the thrust of an MSP claim is the failure to satisfy a responsibility to pay Medicare, that responsibility arises automatically with the commission of a tort. *See* Pl.'s Mem. at 16 (arguing that "the rights and liabilities of the parties are fixed at the moment of the accident with respect to a cause of action sounding in tort" (quoting *Smith v. Salish Kootenai College*, 378 F.3d 1048, 1054 (9th Cir. 2004)).[7] This highly metaphysical point is irrelevant and defies the MSP's text, basic canons of construction, and common sense. The text of the MSP makes clear that a private plaintiff seeking double damages must prove that the

---

[6]    A further example of the difference between the MSP and the other statutes that United Seniors cites is the civil RICO provision, which requires the showing of a "pattern of racketeering activity." *Glover*, 380 F. Supp. 2d at 1293 (quoting 18 U.S.C. § 1962(1)). This term is defined by a specific list of crimes "*chargeable* under State law" or "*indictable*" under federal law. *Id.* (quoting and adding emphasis to 18 U.S.C. § 1961 (1)). RICO does not require a prior conviction; rather, the statute provides that the crimes need only be "chargeable" or "indictable" – and therefore may be proven as part of the RICO cause of action. The MSP contains no such language. The RICO statute demonstrates that, when Congress intended to create a cause of action based on unproven violations of state law, Congress knew how to do so. It did not do so here.

[7]    United Seniors cites no authority for the proposition that an alleged tortfeasor's obligation to pay another's medical costs arises upon completion of the tort and prior to entry of judgment, settlement, or some assumption of liability by the tortfeasor. In other contexts, however, the law is clear that the obligation for another's medical costs does not arise until after the tort claim has been resolved. For example, a tortfeasor's claim for contribution from a joint tortfeasor does not accrue "when the tort is committed, but when the underlying claim, a judgment thereon, or a

defendant both had an established responsibility to pay Medicare and failed to make that required payment. *See* Defs.' Mem. at 13-17. It would serve no legitimate remedial or punitive purpose to impose double damages on a defendant for failing to pay medical costs for which defendant has never been held responsible.

United Seniors' arguments to the contrary are all flawed:

### 1.     United Seniors' Grammatical Arguments

The MSP provides that a primary plan is liable for double damages "if it is demonstrated" that the plan "has or had responsibility" to make payment for an item or service and failed to do so. 42 U.S.C. § 1395y(b)(2)(B)(ii). United Seniors asserts two *ipse dixit* arguments based on this statutory language.

*First*, United Seniors asserts that the use of the present subjunctive tense in the phrase "if it is demonstrated" somehow reveals that Congress intended to permit an MSP plaintiff to demonstrate a defendant's responsibility to pay Medicare by proving the underlying tort in the MSP case itself. *See* Pl.'s Mem. at 15. On the contrary, the thing that must be "demonstrated" in an MSP double-damages action is not the underlying tort, but the defendant's pre-existing established responsibility to pay and the failure to discharge that responsibility. Congress properly used the present tense to require the plaintiff to "demonstrate" the failure to satisfy a responsibility to pay Medicare.

*Second*, United Seniors notes that Congress provided that a plaintiff in an MSP suit must prove that the defendant "*has or had* a responsibility" to pay Medicare. *See* Pl.'s Mem. at 15-16 (quoting and adding emphasis to 42 U.S.C. § 1395y(b)(2)(B)(ii)). United Seniors argues that the

---

settlement thereof is paid or discharged." 57 A.L.R.3d 867 § 2; *see, e.g.*, *Greyhound Lines, Inc. v. Cobb County*, 681 F.2d 1327, 1331-32 (11th Cir. 1982).

inclusion of the word "*has*" evinces an intent that the plaintiff may prove the underlying tort for the first time in the MSP proceeding.  But United Seniors ignores the plain usage of this language.  A tortfeasor maintaining a settlement fund for a class of consumers (as in *United States v. Baxter Int'l, Inc.*, 345 F.3d 866 (11th Cir. 2003)) "has" an ongoing responsibility to reimburse Medicare.  A tortfeasor who in the past was found liable for certain medical costs "had" such a responsibility.  Thus, the statute's use of "has" and "had" is necessary to capture the two kinds of responsibility to which the MSP's double-damages action plainly applies.  In no way do the words "has" and "had" suggest that a plaintiff may demonstrate "responsibility" by proving the underlying tort claim for the first time in the MSP proceeding.  As the *Glover* court recognized, "it cannot be 'demonstrated' that an alleged tortfeasor, which has neither been adjudicated as liable nor has agreed to settle a tort claim, 'has' an existing 'responsibility' to reimburse Medicare or 'had' a previous responsibility to do so."  *Glover*, 380 F. Supp. 2d at 1290.[8]

### 2.    <u>United Seniors' Statutory Construction Arguments</u>

United Seniors' effort to inject ambiguity into the statute through its grammatical arguments not only is meritless, but it is also futile, for the amended MSP *directly addresses* how a defendant's responsibility to pay Medicare may be "demonstrated."  *See* Defs.' Mem. at 15-17. Section 1395y(b)(2)(B)(ii) provides that a primary plan's "responsibility" can be "demonstrated

---

[8]    Furthermore, the true meaning of a statutory phrase, where clearly ascertained in the full context of the statute, is more important than "strict and critical adherence to technical grammatical rules."  73 Am. Jur. 2d *Statutes* § 142; *see* 1 U.S.C. § 1 (grammatical rules like "words importing the plural include the singular" do not apply where "the context indicates otherwise").  In other words, "[g]rammatical rules cannot be allowed to defeat the legislative intent, as expressed in the statute construed as a whole and in connection with other acts in pari materia."  82 C.J.S. *Statutes* § 324; *see Flora v. United States*, 362 U.S. 145, 150 (1960) ("This Court naturally does not review congressional enactments as a panel of grammarians.").

by a judgment, a payment conditioned upon the recipient's compromise, waiver, or release . . . or by other means."  United Seniors does not dispute that its battery claims have never been adjudicated or compromised, waived, or released in exchange for a payment from defendants.

United Seniors' case, therefore, hinges entirely on its assertion that the phrase "by other means" allows it to demonstrate a current responsibility to pay by proving the underlying tort claim in the MSP case itself.  *See* Pl.'s Mem. at 19.  This reading of the MSP, however, violates the basic canons of statutory construction *noscitur a sociis* and *ejusdem generis*, which dictate that "where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words."  *Glover*, 380 F. Supp. 2d at 1291 (quoting *Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 384 (2003)); *see also* Defs.' Mem. at 16-17.  Because all of the specific examples listed in the statute indicate a *pre-existing* determination of the primary plan's obligation to make payment, "by other means" must be construed to embrace similar pre-existing determinations.  *Glover*, 380 F. Supp. 2d at 1291.

United Seniors argues that it would be "inappropriate" to apply these basic canons because "the text [of the MSP] is not eccentric."  Pl.'s Mem at 19 (internal quotation marks omitted).  As the *Glover* court correctly recognized, however, the meaning of the phrase "by other means" when read in isolation is far from clear.  *Glover*, 380 F. Supp. 2d at 1291. Accordingly, to determine the phrase's meaning, the *Glover* court appropriately applied the canons of construction to resolve the ambiguity.  The *Glover* court concluded that "[t]he 'by other means' language of § 1395y(b)(2)(B)(ii) does not encompass the unresolved, unestablished tort claim [that United Seniors] rel[ies] upon to demonstrate defendants' [alleged] responsibility to reimburse Medicare."  *Id.*

10

United Seniors' interpretation of the statute also cannot be squared with other well entrenched legal principles. *First*, United Seniors' interpretation would violate the canon that statutory language "must mean *something*" and may not be rendered "meaningless." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 258 n.8 (1993); *Liberty Cablevision of P.R., Inc. v. Caguas*, 417 F.3d 216, 222 n.8 (1st Cir. 2005); Defs.' Mem. at 17-18. United Seniors' reading of the phrase "by *other* means" to mean "by *any* means" would render the MSP's definition of "responsibility" superfluous. If "by other means" can mean "by proving liability in the MSP lawsuit," then no purpose would be served by the text providing that responsibility "may be demonstrated by a judgment" or settlement.

*Second*, United Seniors' theory would work a fundamental change in balance between federal and state courts. *See* Defs.' Mem. at 19-20. Courts have recognized that Congress' power to "legislate in areas traditionally regulated by the States" is "an extraordinary power in a federalist system," and "a power that we must assume Congress does not exercise lightly." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). When regulating sensitive areas affecting the federal-state balance, Congress must make "its intention to do so unmistakably clear in the language of the statute." *Id*. at 460-61 (quotations and citation omitted). This "clear statement doctrine is simply a tool of statutory construction, designed to ensure that federal legislation is not applied in a manner that may alter the delicate balance of federal and state power unless Congress has carefully considered and fully intended such a result." *County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1306 (2d Cir. 1990).

United Seniors asserts that its interpretation would do no more than combine two lawsuits. *See, e.g.*, Pl.'s Mem. at 5 & 14. But that is the problem. Under United Seniors' interpretation of the MSP, anyone (it need not even be the allegedly injured Medicare

11

beneficiary) can bring a state-law tort action on behalf of a Medicare beneficiary in federal court without meeting the requirements for diversity jurisdiction. United Seniors' interpretation would substantially federalize state tort law claims, fundamentally change the boundaries of federal jurisdiction, and impose double damages for the violation of state-law duties when state law would allow only single damages. It would increase costs for virtually every American business, either in the form of payments pursuant to settlements or judgments or higher premiums for liability insurance policies. Nothing in the text or the legislative history of the MSP even hints that Congress intended such a result. *See* Defs.' Mem. at 13-20; *Glover*, 380 F. Supp. 2d at 1297. "Congress' silence in this regard can be likened to the dog that did not bark." *Chisom v. Roemer*, 501 U.S. 380, 396 n.23 (1991)

   *Finally*, United Seniors' construction of the statute would violate the doctrine of constitutional avoidance. If United Seniors' reading of the MSP were correct, the 2003 amendments would have created a new cause of action that would have retroactively doubled defendants' liability for prior conduct in violation of the Due Process and Takings Clauses of the Constitution. *See* Defs.' Mem. at 21-22. United Seniors cites *Brown v. Thompson*, 374 F.3d 253 (4th Cir. 2004), for the proposition that the new amendments merely "clarify" the MSP and therefore their retroactive application raises no constitutional issues. *See* Pl.'s Mem. at 19 n.97. At most, *Brown* means that the 2003 amendments "clarified" that the MSP authorized the recovery of settlement proceeds. *Brown*, which did not involve an unadjudicated tort claim, says nothing at all about the retroactive recovery of double damages based on unadjudicated tort claims. In this case, interpreting the amendments to allow this suit to go forward would radically alter the substantive law and raise serious constitutional questions.

12

C. **Rejecting United Seniors' Claims Would Not
   Render The MSP Enforcement Provisions Superfluous**

United Seniors argues that defendants' interpretation of the MSP would render the private cause of action provision meaningless in that the "only conceivable use of these MSP recovery actions . . . occurs when a defendant refuses to pay a state court judgment, and state judicial process is for some reason unable to enforce its own courts' judgments." *See* Pl.'s Mem. at 21. United Seniors is incorrect.

As an initial matter, except for suits against cigarette manufacturers (brought by the same counsel who brings the claims at bar) and a recently filed claim against Guidant Corporation,[9] *no private plaintiff has ever attempted to assert unadjudicated tort claims under the MSP*. The notion that United Seniors' interpretation of the MSP is essential to the federal government's efforts to recoup Medicare costs is starkly at odds with reality.

In any event, the MSP private cause of action would not be meaningless, but would continue to provide for the recovery of Medicare costs. The MSP would authorize, for example, a private cause of action against a defendant who paid a judgment or settlement to a Medicare beneficiary, but failed to pay Medicare its share. *See* 42 C.F.R. § 411.24(i). Indeed, *Baxter* was such a case and Congress specifically amended the MSP in 2003 to ensure that the government could recover Medicare's share of settlement funds as in *Baxter*. *See* 149 Cong. Rec. S8,499-02, S8,535 (2003).

---

[9] *Ivens v. Guidant Corp.*, No. 05-CJ-01491-DWF-AJB (D. Minn. Filed July 22, 2005). It is unclear whether *Ivens* raises the precise issue at bar here. In *Ivens*, the plaintiff alleges that Guidant has already assumed liability for the medical costs of Medicare beneficiaries by recalling its implantable cardioverter defibrillators and offering to pay for their replacement. *See* First Am. Compl., *Ivens* (filed Aug. 24, 2005) at 20-21, Exhibit A. No such agreement to cover medical costs is alleged here.

The private cause of action would also allow for the recovery of Medicare expenditures in states in which a plaintiff cannot ordinarily recover damages for medical costs paid by a third party. Although United Seniors correctly points out N.Y. C.P.L.R. § 4545(c) exempts Medicare payments, several other states do not allow a plaintiff to recover medical expenses paid by a third party source even if that source was Medicare. *See, e.g.*, Ala. Code § 6-5-20; Colo. Rev. Stat. Ann. § 13-21-111.6; Mo. Ann. Stat. § 490.715. In those states, once a defendant is found responsible for an injury, the MSP private enforcement provision can be used to recover Medicare expenses from a defendant that fails to reimburse Medicare after an adverse judgment.

There simply is no merit to United Seniors' contention that dismissing its claim would mean that the government could never institute cost recovery actions against alleged tortfeasors. *See* Pl.'s Mem. at 21. Medicare *always* can bring an action in subrogation against a tortfeasor, even if an individual beneficiary has elected not to sue. *See* 42 U.S.C. § 1395y(b)(2)(B)(iv). The cause of action for double damages, however, does not arise until the tortfeasor fails to pay Medicare its share of a resulting judgment or settlement or similar imposition or assumption of liability. *See Glover*, 380 F. Supp. 2d at 1290-91. If, as United Seniors contends, the option of pursuing a claim for double damages against unadjudicated tortfeasors were available under the MSP, it would have made no sense for Congress to provide the federal government with a subrogation claim for single damages.

*Finally*, United Seniors is incorrect that its interpretation of the MSP is necessary to enable Medicare to continue to recover payments from health insurance companies. *See* Pl.'s Mem. at 22. Just as a defendant assumes the responsibility for Medicare costs by entering into a tort settlement with Medicare beneficiaries, a health insurance company assumes responsibility for Medicare costs by contracting to pay the medical costs of its insureds. In both the settlement

and health insurance context, an MSP claim would be the proper setting for challenging the

failure to make a required payment to Medicare. Because an alleged tortfeasor does not have a

similar preexisting contractual obligation to pay medical costs, an alleged tortfeasor's

responsibility to pay medical costs cannot arise until there is a finding of liability or settlement.

The *Glover* court made precisely this point. *See Glover*, 380 F. Supp. 2d at 1294.

## II.    <u>UNITED SENIORS LACKS STANDING</u>

United Seniors admits that it has suffered no injury. Pl.'s Mem. at 29. A party without

an injury lacks constitutional standing and its claims must be dismissed. *See Lujan v. Defenders

of Wildlife*, 504 U.S. 555, 560 (1992); Defs.' Mem. at 22-25. The only argument United Seniors

raises to salvage its claim is that the MSP effects a "partial assignment" of the government's

claim and United Seniors thereby has standing as an assignee of the federal government. Pl.'s

Mem. at 29-30. United Seniors cites nothing in MSP's text or legislative history that supports its

assignment theory. It is wholly unsupported and should be rejected.

But even if United Seniors were an assignee, its claims would still have to be dismissed

because the purported assignor, the federal government, has already maintained – and is still

maintaining – its own MSP claim for the same costs at issue here. Although the United States'

claim against these defendants was dismissed, *see Philip Morris II*, 156 F. Supp. 2d 1, the case is

still pending and the United States will eventually have the opportunity to appeal that dismissal.

If United Seniors were an assignee, it would be bound by the principles governing assigned

claims, which would bar this suit. An assignee "stands in the shoes of the assignor [and] . . . is

subject to any defense that would have been good against the assig[nor]." 6 Am. Jur. 2d

*Assignments* § 144; *see City of Hope Nat. Med. Ctr. v. Healthplus, Inc.*, 156 F.3d 223, 228 (1st

Cir. 1998). Here, the government could hardly have initiated this action once its MSP claims

were dismissed with prejudice in *Philip Morris II*. *See Nixon v. Richey*, 513 F.2d 430, 438 n.75

15

(D.C. Cir. 1975); 18A Charles Alan Wright, et al., *Fed. Prac. & Proc. Jurisdiction* § 4433 (2d ed. 2003).  Its assignee can have no greater rights.  *See United States ex rel. S. Prawer & Co. v. Fleet Bank* 24 F.3d 320, 328 (1st Cir. 1994).[10]  United Seniors cannot have it both ways.  If it is not an assignee, United Seniors has no Article III standing.  If it is an assignee, its claims are barred by the fact that its assignor – the federal government – already has asserted these claims.

United Seniors also lacks statutory standing.  *See* Defs.' Mem. at 26-28.  United Seniors does not dispute that prudential standing requirements apply absent a specific statutory statement to the contrary.  *See Munoz-Mendoza v. Pierce*, 711 F.2d 421, 424-25 (1st Cir. 1983).  United Seniors claims that Congress included such a specific statement in the MSP, but the only statement United Seniors points to is the general provision that allows private parties to assert double damages claims.  *See* Pl.'s Mem. at 31-32.  This general provision, however, in no way precludes the application of prudential standing requirements.  Congress often enacts a private attorney general provision, but those provisions do not give every person in the United States the statutory standing to act as a private attorney general.[11]  The MSP does not specify who has the ability to bring a private suit, merely providing that "[t]here is established a private cause of action for damages."  42 U.S.C. § 1395y(b)(3)(A).  Under prudential standing requirements, the statute must be read to create a private cause of action for the Medicare beneficiaries whose medical expenses were covered by Medicare.  It is they who can best litigate such claims and who fall within the "zone of interests" of the MSP.  *See Maroni v. Pemi-baker Reg'l Sch. Dist.*,

---

[10]   Of course, whether or not United Seniors is satisfied with the government's advocacy, *see* Pl.'s Mem. at 31, is beside the point.  Once the government has adjudicated its own claim, both it and its assignees are barred in subsequent proceedings.

346 F.3d 247, 254 (1st Cir. 2003); *Wheeler v. Travelers Ins. Co.*, 22 F.3d 534, 538 (3d Cir.

1994); *Frazer v. CNA Ins. Co.*, 374 F. Supp. 2d 1067, 1077-78 (N.D. Ala. 2005).  United Seniors

lacks standing in this case.

## III.    UNITED SENIORS IS COLLATERALLY ESTOPPED BY *GLOVER*

Although United Seniors contends that it is an "assignee" of the government for purposes

of standing, it argues in the next breath that it is not collaterally estopped by *Glover* because it is

not in privity with the *Glover* plaintiffs.  *See* Pl.'s Mem. at 32-34.  Yet, if United Seniors is an

"assignee" of the government, so too are the *Glover* plaintiffs, and they both are in privity with

one another.  *See*, *e.g.*, *R.I. Hosp. Trust Nat'l Bank v. Ohio Cas. Ins. Co*, 789 F.2d 74, 82 (1st

Cir. 1986).  Indeed, this would be true even if United Seniors were not an assignee of the

government's claim, as two plaintiffs who assert the same government interest in separate

lawsuits are in privity with one another.  *See Schimmels v. Schimmels*, 127 F.3d 875, 884 (9th

Cir. 1997) ("[R]*es judicata* applies to parties and their privies, and as the government has been

conclusively shown to be in privity with the relators, the involuntary dismissal of the relators'

claim has a preclusive effect not only on the relators, but also on the government."); 18A Charles

Alan Wright, et al., *Fed. Prac. & Proc. Jurisdiction* § 4458.1 (2d ed. 2002)  ("Qui tam actions

brought by a private relator . . . often should bind the government. . . .  In the ordinary setting, it

would be inappropriate to allow the United States, if dissatisfied with the final judgment, to

pursue the defendant again on the same claim.").[12]

---

[11]    For example, although the private attorney general provisions of the Sherman Act are "written broadly," the
prudential requirements of "antitrust standing" still apply.  *See RSA Media, Inc. v. AK Media Group, Inc.*, 260 F.3d
10, 13 (1st Cir. 2001).

[12]    *See also Southwest Airlines Co. v. Tex. Int'l Airlines, Inc.*, 546 F.2d 84, 98 (5th Cir. 1977); *United States ex rel.
Yankston Sioux Tribe v. Gambler's Supply, Inc.*, 925 F. Supp. 658, 662 (D. S.D. 1996).

United Seniors suggests that this Court should reject defendants' collateral estoppel argument because the court in *Glover* ruled against defendants on that issue. *See* Pl.'s Mem. at 4. The *Glover* court, however, based its decision on the change in law that occurred after *Philip Morris I*,[13] *Philip Morris II*, and *Mason* were decided. *See Glover*, 380 F. Supp. 2d at 1288. Congress has not changed the MSP since the *Glover* court dismissed the plaintiffs' claims there. Indeed, the *Glover* court addressed and resolved the precise legal issue presented here, directly holding that "plaintiffs . . . cannot 'demonstrate' that these defendants are 'responsible' to pay under the MSP. . . . [The MSP] simply does not support plaintiffs' private cause of action where the underlying tort is unresolved and defendants' responsibility to pay Medicare has not been established by a judgment, settlement, or other means of 'like kind.'" *Id.* at 1294 (quoting *Baxter*, 345 F.3d at 906). Thus, *Glover* should preclude United Seniors from relitigating the issue of whether defendants are responsible or required to make a payment to Medicare. The complaint should be dismissed.[14]

---

[13] *United States v. Philip Morris Inc.* ("*Philip Morris I*"), 116 F. Supp. 2d 131 (D.D.C. 2000).

[14]    Alternatively, this case should be transferred to the United States District Court for the Middle District of Florida. *See* Defs.' Mem. at 31. United Seniors offers no reason why Massachusetts has an interest in its claim, nor has it identified a connection between any of the parties and its claim (despite a challenge by defendants to do so). *See* Pl.'s Mem. at 35. United Seniors' claim of "forum shopping" by defendants rings hollow in light of United Seniors' counsel's efforts to shop their legal theory around to three different federal courts. This case is duplicative of *Glover* and should proceed in that venue. Any other result would encourage plaintiff's counsel to file yet another suit against these same defendants in yet another federal court even if this suit is dismissed.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should dismiss plaintiff's claims or transfer this case

to the United States District Court for the Middle District of Florida.

Respectfully submitted,

**R.J. REYNOLDS TOBACCO COMPANY**       **PHILIP MORRIS USA INC.**


_/s/_Thomas E. Peisch_____       _/s/_Michael K. Murray_____

Thomas E. Peisch  (BBO #393270)              Michael K. Murray (BBO #563804)
CONN KAVANAUGH ROSENTHAL                      GOODWIN PROCTOR
PEISCH & FORD LLP                             Exchange Place
Ten Post Office Square                        53 State Street
Boston, MA 02109                              Boston, MA 02109
(617)482-8200                                 (617)570-1000
                                              (617)523-1231 (fax)

                                              Murray R. Garnick
                                              Robert A. McCarter
                                              ARNOLD & PORTER LLP
                                              555 12th Street NW
                                              Washington, DC 20004
                                              (202)942-5000
                                              (202)942-5999 (fax)

19

**LIGGETT GROUP, INC.**

  /s/ Patricia A Hartnett
Patricia A. Hartnett (BBO #568206)
CORNELL & GOLLUB
75 Federal Street
Boston, Massachusetts  02110
Phone: (617) 482-8100


**BROWN & WILLIAMSON TOBACCO CORP., Individually and as the successor to AMERICAN TOBACCO CO.**

  /s/  Thomas E. Peisch
Thomas E. Peisch  (BBO #393270)
CONN KAVANAUGH ROSENTHAL PEISCH & FORD LLP
Ten Post Office Square
Boston, MA 02109
(617)482-8200


Dated:  January 9, 2006

**LORILLARD TOBACCO COMPANY, INC.**

  /s/  Scott E. Erlich
Scott E. Erlich (BBO #637202)
NUTTER, MCCLENNEN & FISH LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA  02210-2604
(617)439-2965


Gay Tedder
Andrew Carpenter
SHOOK, HARDY & BACON LLP
2555 Grand Boulevard
Kansas City, Missouri  64108-2613
(816) 474-6550


<u>**Certificate of Service**</u>

    I, Michael K. Murray, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on January 9, 2006.

      /s/  Michael K. Murray

LIBA/1665111.1

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

Tamela Ivens,

        Plaintiff,

  v.

Guidant Corporation and
Guidant Sales Corporation,

        Defendants.

**Court File No. 05-cv-01491 JRT FLN**

**PLAINTIFF'S FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, Tamela Ivens, in her representative capacity (hereinafter "Plaintiff"), by her undersigned counsel, brings this action for damages against Defendants, Guidant Corporation and its wholly-owned subsidiary Guidant Sales Corporation (hereinafter collectively "Guidant") as a "private attorney general" pursuant to the private cause of action provisions of the Medicare as Secondary Payer Statute ("MSP"), 42 U.S.C. §1395y(b)(3)(A), to recover damages including double the amount pursuant to the statute, of all Medicare expenditures made on behalf of Medicare beneficiaries in connection with the Recalled Guidant ICDs (as hereinafter defined) that were introduced to the marketplace and ultimately recalled by Guidant.

Plaintiff makes the following allegations based upon her personal knowledge as to her own acts, and upon information and belief, as well as upon her attorneys' investigative efforts, as to Guidant's actions and misconduct as hereinafter alleged.

## PARTIES

1.    Plaintiff, Tamela Ivens, at all times relevant herein, was and always has been a resident of the State of California. On January 14, 2004, Plaintiff was implanted with a Guidant

VITALITY AVT ICD (Model A155), which was developed, tested, marketed, warranted and sold by Defendant Guidant.  On or about August 5, 2005, Plaintiff had her Recalled Guidant ICD surgically replaced with a non-Guidant ICD.  This Guidant ICD is one of the 11 families of ICDs recalled by Guidant (described as VENTAK PRIZM AVT, VITALITY AVT, CONTAK RENEWAL AVT, VENTAK PRIZM 2 DR (Model 1861) manufactured on or before April 16, 2002; CONTAK RENEWAL (Model H135) and CONTAK RENEWAL 2 (Model H155) devices manufactured on or before August 26, 2004; CONTAK RENEWAL 3 AND 4, CONTAK RENEWAL 3 AVT and CONTAK RENEWAL 4 AVT, and CONTAK RENEWAL RF).

2.      Plaintiff is a Medicare beneficiary.  Medicare has paid and is being charged for the medical expenditures resulting from the Recalled Guidant ICDs.

3.      Defendant, Guidant, developed, tested, marketed, warranted, and sold the Recalled Guidant ICDs directly or through wholly owned operating divisions and subsidiaries.  At all times relevant herein, Guidant Corporation was and is a corporation governed under the laws of the State of Indiana.  Defendant Guidant Sales Corporation is a wholly owned subsidiary of Defendant Guidant Corporation.  Although Guidant leases space for its Worldwide Headquarters in Indiana, the primary place of its ICD business is located in Minnesota, where it conducts its Cardiac Rhythm Management (hereinafter "CRM") Operations in an over 1 million square-foot plant at 4100 Hamline Avenue North, City of St. Paul, County of Ramsey, Minnesota.  Guidant's CRM handles all aspects of the operations and development of its ICDs, which accounts for nearly 50% of Guidant's total sales last year.  Therefore, the relevant actions of Guidant took place and emanated from these Minnesota facilities.

## JURISDICTION AND VENUE

4.     This court has jurisdiction over this matter pursuant to 28 U.S.C. §1331, since a federal question arises under 42 U.S.C. § 1395y(b)(3)(A). In addition, diversity of citizenship between Plaintiff and Defendant exists by virtue of the provisions of 28 U.S.C. §1332 (complete diversity of citizenship).  Plaintiff alleges damages well in excess of $75,000.00.

5.     Venue in this jurisdiction is proper under 28 U.S.C. §1391 as:  (i) Guidant maintains offices in Minnesota and its CRM Operations is headquartered in Minnesota; (ii) Guidant sells and markets the Recalled Guidant ICDs within Minnesota and on a national basis; and (iii) Guidant's Cardiac Rhythm Management facilities operate in St. Paul, Minnesota, its principal place of business for manufacturing, research and development, administration, sales and marketing, warehousing, packaging, shipping, and safety reporting on medical devices (including the Recalled Guidant ICDs).  These facilities in St. Paul, Minnesota consist of 1,373,000 square feet, Guidant's largest operations worldwide.

## THE NATURE OF THE CASE

6.     Plaintiff brings this cause of action as a "private attorney general" pursuant to the private cause of action provisions of the Medicare as Secondary Payer Statute [42 U.S.C. § 1395y(b)(3)(A)] ("MSP") to recover "double damages" of all Medicare expenditures resulting from the Recalled Guidant ICDs.

7.     Pursuant to the MSP, Guidant is a "primary payer" directly responsible to Medicare for the reimbursement of health care costs resulting from the Recalled Guidant ICDs.  As alleged herein Guidant has, to date, avoided these reimbursement obligations to the Medicare program.  Moreover, Guidant has effectively caused the Medicare program to pay the costs of

Guidant's obligations as warrantor of the Recalled Guidant ICDs – an excessive burden on the Medicare program in diametric opposition to the MSP statute.

8.       Guidant failed to timely warn doctors and patients of information within Guidant's knowledge and possession that the Recalled Guidant ICDs were defectively designed and manufactured, unreasonably dangerous, unfit for their intended use, and that they posed health risks to the recipients thereof, including in some cases the risks of death or serious injury.  Guidant placed thousands of Medicare beneficiaries unnecessarily at risk, forcing Medicare to assume substantial medical expenses.  Guidant has wrongfully caused and is causing the overburdened Medicare system to absorb the substantial health care expenses associated with its Recalled Guidant ICDs.

9.       On June 17, 2005 Guidant initiated a worldwide notification regarding the Recalled Guidant ICDs, more than 80,000 of which have been implanted in patients.  Approximately 46,000 of the CONTAK RENEWAL 3 and 4, RENEWAL 3 AND 4 AVT and RENEWAL RF devices are affected by the recall.  Approximately 42,000 of the PRIZM 2 DR, CONTAK RENEWAL, and CONTAK RENEWAL 2 devices are affected by the recall (approximately 20,000 of which are still implanted).  Approximately 18,000 of the VENTAK PRIZM AVT, VITALITY AVT, and RENEWAL AVT devices were implanted in the United States.  In this notification Guidant states that: "Guidant has apprised FDA of these actions, and FDA has indicated that it will classify them as recalls."

10.       Guidant's belated disclosures and warnings to physicians and patients regarding the Recalled Guidant ICDs were only made as a result of, and subsequent to, public scrutiny from the press prompting FDA investigation.

11.     The FDA regards a "recall", i.e., the actions taken by Guidant in recalling the Recalled Guidant ICDs, as a method of removing or correcting products that are in violation of laws administered by the FDA.  21 CFR 7.

12.     On July 1, 2005, the FDA classified as Class I recalls the recalls of (i) VENTAK PRIZM 2 DR, Model 1861, manufactured on or before April 16, 2002, (ii) CONTAK RENEWAL, Model H135, manufactured on or before August 26, 2004, and (iii) CONTAK RENEWAL 2, Model H155, Manufactured on or before August 26, 2004.  Devices included in the Class I recall possess a reasonable probability that if a particular device malfunctions it will cause serious health consequences or death.  The FDA classified as Class II recalls the recalls of (i) VENTAK PRIZM AVT, (ii) VITALITY AVT, (iii) CONTAK RENEWAL AVT, (iv) CONTAK RENEWAL 3 and 4 AVT, (v) CONTAK RENEWAL 3 and 4 AVT and (vi) CONTAK RENEWAL RF.  A Class II recall is distinguished by the fact that a malfunctioning device may cause temporary or medically reversible adverse health consequences.

13.     Congress has expressly authorized private parties, like the Plaintiff, to bring a suit for damages against an entity, like Guidant, and requires payment of all the health care costs incurred by Medicare on behalf of its beneficiaries in connection with the Recalled Guidant ICDs.

14.     The MSP expressly authorizes a private action for the recovery of damages in an amount twice that of the health care costs paid by Medicare, which should have been paid by Guidant.  Plaintiff seeks the recovery of such damages in this action.

## GENERAL ALLEGATIONS

### A.  THE MEDICARE AS SECONDARY PAYER STATUTE

15.     Medicare is a health insurance program for the elderly and disabled, and is funded by the workers of America via contributions through payroll deductions.  Under the Medicare

program, the federal government pays for certain health care expenses of the aged (persons who are 65 years of age and older), the disabled, and persons suffering from the end stage renal disease. The Medicare program is the second-largest social insurance program in the United States, with 41 million beneficiaries and total expenditures of $280.8 billion in 2003.[1] The Trustees of Medicare have reported that "the projected financial status of Medicare has taken a major turn for the worse."[2] It is estimated that by year 2019, the Medicare Hospital Insurance Trust Fund will likely be bankrupt.[3]

16.     According to governmental studies, the majority of ICD recipients are 65 years of age or older and are thus eligible for coverage under the Medicare program. As an example, in the State of Connecticut for fiscal year 2004, Medicare paid for nearly 65% of all ICD therapy. In 2002 total Medicare reimbursements for ICD procedures were approximately $1.2 billion. As reported in the July 21, 2005, New England Journal of Medicine in an article entitled "The Controversy over Guidant's Implantable Defibrillators," "The matter is particularly urgent because the number of people with ICDs is increasing rapidly. In 2003, the Center for Medicare and Medicaid Services paid for 52,500 ICD implantations; in 2004, it paid for 65,000. Hauser has estimated that worldwide more than 200,000 ICDs will be implanted or replaced this year. With expanded coverage, more than 500,000 Medicare beneficiaries may become eligible for an ICD." As recently reported by Sanford C. Bernstein & Company investment firm, the costs to Medicare and private insurers for defibrillators is expected to reach $10 billion, with Medicare covering about half that expense.

---

[1] See 2004 Annual Report of the Board of Trustees of the Federal Hospital Insurance and Federal Supplementary Medical Insurance Trust Funds.

[2] See Department of Justice Press Release No. 613 dated November 10, 2003.

[3] Social Security and Medicare Boards of Trustees, Status of the Social Security and Medicare Programs: A Summary of the 2004 Annual Reports, A Message from the Public Trustees. See also id., A message to the Public ("The financial outlook for the Medicare Hospital Insurance (HI) Trust Fund that pays hospital benefits has deteriorated significantly from last year.")

17.     Medicare originated as a series of amendments to the Social Security Act.  The MSP statute is found at section 1862 of the Social Security Act, and is codified as 42 U.S.C. §1395y. The MSP, in its present form, originated with the enactment of the Omnibus Budget Reconciliation Act ("OBRA") of 1980, Pub. L. No. 96-499, section 953, 94 Stat. 2599 (1980).  The MSP was enacted in 1980 to reduce the Medicare program's rising costs.  H.R. Rep. No. 1167, 96th Cong., 2d Sess. 352 (1980).  The MSP statute functioned to reduce Medicare spending, as well as to insure the financial integrity of the Medicare program.

18.     Since enacting the MSP statute, Congress has expanded its reach several times, making Medicare secondary to a great array of primary coverage sources.  Congress has repeatedly clarified and augmented the Government's powers to recoup conditional Medicare payments from primary sources.

19.     The Deficit Reduction Act ("DERFA") of 1984 conferred on the Government a direct right of action to recover its payments from any entity "which would be responsible for payment," under a, "law, policy, plan or insurance."

20.     In OBRA 1986, Congress added the private right of action for double damages codified at 42 U.S.C. § 1395y(b)(3)(A).[4]  It also cross-referenced to § 1395(b)(2)(B)(ii), which enables the Government to collect double damages "in accordance with" the new private right of action.  H. Res. 5300, 99th Cong., Sess., 100 Stat. (1986) at § 9319.

---

[4] The following excerpt from the Congressional Record exemplifies congressional sentiment as to whether Medicare was recouping as much from primary payers as it should: "Unfortunately, performance under the MSP program has not measured up.  Failure to follow the MSP law is costing the taxpayers billions of dollars. …Studies by the General Accounting Office and the inspector general of the Department of Health and Human Services have repeatedly identified the MSP program as gushing with leaks of Federal tax dollars."  135 Cong. Rec. S11848-01 (daily ed. Sept. 26, 1989) (statement of Sen. Durenberger) (discussing, in context of FY 1990 appropriations bill for health agencies, inadequacy of expenditures by Medicare intermediaries on MSP recoupment activity).  See also GAO report on federal debt collection efforts (including lack of progress made in collecting MSP debts), Debt Collection Improvement Act of 1996: HHS's Centers For Medicare & Medicaid Services Faces Challenges To Fully Implement Certain Key Provisions, 2 (Feb. 2002) (referring to "Medicare Secondary Payer (MSP) debt, for which insurance or other entities are primarily financially responsible." (emphasis added)

21.    The MSP was again amended in 2003. On December 8, 2003, the President signed into law the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("Modernization Act") [Pub.L. No. 108-173, § 301, 117 Stat. 2221].   Section 301 of the Modernization Act amends the MSP provisions, codified at 42 U.S.C. § 1395y (Supp. 2004).  The title of Section 301(b) indicates that Congress regarded these amendments as "[c]larifying" the MSP statute.  Section 301(d) further provides that the amendments therein are effective as if included in the MSP statute as originally enacted in 1980. In addition, both the Joint Conference Committee Report and the House Report clearly express Congress's intention that the Modernization Act clarify, rather than substantively change, the MSP statutes.  *See* H.R. Conf. Rep. No. 108-391, at 571 (2003) (stating that the bill "*clarifies* that the Secretary may make a *conditional* Medicare payment if a…liability insurance policy or plan (including a self-insured plan)…cannot reasonably be expected to make prompt payment) (emphases added): H.R. Rep. No. 108-178(II), at 189 (2003) (explaining that the "Secretary's authority to recover payment from any and all responsible entities" under MSP "would be *clarified*") (emphasis added).

22.    United States Senator Charles E. Grassley, senior Senator from Iowa, Chairman of the Senate Finance Committee (which has exclusive jurisdiction over Medicare in the Senate) and author and sponsor of Section 301 of the Modernization Act clearly expresses the intent of Congress to apply the MSP to tortfeasors. To that end, Senator Grassley made the following statement in the Congressional Record:

> While the False Claims Act is one of our best weapons in the war on fraud and abuse, our policies in this new language of title III conference agreement adds more weapons to our arsenal.  First, we make important technical clarifications to existing law that strengthen and improve what is known as the secondary payer statute…In addition*, when a Medicare beneficiary is injured by wrongful conduct of another entity, that entity's liability insurance or the entity itself, if it has no insurance, or it might be self-insured, is always required to pay first instead of having the taxpayers pay*.  The

8

provisions in title III do not change existing law in this area but, in fact, clarify the intent of Congress in protecting Medicare's resources.

(emphasis added) 149 Cong. Rec. S15574, S15584-S15585 (daily ed. Nov 22, 2003) (statement of

Senator Grassley).

23.     Section 301(b)(1) of the Modernization Act provides that "[a]n entity that

engages in a business, trade, or profession shall be deemed to have a self-insured plan if it carries its

own risk (whether by failure to obtain insurance, or otherwise) in whole or in part."

24.      With this language – stating that a business can create a self-insured plan

through its failure to obtain liability insurance – Congress has plainly indicated that the term "self-

insured plan" should be broadly interpreted, unrestricted by formalistic requirements.  *See also* H.R.

Rep. No. 108-178(II), at 189-90 (stating that the reason for adding the definitional sentence was to

remedy the effects of "[r]ecent court decisions" that would allow "firms that self-insure for product

liability" to be "able to avoid paying Medicare for past medical payments related to the claim").[5]

25.     Section 301(b)(2) of the Modernization Act provides that a primary plan shall

reimburse Medicare for any payments Medicare has made if it is demonstrated that such primary plan

has or had a responsibility to make such payments.

---

[5] *See also* Statement dated July 17, 2003 of William H. Jordan, Senior Counsel to the Assistant Attorney General, Civil Division, before House Committee on Ways and Means addressing section 301 of the MSP statute; "Finally, I would like to restate the Department's support for Section 301 of H.R. 1, the 'Medicare Prescription Drug and Modernization Act of 2003,' which would protect the integrity of the Medicare Trust Fund by clarifying that Medicare must be reimbursed whenever another insurer's responsibility to pay has been established.  This section is consistent with the litigation positions taken by this Department of Health and Human Services in numerous court cases.  Congress enacted the Medicare Secondary Payer ("MSP") statute in 1980 to protect the fiscal integrity of the Medicare program by making Medicare a secondary, rather than a primary payer of health benefits…The Medicare Trust Fund must be reimbursed, however once the primary insurer's obligation to pay is demonstrated… *the section makes clear that the Medicare program may seek reimbursement from a primary plan, from any or all of the entities responsible for or required to make payment under a primary plan*, and additionally from any entity that has received payment from the proceeds of a primary plan's payment. These provisions of section 301 will resolve contentious litigation and are designed to protect the fiscal integrity of the Medicare program."  *Waste, Fraud, and Abuse: Hearing Before the House Comm. On Ways and Means,* 108th Cong. 88 (2003) (Statement of William H. Jordan, Senior Counsel to the Asst. Atty. Gen.) Available at 2003 WL 21667339 (emphasis added).

26.     Section 301(b)(3) of the Modernization Act also provides that: "In order to recover payments made under this title for an item or service, the United States may bring an action against *any or all entities that are or were required or responsible* (directly, as an insurer or self-insurer, as a third-party administrator, as an employer that sponsors or contributes to a group health plan, as a large group health plan, or otherwise) to make payment with respect to the same item or service (or any portion thereof) under a primary plan. (emphasis added).

27.     Moreover, section 301(b)(3) of the Modernization Act deleted the parenthetical phrase "including any physician or provider," thus further clarifying that there is no basis for narrowly interpreting the category of entities liable to reimburse Medicare.

28.     The Modernization Act left intact and thus preserved the "private cause of action" for damages in accordance with the MSP statute.  Though the United States may join or intervene in a lawsuit brought pursuant to this private right of action, whose assistance in protecting the integrity of the Medicare system is encouraged and would be welcomed, the United States has no authority to intervene to the exclusion of the Plaintiff in this private right of action.

29.     As currently codified, 42 U.S.C. §1395y(b)(2),  the MSP provides, in relevant part, as follows:

(2) **Medicare secondary payer**.

(A) In general.  Payment…may not be made, except as provided in subparagraph (B), with respect to any item or service to the extent that…payment has been made or can reasonably be expected to be made under a…**liability insurance policy or plan (including a self-insured plan)…. [T]he term "primary plan" means a…liability insurance policy or plan (including a self-insured plan)….  An entity that engages in a business, trade, or profession shall be deemed to have a self-insured plan if it carries its own risk (whether by a failure to obtain insurance, or otherwise)** in whole or in part.

(B) **Conditional payment**.

(i) **Authority to make conditional payment**. The Secretary may make payment under this title with respect to an item or service **if a primary plan** described in subparagraph (A)(ii) **has not made or cannot reasonably be expected to make a payment** with respect to such item or service promptly….

(ii) **Repayment required. A primary plan**, and an entity that receives payment from a primary plan, **shall reimburse…with respect to an item or service if it is demonstrated that such primary plan** has **or had a responsibility to make payment** with respect to such item or service. A primary plan's responsibility for such payment may be demonstrated by a judgment, a payment conditioned upon the recipient's compromise, waiver, or release (whether or not there is a determination or admission of liability) of payment for items or services included in a claim against the primary plan or the primary plan's insured, or by other means.

(iii) Action by United States. In order to recover payment made under this title…for an item or service, the United States **may bring an action against any or all entities that are or were required or responsible (directly, as an insurer or self-insurer…) to make payment with respect to the same item or service (or any portion thereof) under a primary plan. The United States may, in accordance with paragraph (3)(A) collect double damages against any such entity**. In addition, the United States may recover under this clause from any entity that has received payment from a primary plan or from the proceeds of a primary plan's payment to any entity.

(3) **Enforcement**.

(A) **Private cause of action.** There **is established a private cause of action for damages (which shall be in an amount double the amount otherwise provided) in the case of a primary plan which fails to provide for primary payment (or appropriate reimbursement)** in accordance with paragraphs (1) and (2)(A).

42 U.S.C. § 1395 et seq. (emphasis added).

30.      Some case law calls into question whether a claim is proper under MSP brought against tortfeasors as primary payers. The statute provides that liability insurance is included as a source of payment from a primary payer. The regulations adopted pursuant to MSP declare:

Liability insurance means insurance (including a self-insured plan) that provides payment based on legal liability for injury or illness or damage to property. It includes, but is not limited to, automobile liability insurance, uninsured motorist insurance, underinsured motorist insurance, homeowners' liability insurance, malpractice insurance, product liability insurance, and general casualty insurance.

42 CFR Part 411.50.

31.     For purposes of Medicare's right to recovery, the MSP does not distinguish between, but rather encompasses, both first party insurance coverage and third party (tortfeasor) insurance coverage. First party insurance coverages referenced in the statute include group health plans, large group health plans, workmen's compensation plans and no-fault insurance. Third party insurance coverages referenced in the statute include automobile insurance and liability insurance. 42 U.S.C. §1395y(b)(2)(A).

32.     For purposes of Medicare's right to recovery, the MSP does not distinguish between, but encompasses, both ongoing litigation against primary plans and settled claims paid by primary plans. 42 U.S.C. §1395y(b)(2)(B)(ii).

33.     When Congress passed the Modernization Act, it amended 42 U.S.C. §1395y(b)(2)(B)(iii) to permit actions against "any or all entities" that are or were required or responsible…to make payment…under a primary plan." This language is broader than the prior statute which permitted such actions against "any entity." Congress intended by the broader scope of this language to permit a broader scope of actions for recovery under the MSP.

### B. GUIDANT IS A PRIMARY PLAN UNDER THE MSP AND IS RESPONSIBLE TO FULLY REIMBURSE MEDICARE FOR THE RECALLED GUIDANT ICDs

34.     Guidant conducts its business pursuant to plans under which it has both obtained product liability insurance and elected to increase substantially the degree to which it self-insures for product liability exposures. In fact, Guidant advised the Securities and Exchange Commission at page 9 of its Form 10-K filing on February 15, 2005 as follows:

> Product Liability and Insurance: The design, manufacture and marketing of medical devices of the types the Company produces entail an inherent risk of product liability claims…*A problem with a product can result in product liability claims **or a recall of**, or safety alert or advisory notice relating to, the product*. Product liability insurance remains available to the Company on terms consistent with those available in prior periods. *However, like many of its industry peers, the Company has elected*

*to increase substantially the degree to which it self-insures for product liability
exposures.*

(emphasis added).

35.     As referenced herein above, Guidant, in its Form 10-K filing on February 15,
2005, represented that "*Product liability insurance remains available to the Company on terms
consistent with those available in prior periods.*" (emphasis added).

36.     In June 2003, Guidant's then wholly owned subsidiary Endovascular
Technologies, Inc. (hereinafter "Guidant's EVT Division") agreed to plead guilty to a Criminal
Information, charging it with nine felony counts of introducing misbranded medical devices into
interstate commerce, in violation of 21 U.S.C. §§ 331(a) and 333(a)(2).  In addition to the nine
misbranding counts, Guidant's EVT Division also pled guilty to one felony count of making false
statements to the Food and Drug Administration.

37.     The criminal plea agreement related to a medical device known as the Ancure
Endograft System, released in September 1999 and withdrawn from the marketplace in March 2001,
and used to treat abdominal aortic aneurysms, a potentially life threatening condition commonly
associated with people with heart disease.  Guidant's EVT Division became aware of reports of
malfunctions involving the delivery system of the device (including reports involving serious injury or
death), but such reports were concealed from patients, physicians, and the public. Among the
unreported incidents were 12 deaths and dozens of invasive surgeries.

38.     As a result of the plea agreement, Guidant's EVT Division agreed to pay the
federal government $92.4 million, which included a forfeiture of $10.9 million, a criminal fine of
$32.5 million, and a civil settlement of $49 million to settle claims that the company's actions caused
Medicare, Medicaid and the Veterans Affairs Program to pay millions of dollars for the adulterated
and misbranded devices.

13

39.     Following the plea agreement, Guidant and its product liability insurers became involved in coverage litigation relative to the Ancure Endograft System, which litigation identified the "first-layer" carrier and the six additional insurers, providing Guidant with excess product liability coverage during the same periods.[6]

40.     Guidant's liability insurance policies or plans, including its self-insured plans, are "primary plans" under the MSP statute, making Guidant obligated to provide primary payment for the health care expenditures resulting from the implant of the Guidant Recalled ICDs.

41.     The damages to Medicare hereunder are ascertainable.  Such damages are twice the amount of Medicare's actual health care expenditures resulting from the Recalled Guidant ICD implanted in Medicare beneficiaries.  The amount of damages is ascertainable from various sources including information set forth in the computerized public use data files maintained by The Center for Medicare and Medicaid Services ("CMS").  These data files contain Medicare reimbursement amounts that are matched with the universally recognized system of procedure codes.

42.     Guidant provides both express and implied warranties relating to the Recalled Guidant ICDs.  In fact as alleged hereinafter, Guidant has extended its warranties for these recalled devices and maintains a list of the patients (as well as their physician) who were implanted with the Recalled Guidant ICDs.

43.     Further, Guidant maintains a database of recipients implanted with the Recalled Guidant ICDs who may require replacements.  Guidant maintains and utilizes implant data forms that it calls "Guidant ICD Warranty Validation and Lead Registration" and is completed at the time of

---

[6] *See* Allianz Insurance Company, Plaintiff-Appellee v. Guidant Corporation, Defendant-Appellant (Zurich Specialties London Ltd., Gerling Kozern Allgemeine Versicherungs-AG, Liberty International Insurance Company, Intervenors and Third-Party Plaintiffs-Appellees; American International Specialty Lines Insurance Company, Westchester Fire Insurance Company, Lumbermens Mutual Casualty Company, Third-Party Defendants-Appellees).  Filed in the Appellate Court of Illinois, Second District; Case No. 03--L--1178 (January 28, 2005).

14

implantation/replacement of a Recalled Guidant ICDs.  These forms identify: (i) the particular model type of ICD implanted/replaced; (ii) the name, address and phone number of the implanting physician; (iii) the following physician; (iv) the referring physician; (v) health care facility; (vi) medical record number; and (vii) the ICD recipient's personal information (i.e., name, address, phone number, social security number etc.).  Accordingly, Guidant has knowledge and possession of this and other information relevant to the ascertainment of Medicare's health care expenditures resulting from the Recalled Guidant ICDs.

44.      Furthermore, with recognition that Medicare reimbursements account for a substantial portion of Guidant's revenues from ICD sales, Guidant works directly with CMS in order to promote and secure reimbursements for its products from Medicare.  In this regard Guidant's website represents under the prominent heading "Reimbursement" that, "…[Guidant] work[s] directly with the Centers for Medicare and Medicaid Services (CMS), public and private health insurers, and industry stakeholders to ensure appropriate reimbursements for services involving our products."

45.      Further, Guidant provides detailed instructions to medical providers interpreting Medicare reimbursement guidelines and recommending how to bill Medicare for costs resulting from the Recalled Guidant ICDs, which costs are in fact Guidant's primary responsibility under the MSP.

46.      Following the June 17, 2005 recall of the Recalled Guidant ICDs, members of Guidant's board of outside medical advisers urged Guidant to cover the "full costs" of replacement of the Recalled Guidant ICDs.  Moreover Eric Prystowsky, MD, a member of Guidant's advisory board, Director of the Clinical Electrophysiology Laboratory at St. Vincent Hospital and Editor-in-Chief of Medscape, was quoted in the May 27, 2005 edition of Medscape (in an article entitled "Shorting Problem with Guidant ICD Device Causes Stir in EP Community") as follows:

> …Prystowsky does not agree with Guidant's recommendations not to replace any of the affected units… "The issue now is ethical on our side.  We need to get the word

15

out as soon as we can to all of our [affected] patients, let them know the issue, try to advise them yes or no for replacement, and have the full discussion."

47.     The Multicenter Automatic Defibrillator Implantation Trial II, a scientific study of ICD therapy sponsored by Guidant, ("MADIT-II"), addressed in part the costs of explantation and replacement of an ICD.  MADIT-II reported in April 2004 that the "[c]ost of initial hospitalization for implantation ($23,000) plus device [ICD] ($25,000) was estimated at $48,000."  MADIT-II conservatively assumed that ICD generator replacement would occur every 7 years (notwithstanding the manufacturers' claim that the ICD generators are replaced every 11 years) and that the average cost of ICD generator replacement is $21,742.  MADIT-II also noted additional costs relative to monitoring and follow up after implantation of an ICD.[7]

48.     Contrary to the recommendations of Guidant's board of outside medical advisers, Guidant pursued a means of wrongfully passing on to Medicare costs resulting from the Recalled Guidant ICDs.   On June 27, 2005, Guidant posted on its website a notice entitled "Reimbursement Guidelines For Device Replacements Due to a Recall."  These guidelines instructed medical providers on how to bill Medicare for device replacements due to a recall (as well as hospital, physician and other related medical costs).   Guidant's reimbursement guidelines advised and recommended as follows: "According to Medicare policy, device *replacements may be reimbursed by either the liable party or Medicare*.  However, note that Medicare specifically states "*When defective equipment or a defective medical device is replaced under a warranty, hospital or other provider services rendered by parties other than the warrantor are covered despite the warrantor's liability*." (emphasis added).

---

[7] These amounts are also exclusive of the medical costs resulting from complications (including the recognized risks of infection) and the costs of related component parts such as leads, etc. referenced in MADIT-II.

49.     Guidant's website further recommends and instructs providers how to obtain from Medicare the additional medical costs associated with monitoring the Recalled Guidant ICDs. The Guidant website instructs as follows:

> Device Follow-Ups for Recalled Devices. *Currently, CMS has no national guidelines regarding the number of times a patient can have an ICD or CRT-D device checked within a calendar year.* Guidant recommends device check-ups at least four times per year, but physicians establish device follow-up schedules based on each patient's needs. *In our experience, most payers, including CMS, have reimbursed providers for additional follow-ups based on medical necessity if medically necessary and indicated.*

(emphasis added).

50.     Guidant's June 17, 2005 letter to physicians entitled "Urgent Medical Device Safety Information & Corrective Action, Subject: VENTAK PRIZM 2 DR Model 1861" acknowledges its responsibility while attempting to shift the costs resulting from replacement of this device to Medicare as well as other insurers as follows: "However, if you decide to explant a device, Guidant will provide a replacement device at no charge, pursuant to Guidant's supplemental replacement policy, and provide unreimbursed medical expenses to patients for documented out-of-pocket expenses up to $2500, provided the device being explanted was manufactured prior to November 13, 2002 and has not reached its ERI."

51.     Similarly, Guidant's June 17, 2005 letter to physicians entitled "Urgent Medical Device Safety Information & Corrective Action, Subject: CONTAK RENEWAL (Model H135) and CONTAK RENEWAL 2 (Model H155) devices manufactured on or before August 26, 2004" acknowledges its responsibility, while attempting to shift the costs resulting from replacement of this device to Medicare as well as other insurers as follows: "Guidant will provide a replacement device at no charge, and provide unreimbursed medical expenses to patients for documented out-of-pocket

expenses up to $2500, provided the device being explanted was manufactured on or before August 26, 2004 and has not reached its normal elective replacement indicator."

52.     Consistent with and as further evidence of Guidant's wrongful plan to pass on to Medicare the full costs of replacement for its defective devices, Guidant recently published on its website a notice relating to the Class I recall of its pacemakers and Guidant's "supplemental warranty program" which reads in pertinent part as follows: "Guidant will provide a replacement device at no charge for pacemaker dependent patients and other patients determined by their physicians to be best served by replacement…Additionally, *Guidant will reimburse patients up to $2,500 for medical expenses remaining after Medicare* and/or health insurance coverage, including device replacement or additional follow-up procedures"  (emphasis added).

53.     Guidant's offer to replace certain models of the Recalled Guidant ICDs (under limited conditions) from its inventory over other Guidant ICDs is unsatisfactory to Plaintiff and most patients implanted with a Recalled Guidant ICD given the expected loss of confidence in Guidant.  As reported in the June 8, 2005 article entitled "Guidant Recalls Heart Aids" published in the St. Paul Pioneer Press, Dr. Robert Hauser, a cardiologist at Minneapolis Heart Foundation, with regard to replacement of patients' recalled ICDs, "Most choose to go with a [non-Guidant] device."

54.     Further, Guidant's offer to reimburse some Recalled Guidant ICD patients up to $2500, for a limited period of time, for medical expenses remaining after Medicare, health insurance coverage, or both, constitutes an implicit admission that there are substantial other costs to be borne by Medicare (e.g., surgery and other medical service fees and costs resulting from replacement of the Recalled Guidant ICDs including subsequent monitoring and possible complications from surgery). In essence, Guidant transferred responsibility for its defective devices, forcing Medicare to assume the primary payer's burden of replacement.

55. The MSP statute provides that a private cause of action may be brought against any entity, such as Guidant, that wrongfully shifts the burden of medical costs to Medicare. Guidant cannot be permitted to "pass the buck" to Medicare in its responsibility for the full payment of the health care expenditures related to its defective devices.

56. Moreover Medicare should not be forced to pay Guidant's manufacturer liabilities or warrantor costs of its Recalled Guidant ICDs.

57. In January 2005, CMS expanded Medicare's coverage for ICDs. Guidant aggressively lobbied for this increase of Medicare coverage while simultaneously concealing information regarding device malfunctions and mechanical defects from physicians, patients and the public regarding the Recalled Guidant ICDs as alleged herein.

58. According to Guidant's Form 10-K filing with the Securities and Exchange Commission for its fiscal year ending December 31, 2003: "In 2003, the Company's total sales grew 17% to $3.7 billion. This growth was driven, in substantial part, by 48% growth to $1.5 billion in sales of implantable defibrillator systems." On July 21, 2005, Guidant reported that its ICD sales in the second quarter of 2004 were $348 million.

59. Guidant is a primary payer under MSP's first party insurer provisions. Guidant has agreed to make payment of out of pocket expenses as part of its extended warranty programs. Guidant has an extensive website which provides detailed instructions on how to make claims to Medicare for reimbursement of medical expenses related to its ICD devices. Guidant recognizes on its website that medical costs incurred in connection with review, repair and replacement of the recalled devices will be borne by Medicare. Guidant has either knowledge or constructive knowledge that some of the recipients of the funds they are paying out had received ICD-related medical treatment for

which Medicare already paid. As a result, Guidant is liable to reimburse the government pursuant to MSP.

60.     Guidant is a primary payer under MSP's third party tortfeasor insurer provisions. Guidant carries liability insurance from which a payment can reasonably be expected to be made.

61.     Under the provisions of the MSP (as amended by the Modernization Act) Guidant: (i) is a primary plan, (ii) that is responsible to pay for an item or service, and (iii) that has failed and/or refused to make appropriate payment to Medicare for the item or device.

62.     Section 1395y(b)(2)(B)(ii) of the MSP, requires a primary plan to reimburse Medicare "if it is demonstrated" that the primary plan "has or had a responsibility" to make payment for an item or service.  Applying this plain language, it is clear that Guidant has or had such a responsibility and that it is improperly passing on this burden to the Medicare.

63.     Guidant is obligated to pay for the Recalled Guidant ICDs has, in fact, already been established. The FDA has recalled the Recalled Guidant ICDs and classified the recalls as Class I and Class II indicating the seriousness of the matter as affecting the health and safety of device recipients. Guidant has admitted the defects inherent in the Recalled Guidant ICDs. Guidant has established a program and/or agreement as part of its "supplemental replacement policy" to pay (under limited and specified conditions) for certain costs associated with the replacement of the Recalled Guidant ICDs.  Guidant has expressly agreed to provide a replacement device for certain of the Recalled Guidant ICDs (from its inventory of ICDs) and to provide un-reimbursed medical expenses (after Medicare payments) to patients for out-of-pocket expenses up to $2500.

64.     Moreover, Guidant's responsibility to make payment has been further demonstrated as there is an existing contractual relationship between Guidant (as the primary payer) and the Medicare beneficiaries. In addition to, and without limiting the other express and implied

20

warranties provided by Guidant related to the Recalled Guidant ICDs, Guidant (i) expressly warranted the Recalled Guidant ICDs for 5-7 years upon sale and (ii) via its extended warranty program following the recall has established a supplemental replacement policy for the Recalled Guidant ICDs. As evidenced by various news accounts and The New England Journal of Medicine, a large percentage of patients have already determined to have the Recalled Guidant ICDs surgically replaced following news of the recall.

65.     As distinguished from certain prior court decisions construing the application of the MSP to the facts of those cases, Guidant's obligation to make payment for the replacement of the Recalled Guidant ICDs herein has already been established by the actions of Guidant itself which has assumed responsibility for certain costs , however via concerted actions has improperly shifted the full costs to Medicare as primary payer in contravention of the MSP.

66.     Guidant, which is reported to be merging with Johnson & Johnson for $25 billion, should not be permitted to make Medicare the ultimate insurer and/or warrantor for the costs stemming from its defective products. Guidant's wrongful conduct directly affects the fiscal integrity of the overburdened Medicare program which the MSP was designed to protect.

### C.  GUIDANT'S DEVICE AND ITS INTENDED FUNCTIONS

67.     Cardiovascular disease is the leading cause of death in both women and men in America, claiming more lives every year than the five leading causes of death combined.  Implanted defibrillators have been one of the most popular and fastest growing types of medical devices.  In 2005 alone, over 200,000 patients are expected to receive such defibrillators.

68.     A person with cardiovascular disease requires an ICD as a monitor and response mechanism when a person's heart develops chaotic and irregular rhythm.  Similar to a pacemaker, the device monitors, regulates, and stabilizes in the event of either an increase or decrease in heart

rhythm.  In the event of cardiac arrest, an ICD will deliver an electric shock to the heart to restore the heart to sinus rhythm.  An ICDs power source comes from a battery sealed within the device.  Electric currents are sent from the ICD through insulated leads to the heart, which is shocked back into a steady rhythm.

69.     Patients requiring the device may also suffer from tachycardia that can evolve from ventricular fibrillation (rapid, irregular heartbeat) to ventricular tachycardia (severe heartbeat rate), leading to cardiac arrest or sudden death.

70.     During a heart failure episode, a patient's survival depends upon the success of the device detecting the problem and shocking the heart back to a regular rhythm.  Without a prompt response, a patient's life faces great peril, and may require external resuscitation from medically trained personnel.  Every day, thousands of Americans rely on these devices to monitor their hearts and respond during a time of need.

71.     If functioning properly, the ICD can save lives.  If a device fails to engage during an arrhythmic episode, a patient in cardiac arrest has only minutes before permanent injuries or death occurs.  As Guidant emphasized in its 2003 Annual Report: "Quality is essential; lives depend on us."

### D.  GUIDANT'S WRONGFUL CONDUCT REGARDING THE RECALLED GUIDANT ICDs

72.     On or before February 2002, Guidant's CRM Operations in St. Paul, Minnesota identified a design defect in the VENTAK PRIZM 2 DR (model 1861) ICD.  It was discovered that the wire insulation (which protects the electrical power and energy) was deteriorating resulting in short-circuiting causing failure of the device.  This defect substantially increased the likelihood of

device malfunction and failure thus exposing ICD patients to the risk of serious injury or death during urgent moments of need.[8]

73.     When an ICD malfunctions, it short-circuits, and fails for a 24-hour period. Without medical examinations during an actual failure, a patient would not know of a failure until moments before going into cardiac arrest.

74.     This defect appears uniformly in all VENTAK PRIZM 2 DR (model 861) devices made prior to 2002 and CONTAK RENEWAL and CONTAK RENEWAL 2 devices made on or before August 2004.

75.     Guidant knew the electrical shortage and deterioration in the wire insulator drained the battery, the only power source to the ICD.

76.     According to a New York Times article dated May 25, 2005 entitled "Maker of Heart Device Kept Flaw From Doctors":

> The matter has come to light after the death of a 21-year old college student from Minnesota, Joshua Oukrop, with a genetic heart disease. Guidant acknowledges that his device, known as a defilation, short-circuited. The young man was in Moab, Utah, on a spring break bicycling trip in March with his girlfriend when he complained of fatigue. He then fell to the ground and died of cardiac arrest. Guidant subsequently told hid doctors that it was aware of 25 other cases in which the defibrillator, a Ventak Prizm 2 Model 1861, had been affected by the same flaw. Guidant said it had changed its manufacturing process three years ago to fix the problem. The physicians say that had they known earlier, they would have replaced the unit in their patient because he was at high risk of sudden death. …But late yesterday, when told that The New York Times was preparing an article about the device, the company issued an advisory to doctors about it.

77.     Guidant *subsequently admitted* in a June 17, 2005 letter to physicians entitled

"Urgent Medical Device Safety Information & Corrective Action, Subject: VENTAK PRIZM 2 DR

---

8   Although Guidant has belatedly admitted that it discovered this defect three years earlier (but failed to warn patients, physicians and the public) Plaintiff alleges that Guidant knew or should have known of the defects before that date as predecessor models of the Ventak Prizm device had experienced the same failure mechanism and hundreds of those devices were silently recalled (including Model 1851) for the same problem years before.

Model 1861" that Guidant had identified this device flaw over three years earlier (notwithstanding

that it failed to warn patients or doctors) as follows:

> In February 2002, Guidant's Cardiac Rhythm Management Quality System identified
> a problem in PRIZM 2 DR ICDs. Subsequent laboratory analysis of returned products
> revealed that deterioration in a wire insulator within the lead connector block, in
> conjunction with other factors, resulted in an electrical short. The short caused
> diversion of shock therapy energy away from the heart and into device circuitry.
> Resultant circuit damage caused permanent loss of shock therapy and pacing.
> Manufacturing changes intended to prevent this failure were made on April 16th 2002
> and on November 13th 2002." Guidant *further admitted* in that same June 17, 2005
> letter to physicians that "After making the manufacturing changes, Guidant sold
> product manufactured before the April 2002 change."

78.     Guidant *admitted* in a June 17, 2005 letter to physicians entitled "Urgent

Medical Device Safety Information & Corrective Action, RE; CONTAK RENEWAL (Model H135)

and CONTAK RENEWAL 2 (Model H155) devices manufactured on or before August 26, 2004"

that:

> The FDA has indicated that it will classify this action as a recall…. Laboratory
> analysis revealed that a deterioration in a wire insulator within the lead connector
> block, in conjunction with other factors, could cause a short circuit and loss of device
> function due to diversion of therapy energy away from the heart and into device
> circuitry…. Laboratory analysis has determined that deterioration in a wire insulator
> surrounding a high voltage wire within the lead connector block can, in conjunction
> with other factors, allow shorting of energy to the active titanium case during shock
> delivery. Diversion of energy away from the heart typically triggers a programmer
> screen message upon the next interrogation, warning clinicians that full energy was
> not delivered to the heart during the last shock delivered. Bench testing shows that
> only about 20% of the intended shock energy will be delivered to the heart when this
> type of short occurs. If sufficient shock energy is diverted to internal circuitry, it may
> render the device inoperative, preventing telemetry and delivery of additional shock
> therapy or pacing therapy. In addition, bench testing has shown that the number of
> shocks delivered does not greatly affect the likelihood of device failure. In all cases,
> device replacement is required if this short circuit occurs.

79.     Guidant *admitted* in a June 17, 2005 letter to physicians entitled "Urgent

Medical Device Safety Information & Corrective Action, Re: VENTAK PRIZM AVT, VITALITY

AVT, CONTAK RENEWAL AVT" that:

Guidant's Cardiac Rhythm Management Quality System has determined that the atrial therapy (AVT) subgroups of certain Guidant ICD and CRT-D product families are subject to a condition in which a random memory error causes functional "latching" that limits available therapy…. Latching of AVT devices will suspend detection and treatment of atrial and ventricular arrhythmias. Telemetry and programming are not available. Brady pacing may continue, but will not be programmable and may not match programmed settings. In a latched state, battery usage may increase, but battery status indicator will not be available. In the event that latching occurs during delivery of ATP therapy, ATP therapy delivery could continue independent of patient need. Device replacement is required if latching occurs.[9]

80.     Guidant *admitted* in a June 23, 2005 letter to physicians entitled "Urgent Medical Device Safety Information & Corrective Action, Re: CONTAK RENEWAL 3 AND 4, RENEWAL 3 and 4 AVT, RENEWAL RF" that, "Guidant's Cardiac Rhythm Management Quality System has determined that the devices listed above are subject to a component failure that may limit available therapy. Engineering analysis has determined that the magnetic switch in these devices may stick in the closed position."

81.     Guidant failed to warn physicians and ICD patients of the known malfunctions and of the April 2002 design changes, including those ICD patients implanted with the Recalled Guidant ICDs sold before modification.

82.     In November 2002, Guidant made another undisclosed design change to its Ventak Prizm ICD. Guidant belatedly disclosed this design change to the FDA in November as a part of its annual report to the FDA, filed in August 2003. Guidant failed to warn physicians and ICD patients of these design changes which Guidant secretly made as a result of known defects in the device.

---

9 On July 22, 2005 Guidant subsequently issued an "Urgent Medical Device Safety Information & Corrective Action" to those physicians on Guidant's records who had implanted or are monitoring patients that have a VENTAK PRISM AVT, a VITALITY AVT or a CONTAK RENEWAL AVT who Guidant previously advised that the problem could be corrected with a software "fix" when in fact the "fix" made matters worse: "*Guidant is revising its original recommendations set forth in the June 17, 2005 letter because new information indicates that one of the original recommendations can increase the risk of a latching event.*"

83.     Guidant knew or should have known of the defects in the other models of Recalled Guidant ICDs but failed to provide timely warnings of these defects to physicians and patients with the Recalled Guidant ICDs.

84.     Following the initial recall regarding the VENTAK PRIZM 2 DR Model 1861, Guidant announced recalls of additional models.  According to the June 18, 2005 New York Times article entitled "Citing Flaws, Maker Recalls Heart Devices," the recall came at the urging of the FDA:

> The recall comes as F.D.A. officials continue their review of Guidant's handling of issues surrounding the products, particularly the Prizm 2 DR.  The other models are the Contak Renewal and Contak Renewal 2, which are more complex defibrillators intended for patients with severe heart failure…. The company took the action late last month when it became aware that problems with the device, which date back to 2002, were going to be publicized in other forums… Tim Ulatowski, the director of the agency's Center for Devices and Radiological Health, said Guidant should have treated the matter as a recall at that time...
>
> In the aftermath, the F.D.A. began reviewing Guidant's handling of the matter.  It was during that process that agency officials began to look at the Renewal devices, said Mr. Ulatowski, the F.D.A. official… It also appears that Guidant may have continued to sell older Renewal models in its inventory after improved versions were available, as it had done with the Prizm 2 defibrillator.  Yesterday, Guidant officials declined to comment about the issue… Mr. Ulatowski, the F.D.A. official, said the agency was still reviewing Guidant records.  "We are taking a very careful look at the events that occurred and what decisions were made or were not made," he said…
>
> In addition to the Prizm 2 and the two Renewal models, Guidant said yesterday that it was recalling 21,000 other defibrillators that had a programming error that might affect device performance.  The company said patients could have the device reprogrammed during their next regular doctor's visit… Guidant said the affected units were the Prizm AVT, Vitality AVT, Renewal 3 AVT and Renewal 4 AVT.

85.     As reported in the July 21, 2005 issue of the New England Journal of Medicine in the article entitled: "The Controversy over Guidant's Implantable Defibrillators," Joshua Oukrop (the Minnesota teenage who collapsed and died when his Guidant ICD short-circuited) was a patient of Dr. Barry Maron, a physician at the Minneapolis Heart Institute and the Director of the

26

Hypertrophic Cardiomyopathy Center.  Dr. Maron subsequently discovered other instances where the device had short circuited in exactly the same way Oukrop's had failed.  He met with Guidant officials to discuss the matter as there were numerous other patients implanted with the same Guidant ICD.  As reported by the New England Journal of Medicine (which account has not been publicly refuted by Guidant to date):

> In June, Maron recalled: We became very concerned.  We were keeping a secret not just from our patients and their physicians, but also from the patients with the device and their physicians.  On May 12, four Guidant officials came to my office and gave me a very educational presentation.  I asked, "What are we going to do about this? We are in an untenable situation ethically and morally with our patients.  How are we going to get the word out?"  They said "Well, we are not.  We don't think we need to.  And we don't think it is advisable."  The officials expressed doubt that the patients would be able to understand the medical issues involved in determining whether or not to replace the devices.  I said, "I think this is the biggest mistake you will ever make."  They said they didn't agree.

86.     Guidant, the second-largest manufacturer of implantable defibrillators had identified flaws in the ICDs  three years earlier and had made manufacturing changes in an attempt to address them but concealed the flaws from physicians and patients as well as the changes made in 2002.  Moreover, and in reckless disregard for the health and safety of ICD patients, Guidant continued to sell devices manufactured before the changes were made.

87.     Guidant's first announcement came on May 23, 2005—more than three years after Guidant had become aware of the problem and hours before the New York Times published an article regarding the matter.  After Guidant belatedly provided physicians at the Minneapolis Heart Institute (including Dr. Maron) with a list of the 47 patients with the potentially defective ICDs, all were contacted.  As of July 5 nine had their devices replaced and four others have replacement procedures already scheduled.

88.     As further reported in the health section of the Post-Gazette article dated August 21, 2005 entitled "Implant Recalls Heighten Anxiety; Many Defibrillators Require Surgical Adjustment or Replacements":

> …"It's definitely a big problem," said Dr. Samir Saba, director of the cardiac electrophysiology laboratory at the University of Pittsburgh Medical Center, where "more than 450 patients are involved in one way or the other by the recall." About 160 will have their devices replaced and less than a third of those surgical procedures have been done, he said… Guidant'' handling of the situation has upset doctors and left many patients confused and fearful that the devices implanted in their chests will fail when they need them most…. Those who have needed a lifesaving shock in the past are more likely to be encouraged to get a new device, but all patients who have a potentially flawed defibrillator have to see their doctors to discuss their options… Also contentious is the question of who should pay for the change-outs of recalled devices. Guidant will replace the units, but procedure expenses and other costs could be borne by insurers and Medicare.

89.     In 2004, Guidant sold $1.8 billion of ICDs, nearly half of its $3.8 billion in total sales. On December 15, 2004, it was announced that Johnson and Johnson would acquire Guidant for $25.4 billion. Following the meeting with Dr. Maron on May 12, 2005, to discuss the Recalled Guidant ICDs, Guidant executives have sold millions of dollars of company stock, according to filings with the Securities and Exchange Commission. For example, on May 17, 2005 Guidant's chief medical and technology officer sold 23,000 shares for $1.71 million. On May 23, 2005, the day before the Guidant ICD problems were the subject of a front-page article in The New York Times, she sold 22,667 more shares for $1.68 million.

90.     As the New England Journal of Medicine reported: "For more than three years, Guidant kept quiet about the serious malfunctions of some of its ICDs and continued to sell defective devices after it made manufacturing changes to fix the defects. The Company will have to regain the trust of physicians and patients." Plaintiff and other Medicare beneficiaries (as well as their physicians) have understandably lost confidence in Guidant and have had and/or will have the Recalled Guidant ICDs surgically replaced.

28

91.     Guidant's failure to timely warn precluded thousands of the Recalled Guidant ICD patients from discovering the design defects, dangerous propensities and the potential risks and its wrongful conduct as alleged herein exposed them to the risk of injury or death.

92.     Undeterred by its knowledge of mechanical failures, defects and the risks of potential harm to device recipients, Guidant widely and successfully marketed the Recalled Guidant ICDs in the United States.  This included marketing and promotional campaigns extolling the qualities and virtues of the Recalled Guidant ICDs in mitigating the risk of heart failure as a reliable and mechanically sound device.

93.     For at least three years Guidant concealed and failed to timely warn physicians and Recalled Guidant ICD patients of information which Guidant knew or should have known which indicated that the Recalled Guidant ICDs were unfit for the purposes intended, dangerous and posed an unreasonable risk of harm to patients.

94.     As a direct and proximate result of Guidant's conduct and the Recalled Guidant ICDs, Medicare has paid for medical expenditures that are the primary responsibility of Guidant, entitling Medicare to reimbursement.

### GUIDANT'S LIABILITY FOR MEDICARE BENEFICIARIES' COSTS RELATED TO THE RECALLED GUIDANT ICDs

### COUNT I
### LIABILITY AS FIRST PARTY INSURER UNDER MSP: AGREEMENT TO PAY MEDICAL COSTS

95.     Guidant is a first party insurer under the MSP as that statute has been interpreted from time to time by Courts.

96.     Guidant has acknowledged its obligation as first party insurer by agreeing to pay medical costs incurred in connection with the recalled devices.

97.     By Guidant's acknowledgement of its obligation pay such medical costs, it is a primary plan within the meaning of 42 U.S.C. §1395y(b)(2)(A).

98.     Guidant has an obligation to repay Medicare for all costs incurred with the recalled devices because it has acknowledged a responsibility to make payment with regard to the recalled devices, as required by 42 U.S.C. §1395y(b)(2)(B)(ii).

99.     A private cause of action for such recovery is provided by 42 U.S.C. §1395y(3)(A) because Guidant has failed and refused to make the payments required by 42 U.S.C. §1395y(b)(2)(A).

100.    Plaintiff is entitled to mandatory double damages pursuant to 42 U.S.C. §1395y(3)(A).

## COUNT II
## LIABILITY AS FIRST PARTY INSURER UNDER MSP: PROVISION OF EXPRESS AND IMPLIED WARRANTIES

101.    Guidant is a first party insurer under the MSP as that statute has been interpreted from time to time by Courts.

102.    Guidant has acknowledged it obligation as first party insurer by providing express and implied warranties directly to consumers of its products, and specifically the recalled devices.

103.    By Guidant's provision of express or implied warranties, it is a primary plan within the meaning of 42 U.S.C. §1395y(b)(2)(A).

104.    Guidant has an obligation to repay Medicare for all costs incurred with the recalled devices because it has acknowledged a responsibility under its warranties to make payment with regard to the recalled devices, as is required by 42 U.S.C. §1395y(b)(2)(B)(ii).

105.     A private cause of action for such recovery is provided by 42 U.S.C. §1395y(3)(A) because Guidant has failed and refused to make the payments required by 42 U.S.C. §1395y(b)(2)(A).

106.     Plaintiff is entitled to mandatory double damages pursuant to 42 U.S.C. §1395y(3)(A).

## COUNT III
## LIABILITY AS THIRD PARTY INSURER UNDER MSP: LIABILITY AS HOLDER OF A LIABILITY INSURANCE POLICY OR PLAN

107.     Guidant is a third party insurer under the MSP as that statute has been interpreted from time to time by Courts.

108.     Guidant maintains a liability insurance policy from which payments for medical costs are made once liability has been established.

109.     Guidant has liability for damages incurred in connection with its recalled devices.  As a result of such liability, Guidant's liability policy is a primary plan within the meaning of 42 U.S.C. §1395y(b)(2)(A).

110.     Guidant has an obligation to repay Medicare for all costs incurred with the recalled devices because it maintains a liability insurance policy, as set forth in 42 U.S.C. §1395y(b)(2)(B)(ii).

111.     A private cause of action for such recovery is provided by 42 U.S.C. §1395y(3)(A) because Guidant has failed and refused to make the payments required by 42 U.S.C. §1395y(b)(2)(A).

112.     Plaintiff is entitled to mandatory double damages under pursuant to 42 U.S.C. §1395y(3)(A).

## COUNT IV
## STRICT LIABILITY - FAILURE TO WARN

113.    Guidant has liability for the recalled devices for the reasons set forth in this Count.

114.    Guidant was engaged in the business of manufacturing, creating, designing, testing, labeling, sterilizing, packaging, supplying, marketing, selling, advertising, warning, and otherwise distributing the Recalled Guidant ICDs in interstate commerce, which Guidant sold and distributed throughout the country to the Plaintiff and to other Medicare beneficiaries and continued to do so even after acquiring knowledge as to the defective nature of the devices.

115.    Plaintiff and other Medicare beneficiaries were implanted with the Recalled Guidant ICDs in the manner for which the ICDs were intended or in a reasonably foreseeable manner.

116.    The Recalled Guidant ICDs were expected to and did reach Plaintiff and the other Medicare beneficiaries implanted with the Recalled Guidant ICDs without substantial change in the ICDs condition as manufactured, created, designed tested, labeled, sterilized, packaged, supplied, marketed, sold, advertised, warned, and otherwise distributed by Guidant.

117.    Plaintiff and other Medicare beneficiaries who were implanted with the Recalled Guidant ICDs were not aware of, and reasonably could not have discovered, the dangerous nature of the Recalled Guidant ICDs.

118.    Guidant knew or should have known that the Recalled Guidant ICDs were defective and dangerous; however, Guidant did not give adequate, meaningful, or timely warnings regarding the Recalled Guidant ICDs.

119.    As a direct and proximate result of Guidant's failures to warn, Plaintiff and other Medicare beneficiaries who were implanted with the Recalled Guidant ICDs have incurred health care

costs that have been paid by Medicare, but are the responsibility of Guidant, in an amount to be proven at trial.

120. Guidant, therefore, is strictly liable to pay Medicare for the costs of the health care services resulting from the Recalled Guidant ICDs implanted in Plaintiff and other Medicare beneficiaries.

## COUNT V
## NEGLIGENCE

121. Guidant has liability for the recalled devices for the reasons set forth in this Count.

122. It was the duty of Guidant to use reasonable care in manufacturing, creating, designing, testing, labeling, sterilizing, packaging, supplying, marketing, selling, advertising, warning, and otherwise distributing the Recalled Guidant ICDs.

123. Contrary to its duty, Guidant: (i) failed to timely and adequately warn of known or knowable defects; (ii) failed to adequately and properly warn the Plaintiff and other Medicare beneficiaries implanted with the Recalled Guidant ICDs of the risks related to the Recalled Guidant ICDs when used in a manner for which they were intended; and (iii) was otherwise careless and negligent.

124. As a direct and proximate result of Guidant's failure to provide timely and adequate warnings, and as a direct and proximate result of Guidant's negligence, carelessness, and other wrongdoing and actions or omissions the Plaintiff and other Medicare beneficiaries who were implanted with the Recalled Guidant ICDs have suffered damages including incurring health care costs that have been paid by Medicare, but are the responsibility of Guidant, in an amount to be proven at trial.

## COUNT VI
## NEGLIGENCE PER SE

125.     Guidant has liability for the recalled devices for the reasons set forth in this Count.

126.     Guidant had an obligation not to violate the law in the manufacture, design, testing, manufacturing, assembly, inspection, labeling, packaging, supplying, marketing, selling, advertising, preparing for use, warning of the risks and dangers of the Recalled Guidant ICDs, and otherwise distributing the Recalled Guidant ICDs.

127.     Guidant's acts constitute an adulteration, misbranding, or both, as defined by the Federal Food, Drug and Cosmetic Act, 21 U.S.A. §§ 331(a) and 333(a)(2), and constitutes a breach of duty subjecting Guidant to civil liability for all damages arising there from, under theories of negligence per se.

128.     Guidant violated the MSP, and federal regulations provided thereunder.

129.     As a direct and proximate result of Guidant's wrongful conduct, Plaintiff and other Medicare beneficiaries who were implanted with the Recalled Guidant ICDs have suffered damages including incurring health care costs that have been paid by Medicare, but are the responsibility of Guidant, in an amount to be proven at trial.

## COUNT VII
## BREACH OF EXPRESS WARRANTY

130.     Guidant has liability for the recalled devices for the reasons set forth in this Count.

131.     Guidant expressly warranted to the Plaintiff and other Medicare beneficiaries who were implanted with the Recalled Guidant ICDs, by and through Guidant or its authorized agents or sales representatives, in publications, package inserts, the internet, and other communications

intended for physicians, medical patients, and the general public, that the Recalled Guidant ICDs was safe, effective, fit and proper for its intended use.

132.    In allowing the implantation of the Recalled Guidant ICDs Plaintiff and other Medicare beneficiaries who were implanted with the Recalled Guidant ICDs relied on the skill, judgment, representations, and express warranties of Guidant.  These warranties and representations were false in that the Recalled Guidant ICDs were not safe and were unfit for the uses for which they were intended.

133.    Through their sale of the Recalled Guidant ICDs, Guidant was a merchant pursuant to Section 2-314 of the Uniform Commercial Code.

134.    As a direct and proximate result of Guidant's breaches of warranties, Plaintiff and other Medicare beneficiaries who were implanted with the Recalled Guidant ICDs have experienced health care costs related to the Recalled Guidant ICDs that have been paid by Medicare, but are the responsibility of Guidant, in an amount to be proven at trial.

## COUNT VIII
## BREACH OF IMPLIED WARRANTY

135.    Guidant has liability for the recalled devices for the reasons set forth in this Count.

136.    Prior to the time that Plaintiff and other Medicare beneficiaries who were implanted with the Recalled Guidant ICDs were so implanted, Guidant impliedly warranted to Plaintiff and other Medicare beneficiaries who were implanted with the Recalled Guidant ICDs that the Recalled Guidant ICDs was of merchantable quality and safe and fit for the use for which they were intended.

137.    Plaintiff and other Medicare beneficiaries who were implanted with the Recalled Guidant ICDs (as well as their physicians) were and are unskilled in the research, design and

manufacture of the Recalled Guidant ICDs, and reasonably relied entirely on the skill, judgment, and implied warranty of Guidant in allowing the implantation of the Recalled Guidant ICDs.

138.    Guidant breached the implied warranty for the Recalled Guidant ICDs because said devices were defective, unmerchantable, and not fit for their intended purpose.

139.    As a direct and proximate result of Guidant's breaches of warranties, Plaintiff and other Medicare beneficiaries who were implanted with the Recalled Guidant ICDs have experienced health care costs related to the Recalled Guidant ICDs that have been paid by Medicare, but are the responsibility of Guidant, in an amount to be proven at trial.

## COUNT IX
## MISREPRESENTATION BY OMISSION

140.    Guidant has liability for the recalled devices for the reasons set forth in this Count.

141.    Guidant misrepresented the mechanical soundness and reliability of the Recalled Guidant ICDs through promotional and marketing campaigns.    Guidant continued this misrepresentation for an extended period of time, without disclosing material information.

142.    Guidant took advantage of the limited opportunity Plaintiff and other Medicare beneficiaries (and their physicians) implanted with the Recalled Guidant ICDs had to discover Guidant's intentional concealment of the defects and risks in the Recalled Guidant ICDs.

143.    Guidant concealed these design defects by withholding information pertaining to the inherent design defects and high risks of failure relating to the Recalled Guidant ICDs, and presenting the devices as safe and reliable.

144.    Guidant's intentional misrepresentations and omissions were made willfully, wantonly or recklessly to Plaintiff and Medicare beneficiaries (through their physicians) implanted

with the Recalled Guidant ICDs to induce purchase of the Recalled Guidant ICDs over its competitors.

145.    Guidant knew or should have known of the high risk Plaintiff and Medicare beneficiaries implanted with the Recalled Guidant ICDs would encounter by unwittingly agreeing to have implanted the Recalled Guidant ICDs.

146.    As a direct and proximate result of Guidant's wrongful conduct, Plaintiff and other Medicare beneficiaries who were implanted with the Recalled Guidant ICDs have experienced health care costs related to the Recalled Guidant ICDs that have been paid by Medicare, but are the responsibility of Guidant, in an amount to be proven at trial.

## COUNT X
## CONSTRUCTIVE FRAUD

147.    Guidant has liability for the recalled devices for the reasons set forth in this Count.

148.    Guidant, while in possession of unique and pertinent information involving the safety and mechanical reliability of the Recalled Guidant ICDs, presented the Recalled Guidant ICDs as a safe and mechanically sound device and failed to warn of defects in the devices which it knew or should have known.  Guidant suppressed this information and continued sales and marketing of its product to the general public.  Guidant knew or should have known Plaintiff and other Medicare beneficiaries implanted with the Recalled Guidant ICDs (as well as their physicians) had no means, other than Guidant's full, accurate, and objective disclosure, of obtaining the relevant information, upon which they relied.

149.    Through its unique knowledge and expertise regarding the affected nature of the Recalled Guidant ICDs, and through its statements to physicians and their patients in advertisement, promotional materials, and other communications, Guidant affirmed to Plaintiff and other Medicare

37

Beneficiaries implanted with the Recalled Guidant ICDs its knowledge of the truth of the representation that the Recalled Guidant ICDs were safe for their intended use and were free from defects.

150.    Guidant's misrepresentations and omissions were made intentionally to induce Plaintiff and other Medicare Beneficiaries implanted with the Recalled Guidant ICDs to purchase the Recalled Guidant ICDs, in order to reap the high profit margin relating to Guidant's affected ICD family of products.

151.    Guidant's conduct took unconscionable advantage of its dominant position of knowledge, engaging in constructive fraud in its relationship with Plaintiff other Medicare beneficiaries (through their physicians) implanted with the Recalled Guidant ICDs.  Misled by this veil of fraud, the Plaintiff other Medicare beneficiaries (through their physicians) implanted with the Recalled Guidant ICDs reasonably relied on Guidant's representations.

152.    As a direct and proximate result of Guidant's wrongful conduct, Plaintiff and other Medicare beneficiaries who were implanted with the Recalled Guidant ICDs have experienced health care costs related to the Recalled Guidant ICDs that have been paid by Medicare, but are the responsibility of Guidant, in an amount to be proven at trial.

## COUNT XI
## VILOLATION OF THE MINNESOTA DECEPTIVE TRADE PRACTICE ACT

153.    Guidant has liability for the recalled devices for the reasons set forth in this Count.

154.    Guidant applied advertising and marketing campaigns representing the Recalled Guidant ICDs as mechanically sound and medically safe, while Guidant knew of devices' defects. Guidant continued these campaigns of deception until 2005, when the tragic death of a young man and the FDA demands for a public recall outed Guidant's deceptive practices.

155.     Guidant knew or should have known of the defective nature of the Recalled Guidant ICDs, but denied public access to the information, to avoid corporate responsibility. Guidant knew its patients and their physicians were at a disadvantage in accessing information involving the safety of its affected devices.

156.     Guidant concealed the design defects of its device for the purposes of higher profits and increased sales in its highly profitable ICD division.

157.     Guidant has violated Minn. Stat. §325D.44 (5) by representing the Recalled Guidant ICDs as having characteristics, uses, and benefits of a safe and mechanically sound device while knowing the statements were false and the devices contained inherent design defects.

158.     Guidant has violated Minn. Stat. § 325D.44 (7) by representing the Recalled Guidant ICDs as a non-defective medical product of a particular standard, quality, or grade while knowing the statements were false and the devices contained inherent design defects.

159.     Guidant has violated Minn. Stat. § 325D.44 (9) by advertising, marketing, and selling the Recalled Guidant ICDs as medically reliable and without a known design defect while knowing those claims were false and without any medical support.

160.     Guidant has violated Minn. Stat. § 325D.44 (13) by creating a likelihood of confusion about the efficacy and mechanical soundness of its medical device, comparing the Recalled Guidant ICDs with other non-defective products.

161.     The Minnesota statutes prohibiting unfair and deceptive trade practices apply because Guidant's deceptive scheme was carried out in Minnesota and affected Plaintiff and other Medicare beneficiaries implanted with the Recalled Guidant ICDs containing the known defects.

162.     As a direct and proximate result of Guidant's wrongful conduct, the Plaintiff and other Medicare beneficiaries who were implanted with the Recalled Guidant ICDs have experienced

health care costs related to the Recalled Guidant ICDs that have been paid by Medicare, but are the responsibility of Guidant, in an amount to be proven at trial.

## COUNT XII
## VIOLATION OF MINNESOTA FALSE STATEMENT IN ADVERTISING ACT

163. Guidant has liability for the recalled devices for the reasons set forth in this Count.

164. Guidant produced and published advertisements and deceptive and misleading statements of the soundness and mechanical reliability of the Recalled Guidant ICDs, after learning of its inherent defect, with the intent to sell the Recalled Guidant ICDs.

165. Guidant concealed its deceptive practices in order to increase the sale of and profit from the Recalled Guidant ICDs.

166. Guidant has violated Minn. Stat. § 325F.67 by intending to sell and create a customer demand for the Recalled Guidant ICDs using deceptive or untrue statements of fact about the device's mechanical soundness and reliability on Guidant's website and medical brochures distributed to patients and physicians.

167. The Minnesota statutes prohibiting false statements in advertising apply to Plaintiff and other Medicare beneficiaries implanted the Recalled Guidant ICDs transactions with Guidant because Guidant's deceptive scheme was carried out in Minnesota.

168. As a direct and proximate result of Guidant's wrongful conduct, Plaintiff and other Medicare beneficiaries who were implanted with the Recalled Guidant ICDs have experienced health care costs related to the Recalled Guidant ICDs that have been paid by Medicare, but are the responsibility of Guidant, in an amount to be proven at trial.

## COUNT XIII
## VIOLATION OF THE MINNESOTA PREVENTION OF CONSUMER FRAUD ACT

169.    Guidant has liability for the recalled devices for the reasons set forth in this Count.

170.    Guidant intentionally concealed its design defect and failed to disclose for the purposes of continuing the sale and distribution of the Recalled Guidant ICDs.

171.    Between 2002 and 2004, Guidant's sales increased over 80%, from $499.2 million to $1.786 billion due to its ICD sales.

172.    Guidant represented that the Recalled Guidant ICDs were as safe and effective and intended that patients and physicians rely on those representations when deciding if Guidant's device was optimal for meeting the patient's needs.

173.    Through these misleading and deceptive statements and false promises, Guidant violated Minn. Stat. § 325F.69.

174.    The Minnesota statutes prohibiting consumer fraud apply to all Guidant's transactions with Plaintiff and other Medicare beneficiaries implanted with the Recalled Guidant ICDs because Guidant's deceptive scheme was carried out in Minnesota and affected Plaintiff and other Medicare beneficiaries implanted with the Recalled Guidant ICDs.

175.    As a direct and proximate result of Guidant's wrongful conduct, Plaintiff and other Medicare beneficiaries who were implanted with the Recalled Guidant ICDs have experienced health care costs related to the Recalled Guidant ICDs which have been paid by Medicare, but are the responsibility of Guidant, in an amount to be proven at trial.

41

## COUNT XIV
## STRICT LIABILITY - DESIGN AND MANUFACTURING DEFECT

176.    Guidant has liability for the recalled devices for the reasons set forth in this Count.

177.    The Recalled Guidant ICDs are defectively designed and manufactured because the foreseeable risks of mechanical malfunction and failure outweigh the benefits associated with the devices.

178.    The Recalled Guidant ICDs were expected to and did reach Plaintiff and other Medicare beneficiaries who were implanted with the Recalled Guidant ICDs without substantial change or adjustment to their mechanical function upon implanting the device.

179.    Guidant knew or should have known of the design and manufacturing defect and the risk of serious bodily injury that exceeded the benefits associated with the design of the Recalled Guidant ICDs.

180.    Furthermore, the Recalled Guidant ICDs and its defects presented an unreasonably dangerous risk beyond what the ordinary consumer would reasonably expect.

181.    The Recalled Guidant ICDs was defective due to inadequate warnings or instruction because Guidant knew or should have known that the devices created a high risk of bodily injury and serious harm.  Guidant failed to adequately and timely warn consumers of this risk.

182.    The Recalled Guidant ICDs are inherently dangerous for its intended use due to design and manufacturing defect and improper functioning.  Guidant is therefore strictly liable.

183.    As a direct and proximate result of Guidant's wrongful conduct, Plaintiff and other Medicare beneficiaries who were implanted with the Recalled Guidant ICDs have experienced health care costs related to the Recalled Guidant ICDs which have been paid by Medicare, but are the responsibility of Guidant, in an amount to be proven at trial.

**WHEREFORE,** Plaintiff prays for relief against Guidant as follows:

1.             Awarding Plaintiff damages in an amount double the amount paid by Medicare to reimburse health care providers for all health care services provided to Plaintiff and all other Medicare beneficiaries resulting from the Recalled Guidant ICDs, which expenditures Guidant was required or responsible to make under The Medicare Secondary Payer Statute;

2.             Awarding Plaintiff attorneys' fees and cost of this litigation;

3.             For prejudgment interest, as permitted by law; and

4.             For all other just and proper relief.

ZIMMERMAN REED P.L.L.P.

Dated: August 24, 2005        By: _s/J. Gordon Rudd, Jr._____
                                Charles S. Zimmerman - MN #120054
                                Ronald S. Goldser – MN #35932
                                J. Gordon Rudd, Jr. - MN #222082
                                David M. Cialkowski - MN #306526
                                651 Nicollet Mall, Suite 501
                                Minneapolis, Minnesota 55402
                                (612) 341-0400

                                JENNINGS & DRAKULICH L.L.P.
                                Nicholas J. Drakulich - CA #98135 and NV#1407
                                *(pro hac vice)*
                                2002 Jimmy Durante Blvd., Ste. 400
                                Del Mar, California 92014
                                (858) 755-5887

                                **ATTORNEYS FOR PLAINTIFF**