Filed 1/18/05 USDC Clerk's Office EAF

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

UNITED SENIORS ASSOCIATION, INC., as a private attorney general,

Plaintiff,

v.

PHILIP MORRIS, USA, R.J. REYNOLDS TOBACCO COMPANY, BROWN & WILLIAMSON TOBACCO CORPORATION, individually and as the successor to THE AMERICAN TOBACCO COMPANY, LORILLARD TOBACCO COMPANY, INC., and LIGGETT GROUP, INC.,

Defendants.

CASE NO. 05-11623 RGS

**BRIEF *AMICUS CURIAE***
**OF SENATOR CHARLES E. GRASSLEY IN SUPPORT OF**
**PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS**

Brian Koukoutchos
Mass. BBO No. 547446
28 Eagle Trace
Mandeville, LA 70471
(985) 626-5052
*Counsel for Amicus Curiae*
*Senator Charles E. Grassley*

TABLE OF CONTENTS

INTEREST OF *AMICUS CURIAE* ....1

ARGUMENT ....2

I. DEFENDANTS MISREAD THE TEXT, STRUCTURE AND HISTORY OF THE MSP STATUTE ....4

II. DEFENDANTS' POLICY-BASED OBJECTIONS TO THE MSP REGIME ARE PROPERLY ADDRESSED TO CONGRESS, NOT TO THIS COURT, AND ARE IN ANY EVENT MISGUIDED ....9

A. Defendants' Evident Dislike of Enforcement of the MSP Statute by Private Attorneys General Is Irrelevant and Leads Them to Misapprehend the Statute ....9

B. Congressional Provision of a Federal Right of Action in a Federal Court to Enforce a Federal Program Protecting the Federal Treasury Is Not an Affront To the Balance of Federal-State Authority ....15

CONCLUSION ....19

TABLE OF AUTHORITIES

CASES

*Acevedo-Garcia v. Monroig*, 351 F.3d 547 (1st Cir. 2003) ........ 15

*Agency Holding Corp. v. Malley-Duff & Assocs. Inc.*, 483 U.S. 143 (1987) ........ 10, 13

*Brown v. Thompson*, 374 F.3d 253 (4th Cir. 2004) ........ 15

*Cook County v. United States ex rel. Chandler*, 538 U.S. 119 (2003) ........ 13, 18

*Glover v. Phillip Morris USA*, 380 F. Supp. 2d 1279 (M.D. Fla. 2005), *appeal pending*, No. 05-14219 (11th Cir.) ........ 1, 5, 11

*Gregory v. Ashcroft*, 501 U.S. 452 (1991) ........ 16

*Liquilux Gas Corp. v. Martin Gas Sales*, 979 F.2d 887 (1st Cir. 1992) ........ 15

*Manning v. Utilities Mut. Ins.*, 254 F.3d 387 (2d Cir. 2001) ........ 10, 13, 14, 17

*Mason v. The American Tobacco Co.*, 346 F.3d 36 (2d Cir. 2003), *cert. denied*, 541 U.S.1057 (2004) ........ 1

*Mason v. American Tobacco Co.*, 212 F.Supp.2d 88 (E.D.N.Y. 2002) ........ 10

*Piamba Cortes v. American Airlines, Inc.*, 177 F.3d 1272 (11th Cir. 1999) ........ 15

*United States v. Baxter Int'l*, 345 F.3d 866 (11th Cir. 2003) ........ 17

*United States v. Philip Morris*, 156 F.Supp.2d 1 (D.D.C. 2001) ........ 11

*United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ........ 15

*United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943) ........ 12, 13, 14

*United States ex rel. Milam v. Univ. of Texas*, 961 F.2d 46 (4th Cir. 1992) ........ 9, 12

*United States ex rel. Taxpayers Against Fraud v. General Electric*, 41 F.3d 1032 (6th Cir. 1994) ........ 10

*Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765 (2000) ........ 10, 11

STATUTES

Medicare Prescription Drug, Improvement and Modernization Act of 2003, § 301(b), Pub. L. No. 108-73, 117 Stat. 2066, 2221 (2003) ....1

42 U.S.C. § 1395y(b)(2)(B)(ii) ....4, 5

OTHER AUTHORITIES

149 Cong. Rec. S15574 (daily ed. Nov. 22, 2003) ....15

149 Cong. Rec. S15585 (daily ed. Nov. 22, 2003) ....8

2004 Annual Report of the Boards of Trustees of the Federal Hospital Insurance and Federal Supplementary Medical Insurance Trust Fund, *available at* http://www.cms.hhs.gov/publications/trusteesreport/2004/tr.pdf ....2

DOJ Press Release No. 613 (November 10, 2003), *available at* www.usdoj.gov/opa/pr/2003/November/03_civ_613.htm. ....18

Merton E. Marks, Chicago International Dispute Resolution Association, *New Trends in Domestic and International Commercial Arbitration and Mediation* (2003), *available at* http://www.cidra.org/articles/newtrends.htm ....6

Andrew D. Neiss, *Revised Uniform Arbitration Act of 2000 Makes Only Incremental Changes*, (*available at* http://www.construction weblinks.com/Resources/Industry_Reports_ _Newsletters/April_8_2002/uniform_arbitration_act.htm ....6

U.S. Dep't of Health and Human Servs., Office of Assistant Sec'y for Planning and Evaluation, *Addressing the New Health Care Crisis: Reforming the Medical Litigation System to Improve the Quality of Health Care*, March 3, 2003, *available at* http://aspe.hhs.gov/daltcp/reports/medliab.htm. ....7

**INTEREST OF *AMICUS CURIAE***

*Amicus curiae*, the Honorable Charles E. Grassley, is the Chairman of the Senate Finance Committee, which has exclusive Senate jurisdiction over Medicare. For over twenty years, Senator Grassley has been the strongest supporter in Congress of the role of citizens as private attorneys general in protecting the Treasury, and this includes the enlistment of citizens under the Medicare as Second Payer ("MSP") statute to stem the flow of Medicare dollars when others should be paying a beneficiary's medical bills.

Senator Grassley participated as an *amicus* throughout *Mason v. The American Tobacco Co.*, 346 F.3d 36 (2d Cir. 2003), *cert. denied*, 541 U.S.1057 (2004). After announcing its restrictive reading of the MSP statute, the Second Circuit quoted Senator Grassley's *amicus* brief and invited Congress to address the issue if it disagreed with the court's interpretation. *Id.* at 43. In response, Senator Grassley sponsored clarifying legislation that was enacted to correct erroneous readings of the MSP by the Second Circuit and other courts. *See* Medicare Prescription Drug, Improvement and Modernization Act of 2003 ("MMA"), § 301(b), Pub. L. No. 108-73, 117 Stat. 2066, 2221 (2003).

The first and only court to date to interpret those clarifying amendments was a federal district court in Jacksonville, Florida. Senator Grassley participated in those proceedings as an *amicus* in support of Plaintiffs' reading of the statute, both at the trial and appellate levels. *Glover v. Phillip Morris USA*, 380 F. Supp. 2d 1279 (M.D. Fla. 2005), *appeal pending*, No. 05-14219 (11th Cir.).

Senator Grassley respectfully submits that the reading of the statute that defendants urged in *Glover* and reiterate here works a fundamental distortion of the MSP regime and would have

significant adverse consequences for Medicare and the federal Treasury. The importance of Medicare as a source of healthcare funding for tens of millions of Americans is beyond dispute.[1]

The Senator therefore has both an institutional and a personal interest in ensuring that the MSP regime is faithfully applied as written and that Medicare dollars are promptly returned to the Treasury where appropriate. Senator Grassley cannot offer this Court any guidance on the merits of the underlying litigation against the tobacco company defendants. However, as chief architect of the legislation that the defendants misread, the Senator is in a unique position to assist this Court in understanding these statutes in a manner consistent with congressional intent and the national interest.

**ARGUMENT**

The interpretation urged by defendants works a fundamental distortion of the MSP regime. Unless rejected, the harmful impact of this misinterpretation would be immense. But apart from the heavy blow to the Medicare reimbursement regime that such a ruling would occasion, Defendants' gross distortion of Congressional legislation is simply unacceptable as a matter of statutory interpretation. The motion to dismiss should be denied.

The MMA's clarifying amendments were enacted in direct response to some federal court rulings that, in Congress's view, effected an inaccurate and undesirably cramped view of the Medicare reimbursement regime. Clarifying legislation such as this, of course, is part of the ongoing "conversation" that occurs between Congress and the courts. But unfortunately the district court's

---

[1] The Medicare program is the second-largest social insurance program in the United States, with 41 million beneficiaries and total expenditures of $280.8 billion in 2003. @ 2004 ANNUAL REPORT OF THE BOARDS OF TRUSTEES OF THE FEDERAL HOSPITAL INSURANCE AND FEDERAL SUPPLEMENTARY MEDICAL INSURANCE TRUST FUND, *available at* http://www.cms.hhs.gov/publications/trusteesreport/2004/tr.pdf (hereafter "2004 Annual Report").

ruling in *Glover* suggests that particular court was not listening to what Congress had said. That error should not be repeated here. Defendants' arguments cannot be squared with the text, structure, or legislative history of the Medicare statutes. Moreover, the ruling that defendants urge would significantly frustrate the very purpose of the MSP regime, which is to maintain the ongoing viability of the Medicare system by recovering taxpayer dollars that have been expended when a third party is primarily responsible in contract or in tort.

There is no basis for defendants' suggestion that congressional authorization to bring a single, unified MSP action against an alleged tortfeasor is some sort of boondoggle for certain litigants or an unfair penalty against alleged tortfeasors. Rather, the MSP statute provides the tools that Congress -- over a span of twenty-five years -- has decided are necessary to help save the Medicare system in an era of tight budgets, an aging population and soaring healthcare costs. The mass personal injury torts that have begun to populate the legal landscape in recent decades -- whether as environmental pollution or product liability suits or in other forms -- have not spared those on Medicare's rolls. Medicare beneficiaries are as likely as anyone else to suffer tort injuries, and the purpose of the MMA was to clarify that Congress willed that those tortfeasors, like health or liability insurance carriers, must be primary payers before Medicare picks up the tab. The double damages available under the MSP act both (1) to mobilize private citizens to help police what would otherwise be unnoticed and unredressed injuries on the U.S. Treasury and (2) to ensure that the public fisc is indeed made whole. These tools are not conceptually different from those Congress has provided in other "private attorney general" statutes. Therefore, defendants' allegation of a massive "federalization" of tort law reveals a profound misunderstanding of the MSP regime. In short, there is simply no support for the view that the MSP regime calls for two separate lawsuits before the

taxpayers can recoup their expenses against an alleged tortfeasor. Defendants' interpretation of the statute is wrong and their motion should be denied.

**I. DEFENDANTS MISREAD THE TEXT, STRUCTURE AND HISTORY OF MSP.**

According to defendants' interpretation, MSP liability is triggered if and only if: (1) underlying liability is triggered by pre-existing contract, judgment, or admission; (2) the liable party then simply refuses to pay in the face of its determined liability; and (3) 120 days then elapse. Defs. Br. at 21 ("Under the MSP, a plaintiff cannot combine an unadjudicated tort claim with an MSP double damages action because the MSP action does not arise until after the defendant is found liable and then fails to make payment to Medicare within 120 days."). Defendants advance this creative reading and are quick to remind the Court that it avoids the (perceived) thorny issue of expanded federal liability to alleged tortfeasors. In reality, this is precisely why Congress enacted and expanded MSP in the first place. Under defendants' view, the legislative purpose behind the ever-expanding MSP regime was merely to use double damages to penalize deadbeats who have been adjudicated to owe Medicare (or have effectively admitted as much) but who nevertheless refuse to pay their debts. This reasoning is flawed.

The MSP, as amended by the MMA, requires a primary plan to reimburse Medicare "if it is demonstrated that such primary plan has or had a responsibility to make payment[.]" 42 U.S.C. § 1395y(b)(2)(B)(ii). In asserting that a yet-unlitigated tort claim cannot be brought in an MSP enforcement action, defendants focus on the verb tense Congress used in this statutory provision. Quoting the district court in *Glover*, they argue "it cannot be 'demonstrated' that an alleged tortfeasor, which has neither been adjudicated as liable nor has agreed to settle a tort claim, 'has' 'an

existing responsibility' to reimburse Medicare or 'had' a previous responsibility to do so." Defs. Br. at 15 (quoting *Glover*, 380 F. Supp. 2d at 1290).

As Plaintiff's response brief correctly points out (Plf. Br. at 16-17), this reasoning does not withstand scrutiny either as a matter of logic -- there is no rationale that a judgment in an MSP action should be excluded from the statutory term "judgment" -- nor even as a matter of basic grammar. It would render one clause of the statute entirely redundant ("such plan *has or had* a responsibility"), and it would moot yet another clause ("responsibility may be demonstrated . . . *by other means*"). *See* 42 U.S.C. § 1395y(b)(2)(B)(ii) (emphasis supplied). Defendants attempt to answer only the second of these obvious gaps, and that lone effort is unavailing.[2]

To rebut the notion that their unorthodox reading of the statute would negate the "by other means" clause, defendants have proffered the interesting theory that all Congress meant to convey was that an MSP action could also be brought if an arbitrator or administrative agency had already made a specific finding of liability. Defs. Br. at 17. This argument overreaches. It is of course true that these are "other means." But there is no principled line distinguishing these (assertedly permissible) methods from the (assertedly impermissible) "other means" that Plaintiffs have elected to use in this action.[3] As this Court is well aware, arbitrations and administrative decisions are

[2] Plaintiff's response brief correctly cites several examples of the ordinary interpretation of legal materials drafted in the present subjunctive tense, which was Congress's choice in drafting the MMA clarification of MSP. Plf. Br at 17 & n. 93. Defendants, on the other hand, are the ones seeking an unorthodox reading of this familiar construction, so at the very least, it is incumbent upon them to produce examples where analogous legislative language has been interpreted in such an unusual manner.

[3] Defendants' brief includes a long foray about canons of statutory construction to suggest that Congress's choice to say "by other means" really meant "by other *similar* means." Defs. Br. at 16-17. Some similarity is of course required, but similarity *in the sense that each of the various triggers for MSP liability must be sufficiently reliable to form the basis for the ultimate imposition of MSP damages*. There is no requirement of *temporal* similarity -- *i.e.*, no requirement of a pre-existing determination of liability as opposed to a present determination. Stated differently, there is no basis for Defendants' implicit suggestion that a judgment reached in the context of an MSP action would be any less reliable or trustworthy than (and hence, dissimilar from) a judgment that pre-dated the MSP litigation. After all, it is not as if the full panoply of due process protections that civil litigation affords -- e.g., notice of the claim, the right to call and

commonly challenged in subsequent court proceedings (often involving the authority *vel non* of the non-judicial body to issue any finding in the first instance), so defendants' characterization of such determinations as "pre-existing" is fanciful.[4]

Presumably, defendants are operating under the assumption -- and it is only an assumption, because Congress of course chose not to delimit the "other means" available to an MSP plaintiff -- that a quasi-judicial finding is adequately firm and reliable to form the trigger for an MSP action, but "merely alleging that the defendant engaged in wrongdoing" is not. Defs. Br. at 18. This unsubstantiated assertion merely raises another series of troubling questions that defendants have not attempted to answer.

If only a "pre-existing" liability (as defendants choose to define it, meaning a formal legal ruling or a formal admission) can trigger MSP liability, when is a ruling sufficiently final and reliable to be "pre-existing" for MSP purposes? Must a would-be MSP plaintiff wait for a tort lawsuit to be filed, prosecuted, completed, and for all appeals (both "as of right" and discretionary) to be exhausted before liability is "pre-existing" and an MSP action can finally be initiated? If that indeed is defendants' position, then perhaps the Treasury should not expect to see any MSP reimbursements

---

cross-examine witness, burdens of proof, etc. -- will somehow be thrown out the window in an MSP action. To the contrary, Defendants here will have a full and fair opportunity to defend themselves against the Plaintiff's allegations, and a judgment either way will issue based on the evidence adduced.

[4] *See generally* Andrew D. Neiss, *Revised Uniform Arbitration Act of 2000 Makes Only Incremental Changes*, ("The [Uniform Arbitration Act] did not address the question of who decides the arbitrability of a dispute and by what criteria, an issue that is frequently litigated as a result of this omission."), *available at* http://www.constructionweblinks.com/Resources/Industry_Reports__Newsletters/April_8_2002/uniform_arbitration_act.htm; Merton E. Marks, CHICAGO INTERNATIONAL DISPUTE RESOLUTION ASSOCIATION, *New Trends in Domestic and International Commercial Arbitration and Mediation* (2003) ("A frequently litigated issue is whether all or only some issues are arbitrable, e.g. whether a breach of contract caused by tortious conduct (as distinguished from non-tortious conduct) must be litigated in court or arbitrated "), *available at* http://www.cidra.org/articles/newtrends.htm.

any time soon, given the unfortunately glacial pace of litigation in many American jurisdictions.[5] Put another way, defendants would have this Court believe that Congress's decision to enact and strengthen the MSP regime was essentially a series of futile acts.

If, however, this is not defendants' position -- and instead they are advocating that no drop-dead final judgment is required to trigger a MSP liability, but rather that an initial determination by a judicial or quasi-judicial body is all that is necessary -- then a whole other set of problems arises. For example, it is not difficult to imagine a scenario where the initial tribunal determines that the tobacco companies have indeed committed a tort, but then the companies refuse to pay for 120 days, insisting that the ruling will be overturned on appeal. If an MSP plaintiff then files suit in federal court (the "pre-existing" liability having been "established" by the ruling of *nisi prius* tribunal), what happens to the MSP action if the underlying liability determination is later reversed on appeal? Or what if the MSP action proceeds to final judgment before the underlying appeal is conclusively resolved? Is the MSP defendant simply entitled to defy that MSP final judgment?

These questions are not abstract hypothesizing. On the contrary, they demonstrate that defendants have advanced an ill-conceived theory to avoid liability, but (for obvious reasons) they have not thought through its consequences. Whereas defendants' reading of the statute leans on fuzzy statutory construction canons and leads to an endless series of possible procedural

---

[5] According to this theory, the MSP statute of limitations clock presumably would not even begin to tick until the final appellate maneuver was rejected B and then another 120 days elapsed Because the MSP statute of limitations would then run from that point for another several years, and then a whole second round of litigation would have to begin and then conclude, it is not overstatement to suggest that, under Defendants' view of the law, the Government might have to wait a decade or two before an actual MSP recovery could be realized. *See generally* U.S. Dep't of Health and Human Servs., Office of Assistant Sec'y for Planning and Evaluation, *Addressing the New Health Care Crisis: Reforming the Medical Litigation System to Improve the Quality of Health Care*, March 3, 2003 ("Even successful claimants do not recover anything on average until five years after the injury, longer if the case goes to trial."), *available at* http://aspe.hhs.gov/daltcp/reports/medliab.htm

conundrums, Plaintiff's interpretation is coherent and straightforward: Congress meant exactly what it said.

The legislative history of the MSP regime in general, and the MMA clarifications in particular, further confirm the Plaintiff's interpretation of the statute. Defendants attempt to turn this legislative history on its head by assailing Congress for failing to include in the MMA an extensive legislative record explaining a point that has become essentially obvious over the past quarter-century: Congress wants an expansive, forward-leaning Medicare reimbursement regime that encourages aggressive pursuit of any entity that has depleted Medicare funds through its misdeeds. *See, e.g.*, 149 Cong. Rec. S15585 (Nov. 22, 2003) (statement of Sen. Grassley) ("when a Medicare beneficiary is injured by the wrongful conduct of another entity, that entity's liability insurance or the entity itself, if it has no insurance, or it might be self-insured, is *always* required to pay first instead of having the taxpayers pay.") (emphasis added). But at the same time, defendants conveniently ignore the fact that there is no legislative history supporting their cramped reading of the statute. Indeed, if the statute truly meant what defendants are now urging, one might reasonably expect to find congressional findings that a significant number of state court judgments (or private settlements) were not being satisfied, and that in the process Medicare had been left holding the bag. But Congress has made no findings that such scenarios have occurred at all, much less with the degree of frequency as to necessitate federal legislation. In the absence of such findings, it is defendants' reading of the statute (not Plaintiff's reading) that would be an affront to federalism.

In short, defendants' interpretation of the MSP statute is simply wrong. That they have unfortunately managed to convince one federal judge to accept their incorrect reading does not make it right -- after all, Congress had to pass the MMA to correct persistent judicial

misunderstanding the MSP statute.[6] Senator Grassley remains confident that the erroneous legal ruling from Florida will be corrected on appeal, and that this Court will effectuate Congress's words, not resist them in the manner that defendants have invited.

## II. DEFENDANTS' POLICY-BASED OBJECTIONS TO THE MSP REGIME ARE PROPERLY ADDRESSED TO CONGRESS, NOT TO THIS COURT, AND ARE IN ANY EVENT MISGUIDED.

### A. Defendants' Evident Dislike of Enforcement of the MSP Statute by Private Attorneys General Is Irrelevant and Leads Them to Misapprehend the Statute.

The impetus for the defendants' misreading of the MSP on the merits appears to be a grab-bag of policy arguments, although some of them travel under a different label. To begin with, defendants make an offering under the rubric of standing, claiming that United Seniors is caught on the horns of a dilemma: if their action is in the nature of *qui tam*, then it is duplicative of an MSP claim brought by the Justice Department against the defendants; and if it is not a *qui tam* action, then United Seniors have no standing because the statutory bounty is not sufficient to confer standing in the absence of other injury. Defs. Br. 3, 22-24. But defendants' supposed dilemma has no horns.

The defendants have become engrossed with Latin phrases. Formal status as a "*qui tam*" plaintiff or the presence in the case caption of the phrase "*ex rel.*" is not essential for standing as a private attorney general. A *qui tam* plaintiff is but one of many forms of private attorney general, and statutes authorizing such private enforcement of government programs "are older than the Republic." *United States ex rel. Milam v. Univ. of Texas*, 961 F.2d 46, 49 (4th Cir. 1992). The "current statutory framework includes many laws that authorize individuals to act as 'private

---

[6] Defendants' hyperbolic assertion that United Seniors' argument has been "rejected by every court to have considered it" (Defs. Br. at 1) is a transparently misleading attempt to frame this Court's consideration of the case. The reality is that, since the MMA clarification, there has been only one case: the *Glover* district court decision in Florida, which is currently pending on appeal.

attorneys general,' bringing causes of action for the common weal." *United States ex rel. Taxpayers Against Fraud v. General Electric*, 41 F.3d 1032, 1041-42 (6th Cir. 1994). *See also Agency Holding Corp. v. Malley-Duff & Assocs. Inc.*, 483 U.S. 143, 151 (1987) (antitrust and RICO create "private attorneys general"); *Milam*, 961 F.2d at 49 ("A *qui tam* relator is essentially a self-appointed private attorney general."). And it is beyond dispute that MSP authorizes actions by private attorneys general acting as whistleblowers, not just by participants in government programs who have themselves been personally victimized by the defendant they are suing. Both the FCA and the MSP "allow individual citizens, as well as the government, to sue in order to right an economic wrong done to the government. Both the FCA and MSP allow for a multiplier of damages to enable the government to recover its funds while also providing a financial incentive for private citizens to bring such suits. Both statutes thus create 'private attorneys general' by authorizing private citizens to receive part of the recovery." *Manning v. Utilities Mut. Ins.*, 254 F.3d 387, 394 (2d Cir. 2001).[7]

That private citizen's share of the recovery on Medicare's claim for reimbursement is the incentive for the private attorney general to sue, and it gives United Seniors the concrete stake in the outcome required for standing: "There is no doubt, of course, that as to this portion of the recovery -- the bounty he will receive if the suit is successful -- a *qui tam* relator has a 'concrete private interest in the outcome of [the] suit.'" *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 772 (2000) (citation omitted). This statutory "partial assignment of the Government's

---

[7] Defendants' half-hearted contention that only Medicare beneficiaries may sue as MSP private attorneys general is an *ipse dixit* without any support in the statute or the caselaw. The statute "establishe[s] a private cause of action" without restricting it to Medicare recipients. *See* § 1395y(b)(3)(A). *See also Mason v. American Tobacco Co.*, 212 F.Supp.2d 88, 94 (E.D.N.Y. 2002) (MSP statute creates "a civil proceeding *similar to a qui tam action where anyone can bring a claim on behalf of the United States* and receive a bounty") (emphasis added). The MSP cause of action would have little point if it were restricted to Medicare recipients alone -- they already have claims against the primary payers (either in tort or in contract) for the costs of their medical care, and the federal government already had rights of subrogation to those claims.

damages claim," *id.* at 773, just like other forms of assignment by an injured party of its claim, such as "suits by subrogees, who have been described as 'equitable assignees,'" *id.* at 774, constitutes "injury in fact suffic[ient] to confer standing" on United Seniors. *Id.* Despite having briefed this issue many times in many courts, the defendants have yet to identify any apposite authority to the contrary.[8]

United Seniors thus has standing. The other horn of defendants' purported dilemma -- that their suit is invidiously duplicative of a government MSP claim -- is equally lacking in point. The MSP statute does not make private attorneys general the exclusive authority charged with policing abuse of Medicare by primary payers -- the statute works only a *partial* assignment. The federal government is likewise authorized to bring claims under MSP, but the availability of private attorneys general as a reserve team to augment federal enforcement does not prohibit a private MSP action as duplicative whenever there is a possibility of a government MSP action. Indeed, the Supreme Court's holding that a private plaintiff had Article III standing in *Vermont Agency* was expressly predicated on just such "a *partial assignment* of the Government's damages claim." 529 U.S. at 773 (emphasis added). Moreover, the government MSP claim to which the defendants refer was dismissed four years ago, as defendants are aware, *see United States v. Philip Morris*, 156 F.Supp.2d 1, 8 (D.D.C. 2001), and even the *Glover* court rejected defendants' contention that the private MSP action was barred by the Justice Department claim dismissed in *Philip Morris*. *See Glover v. Philip Morris*, 380 F.Supp.2d 1279, 1284-86 (M.D. Fla. 2005), *appeal pending*, No. 05-14219 (11th Cir.).[9]

---

[8] As United Seniors demonstrate in their brief at 29-30, the cases defendants offer as authority all distinguish themselves

[9] If and when identical MSP claims against identical defendants are brought simultaneously by private attorneys

Given the uniformity and solidity of this body of authority on the propriety of congressional assignment of Medicare claims to private attorneys general, it becomes apparent that the defendants' supposed objection to United Seniors' standing is really about something else. It is clear from the defendants' repeated complaints about supposedly undeserved "bounties" (Defs. Br. at 3, 12, 24) and supposedly "harsh" and "unfair" "double damages" (Defs. Br. at 2, 7, 11, 12, 13, 14, 19), that what really irks the defendants is the MSP statute's recruitment of private citizens to police injuries to the federal treasury wrought by tortfeasors who injure Medicare recipients. Defendants denounce all who enlist as private attorneys general under MSP as meddlesome "stranger[s]." Defs. Br. at 12.

But such "strangers" -- whether United Seniors or anyone else -- have been deputized by Congress as watchdogs against tortfeasors who try to evade responsibility for injuries to Medicare beneficiaries and thereby dump the costs of their wrongs on the American taxpayer. In bringing these objections to the MSP regime to this Court, the defendants are barking up the wrong tree -- or rather, the wrong branch of the federal government. In the words of the Supreme Court, defendants' policy arguments "are addressed to the wrong forum." *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 547 (1943) (emphasis added). The question of whether to employ a regime of private attorneys general motivated by multiple damages is "a problem *for Congress*." *Id.* at 542 (emphasis added). When enacting the MMA clarifying amendments, "perhaps Congress should have taken note of the possibility" that manufacturers and other self-insured primary payers "would be harassed by vexatious" MSP actions, or "[p]erhaps it did, but decided that the benefits" of the private attorney general scheme "outweighed its defects. In any event, [the courts] have no inclination or power to delve into the wisdom of the balance Congress struck." *Milam v. Univ. of Texas*, 961 F.2d at 49.

---

general and by the federal government, there will be time enough for some court to address any lingering issues that, for now, are purely hypothetical.

"Congress has let loose a posse of *ad hoc* deputies to uncover and prosecute frauds against the government. [Defendants] may prefer the dignity of being chased only by the regular troops; if so, they must seek relief from Congress." *Id.* Congress has chosen the remedy and that concludes the matter: *quod erat demonstrandum*.

The defendants are equally confused (and likewise in the wrong forum) with respect to their protests about the supposedly unfair or punitive nature of the MSP's double-damages provision. Although defendants plainly harbor hostility to the bounty that the MSP pays to private attorneys general, that statutory apparatus was:

> passed upon the theory, based on experience as old as modern civilization, that one of the least expensive and most effective means of preventing frauds on the Treasury is to make the perpetrators of them liable to actions by private persons acting . . . under the strong stimulus of personal ill will or the hope of gain. Prosecutions conducted by such means compare with the ordinary methods as the enterprising privateer does to the slow-going public vessel.

*Marcus v. Hess*, 317 U.S. at 541 n.5 (citation omitted). As the Supreme Court recently explained, such damage multipliers "serve not to punish, but to quicken the self-interest of some private plaintiff who can spot violations and start litigating to compensate the Government, while benefiting himself as well." *Cook County v. United States ex rel. Chandler*, 538 U.S. 119, 131 (2003). *See also Agency Holding Corp.*, 483 U.S. at 151 ("Both [RICO and the Clayton Act] bring to bear the pressure of 'private attorneys general' on a serious national problem for which public prosecutorial resources are deemed inadequate; the mechanism chosen to reach the objective in both the Clayton Act and RICO is the carrot of treble damages."); *Manning*, 254 F.3d at 394 ("Both the FCA and MSP allow for a multiplier of damages to enable the government to recover its funds while also providing a financial incentive for private citizens to bring such suits.").

Whether defendants find this justification for private rights of action and damage multipliers persuasive is irrelevant. Federal courts may not disparage or act in derogation of the MSP on the basis of their reservations about the remedy it provides: "Congress has power to choose this method to protect the government from burdens" imposed upon the Treasury by tortious conduct. *Hess*, 317 U.S. at 541 n.5. The Supreme Court has ruled that, to "nullify the . . . statute because of dislike" of its damages award or its private right of action "would be to exercise a veto power which is not ours." *Id.* Accordingly, this Court should reject the defendants' invitation to second-guess the Legislative Branch.[10]

Finally, the defendants' aversion to the private attorney general system propels them to denounce the MSP as "a backdoor class action" of "tort claims" in supposed violation of Fed.R.Civ.P. 23. Defs. Br. at 12, 14. This assertion is belied by the facts. The claims being raised by United Seniors are not the tort claims of Medicare beneficiaries who have been injured by defendants' products, but rather the claims of the United States Treasury for reimbursement of health care costs that defendants imposed on the Medicare program. *See Manning*, 254 F.3d at 394, 396. If a Medicare beneficiary is physically injured by a tortfeasor in an isolated, one-on-one scenario -- *e.g.*, an automobile accident -- it makes sense for any resulting MSP claim to be adjudicated in like fashion. But if a tortfeasor's actions injure a large group including many Medicare beneficiaries -- *e.g.*, defective manufacture of a widely sold automobile -- there is no policy in the MSP regime (and

---

[10] Defendants admit that prior MSP lawsuits against tortfeasors "drew criticism from many courts, which held that companies were not 'primary plans.'" Defs. Br. 6 & n.1 (listing cases). Of course, all of those erroneous judicial interpretations of the MSP have been superseded by the MMA, which Congress enacted expressly to clarify for the benefit of the courts that the MSP's right of action extends to manufacturers and other tortfeasors, whether they buy liability policies or choose to self-insure. Accordingly, this Court should be wary of being misled by the defendants into new, equally crabbed and misguided interpretations of the MSP.

certainly no provision) barring those MSP claims from being efficiently resolved in a collective fashion.[11]

**B. Congressional Provision of a Federal Right of Action in a Federal Court to Enforce a Federal Program Protecting the Federal Treasury Is Not an Affront To the Balance of Federal-State Authority.**

Defendants warn that use of MSP actions to recoup Medicare expenditures from tortfeasors acting as "primary payers" under the statute would "federalize state tort law and greatly expand federal jurisdiction over state products liability suits" by bringing "garden-variety state-law tort claims into federal court." Defs.Br. 2. *See also id.* at 14, 19 (same). This argument is wrong for several reasons.

First, and most obviously, MSP does not create any substantive tort law. State tort law is left undisturbed and will continue to govern the defendants' legal duties to those whom they injure.

Second, defendants allege that MSP enforcement in federal courts will work a "revolutionary

[11] In any event, defendants' passing mention of this objection is insufficient to garner the Court's attention. "It is not enough merely to mention a possible argument ... leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990). Indeed, defendants note that they are not actually pressing the argument now, but merely "reserv[ing] the right" to make it later. Defs Br. 12 n.3. If and when defendants actually present such an argument, the Court will have occasion to address it, assuming *arguendo* that defendants have not waived it. *See, e.g., Acevedo-Garcia v. Monroig*, 351 F.3d 547, 560-61 (1st Cir. 2003) (perfunctory arguments are deemed waived).

Defendants likewise engage in some hand wringing about supposedly retroactive imposition of double damages by the MMA. Defs.Br. 18-19. But again they disclaim making an actual argument and merely reserve the right to assert it later. *Id.* 19 n.4. If and when this objection to the MSP is actually presented, the Court will have occasion to address it -- and to dispatch it by reference to the authorities that defendants ignore. The MMA, as Congress said explicitly (*see* MMA § 301(a)-(b), (d)) and as the courts have held, "merely clarified the meaning of the MSP as it existed before those amendments" -- therefore, application of the MMA does not involve any question of "retroactivity." *Brown v. Thompson*, 374 F.3d 253, 259-61 & n.6 (4th Cir. 2004). *See also* 149 Cong. Rec. S15574, S15584-85 (daily ed. Nov. 22, 2003) (statement of Sen. Grassley) (stating that MSP amendments "do *not* change existing law ... but, in fact, *clarify* the intent of Congress in protecting Medicare's resources") (emphases added). In this Circuit, such congressional declaration that a statute is a clarification of a prior law is well nigh dispositive. *See Liquilux Gas Corp. v. Martin Gas Sales*, 979 F.2d 887, 890 (1st Cir. 1992) (using the Alegislature's expression of what it understood itself to be doing@ to determine whether an amendment is a clarification). *See also Brown*, 374 F.3d at 259-60; *Piamba Cortes v. American Airlines, Inc.*, 177 F.3d 1272, 1284 (11th Cir. 1999)("Courts may rely upon a declaration by the enacting body that its intent is to clarify [a] prior enactment.").

change in tort law, federal-state relations, and the boundaries of federal jurisdiction." Defs. Br. 14. Defendants urge that the "power of Congress to 'legislate in areas traditionally regulated by the States'" is limited and that Congress must be "unmistakably clear" in its intent to override and displace state law. Defs.Br. 19 (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)). That was an appropriate judicial sentiment when, as in the case from which defendants quote, the Supreme Court was reviewing a congressional statute that overrode a State's sovereign judgment as to who was qualified to hold State constitutional office. *See* 501 U.S. at 460. But whereas qualifications for State-court judges are indeed "an area traditionally regulated by the States," *id.*, precisely the opposite is true of the MSP enforcement actions at issue here. Actions brought in *federal* court by *federally authorized* private attorneys general to recoup injuries to the *federal* treasury are as far from the "traditional areas regulated by the states" as one can get. Safeguarding the fiscal integrity of the United States Treasury is profoundly -- and exclusively -- *federal* business. Defendants' claims of federal usurpation are therefore wholly mistaken.

Third, and finally, defendants' objections betray their genuine agenda -- an agenda that is at war with Congress's design in the MSP. Defendants quote the MSP definition of primary plan and then complain of its scope. The MMA, we are told, "expanded the definition of a 'primary plan' to include '[a]n entity that engages in a business, trade, or profession ... if it carries its own risk (whether by a failure to obtain insurance, or otherwise) in whole or in part.' H.R. 1 (108th Cong.) § 301(b)(1)." Defs.Br. 9. This concession by defendants is stunning: the principal feature of the MMA to which they object -- its clarification of the expansion of primary payer liability to manufacturers and other self-insured tortfeasors -- is *not* a literary gloss concocted by United Seniors, *but is instead the precise text enacted by Congress in haec verba.* Defendants' endgame is

thus starkly revealed: they ask this Court to defeat *Congress's* policy objectives in MSP by trying to seduce the Court into accepting a gross distortion of the statute as Congress wrote it.

The whole point of MSP is to save Medicare's scarce resources from being wasted when other sources should be paying for a Medicare beneficiary's healthcare. This is not a small matter: tens of millions of the most vulnerable Americans rely on Medicare. Under the defendants' two-lawsuit theory of MSP enforcement, a third party's responsibility to pay a Medicare beneficiary's medical bill would be adjudicated exclusively in state court, with the subsequent federal MSP action being reduced to the utterly trivial and seldom (if ever) utilized role of filling a supposed gap in New York's state-court-judgment enforcement procedures. *See* Defs.Br. 20. This *amicus* can assure the defendants that the United States Congress does not sit to tinker with the peculiarities of the New York Civil Practice Law and Rules.

The practical importance of the private MSP enforcement action cannot be understated. "HHS and Congress have repeatedly flagged Medicare's inability to ascertain the existence of alternative sources of coverage as a weakness in the secondary payer program." *United States v. Baxter Int'l*, 345 F.3d 866, 901 n.30 (11th Cir. 2003) ("Medicare lost in excess of $600 million in FY 1988 due to unidentified primary payment sources"). The MSP private right of action was enacted "to save the government money by giving private citizens incentives to recover funds erroneously paid by Medicare." *Manning*, 254 F.3d at 397 n.8.

Defendants repeatedly express dismay that United Seniors' interpretation of the MSP "would allow a Medicare beneficiary injured by any" tort to bring an MSP action against the tortfeasor "in federal court to recoup double damages" on behalf of the Federal Treasury. Defs.Br. 14. *See also id.* at 2, 19. *What defendants fail to grasp is that this is precisely what Congress intended.* Whenever a

tortfeasor injures a Medicare beneficiary, the tort also inflicts an injury upon the taxpayers in the form of outlays for health care under the Medicare program. As the statutorily designated "primary plan," that tortfeasor owes the U.S. Treasury reimbursement for the healthcare provided by Medicare to that beneficiary. And that is precisely why the MSP statutory cause of action was created: Congress wants an MSP claim prosecuted in every instance where a tortfeasor inflicts injury on a Medicare beneficiary (and by extension, on the Treasury). Only in that way will the costs of the tortfeasor's wrongs be borne by the wrongdoer rather than by the American taxpayers. The MSP private right of action, like the FCA, empowers private citizens to prosecute cases in which the federal government has overpaid. In Fiscal Year 2003, a record $2.1 billion was recovered under the FCA (a 75% increase from FY 2002), and of that sum a staggering 70% was recovered in suits brought *not* by the government but by private attorneys general.[12] That is the engine of fiscal recovery that the MSP was enacted to harness for Medicare.

As with the damages multiplier employed in the FCA, the double damages awarded in an MSP action serve the dual purposes of: (1) "quicken[ing] the self-interest of some private plaintiff who can spot violations and start litigating to compensate the Government," and (2) ensuring that the Treasury receives "make-whole recovery beyond mere recoupment" of the Medicare benefits themselves. *Cook County*, 538 U.S. at 131. The Supreme Court has unanimously held that making the Treasury whole includes such "'ancillary costs'" as "prejudgment interest, which is usually thought essential to compensation," as well as "'the costs of detection and investigation, that routinely attend the Government's efforts to root out deceptive practices directed at the public

---

12 *See* DOJ Press Release No. 613 (November 10, 2003), *available at* www.usdoj.gov/opa/pr/2003/November/03_civ_613.htm.

purse.'" *Id.* at 131 (citation omitted). By treating the damages multiplier of the MSP as a vice rather than a virtue, the defendants (like the District Court in *Glover*) betray their basic misunderstanding of the congressional design.

## CONCLUSION

Therefore, *amicus* urges that the defendants' motion to dismiss be denied.

Respectfully submitted,

/s/ Brian Koukoutchos

Brian Koukoutchos
Mass. BBO No. 547446
28 Eagle Trace
Mandeville, LA 70471
(985) 626-5052
*Counsel for Amicus Curiae,*
*The Honorable Charles E. Grassley*

Dated: January 17, 2006

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by ~~mail-hand-on~~ electronic mail on 1-17-06